# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

## CLERK'S CERTIFICATE AND APPEALS COVER SHEET

### ABBREVIATED ELECTRONIC RECORD

Case Caption: _President and Fellows of Harvard College v. United States Department of Homeland Security et al_

District Court Number: _25cv11472-ADB_

Fee:    Paid?   Yes _____   No _____   Government filer _X_   _In Forma Pauperis_ Yes _____   No _____

Motions Pending        Yes _X_ No _____          Sealed documents        Yes _____ No _X_
_If yes, document #_    _76_                       _If yes, document #_    _____

_Ex parte_ documents   Yes _____ No _X_           Transcripts             Yes _X_ No _____
_If yes, document #_   _____              _If yes, document #_    _52,70_

Notice of Appeal filed by: Plaintiff/Petitioner _____   Defendant/Respondent _X_   Other: _____

Appeal from:

## #75 Memorandum and Order

Other information:

        I, Robert M. Farrell, Clerk of the United States District Court for the District of Massachusetts, do hereby certify that the annexed electronic documents:

## #75 and #77

with the electronic docket sheet, constitute the abbreviated record on appeal in the above entitled case for the Notice of Appeal # _77_ filed on _June 27, 2025_ .

        In testimony whereof, I hereunto set my hand and affix the seal of this Court on _June 28, 2025_ .


**ROBERT M. FARRELL**
Clerk of Court


_/s/Matthew A. Paine_
Deputy Clerk


COURT OF APPEALS DOCKET NUMBER ASSIGNED: _____

### PLEASE RETURN TO THE USDC CLERK'S OFFICE

# United States District Court
## District of Massachusetts (Boston)
## CIVIL DOCKET FOR CASE #: 1:25-cv-11472-ADB

President and Fellows of Harvard College v. United States
Department of Homeland Security et al
Assigned to: Judge Allison D. Burroughs
related Case: 1:25-cv-11048-ADB
Cause: 05:702 Administrative Procedure Act

Date Filed: 05/23/2025
Jury Demand: None
Nature of Suit: 899 Other Statutes:
Administrative Procedures Act/Review or
Appeal of Agency Decision
Jurisdiction: U.S. Government Defendant

**Plaintiff**

**President and Fellows of Harvard College**          represented by     **Andrianna Kastanek**
Jenner & Block LLP
353 N. Clark St.
Chicago, IL 60654
312-840-7285
Email: akastanek@jenner.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Danielle Kerker Goldstein**
Lehotsky Keller Cohn LLP
3280 Peachtree Road NE
Atlanta, GA 30305
512-693-8350
Email: danielle@lkcfirm.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ian Heath Gershengorn**
Jenner & Block LLP
1099 New York Ave., NW
Suite 900
Washington, DC 20001
202-639-6869
Email: igershengorn@jenner.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ishan Bhabha**
Jenner & Block, LLP
1099 New York Avenue NW, Suite 900
Washington, DC 20001
(202) 639- 6000
Email: ibhabha@jenner.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joshua Paul Morrow**
Lehotsky Keller Cohn LLP
408 W. 11th Street
5th Floor
Austin, TX 78701
512-693-8350
Fax: 512-727-4755
Email: josh@lkcfirm.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lauren J. Hartz**
Jenner & Block, LLP
1099 New York Avenue NW, Suite 900
Suite 900
Washington, DC 20001
202-637-6363
Email: lhartz@jenner.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Robert K. Hur**
King & Spalding LLP
1700 Pennsylvania Ave NW
Ste 200
Washington, DC 20006
202-737-0500
Email: rhur@kslaw.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Scott Allen Keller**
Lehotsky Keller Cohn LLP
200 Massachusetts Ave. NW
Washington, DC 20001
512-693-8350
Fax: 512-727-4755
Email: scott@lkcfirm.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Shannon Grammel Denmark**
Lehotsky Keller Cohn LLP
200 Massachusetts Ave., NW
Washington, DC 20001
270-498-5375
Email: shannon@lkcfirm.com
*LEAD ATTORNEY*
*PRO HAC VICE*

*ATTORNEY TO BE NOTICED*

**Steven Paul Lehotsky**
Lehotsky Keller Cohn LLP
200 Massachusetts Avenue NW
Washington, DC 20001
202-365-2509
Email: steve@lkcfirm.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William A. Burck**
Quinn Emanuel Urquhart & Sullivan
1300 I Street NW
Suite 900
Washington, DC 20005
202-538-8120
Fax: 202-538-8100
Email: williamburck@quinnemanuel.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jacob Richards**
Lehotsky Keller Cohn
200 Mass Ave
Washington, DC 20001
623-377-0227
Email: jacob@lkcfirm.com
*ATTORNEY TO BE NOTICED*

**Katherine Yarger**
Lehotsky Keller Cohn LLP
700 Colorado Blvd.
Unit 407
Denver, CO 80206
303-717-4749
Email: katie@lkcfirm.com
*ATTORNEY TO BE NOTICED*

**Serena M. Orloff**
Lehotsky Keller Cohn LLP
200 Massachusetts Ave.
Suite 700
Washington, DC 20001
510-524-4004
Email: serena@lkcfirm.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

| | | |
|---|---|---|
| **United States Department of Homeland Security** | represented by | **Tiberius T Davis**<br>DOJ-Civ<br>Civil Division<br>950 Pennsylvania Avenue<br>Suite 400<br>Washington, DC 20530-0001<br>202-514-4357<br>Email: tiberius.davis@usdoj.gov<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br><br>**Rayford A. Farquhar**<br>United States Attorney's Office<br>John Joseph Moakley Federal Courthouse<br>1 Courthouse Way<br>Suite 9200<br>Boston, MA 02210<br>617-748-3100<br>Fax: 617-748-3971<br>Email: rayford.farquhar@usdoj.gov<br>*ATTORNEY TO BE NOTICED* |

**Defendant**

| | | |
|---|---|---|
| **Kristi Noem**<br>*in her official capacity as Secretary of the United States Department of Homeland Security* | represented by | **Tiberius T Davis**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br><br>**Rayford A. Farquhar**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

**Defendant**

| | | |
|---|---|---|
| **United States Immigration and Customs Enforcement** | represented by | **Tiberius T Davis**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br><br>**Rayford A. Farquhar**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

**Defendant**

| | | |
|---|---|---|
| **Todd Lyons**<br>*in his official capacity as Acting Director of United States Immigration and Customs Enforcement* | represented by | **Tiberius T Davis**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br><br>**Rayford A. Farquhar**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

**Defendant**

**Student and Exchange Visitor Program**

represented by **Tiberius T Davis**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Rayford A. Farquhar**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**John Doe**
*in their official capacity as Director of the Student and Exchange Visitor Program*

represented by **Tiberius T Davis**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Rayford A. Farquhar**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**James Hicks**
*in his official capacity as Deputy Assistant Director of the Student and Exchange Visitor Program*

represented by **Tiberius T Davis**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Rayford A. Farquhar**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**United States Department of Justice**

represented by **Tiberius T Davis**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Rayford A. Farquhar**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Pamela Bondi**
*in her official capacity as Attorney General of the United States*

represented by **Tiberius T Davis**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Rayford A. Farquhar**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**United States Department of State**

represented by **Tiberius T Davis**
(See above for address)
*LEAD ATTORNEY*

*ATTORNEY TO BE NOTICED*

**Rayford A. Farquhar**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Marco Rubio**                                represented by   **Tiberius T Davis**
*in his official capacity as Secretary of the*                 (See above for address)
*United States Department of State*                            *LEAD ATTORNEY*
                                                              *ATTORNEY TO BE NOTICED*

                                               **Rayford A. Farquhar**
                                               (See above for address)
                                               *ATTORNEY TO BE NOTICED*

**Amicus**

**Commonwealth of Massachusetts**             represented by   **Tasha J. Bahal**
                                               One Ashburton Place
                                               Boston, MA 02108
                                               617-963-2066
                                               Email: tasha.bahal@mass.gov
                                               *LEAD ATTORNEY*
                                               *ATTORNEY TO BE NOTICED*

[Email All Attorneys]
[Email All Attorneys and Additional Recipients]

| Date Filed | # | Docket Text |
|------------|---|-------------|
| 05/23/2025 | 1 | COMPLAINT against All Defendants Filing fee: $ 405, receipt number AMADC-11026907 (Fee Status: Filing Fee paid), filed by President and Fellows of Harvard College. (Attachments: # 1 Exhibit 1. DHS Appeals Website, # 2 Exhibit 2. ICE Appeals Website, # 3 Exhibit 3. DHS Loss of SEVP Certification Website, # 4 Exhibit 4. February 3, 2025 DOJ Press Release, # 5 Exhibit 5. February 26, 2025 Jewish News Syndicate Article, # 6 Exhibit 6. February 28, 2025 DOJ Press Release, # 7 Exhibit 7. March 31, 2025 Federal Task Force Letter to Harvard, # 8 Exhibit 8. April 3, 2025 Federal Task Force Letter to Harvard, # 9 Exhibit 9. April 11, 2025 Federal Task Force Demand Letter to Harvard, # 10 Exhibit 10. Garber Letter, Promise of American Education, # 11 Exhibit 11. April 14, 2025 Letter from Harvard, # 12 Exhibit 12. April 14, 2025 Funding Freeze Order, # 13 Exhibit 13. April 15, 2025 Truth Social Post, # 14 Exhibit 14. April 15, 2025 New York Times Article, # 15 Exhibit 15. April 16, 2025 President Trump Truth Social Post, # 16 Exhibit 16. April 16, 2025 DHS Records Request, # 17 Exhibit 17. April 16, 2025 DHS Press Release re: Records Request, # 18 Exhibit 18. April 24, 2025 President Trump Truth Social Post, # 19 Exhibit 19. April 30, 2025 Letter from Harvard, # 20 Exhibit 20. May 2, 2025 President Trump Truth Social Post, # 21 Exhibit 21. May 5, 2025 Secretary McMahon Letter to Harvard, # 22 Exhibit 22. May 7, 2025 DHS E-Mail to Harvard, # 23 Exhibit 23. May 13 & 14, 2025 DHS E-Mails with Harvard, # 24 Exhibit 24. May 14, 2025 Harvard Production Letter, # 25 Exhibit 25. May 22, 2025 DHS Decertification Letter, # 26 Exhibit 26. May 22, 2025 Noem Tweet, # 27 Exhibit 27. May 22, 2025 DHS Press Release, # 28 Exhibit 28. March 28, 2025 Garber Message, Our Resolve, # 29 Civil Cover Sheet, # 30 Category Form, # 31 Supplement |

| 05/23/2025 | | Certification of Basis for Designating as Related Case)(Lehotsky, Steven) (Entered: 05/23/2025) |
|---|---|---|
| 05/23/2025 | 2 | CORPORATE DISCLOSURE STATEMENT by President and Fellows of Harvard College. (Lehotsky, Steven) (Entered: 05/23/2025) |
| 05/23/2025 | 3 | MOTION for Leave to File Excess Pages by President and Fellows of Harvard College. (Attachments: # 1 Text of Proposed Order)(Lehotsky, Steven) (Entered: 05/23/2025) |
| 05/23/2025 | 4 | MOTION for Temporary Restraining Order by President and Fellows of Harvard College. (Attachments: # 1 Supplement Memorandum in Support, # 2 Text of Proposed Order, # 3 Affidavit Lehotsky Declaration, # 4 Affidavit Martin Declaration, # 5 Affidavit Elliott Declaration)(Lehotsky, Steven) (Entered: 05/23/2025) |
| 05/23/2025 | 5 | ELECTRONIC NOTICE of Case Assignment. Judge Allison D. Burroughs assigned to case. If the trial Judge issues an Order of Reference of any matter in this case to a Magistrate Judge, the matter will be transmitted to Magistrate Judge M. Page Kelley. (SP) (Entered: 05/23/2025) |
| 05/23/2025 | 6 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered GRANTING 3 Motion for Leave to File Excess Pages ; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include - Leave to file granted on (date of order)- in the caption of the document. (CAM) (Entered: 05/23/2025) |
| 05/23/2025 | 7 | Entered in error. (Entered: 05/23/2025) |
| 05/23/2025 | 8 | Summons Issued as to All Defendants. **Counsel receiving this notice electronically should download this summons, complete one for each defendant and serve it in accordance with Fed.R.Civ.P. 4 and LR 4.1. Summons will be mailed to plaintiff(s) not receiving notice electronically for completion of service.** (NVB) (Entered: 05/23/2025) |
| 05/23/2025 | 9 | MEMORANDUM in Support re 4 MOTION for Temporary Restraining Order filed by President and Fellows of Harvard College. (Attachments: # 1 Text of Proposed Order, # 2 Affidavit Lehotsky Declaration, # 3 Affidavit Martin Declaration, # 4 Affidavit Elliott Declaration)(Lehotsky, Steven) (Entered: 05/23/2025) |
| 05/23/2025 | 10 | NOTICE of Appearance by Jacob Richards on behalf of President and Fellows of Harvard College (Richards, Jacob) (Entered: 05/23/2025) |
| 05/23/2025 | 11 | Judge Allison D. Burroughs: ORDER entered granting 4 Motion for Temporary Restraining Order. Plaintiff shall serve defendants a copy of this order. (KF) (Entered: 05/23/2025) |
| 05/23/2025 | 12 | ELECTRONIC NOTICE of Hearing. Status Conference set for 5/27/2025 09:30 AM in Remote Proceeding : Boston before Judge Allison D. Burroughs. Plaintiff shall notify defendants of hearing date. (KF) (Entered: 05/23/2025) |
| 05/23/2025 | 13 | ELECTRONIC NOTICE of Hearing. Preliminary Injunction Hearing set for 5/29/2025 10:30 AM in Courtroom 17 (In person only) before Judge Allison D. Burroughs. Plaintiff shall notify defendants of hearing date. (KF) (Entered: 05/23/2025) |
| 05/23/2025 | 14 | MOTION for Leave to Appear Pro Hac Vice for admission of Lauren J. Hartz Filing fee: $ 125, receipt number AMADC-11028249 by President and Fellows of Harvard |

| | | College. (Attachments: # 1 Affidavit Affidavit of Lauren J. Hartz)(Lehotsky, Steven) (Entered: 05/23/2025) |
|---|---|---|
| 05/23/2025 | 15 | MOTION for Leave to Appear Pro Hac Vice for admission of Scott A. Keller Filing fee: $ 125, receipt number AMADC-11028285 by President and Fellows of Harvard College. (Attachments: # 1 Affidavit Affidavit of Scott A. Keller)(Lehotsky, Steven) (Entered: 05/23/2025) |
| 05/23/2025 | 16 | MOTION for Leave to Appear Pro Hac Vice for admission of Serena M. Orloff Filing fee: $ 125, receipt number AMADC-11028296 by President and Fellows of Harvard College. (Attachments: # 1 Affidavit Affidavit of Serena M. Orloff)(Lehotsky, Steven) (Entered: 05/23/2025) |
| 05/23/2025 | 17 | MOTION for Leave to Appear Pro Hac Vice for admission of Shannon G. Denmark Filing fee: $ 125, receipt number AMADC-11028308 by President and Fellows of Harvard College. (Attachments: # 1 Affidavit Affidavit of Shannon G. Denmark) (Lehotsky, Steven) (Entered: 05/23/2025) |
| 05/23/2025 | 18 | MOTION for Leave to Appear Pro Hac Vice for admission of Katherine C. Yarger Filing fee: $ 125, receipt number AMADC-11028317 by President and Fellows of Harvard College. (Attachments: # 1 Affidavit Affidavit of Katherine C. Yarger) (Lehotsky, Steven) (Entered: 05/23/2025) |
| 05/23/2025 | 19 | MOTION for Leave to Appear Pro Hac Vice for admission of Joshua P. Morrow Filing fee: $ 125, receipt number AMADC-11028328 by President and Fellows of Harvard College. (Attachments: # 1 Affidavit Affidavit of Joshua P. Morrow) (Lehotsky, Steven) (Entered: 05/23/2025) |
| 05/23/2025 | 20 | MOTION for Leave to Appear Pro Hac Vice for admission of Danielle K. Goldstein Filing fee: $ 125, receipt number AMADC-11028338 by President and Fellows of Harvard College. (Attachments: # 1 Affidavit Affidavit of Danielle K. Goldstein) (Lehotsky, Steven) (Entered: 05/23/2025) |
| 05/23/2025 | 21 | MOTION for Leave to Appear Pro Hac Vice for admission of Ishan Bhabha Filing fee: $ 125, receipt number AMADC-11028346 by President and Fellows of Harvard College. (Attachments: # 1 Affidavit Affidavit of Ishan Bhabha)(Lehotsky, Steven) (Main Document 21 replaced on 5/23/2025) (CAM). (Entered: 05/23/2025) |
| 05/23/2025 | 22 | MOTION for Leave to Appear Pro Hac Vice for admission of Ian Heath Gershengorn Filing fee: $ 125, receipt number AMADC-11028367 by President and Fellows of Harvard College. (Attachments: # 1 Affidavit Affidavit of Ian Heath Gershengorn) (Lehotsky, Steven) (Entered: 05/23/2025) |
| 05/23/2025 | 23 | MOTION for Leave to Appear Pro Hac Vice for admission of Andrianna Kastanek Filing fee: $ 125, receipt number AMADC-11028375 by President and Fellows of Harvard College. (Attachments: # 1 Affidavit Affidavit of Andrianna Kastanek) (Lehotsky, Steven) (Entered: 05/23/2025) |
| 05/23/2025 | 24 | MOTION for Leave to Appear Pro Hac Vice for admission of William A. Burck Filing fee: $ 125, receipt number AMADC-11028386 by President and Fellows of Harvard College. (Attachments: # 1 Affidavit Affidavit of William A. Burck) (Lehotsky, Steven) (Entered: 05/23/2025) |
| 05/23/2025 | 25 | MOTION for Leave to Appear Pro Hac Vice for admission of Robert K. Hur Filing fee: $ 125, receipt number AMADC-11028388 by President and Fellows of Harvard College. (Attachments: # 1 Affidavit Affidavit of Robert K. Hur)(Lehotsky, Steven) (Entered: 05/23/2025) |

| 05/23/2025 | 26 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting <u>14</u> , <u>15</u> , <u>17</u> , <u>19</u> , <u>20</u> , <u>21</u> , <u>24</u> , and <u>25</u> , Motions for Leave to Appear Pro Hac Vice. Added Lauren J. Hartz, Scott A. Keller, Shannon G. Denmark, Joshua P. Morrow, Danielle K. Goldstein, Ishan Bhabha, William A. Burck, andRobert K. Hur<br><br>**Attorneys admitted Pro Hac Vice must have an individual upgraded PACER account, not a shared firm account, to electronically file in the District of Massachusetts. Counsel may need to link their CM/ECF account to their upgraded individual pacer account.** Instructions on how to link CM/ECF accounts to upgraded pacer account can be found at <u>https://www.mad.uscourts.gov/caseinfo/nextgen-current-pacer-accounts.htm#link-account</u>.<br><br>**Pursuant to Local Rule 83.5.3, local counsel shall also file an appearance in this matter. Further, local counsel shall review all filings and shall personally appear in Court for any hearings or conferences, unless expressly excused by the Court for good cause.** (CAM) (Entered: 05/23/2025) |
|---|---|---|
| 05/23/2025 | 27 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting <u>16</u> , <u>18</u> , <u>22</u> ,and <u>23</u> , Motions for Leave to Appear Pro Hac Vice of Serena M. Orloff, Katherine C. Yarger, Ian Heath Gershengorn andAndrianna Kastanek<br><br>**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at <u>https://pacer.uscourts.gov/register-account</u>. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.**<br><br>Pro Hac Vice Admission Request Instructions <u>https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm</u>.<br><br>Notices of Appearance must be entered on the docket by each newly admitted attorney.<br><br>**Pursuant to Local Rule 83.5.3, local counsel shall also file an appearance in this matter. Further, local counsel shall review all filings and shall personally appear in Court for any hearings or conferences, unless expressly excused by the Court for good cause.**(CAM) (Entered: 05/23/2025) |
| 05/23/2025 | <u>28</u> | NOTICE of Appearance by Ishan Bhabha on behalf of President and Fellows of Harvard College (Bhabha, Ishan) (Entered: 05/23/2025) |
| 05/23/2025 | <u>29</u> | NOTICE of Appearance by Lauren J. Hartz on behalf of President and Fellows of Harvard College (Hartz, Lauren) (Entered: 05/23/2025) |
| 05/27/2025 | <u>30</u> | NOTICE of Appearance by Ian Heath Gershengorn on behalf of President and Fellows of Harvard College (Gershengorn, Ian) (Entered: 05/27/2025) |
| 05/27/2025 | <u>31</u> | NOTICE of Appearance by Andrianna Kastanek on behalf of President and Fellows of Harvard College (Kastanek, Andrianna) (Entered: 05/27/2025) |
| 05/27/2025 | 32 | Electronic Clerk's Notes for proceedings held before Judge Allison D. Burroughs: Status Conference held on 5/27/2025. Colloquy re: schedule. Thursday's hearing date works for all parties. Plaintiff will be submitting a revised order for PI and supplemental declaration before the hearing. (Court Reporter: Kelly Mortellite at |

|  |  | mortellite@gmail.com.)(Attorneys present: Lehotsky, Gershengorn, Hartz, Richards, Bhabha, Davis, Hickey, Farqhar) (KF) (Entered: 05/27/2025) |
|---|---|---|
| 05/27/2025 | 33 | NOTICE of Appearance by Serena M. Orloff on behalf of President and Fellows of Harvard College (Orloff, Serena) (Entered: 05/27/2025) |
| 05/27/2025 | 34 | NOTICE of Appearance by Scott Allen Keller on behalf of President and Fellows of Harvard College (Keller, Scott) (Entered: 05/27/2025) |
| 05/27/2025 | 35 | NOTICE of Appearance by Katherine Yarger on behalf of President and Fellows of Harvard College (Yarger, Katherine) (Entered: 05/27/2025) |
| 05/27/2025 | 36 | NOTICE of Appearance by Shannon Grammel Denmark on behalf of President and Fellows of Harvard College (Denmark, Shannon) (Entered: 05/27/2025) |
| 05/27/2025 | 37 | NOTICE of Appearance by Danielle Kerker Goldstein on behalf of President and Fellows of Harvard College (Goldstein, Danielle) (Entered: 05/27/2025) |
| 05/27/2025 | 38 | NOTICE of Appearance by Joshua Paul Morrow on behalf of President and Fellows of Harvard College (Morrow, Joshua) (Entered: 05/27/2025) |
| 05/27/2025 | 39 | NOTICE of Appearance by Robert K. Hur on behalf of President and Fellows of Harvard College (Hur, Robert) (Entered: 05/27/2025) |
| 05/28/2025 | 40 | NOTICE of Appearance by Tiberius T Davis on behalf of Pamela Bondi, John Doe, James Hicks, Todd Lyons, Kristi Noem, Marco Rubio, Student and Exchange Visitor Program, United States Department of Homeland Security, United States Department of Justice, United States Department of State, United States Immigration and Customs Enforcement (Davis, Tiberius) (Entered: 05/28/2025) |
| 05/28/2025 | 41 | NOTICE of Appearance by William A. Burck on behalf of President and Fellows of Harvard College (Burck, William) (Entered: 05/28/2025) |
| 05/28/2025 | 42 | NOTICE of Appearance by Tasha J. Bahal on behalf of COMMONWEALTH OF MASSACHUSETTS (Bahal, Tasha) (Entered: 05/28/2025) |
| 05/28/2025 | 43 | MOTION for Leave to File *Amicus Brief* by COMMONWEALTH OF MASSACHUSETTS. (Attachments: # 1 Exhibit Proposed amicus brief)(Bahal, Tasha) (Entered: 05/28/2025) |
| 05/28/2025 | 44 | SUMMONS Returned Executed as to US Attorney by President and Fellows of Harvard College. All Defendants. (Gershengorn, Ian) (Entered: 05/28/2025) |
| 05/28/2025 | 45 | Proposed Document(s) submitted by President and Fellows of Harvard College. Document received: Proposed Order Granting Plaintiff's Motion for a Preliminary Injunction. (Gershengorn, Ian) (Entered: 05/28/2025) |
| 05/28/2025 | 46 | DECLARATION re 9 Memorandum in Support of Motion, / *Supplemental Declaration of Maureen Martin* by President and Fellows of Harvard College. (Gershengorn, Ian) (Entered: 05/28/2025) |
| 05/28/2025 | 47 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered GRANTING 43 Motion for Leave to File Amicus Brief ; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include - Leave to file granted on (date of order)- in the caption of the document. (CAM) (Entered: 05/28/2025) |
| 05/28/2025 | 48 | MEMORANDUM in Support re 4 MOTION for Temporary Restraining Order *Amicus Brief* filed by Commonwealth of Massachusetts. (Bahal, Tasha) (Entered: |

| | | |
|---|---|---|
| | | 05/28/2025) |
| 05/29/2025 | 49 | NOTICE by Pamela Bondi, John Doe, James Hicks, Todd Lyons, Kristi Noem, Marco Rubio, Student and Exchange Visitor Program, United States Department of Homeland Security, United States Department of Justice, United States Department of State, United States Immigration and Customs Enforcement *Notice of Filing* (Davis, Tiberius) (Entered: 05/29/2025) |
| 05/29/2025 | 50 | Electronic Clerk's Notes for proceedings held before Judge Allison D. Burroughs: Hearing on Preliminary Injunction held on 5/29/2025. Notice of Intent to Withdraw SEVP certification was sent to Harvard last night (5/28/25). TRO will remain in place while parties confer and submit either a joint proposed PI Order or individual proposed Orders for the judge to consider, after which time a final PI order will be issued. Status quo to remain in place while the Notice of Intent to Withdraw process is ongoing. (Court Reporter: Kelly Mortellite at mortellite@gmail.com.)(Attorneys present: Bhabha, Gershengorn, Hartz, Lehotsky, Orloff, Davis, Farqhar) (KF) (Entered: 05/29/2025) |
| 05/29/2025 | 51 | NOTICE of Appearance by Rayford A. Farquhar on behalf of Pamela Bondi, John Doe, James Hicks, Todd Lyons, Kristi Noem, Marco Rubio, Student and Exchange Visitor Program, United States Department of Homeland Security, United States Department of Justice, United States Department of State, United States Immigration and Customs Enforcement (Farquhar, Rayford) (Entered: 05/29/2025) |
| 05/30/2025 | 52 | Transcript of Hearing held on May 29, 2025, before Judge Allison D. Burroughs. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Kelly Mortellite at mortellite@gmail.com. Redaction Request due 6/20/2025. Redacted Transcript Deadline set for 6/30/2025. Release of Transcript Restriction set for 8/28/2025. (DRK) (Entered: 05/30/2025) |
| 05/30/2025 | 53 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above-captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at https://www.mad.uscourts.gov/caseinfo/transcripts.htm (DRK) (Entered: 05/30/2025) |
| 06/05/2025 | 54 | AMENDED COMPLAINT against All Defendants, filed by President and Fellows of Harvard College. (Attachments: # 1 Exhibit 29 - Truth Social Post 8:27 am (May 26), # 2 Exhibit 30 - Truth Social Post 8:42 am (May 26), # 3 Exhibit 31 - Politico Article White House Meeting (May 30), # 4 Exhibit 32 - CNN Article (May 31), # 5 Exhibit 33 - Department of State Cable (May 30), # 6 Exhibit 34 - Politico Article (May 30), # 7 Exhibit 35 - Proclamation (June 4), # 8 Exhibit 36 - Proclamation Fact Sheet (June 4), # 9 Exhibit 37 - Hong Kong Press Release (May 23))(Lehotsky, Steven) (Entered: 06/05/2025) |
| 06/05/2025 | 55 | MOTION for Leave to File Excess Pages by President and Fellows of Harvard College. (Attachments: # 1 Text of Proposed Order)(Lehotsky, Steven) (Entered: 06/05/2025) |
| 06/05/2025 | 56 | MOTION for Temporary Restraining Order by President and Fellows of Harvard College.(Lehotsky, Steven) (Entered: 06/05/2025) |
| 06/05/2025 | 57 | MEMORANDUM in Support re 56 MOTION for Temporary Restraining Order filed by President and Fellows of Harvard College. (Attachments: # 1 Text of Proposed Order, # 2 Affidavit Lehotsky Declaration (Supplemental))(Lehotsky, Steven) (Entered: 06/05/2025) |

| 06/05/2025 | 58 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 55 Motion for Leave to File Excess Pages. (KF) (Entered: 06/05/2025) |
|---|---|---|
| 06/05/2025 | 59 | Judge Allison D. Burroughs: ORDER entered granting Motion for Temporary Restraining Order. (KF) (Entered: 06/05/2025) |
| 06/05/2025 | 60 | ELECTRONIC NOTICE of Hearing.Preliminary Injunction Hearing set for 6/16/2025 10:00 AM in Courtroom 17 (In person only) before Judge Allison D. Burroughs. (KF) (Entered: 06/05/2025) |
| 06/09/2025 | 61 | ELECTRONIC NOTICE OF RESCHEDULING. **Time change only**: Preliminary Injunction Hearing reset for 6/16/2025 10:30 AM in Courtroom 17 (In person only) before Judge Allison D. Burroughs. (CAM) (Entered: 06/09/2025) |
| 06/12/2025 | 62 | MOTION to Enter Plaintiff's Proposed Preliminary Injunction Order by President and Fellows of Harvard College. (Attachments: # 1 Exhibit A - Proposed Order Granting Plaintiff's Motion for a Preliminary Injunction)(Gershengorn, Ian) (Entered: 06/12/2025) |
| 06/12/2025 | 63 | BRIEF by Pamela Bondi, John Doe, James Hicks, Todd Lyons, Kristi Noem, Marco Rubio, Student and Exchange Visitor Program, United States Department of Homeland Security, United States Department of Justice, United States Department of State, United States Immigration and Customs Enforcement *Regarding Proposed Preliminary Injunction Order*. (Attachments: # 1 Exhibit Proposed Preliminary Injunction Order Redline)(Davis, Tiberius) (Entered: 06/12/2025) |
| 06/12/2025 | 64 | SUMMONS Returned Executed (Attachments: # 1 Proof of Service - U.S. Department of Homeland Security, # 2 Proof of Service - John Doe, in their official capacity as Director of the Student and Exchange Visitor Program, # 3 Proof of Service - U.S. Department of Justice, # 4 Proof of Service - Jim Hicks, in his official capacity as Deputy Assistant Director of the Student and Exchange Visitor Program, # 5 Proof of Service - U.S. Immigration and Customs Enforcement, # 6 Proof of Service - Todd M. Lyons, in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement, # 7 Proof of Service - Kristi Noem, in her official capacity as Secretary of the United States Department of Homeland Security, # 8 Proof of Service - Marco Rubio, in his official capacity as United States Secretary of State, # 9 Proof of Service - Student Exchange and Visitor Program, # 10 Proof of Service - United States Department of State)(Gershengorn, Ian) (Entered: 06/12/2025) |
| 06/13/2025 | 65 | DECLARATION re 57 Memorandum in Support of Motion, *Second Supplemental Declaration of Maureen Martin* by President and Fellows of Harvard College. (Gershengorn, Ian) (Entered: 06/13/2025) |
| 06/13/2025 | 66 | MOTION for Leave to File Excess Pages by Pamela Bondi, Commonwealth of Massachusetts, John Doe, James Hicks, Todd Lyons, Kristi Noem, Marco Rubio, Student and Exchange Visitor Program, United States Department of Homeland Security, United States Department of Justice, United States Department of State, United States Immigration and Customs Enforcement. (Attachments: # 1 Text of Proposed Order)(Davis, Tiberius) (Entered: 06/13/2025) |
| 06/14/2025 | 67 | MEMORANDUM in Opposition re 56 MOTION for Temporary Restraining Order filed by Pamela Bondi, John Doe, James Hicks, Todd Lyons, Kristi Noem, Marco Rubio, Student and Exchange Visitor Program, United States Department of Homeland Security, United States Department of Justice, United States Department of State, United States Immigration and Customs Enforcement. (Attachments: # 1 Exhibit FINAL-Harvard-ASAIB-Report-4.29.25, # 2 Exhibit H. Comm. On Educ. |

| | | |
|---|---|---|
| | | and the Workforce, Harvard University Failed to Discipline Antisemitic Conduct Violations, # 3 Exhibit Federal Task Force to Combat Antisemitism Announces Visits to 10 College Campuses, # 4 Exhibit DOJ Announces Formation of Task Force to Combat Anti-Semitism, # 5 Exhibit DOJ, HHS, ED, and GSA Announce Initial Cancelation of Grants and Contracts to Columbia University Worth $400 Million, # 6 Exhibit Dept of Eds Office for Civil Rights Sends Letters to 60 Universities Under Investigation for Antisemitic Discrimination and Harassment, # 7 Exhibit Harvard Mag, Max J. Krupnick, Harvard Settles Antisemitism Lawsuits, # 8 Exhibit Crimson, Sally E. Edwards and Asher J. Montgomery, Hate Crimes Reported to Harvard Police, # 9 Exhibit US News, Harvard University)(Davis, Tiberius) (Entered: 06/14/2025) |
| 06/16/2025 | 68 | Electronic Clerk's Notes for proceedings held before Judge Allison D. Burroughs: Hearing held on 6/16/2025. Oral arguments by the parties. Court takes matter under advisement. Current TRO will stay in effect through 6/23/25. (Court Reporter: Kelly Mortellite at mortellite@gmail.com.)(Attorneys present: Gershengorn, Davis) (KF) (Entered: 06/16/2025) |
| 06/16/2025 | 69 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 66 Motion for Leave to File Excess Pages ; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include - Leave to file granted on (date of order)- in the caption of the document. (KF) (Entered: 06/16/2025) |
| 06/17/2025 | 70 | Transcript of Hearing held on June 16, 2025, before Judge Allison D. Burroughs. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Kelly Mortellite at mortellite@gmail.com. Redaction Request due 7/8/2025. Redacted Transcript Deadline set for 7/18/2025. Release of Transcript Restriction set for 9/15/2025. (DRK) (Entered: 06/17/2025) |
| 06/17/2025 | 71 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above-captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at https://www.mad.uscourts.gov/caseinfo/transcripts.htm (DRK) (Entered: 06/17/2025) |
| 06/17/2025 | 72 | REPLY to Response to 56 MOTION for Temporary Restraining Order filed by President and Fellows of Harvard College. (Attachments: # 1 Declaration of Ian H. Gershengorn, # 2 Exhibit A - CRS Report, # 3 Exhibit B - Truth Social (June 11)) (Gershengorn, Ian) (Entered: 06/17/2025) |
| 06/20/2025 | 73 | Judge Allison D. Burroughs: ORDER entered. Preliminary Injunction entered GRANTING 62 Motion. (CAM) (Entered: 06/20/2025) |
| 06/23/2025 | 74 | STATUS REPORT regarding Court's Preliminary Injunction Order by Pamela Bondi, John Doe, James Hicks, Todd Lyons, Kristi Noem, Marco Rubio, Student and Exchange Visitor Program, United States Department of Homeland Security, United States Department of Justice, United States Department of State, United States Immigration and Customs Enforcement. (Davis, Tiberius) (Entered: 06/23/2025) |
| 06/23/2025 | 75 | Judge Allison D. Burroughs: MEMORANDUM AND ORDER entered. For the reasons sets forth (herein), Plaintiff's motion for a preliminary injunction is GRANTED. Defendants and their officers, employees, servants, agents, appointees, and successors are hereby enjoined from implementing, instituting, maintaining, or giving effect to the Proclamation until a further order is issued by this Court. |

| | | |
|---|---|---|
| | | **SO ORDERED.** <br><br> (CAM) (Entered: 06/23/2025) |
| 06/25/2025 | 76 | MOTION to Intervene of non-party Theodore William Somach. (CAM) (Entered: 06/25/2025) |
| 06/27/2025 | 77 | NOTICE OF APPEAL as to 75 Memorandum & ORDER, by Pamela Bondi, John Doe, James Hicks, Todd Lyons, Kristi Noem, Marco Rubio, Student and Exchange Visitor Program, United States Department of Homeland Security, United States Department of Justice, United States Department of State, United States Immigration and Customs Enforcement. Fee Status: US Government. <br><br> NOTICE TO COUNSEL: A Transcript Report/Order Form, which can be downloaded from the First Circuit Court of Appeals web site at http://www.ca1.uscourts.gov MUST be completed and submitted to the Court of Appeals. **Counsel shall register for a First Circuit CM/ECF Appellate Filer Account at http://pacer.psc.uscourts.gov/cmecf. Counsel shall also review the First Circuit requirements for electronic filing by visiting the CM/ECF Information section at http://www.ca1.uscourts.gov/cmecf.** US District Court Clerk to deliver official record to Court of Appeals by 7/17/2025. (Davis, Tiberius) (Entered: 06/27/2025) |

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| PRESIDENT AND FELLOWS OF HARVARD COLLEGE, | * * * | |
| Plaintiff, | * * | |
| v. | * * | Civil Action No. 25-cv-11472-ADB |
| UNITED STATES DEPARTMENT OF HOMELAND SECURITY, et al., | * * * | |
| Defendants. | * | |

**MEMORANDUM AND ORDER**

BURROUGHS, D.J.

Plaintiff, the President and Fellows of Harvard College ("Plaintiff" or "Harvard"), seeks a preliminary injunction enjoining the United States Department of Homeland Security, Kristi Noem, United States Immigration and Customs Enforcement, Todd Lyons, Student and Exchange Visitor Program, James Hicks, United States Department of Justice, Pamela Bondi, United States Department of State, and Marco Rubio (collectively, "Defendants") from implementing or enforcing a presidential proclamation entitled "Enhancing National Security by Addressing Risks at Harvard University" (the "Proclamation"). The Proclamation suspends "the entry of any alien into the United States as a nonimmigrant to pursue a course of study at Harvard University under § 101(a)(15)(F) or § 101(a)(15)(M) of the INA, 8 U.S.C. §§ 1101(a)(15)(F) or 1101(a)(15)(M), or to participate in an exchange visitor program hosted by Harvard University under § 101(a)(15)(J) of the INA, 8 U.S.C. § 1101(a)(15)(J)."

In sum, Plaintiff alleges that the Proclamation is unlawful under the governing statute, 8 U.S.C. § 1182(f) and further asserts that, even if otherwise lawful under the statute, the

Proclamation must be enjoined because it is part of an unconstitutional course of retaliatory conduct directed at Harvard in response to its exercise of its First Amendment rights, is unconstitutional viewpoint discrimination, and violates Harvard's equal protection rights. Defendants respond that the Proclamation is a proper use of the President's broad legal authority to exclude aliens or classes of aliens, the Proclamation is unrelated to Harvard's First Amendment-protected activity, and the Proclamation does not violate Harvard's equal protection rights. For the foregoing reasons, Plaintiff's motion for a preliminary injunction is **GRANTED**.

## I.    BACKGROUND

### A.    Factual Background

In considering a preliminary injunction, "[t]he Court may accept as true 'well-pleaded allegations [in the complaint] and uncontroverted affidavits.'" Am. Inst. for Foreign Study, Inc. v. Fernandez-Jimenez, 468 F. Supp. 3d 414, 419 (D. Mass. 2020) (quoting Rohm & Haas Elec. Materials, LLC v. Elec. Cirs., 759 F. Supp. 2d 110, 114 n.2 (D. Mass. 2010)), aff'd, 6 F.4th 120 (1st Cir. 2021). "Exhibits attached to the complaint are properly considered part of the pleading for all purposes." Costa v. Zurich Am. Ins. Co., No. 23-cv-11594, 2024 WL 1093002, at *1 (D. Mass. Mar. 13, 2024).

#### 1.    The Administration's Rhetorical Campaign Against Harvard

On October 7, 2023, Hamas, a Palestinian terrorist organization, conducted a violent attack on Israeli citizens. [ECF No. 54 ("Amended Complaint" or "Am. Compl.") ¶ 109]. This has led to an ongoing war between Israel and Hamas, and since October 7, many universities have experienced large-scale protests against the war. [Id.]

On February 3, 2025, the government announced the formation of the Task Force to Combat Anti-Semitism (the "Task Force"). [Am. Compl. ¶¶ 17, 111]. On February 28, 2025,

the Task Force announced that it was investigating ten universities regarding antisemitic incidents in the wake of these protests. [Id. ¶ 113]. On March 31, 2025, the Task Force sent Harvard a memorandum indicating its intent to review approximately $8.7 billion in federal research grants because Harvard had failed to "curb or combat anti-Semitic harassment." [Id. ¶ 114]. A few days later, on April 3, Harvard received an additional letter from the General Services Administration ("GSA"), the Department of Health and Human Services ("HHS"), and the Department of Education ("DoE") setting forth reforms "the government view[ed] as necessary for Harvard to implement to remain a responsible recipient of federal taxpayer dollars." [Id. ¶ 115].

The April 3 memorandum was superseded by a letter, dated April 11, 2025 (the "April 11 Letter"), which dictated specific conditions required for Harvard to "maintain [its] financial relationship with the federal government." [Am. Compl. ¶ 116 (alteration omitted)]. These conditions included, among other things:

- "reducing the power held by faculty (whether tenured or untenured) and administrators more committed to activism than scholarship";

- "reform[ing] its recruitment, screening, and admissions of international students to prevent admitting students hostile to the American values and institutions inscribed in the U.S. Constitution and Declaration of Independence";

- "commission[ing] an external party, which shall satisfy the federal government as to its competence and good faith, to audit the student body, faculty, staff, and leadership for viewpoint diversity, such that each department, field, or teaching unit must be individually viewpoint diverse";

3

- "[reforming e]very department or field found to lack viewpoint diversity . . . by hiring a critical mass of new faculty within that department or field who will provide viewpoint diversity";

- "[reforming] every teaching unit found to lack viewpoint diversity . . . by admitting a critical mass of students who will provide viewpoint diversity";

- "commission[ing] an external party, which shall satisfy the federal government as to its competence and good faith, to audit [certain] programs and departments that most fuel antisemitic harassment or reflect ideological capture";

- "shutter[ing] all diversity, equity, and inclusion (DEI) programs, offices, committees, positions, and initiatives, under whatever name, and stop[ing] all DEI-based policies, including DEI-based disciplinary or speech control policies, under whatever name [and] demonstrat[ing] that it has done so to the satisfaction of the federal government"; and

- "end[ing] support and recognition of those student groups or clubs that engaged in anti-Semitic activity since October 7th, 2023, including the Harvard Palestine Solidarity Committee, Harvard Graduates [sic] Students 4 Palestine, Law Students 4 Palestine, Students for Justice in Palestine, and the National Lawyers Guild."

[ECF No. 1-9 at 2–6].

On April 14, Harvard President Alan Garber wrote a letter to the Harvard Community repudiating the demands made in the April 11 Letter. [Am. Compl. ¶ 118]. His letter rebuked the "direct governmental regulation of the 'intellectual conditions' at Harvard" and stated, among other things, that the April 11 Letter went "beyond the power of the federal

government[,] violate[d] Harvard's First Amendment rights[,] exceed[ed] the statutory limits of the government's authority," and "threaten[ed] [Harvard's] values as a private institution devoted to the pursuit, production, and dissemination of knowledge." [ECF No. 1-10 at 2–3].  President Garber's letter ultimately forcefully rejected the April 11 Letter's "assertions of power, unmoored from the law, to control teaching and learning at Harvard and to dictate how [it] operate[s]."  [Id. at 3].

The Administration reacted quickly and relentlessly.  Within hours of President Garber's letter denouncing the Administration's conduct and demands, the Task Force announced a multi-billion-dollar grant funding freeze.  [Am. Compl. ¶ 120].  By the next day, President Trump had joined the conversation, posting on his social media website, Truth Social: "Perhaps Harvard should lose its Tax Exempt Status and be Taxed as a Political Entity if it keeps pushing political, ideological, and terrorist inspired/supporting 'Sickness?'  Remember, Tax Exempt Status is totally contingent on acting in the PUBLIC INTEREST!"  [Id. ¶ 122].  He followed this on April 16 with a longer Truth Social post aimed at Harvard's views, its faculty and their views, and presumed political leanings, stating in part:

> [Harvard] hired, from New York (Bill D) and Chicago (Lori L), at ridiculously high salaries/fees, two of the WORST and MOST INCOMPETENT mayors in the history of our Country, to "teach" municipal management and government.  These two Radical Left fools left behind two cities that will take years to recover from their incompetence and evil. Harvard has been hiring almost all woke, Radical Left, idiots and "birdbrains" who are only capable of teaching FAILURE to students and so-called "future-leaders." . . . Many others, like these Leftist dopes, are teaching at Harvard, and because of that, Harvard can no longer be considered even a decent place of learning, and should not be considered on any list of the World's Greatest Universities or Colleges. Harvard is a JOKE, teaches Hate and Stupidity, and should no longer receive Federal Funds.

[Id. ¶ 123].

Within hours of the President's Truth Social post, Secretary of Homeland Security Kristi Noem sent a letter to Harvard regarding the Student Exchange Visitor Program ("SEVP"), which is discussed in more detail infra, demanding voluminous documents from Harvard and threatening to revoke Harvard's ability to host international students if Harvard did not comply with a set demands, all seemingly outside of the usual regulatory process.  [Am. Compl. ¶ 124].  This letter was accompanied by a press release that tied the demand for information and accompanying threats to Harvard's alleged adoption of "radical ideology" and permissive approach to "anti-American, pro-Hamas ideology poisoning its campus and classrooms."  [ECF No. 1-17 at 2].  The press release also directly tied the SEVP compliance issue to the Administration's prior actions against Harvard and the President's Truth Social posts, stating: "This action follows President Donald J. Trump's decision to freeze $2.2 billion in federal funding to Harvard University, proposing the revocation of its tax-exempt status over its radical ideology."  [Id.]

The Administration's focus on Harvard continued.  On April 20, 2025, the Administration threatened to revoke an additional $1 billion of funding.  [Am. Compl. ¶ 131].  And on April 24, 2025, President Trump again took to Truth Social, writing that:

> Harvard is an Anti-Semitic, Far Left Institution, as are numerous others, with students being accepted from all over the World that want to rip our Country apart. The place is a Liberal mess, allowing a certain group of crazed lunatics to enter and exit the classroom and spew fake ANGER AND HATE. It is truly horrific! Now, since our filings began they act like they are all "American Apple Pie."  Harvard is a threat to Democracy.

[Id. ¶ 132].

The President reiterated many of his criticisms at a public cabinet meeting on April 30, 2025, where he stated that Harvard was "scamming the public and hiring people like DeBlasio and Lori Lightfoot who are certainly two of the worst mayors in the history of our country,

paying them a fortune on salary, and having them teach our children how to manage cities and

how to manage government." [Am. Compl. ¶ 134 (alterations omitted)]. And during an

exchange between DoE Secretary Linda McMahon, President Trump, and Secretary Noem at the

same meeting, Secretary McMahon stated: "When we went back to [Harvard] to say we'd

welcome them back to the negotiating table, their response was a lawsuit . . . We're staying

tough with them." [Id.] President Trump replied that "[t]he students they have, the professors

they have, the attitude they have, is not American." [Id. (emphasis omitted)].

On May 2, 2025, President Trump again threatened Harvard's 501(c)(3) status on Truth

Social. [Am. Compl. ¶ 147]. Three days later, on May 5, 2025, Secretary McMahon sent a letter

to Harvard stating it would no longer receive federal grants, stating specifically:

> [Harvard's] incomprehensible failure becomes more understandable after
> reviewing Harvard's management. The Harvard Corporation, which is supposed
> to competently and professionally manage Harvard's vast academic, financial, and
> physical resources, is run by strongly left-leaning Obama political appointee Penny
> Pritzker, a Democrat operative, who is catastrophic and running the institution in a
> totally chaotic way. Harvard alumnus and highly successful hedge fund manager
> Bill Ackman noted that, under her leadership, Harvard has become a "political
> advocacy organization for one party." . . . [Universities] should not be incubators
> of discrimination that encourage resentment and instill grievance and racism into
> our wonderful young Americans.

[ECF No. 1-21 at 2–3]. Secretary McMahon's letter went on to reiterate the

Administration's commitment to the demands set forth in the April 11 Letter, stating that the

"priorities have not changed." [Id. at 3–4]. Secretary McMahon in an interview two days later

asked, presumably rhetorically, "Are they vetting professors that they're hiring to make sure that

they're not teaching ideologies, but that they're teaching subject matter?" [Am. Compl. ¶ 149].

As discussed further infra, on May 22, 2025, after much back and forth regarding the

earlier records requests, the Department of Homeland Security ("DHS") sent Harvard a notice

that it was revoking Harvard's SEVP certification, effective immediately (the "SEVP Revocation

Letter"). [Am. Comp. ¶¶ 150–58]. The following day, Harvard filed a complaint as well as a motion for a TRO against the enforcement of the SEVP Revocation Letter with this Court, [ECF No. 4], which the Court granted the same day, [ECF No. 11]. The Court also scheduled a status conference for May 27, 2025, [ECF No. 12], and a preliminary injunction hearing for May 29, 2025, [ECF No. 13].

On May 26, 2025, the day before the scheduled status conference, President Trump posted twice more on Truth Social about possibly cutting an additional $3 billion of funding to Harvard and referencing the present litigation. [Am. Compl. ¶¶ 182–83]. Public reports surfaced a few days later that, on May 28, 2025, the evening before this Court's preliminary injunction hearing, the White House convened government officials from "nearly a dozen agencies" to brainstorm additional actions the Administration could take against Harvard. [ECF No. 54-3 at 3]. At a press conference that day, President Trump said that "Harvard is treating our country with great disrespect and all they're doing is getting in deeper and deeper and deeper." [Id.]. Offering comment on the meeting to Politico, White House spokesperson Harrison Fields stated that "Harvard decided to litigate this on MSNBC, the now defunded NPR, and the ratings-disaster CNN instead of acting like adults like many of their competitors have done and engaging in fruitful conversations and actions that would have saved them from their self-inflicted demise." [Id. at 4]. Shortly thereafter, on June 1, 2025, Secretary Noem echoed these sentiments, posting on X a video of an interview on Fox News where she criticized Harvard because, among other things, "communist and Marxist ideologies were allowed" on

campus.  Secretary Kristi Noem (@Sec_Noem), X (Jun. 1, 2025 at 12:00 PM ET),

https://x.com/sec_noem/status/1929206429912600994?s=46&t=K9-SEzbtbhZp-Upq_A7fLg.[1]

2.  <u>Regulatory Background Governing International Students</u>

Concurrently with the escalating rhetoric, the Administration and Harvard have gone

several rounds on Harvard's ability to host international students, leading to the present

proceedings.  Because this case requires an understanding of the relevant regulatory scheme and

procedural history of this issue, a discussion of the same follows.

"Enacted in 1952, the [Immigration and Nationality Act ('INA')] governs noncitizens'

entrance into and removal from the United States."  <u>Lopez v. Att'y Gen.</u>, <u>49 F.4th 231, 232</u> (3d

Cir<u>. 2022</u>) (citing <u>8 U.S.C. §§ 1101–1537</u>).  Under the INA, admission to the United States

normally requires a valid visa or other travel document.  <u>See</u> <u>8 U.S.C. §§ 1181</u>, <u>1182(a)(7)(A)(i)</u>

and <u>(B)(i)(II)</u>, <u>1203</u>.  One type of visa, an F-1 visa, can be granted to

> an alien having a residence in a foreign country which he has no intention of
> abandoning, who is a bona fide student qualified to pursue a full course of study
> and who seeks to enter the United States temporarily and solely for the purpose
> of pursuing such a course of study . . . at an established college [or] university .
> . . particularly designated by him and approved by the Attorney General . . . .

<u>Id.</u> § 1101(a)(15)(F)(i).

This is known as the SEVP, and the process for such approval by the Attorney General is

governed by regulation and called "SEVP Certification."  <u>8 C.F.R. § 214.3(f)</u>.  To qualify for

initial certification and subsequent biennial certification, a school must demonstrate that it meets

four basic criteria: 1) it is "a bona fide school," 2) it is "an established institution of learning or

other recognized place of study," 3) it possesses the facilities, personnel, and finances to conduct

---

[1] "We think we may take judicial notice of such official statements made by the head of one of
the branches of the executive department."  <u>Heath v. Wallace</u>, <u>138 U.S. 573, 584</u> (1891).

instruction, and 4) it actually engages in that instruction.  Id. § 214.3(a)(3)(i)(A)–(D), (h)(2); see also 8 U.S.C. § 1762 (mandating biennial review).  As particularly relevant to the present dispute, it must also demonstrate that it complies with recordkeeping mandates under 8 C.F.R. § 214.3(g).

Outside of the biennial certification process, the government may withdraw a school's certification, but it must serve the school with a Notice of Intent to Withdraw ("NOIW"), which can only be issued "if SEVP determines that a school reviewed out-of-cycle has failed to sustain eligibility or has failed to comply with the [compliance criteria]."  8 C.F.R. § 214.3(e)(4).  The school then has 30 days to answer the allegations, submit evidence, and request a "telephonic interview in support of its response."  Id. § 214.4(b).  The effect of withdrawing a school from the program is that the school can no longer host international students.  Id. § 214.4(h)(i)(1).

Another type of visa called a "J visa" operates similarly.  This is a class of visas for foreign citizens who are approved to participate in an exchange visitor program in the United States, see 8 U.S.C. § 1101(a)(15)(J), and includes students, professors, and research scholars, 22 C.F.R. § 62.4.  To participate, an institution must be designated as an "Exchange Visitor Program sponsor" by the State Department.  Id. §§ 62.3, 62.5.  Although the criteria for revocation of such a designation are broader than for F-1 visas, including if a school runs "its program in such a way as to undermine the foreign policy objectives of the United States, compromise the national security interests of the United States, or bring the Department or the Exchange Visitor Program into notoriety or disrepute," [Am. Compl. ¶ 95 (citing 22 C.F.R. § 62.50(a))], the relevant regulations still require a 30-day notice of intent to revoke and include procedural steps that must be taken prior to revocation, 22 C.F.R. § 62.50(d).

In addition to the statutory provisions and implementing regulations cited above, the INA separately confers on the President the power to suspend or restrict the entry of aliens. Section 1182(f) of Title 8 provides:

> Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate.

### 3.  Harvard's Ability to Host International Students

As referenced supra, on April 16, 2025, Secretary Noem sent Harvard's International Office ("HIO") a letter requesting information within ten business days of receipt about each student visa holder. [Am. Compl. ¶ 15]. On April 30, 2025 and again on May 14, 2025, Harvard provided information it claims was responsive to the request. [Id. ¶ 16]. On May 22, 2025, DHS sent Harvard the SEVP Revocation Letter. [Id.]

The following day, Harvard filed its complaint and TRO Motion against the enforcement of the SEVP Revocation Letter with this Court, [ECF No. 4]. After granting the TRO, the Court scheduled a hearing for May 29, 2025. [ECF No. 13]. That morning, prior to the hearing, DHS filed a copy of a NOIW issued to Harvard. [ECF No. 49]. At the hearing, Defendants represented that the SEVP Revocation Letter would not be in force while the NOIW proceedings took place. [ECF No. 52 at 15:11–16]. Defendants nevertheless resisted an "overbroad" injunction against enforcement of the SEVP Revocation Letter, admitting that "there might be other legal avenues or things that the government might consider." [ECF No. 52 at 15:12–13].[2]

---

[2] The Court asked the parties to submit joint or individual proposed orders reflecting their agreement that the SEVP program would not be terminated while the NOIW process was taking

Those "other legal avenues" materialized on June 4, 2025, when the President issued the Proclamation, which bars F-1 and M visas for "any alien . . . to pursue a course of study at Harvard University" and J-1 visas for "any alien . . . to participate in an exchange visitor program hosted by Harvard University," pursuant to 8 U.S.C. § 1182(f). The Proclamation cites a purported rise in crime rates at Harvard, Harvard's receipt of funds from China and other foreign governments, and Harvard's admission of students from "non-egalitarian" countries. [ECF No. 54-7 at 3–4]. The press release accompanying the Proclamation reiterated these justifications and referenced Harvard's "demonstrated history of . . . radicalism." [ECF No. 54-8 at 2].

Harvard filed a motion for another TRO, this time to enjoin the implementation of the proclamation on June 5, [ECF No. 56], which was granted the same day, [ECF No. 59]. Defendants filed an opposition on June 14, [ECF No. 67], and a hearing was held on June 16. Harvard filed a reply on June 17, [ECF No. 72]. This opinion follows.

## II.    PRELIMINARY INJUNCTION LEGAL STANDARD

When deciding whether to grant a motion for preliminary injunction, courts must consider four factors: "(i) the movant's likelihood of success on the merits of its claims; (ii) whether and to what extent the movant will suffer irreparable harm if the injunction is withheld; (iii) the balance of hardships as between the parties; and (iv) the effect, if any, that an injunction (or the withholding of one) may have on the public interest." Corp. Techs., Inc. v. Harnett, 731 F.3d 6, 9 (1st Cir. 2013). The First Circuit has held that these four factors "are not entitled to equal weight in the decisional calculus." Id. Rather, the movant's likelihood of success on the

_____

its course. The parties submitted different versions of the Order and on June 20, 2025, the Court entered the more limited order proposed by Defendants. [ECF No. 73].

merits "is the main bearing wall of the four-factor framework." Id. at 10 (citation omitted).
"[P]roving likelihood of success on the merits is the 'sine qua non' of a preliminary injunction."
Arborjet, Inc. v. Rainbow Treecare Sci. Advancements, Inc., 794 F.3d 168, 173 (1st Cir. 2015)
(quoting New Comm Wireless Servs., Inc. v. SprintCom, Inc., 287 F.3d 1, 9 (1st Cir. 2002)).
Therefore, "[i]f the moving party cannot demonstrate that [they are] likely to succeed in [their]
quest, the remaining factors become matters of idle curiosity." Id. (quoting New Comm
Wireless Servs., 287 F.3d at 9). Likewise, the balance of hardships and public interest factors
"merge when the Government is the opposing party." Nken v. Holder, 556 U.S. 418, 435
(2009). As the moving party, Plaintiff bears the burden of satisfying each of these four elements.
See Nieves-Marquez v. Puerto Rico, 353 F.3d 108, 120 (1st Cir. 2003). Preliminary injunctions
function to "preserve the relative positions of the parties until a trial on the merits can be held."
Univ. of Tex. v. Camenisch, 451 U.S. 390, 395 (1981). As a result, "findings of fact and
conclusions of law made by a court granting a preliminary injunction are not binding at trial on
the merits." Id. (first citing Indus. Bank of Wash. v. Tobriner, 405 F.2d 1321, 1324 (D.C. Cir.
1968); and then citing Hamilton Watch Co. v. Benrus Watch Co., 206 F.2d 738, 742 (2d Cir.
1963)). The granting of a preliminary injunction is "an 'extraordinary and drastic remedy' that
'is never awarded as of right.'" Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc.,
645 F.3d 26, 32 (1st Cir. 2011) (quoting Munaf v. Geren, 553 U.S. 674, 689–90 (2008)).

In the First Amendment context in particular, the balance of equities and irreparable harm
are inextricably linked to the merits. Moreover, the Court finds here that the harm, the balance
of hardships and the public interest all easily weigh in favor of an injunction, and therefore it will
focus its attention on the likelihood of success on the merits.

## III.     DISCUSSION

### A.     Justiciability

As an initial matter, Defendants claim that Plaintiff's statutory claims are not justiciable because, under the Supreme Court's precedent <u>Fiallo v. Bell</u>, <u>430 U.S. 787</u> (1977), the President has a "'sweeping proclamation power' to suspend entry of aliens and impose restrictions wholly in [his] discretion."  [<u>ECF No. 67 at 15</u> (quoting <u>Abourezk v. Reagan</u>, <u>785 F.2d 1043, 1049</u> n.2 (D.C. Ci<u>r. 1986</u>) (R.B. Ginsburg, J.))].

The Court finds Defendants' reliance on <u>Fiallo</u> to be misplaced.  Although it is true that <u>Fiallo</u> "underscore[s] the limited scope of judicial inquiry into immigration <u>legislation</u>," <u>430 U.S. at 792</u> (emphasis added), the section of <u>Fiallo</u> upon which Defendants rely is discussing <u>Congress's</u> power to regulate the entry of aliens, not the power of the Executive to do so.  <u>See</u> <u>id.</u> ("This Court has repeatedly emphasized that over no conceivable subject is the legislative power of <u>Congress</u> more complete than it is over the admission of aliens. . . . And we observed recently that in the exercise of its broad power over immigration and naturalization, <u>Congress</u> regularly makes rules that would be unacceptable if applied to citizens." (emphasis added) (citation modified)).  Given, then, "the strong presumption that Congress intends judicial review of administrative action," <u>Smith v. Berryhill</u>, <u>587 U.S. 471, 483</u> (2019) (quoting <u>Bowen v. Mich. Acad. of Family Physicians</u>, <u>476 U.S. 667, 670</u> (1986)), the Court finds Defendants' sweeping assertions to be insufficient.  Although the scope of review may be "limited," the Court sees no reason why that review cannot include ensuring the Administration's compliance with the statutory scheme, particularly where the dispute implicates core constitutional concerns distinct from the statutory analysis.

**B.    Likelihood of Success on the Merits**

1.    Compliance with the INA

Harvard's first argument is statutory—namely, that the Proclamation exceeds the President's authority under 8 U.S.C. § 1182(f).  Defendants disagree and maintain that the President's authority is sufficiently broad under § 1182(f) that the Proclamation fits squarely into it.

As stated supra, the President may issue a proclamation restricting the entry of aliens "[w]henever [he] finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States." 8 U.S.C. § 1182(f).  The Supreme Court last addressed the framework for analyzing "national security directive[s] regulating the entry of aliens abroad" during President Trump's previous term in Trump v. Hawaii, 585 U.S. 667 (2018).  Id. at 702.  Defendants argue that Hawaii is dispositive to the case at hand, as, per the holding in Hawaii, it is clear that "§ 1182(f) grants the President broad discretion" and "exudes deference to the President in every clause." Id. at 683–84; see [ECF No. 67 at 13–14].  Plaintiff counters that, even given Hawaii, the Proclamation nonetheless exceeds the President's authority under 8 U.S.C. § 1182(f).  [ECF No. 57 at 27–31; ECF No. 72 at 13–18].

Defendants are correct that § 1182(f) and Hawaii establish broad presidential discretion, "vest[ing] the President with 'ample power' to impose entry restrictions in addition to those elsewhere enumerated in the INA." 585 U.S. at 684 (quoting Sale v. Haitian Ctrs. Council, Inc., 509 U.S. 155, 187 (1992)).  That said, Plaintiff is also correct that the facts in Hawaii are readily distinguishable from those currently before the Court, making the precedent far from dispositive.  The Court briefly summarizes some of those factual differences to give context to the analysis that follows.

15

First, the gravamen of the holding in <u>Hawaii</u> was that it was allowable for the President to restrict the entry of aliens into the United States who could not be properly vetted prior to their admission.  <u>585 U.S. at 685</u> ("[T]he President found that it was in the national interest to restrict entry of aliens who could not be vetted with adequate information—both to protect national security and public safety, and to induce improvement by their home countries.").  Here, there is no dispute that the students seeking entry can be properly vetted prior to admission; in fact, the DHS and Department of State-administered programs, already highly regulated, are currently considering heightened vetting for visa applicants—piloting this heightened vetting with students coming to Harvard, [Am. Compl. ¶ 22].  The Proclamation itself contains no language indicating a concern with the vetting that underlies the granting of these visas.  Rather, the Administration in this action, per the terms of the Proclamation, is concerned about what happens <u>after</u> the applicants enter.  The Proclamation identifies the problem as a risk created by Harvard's failure to collect and share the information sought by the government, not a risk directly posed by the international people seeking admission, unlike in <u>Hawaii</u>.[3]

Second, the "class" the presidential proclamation in <u>Hawaii</u> sought to bar from entry was defined by nationality, and the detriment to the United States was directly linked to that characteristic.  <u>585 U.S. at 685</u> ("The Proclamation therefore crafted country-specific restrictions that would be most likely to encourage cooperation given each country's distinct circumstances, while securing the Nation 'until such time as improvements occur.' (citation modified)).  In upholding the proclamation at issue, the <u>Hawaii</u> Court found that "the word 'class' comfortably encompasses a group of people linked by nationality."  <u>Id.</u> at 688.  Here, the Proclamation's

_____

[3] Harvard maintains that it has adequately responded to the Administration's requests for information, but that dispute is not currently before the Court.

relevant "class" is defined as students intending to go to Harvard. [ECF No. 54-7]. Per the Proclamation, if the students elected to attend a different school, they would no longer fall within the Proclamation's class and would therefore not be subject to the Proclamation. [Id.] It is far from clear that Hawaii's class definition would as comfortably encompass a group of people linked not by nationality but by their intent to attend a particular school once admitted to this country. Further, Defendants notably assert no risk or detriment at the time of entry, no risk or detriment directly associated with the students themselves, and, indeed, no international risk at all. In other words, the only articulated risk or detriment arises from a domestic institution's purported conduct, not from the risks posed by the visa holders, which is distinct from the circumstances in Hawaii.

Third, Hawaii involved a blanket ban on entry for broad, categorical purposes and not a ban on entry related to the specific destination upon entry. 585 U.S. at 679–80 (proclamation banned all visas, immigrant and nonimmigrant business and tourist visas, or just immigrant visas depending on country). Here, the Administration does not generally object to the entry of the students, but rather is concerned solely with where they are going once admitted. [ECF No. 54-7]. As the Supreme Court stated in Hawaii, the statute "enables the President to 'suspend the entry of all aliens or any class of aliens' whenever he 'finds' that their entry 'would be detrimental to the interests of the United States.'" 585 U.S. 683 (quoting 8 U.S.C. § 1182(f)). In the instant case, the President has arguably (and, very specifically) not found that the entry would be detrimental, given that these students are allowed to enter—provided that they do not attend Harvard.

This all said, the Court's statutory analysis, although informed by Hawaii, must focus on the statute itself. By its terms, the statute, as relevant here, requires: (1) a finding; (2) that the

17

entry into the United States; (3) of any aliens or class of aliens; (4) would be detrimental to the interests of the United States.  8 U.S.C. § 1182(f).

In arguing that the Proclamation exceeds the authority granted by § 1182(f), Harvard first asserts that the President has not made the predicate "finding" of "detriment[]" to the United States.  [ECF No. 57 at 28–29].  The statute is silent as to what constitutes a presidential "finding," and, in the absence of statutory guidance, Harvard's argument is largely foreclosed by Hawaii and therefore unavailing.  In Hawaii, the Supreme Court indicated that the premise that the statute required a "finding with sufficient detail to enable judicial review" was questionable and rejected a request for a "searching inquiry into the persuasiveness of the President's justifications."  585 U.S. at 686.  Absent any countervailing indication that it should, the Court likewise declines to undertake such a searching inquiry here.

Second, Harvard argues that the Proclamation is impermissibly targeted at a domestic entity's conduct, rather than at any foreign nationals or entities, contrary to both the text and purpose of the statute.  [ECF No. 72 at 14–18].  Specifically, as a textual matter, Harvard argues that the President cannot define the terms "entry" and "class" as used in the statute with respect to a visa applicant's purpose of attending "a particular destination [within the United States]." [ECF No. 72 at 15–16].

Regarding "entry," Defendants are technically correct that the Proclamation has the effect of restricting entry as the types of visas at issue here are only valid for the purpose of attendance at one particular institution, and entry would not be allowed if attendance at that institution was foreclosed.  [ECF No. 67 at 17].  Nevertheless, the Court agrees with Harvard that, although the SEVP program properly limits entry to those with student visas, it is an unusual reading of § 1182(f) to restrict that entry based solely on the student's purpose of entry, that is, to attend

Harvard.  Thus, while the Proclamation may have the effect of restricting entry, its intent is not to restrict entry but rather to allow entry so long as that entry is not to attend Harvard.  This seems to be a perversion of the language and purpose of the statute.  The Court will not, however, base its decision solely on this reading of "entry," but will factor it into its analysis of the motivations underlying the Proclamation.

With regard to "class of aliens," Defendants argue that the statute provides no definition of the term, and therefore purpose of entry is a proper characteristic on which to base a class.  [ECF No. 67 at 16].  Defendants here claim that the class at issue is defined as a group of aliens attending Harvard.  Although the Court agrees that the term "class" can be construed broadly, the Court also recognizes and gives weight to Harvard's argument that no previous proclamation has ever defined "class" by an alien's potential relationship with a specific domestic entity for the purpose of influencing that domestic entity's conduct.  See Kelsey Y. Santamaria, Calvin Gibson & Hillel R. Smith, Cong. Rsch. Serv., LSB10458, Presidential Authority to Suspend Entry of Aliens Under 8 U.S.C. § 1182(f) (2024) (listing previous invocations of authority under § 1182(f)).  "[J]ust as established practice may shed light on the extent of power conveyed by general statutory language, so the want of assertion of power by those who presumably would be alert to exercise it, is equally significant in determining whether such power was actually conferred."  West Virginia v. EPA, 597 U.S. 697, 725 (2022) (citation omitted); see also Biden v. Nebraska, 600 U.S. 477, 501 (2023) (no authority to cancel student loans where the "Secretary has never previously claimed powers of this magnitude under the . . . Act").

Harvard likewise presents a compelling argument as to the purpose of the statute, which Defendants do not significantly rebut; that is, that the statute's purpose is to regulate and influence conduct abroad, rather than at home.  [ECF No. 72 at 16–17].  In Hawaii, the Court

recognized that the statute gave the President "flexible authority to suspend entry <u>based on foreign policy interests</u>." <u>585 U.S. at 696</u> (emphasis added). And other courts have similarly expressed skepticism that the President's authority under § 1182(f) is as extensive when it is aimed at domestic policy as opposed to foreign policy or national security. <u>Nat'l Ass'n of Mfrs. v. U.S. Dep't of Homeland Sec.</u>, <u>491 F. Supp. 3d 549, 563</u> (N.D. Cal. 2020) ("Indeed, there must be some measure of constraint on Presidential authority in the domestic sphere in order not to render the executive an entirely monarchical power in the immigration context, an area within clear legislative prerogative."), <u>appeal dismissed as moot</u>, No. 20-17132, <u>2021 WL 1652646</u>, at *1 (9th Cir. Ap<u>r. 8</u>, <u>2021)</u>.

Given its many unprecedented features, the Court is skeptical that, despite its breadth, § 1182(f) authorizes the Proclamation. Although this could end the inquiry, in the interest of a complete record, the Court reaches the parties' constitutional arguments.[4]

---

[4] Harvard makes one other statutory argument: it argues that the Proclamation, by demanding additional records from Harvard, conflicts with the part of the statute governing the SEVP program by setting forth additional reporting requirements beyond what is required by the implementing regulations. [ECF No. 72 at 18 (citing <u>8 U.S.C. § 1372(c)</u> and <u>8 C.F.R. § 214.3(g))</u>]. Defendants respond that "Section 1182(f) is an independent grant of authority that allows the President to restrict entry irrespective of agency-level reporting frameworks." [ECF No. 67 at 19]. Here, the Court agrees with the Defendants that the Proclamation does not conflict with § 1372 to the extent that the Proclamation is otherwise lawful. <u>See</u> <u>Hawaii</u>, <u>585 U.S. at 689</u>. Taking the proclamation at issue in <u>Hawaii</u> as an example, if entry was lawfully restricted for aliens from certain countries, it seems implausible that the ability of the President to restrict the entry of these aliens could be overridden by DHS's ability to admit them pursuant to the SEVP. Likewise here; the Court's other doubts about the legality of the Proclamation notwithstanding, it seems contrary to the statutory scheme that regulations governing DHS's discretionary ability to grant SEVP visas would override the President's broad authority under § 1182(f).

20

2.  Constitutional Claims

Harvard asserts three First Amendment claims and one Fifth Amendment claim, all of
which are based almost entirely on the factual record outside of the text of the Proclamation
itself.  See [Am. Compl. ¶¶ 281–91, 300–06; ECF No. 57 at 18–27, 31–33].  These claims rest on
the contention that the Administration issued the Proclamation in retaliation for Harvard's
exercise of academic freedom and its public statements committing to the same, [ECF No. 57 at
19–20]; that the Administration issued the Proclamation in retaliation for Harvard deciding to
litigate the validity of the Administration's funding cuts and the SEVP Revocation Letter, [id. at
25–27]; and that the Administration is discriminating against Harvard for having perceived
viewpoints that are disfavored by the Administration, [id. at 23–25].  Harvard also asserts a
"class-of-one" equal protection claim under the Fifth Amendment.  [Id. at 31–33].  In Harvard's
view, even a lawful action is rendered unlawful if done in violation of the First and Fifth
Amendments, and those inquiries are independent of the legality of the Proclamation under the
relevant statutory authority.  [ECF No. 72 at 6, 10].

Defendants argue that under Supreme Court precedent in Hawaii and Mandel, the Court
may not look at the factual record outside the text of the Proclamation in deciding whether the
Proclamation violates the First or Fifth Amendments.  [ECF No. 67 at 21–24].  They also aver
that the record insufficiently supports a finding of retaliation for either Harvard's speech or its
decisions to litigate against the Administration, [id. at 26–35], and that it likewise does not
support a finding of viewpoint discrimination or an equal protection violation, [id. at 35–38].

i.  Application of the Hawaii/Mandel Standard

The Court turns first to the applicable standard of review for Harvard's constitutional
claims.  In Hawaii, the Supreme Court recognized that, "although foreign nationals seeking

21

admission have no constitutional right to entry, this Court has engaged in a circumscribed

judicial inquiry when the denial of a visa allegedly burdens the constitutional rights of a U.S.

citizen." 585 U.S. at 703. That said, "'when the Executive exercises [power over admission of

aliens] negatively on the basis of a facially legitimate and bona fide reason, the courts will

neither look behind the exercise of that discretion, nor test it by balancing its justification'

against the asserted constitutional interests of U.S. citizens." Id. (quoting Kleindienst v. Mandel,

408 U.S. 753, 770 (1972)).

Defendants argue that, under this framework, Harvard's constitutional claims fail because

the Proclamation is "facially legitimate" and therefore the "deferential framework" set out in

Hawaii and Mandel precludes the Court from "look[ing] behind" the reasoning set out in the

Proclamation itself. [ECF No. 67 at 21]. Harvard disagrees and points out that, unlike Hawaii

and Mandel, the Proclamation is aimed at directly regulating a domestic entity, rather than

incidentally burdening the rights of U.S. citizens, and therefore a "deferential framework" is

inapplicable. [ECF No. 72 at 9].

The Court notes that, if the Proclamation is in fact unlawful under § 1182(f), the

Hawaii/Mandel framework would be irrelevant. See Hawaii, 585 U.S. at 703 (requiring "facially

legitimate and bona fide reason" for exercise of "delegated power" (citation modified)).

Assuming, as it does for its constitutional analysis, that the broad language of § 1182(f)

authorizes the Proclamation, the Court nevertheless need not do much to distinguish Hawaii,[5] as

_____

[5] The Court focuses its analysis on Hawaii as it is the Supreme Court's most recent guidance on
the issues at hand. In Hawaii, the Supreme Court noted that a "conventional application of
Mandel, asking only whether the policy is facially legitimate and bona fide, would put an end" to
its review but then proceeded to engage in a rational basis review and look outside the four
corners of the proclamation to do so, at the government's invitation. 585 U.S. at 704–05. As a

the Proclamation falls squarely within the type of action that would be impermisible even under

Hawaii's deferential review.[6]  There, the Supreme Court, in reviewing the Establishment Clause

challenge to the proclamation at issue, ultimately decided that it would "uphold the policy so

long as it [could] reasonably be understood [as] result[ing] from a justification independent of

unconstitutional grounds," and went on to apply rational basis scrutiny.  Id. at 705.  The Court

then stated:

> Given the standard of review, it should come as no surprise that the Court hardly
> ever strikes down a policy as illegitimate under rational basis scrutiny.  On the
> few occasions where we have done so, a common thread has been that the laws
> at issue lack any purpose other than a "bare . . . desire to harm a politically
> unpopular group." . . . [The government action in such cases was] "divorced
> from any factual context from which we could discern a relationship to

---

result, it is unclear to this Court whether Hawaii affirmed, overruled, refined, or built additional
layers into Mandel.  See, e.g., Int'l Refugee Assistance Project v. Trump, 961 F.3d 635, 648 (4th
Cir. 2020) (applying Hawaii and Mandel separately, and noting that "[w]hile important
differences exist between the two standards, they are both 'highly constrained' forms of judicial
review" (quoting Hawaii, 585 U.S. at 704)).  To the extent this Court, before engaging in
Hawaii's rational basis review (including evidence extraneous to the text of the Proclamation), is
required to find that the Proclamation fails Mandel, the Court so finds for the reasons articulated
herein in Section II.B, which, for clarity, show that the Proclamation is neither facially legitimate
nor bona fide.  See Kerry v. Din, 576 U.S. 86, 105 (2015) (Kennedy, J., concurring in the
judgment) (interpreting Mandel as allowing courts to "look behind" the face of the government's
decision based on "an affirmative showing of bad faith").
[6] The Court believes that the level of scrutiny that a governmental action receives may be greater
when aimed at influencing the conduct of a domestic entity, even if the action relies on the
"authority of the political branches over admission."  Hawaii, 585 U.S. at 703; see Holder v.
Humanitarian L. Project, 561 U.S. 1, 34 (2010) ("Our precedents, old and new, make clear that
concerns of national security and foreign relations do not warrant abdication of the judicial role.
We do not defer to the Government's reading of the First Amendment, even when such interests
are at stake. . . . [T]he Government's authority and expertise in these matters do not
automatically trump the Court's own obligation to secure the protection that the Constitution
grants to individuals." (internal quotation and citation omitted)).  Therefore, the limited review
prescribed by Hawaii is arguably inapplicable, and the Proclamation should receive the level of
review normally afforded to the claims at issue in the First Amendment context.  Stilwell v. City
of Williams, 831 F.3d 1234, 1250 (9th Cir. 2016) ("It is well established that First Amendment
claims . . . that allege retaliation following speech on a matter of public concern, are reviewed
with heightened scrutiny.").

legitimate state interests," and "its sheer breadth [was] so discontinuous with the reasons offered for it" that the initiative seemed "inexplicable by anything but animus."

Hawaii, 585 U.S. at 705–06 (first quoting Dep't of Agric. v. Moreno, 413 U.S. 528, 534 (1973); and then quoting Romer v. Evans, 517 U.S. 620, 632, 635 (1996)).  Such is the case here: the Proclamation quite obviously has no "legitimate grounding" in its stated concerns, and it is "inexplicable by anything but animus."  Id. at 706 (citation omitted).

The purported justifications in the Proclamation are threefold.  First, the Proclamation cites "[c]rime rates at Harvard University," which it claims "have drastically risen in recent years."  [ECF No. 54-7 at 3].  But, other than citing an alleged failure by Harvard to turn over certain data, the Proclamation does nothing to tie these higher crime rates to the number of international students at Harvard.  The Proclamation does not state, for example, that the rise in crime is correlated with a rise in the percentage of international students of Harvard, nor does it cite any evidence whatsoever that international students are committing these crimes, statistics which, presumably, would be available to the federal government if they exist.  Indeed, it is telling that, when describing this alleged problem in its brief, Defendants do not cite to any records or statistics kept by any of the myriad of federal law enforcement agencies tasked with collecting such data, but instead cite to an article by the Harvard Crimson, a college student newspaper, presumably without access to the data available to the executive branch.  Contrast [ECF No. 67 at 33 n.10], with, e.g., Press Release, Federal Bureau of Investigation, FBI Releases 2023 Crime in the Nation Statistics (Sept. 23, 2024), https://www.fbi.gov/news/press-releases/fbi-releases-2023-crime-in-the-nation-statistics.  Equally perplexing is the fact that the Proclamation provides no rationale for why the Administration needs Harvard to disclose any alleged crimes committed by international students, when, again, this information should be

easily accessible to the Executive given that it is the State Department that issues the relevant visas, see, e.g., 8 U.S.C. § 1372(a)(3)(A), and any convictions would be matters of public record. This purported justification, then, is completely "divorced from any factual context from which we could discern a relationship to legitimate state interests." Hawaii, 585 U.S. at 706 (quoting Romer, 517 U.S. at 635).

Next, the Proclamation cites Harvard's "entanglements with foreign countries, including our adversaries." [ECF No. 54-7 at 4]. It specifically takes issue with Harvard's alleged receipt of $150 million from China, stating that, "[i]n exchange, Harvard has, among other things, repeatedly hosted and trained members of a Chinese Communist Party paramilitary organization," and "Harvard researchers have also partnered with China-based individuals on research that could advance China's military modernization." [Id.] The Proclamation, however, bans "entry of any alien . . . as a nonimmigrant to pursue a course of study at Harvard University." [Id. at 5 (emphasis added)]. It does not ban members of the cited Chinese Communist Party paramilitary organization, or even all students from China. This is a textbook example of where the "sheer breadth" of the ban is "discontinuous with the reasons offered for it." Hawaii, 585 U.S. at 706 (quoting Romer, 517 U.S. at 632).[7]

Finally, the Proclamation states that Harvard "flout[s] the civil rights of its students and faculty" by "admit[ting] students from non-egalitarian nations, including nations that seek the destruction of the United States and its allies, or the extermination of entire peoples." [ECF No. 54-7 at 4]. But again, the Proclamation is not limited to students from such "non-egalitarian

---

[7] The same logic applies to any justification on the basis of anti-Israeli or antisemitic bias, which, although not cited in the text of the Proclamation, appears frequently in the record. The Proclamation does not make exceptions for Jewish or Israeli students. [ECF No. 54-7].

nations."  Nor does the Proclamation explain why having such students educated at other universities, as is plainly allowed under the Proclamation, see [id. at 5], is any different from them attending Harvard, where their admission would, under the Proclamation's theory, equally flout the civil rights of the students and faculty at the other universities.  Here again, the "sheer breadth" of the ban is "discontinuous with the reasons offered for it."  Hawaii, 585 U.S. at 706 (quoting Romer, 517 U.S. at 632).

     The examples used by the Court in Hawaii are illustrative.  A policy that the Court cited as failing rational basis review involved "a local zoning ordinance that required a special permit for group homes for the intellectually disabled, but not for other facilities such as fraternity houses or hospitals."  Hawaii, 585 U.S. at 705.  The Court held that the city's stated concerns regarding "'legal responsibility' and 'crowded conditions' rested on 'an irrational prejudice'" against the intellectually disabled," rather than any rational basis for believing that a group home for the intellectually disabled would pose a special threat to the city's legitimate interests.  Id. (quoting City of Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432, 448–50 (1985)).  Likewise here, the purported concern about students from "non-egalitarian nations" attending Harvard but not other universities, for example, makes little sense in the context of the justifications offered by the Proclamation.  And disallowing only international students despite a lack of any justification tying them to the purported rise in crime at Harvard certainly constitutes an "irrational prejudice."

     The differences between this case and the proclamation upheld in Hawaii are stark.  The constitutional concern at issue in Hawaii was the purported disfavoring of a particular religion, i.e. Islam.  Id. at 697.  There, despite the allegations that the proclamation at issue in Hawaii was a "Muslim ban," id. at 700 (citation omitted), "[t]he text sa[id] nothing about religion," id. at

706.  And in fact, only "five of the seven nations . . . included in the Proclamation ha[d] Muslim-majority populations" and "the policy cover[ed] just 8% of the world's Muslim population and [wa]s limited to countries that were previously designated by Congress or prior administrations as posing national security risks."  Id.  That could not be further from the case in front of us.  The alleged target of the constitutional concern here is Harvard, and the Proclamation both expressly targets Harvard and, by its terms, exclusively impacts Harvard.  [ECF No. 54-7 at 5].  If this were not enough, the press release accompanying the Proclamation cites Harvard's "demonstrated history of . . . radicalism," disabusing the Court of any notion that the Proclamation is facially neutral.[8]  [ECF No. 54-8 at 2].  All told, it is difficult, if not impossible, to conclude that the reasons offered in support of the Proclamation are anything other than pretextual.

Having decided that the Proclamation's justifications do not provide a rational—or, as noted supra, a facially legitimate and bona fide—basis for the measures implemented in the Proclamation, and that the Proclamation therefore cannot "be reasonably understood to result from a justification independent of unconstitutional grounds," Hawaii, 585 U.S. at 705, the Court turns to the merits of Harvard's constitutional claims.[9]

---

[8] The Court assumes that it may treat the accompanying press release as part of the Proclamation for the purposes of the Hawaii/Mandel analysis, as it would defy logic if the President could avoid constitutionality concerns by saying things in a press release to avoid scrutiny. Nevertheless, the cited statement in the press release is not dispositive to this opinion.

[9] In proceeding to the merits of Harvard's constitutional claims, the Court notes that it is uncertain whether Harvard must actually demonstrate that it meets each of the elements of its claims, or whether it is sufficient that Harvard show that the Proclamation is "inexplicable by anything but animus," Hawaii, 585 U.S. at 706 (citation omitted), given that, as the Court has already explained, the Proclamation is "divorced from any factual context from which [the Court] could discern a relationship to legitimate state interests" and "discontinuous with the reasons offered for it," id. (citation omitted).  In Hawaii, the Supreme Court concluded that the

ii.    <u>Freedom of Speech Retaliation</u>

Harvard's first constitutional claim is premised on the idea that the Proclamation was issued to retaliate against Harvard for its exercise of its right to free speech protected under the First Amendment.  [<u>ECF No. 57 at 19</u>–23].  Plaintiff argues that "[t]he Proclamation unlawfully retaliates against Harvard for its refusal to allow the federal government to control its academic decisionmaking."  [<u>Id.</u> at 19].  Defendants rejoin that this assertion is "groundless" and that the government merely "does not trust Harvard to vet and monitor incoming foreign students the way other universities might."  [<u>ECF No. 67 at 33</u>–34].

"[T]he First Amendment prohibits government officials from relying on the 'threat of invoking legal sanctions and other means of coercion . . . to achieve the suppression' of disfavored speech."  <u>Nat'l Rifle Ass'n of Am. v. Vullo</u>, <u>602 U.S. 175, 176</u> (2024) (quoting <u>Bantam Books, Inc. v. Sullivan</u>, <u>372 U.S. 58, 67</u> (1963)).  Importantly, "a government official cannot directly or indirectly coerce a private party to punish or suppress disfavored speech on her behalf."  <u>Id.</u> at 177.  Against that backdrop, the elements of a retaliation claim are that "(1) the plaintiff engaged in protected conduct; (2) an adverse action was taken against the plaintiff that

---

proclamation survived rational basis review, and did not separately analyze the merits of the plaintiffs' Establishment Clause claim.  Here, the Proclamation fails <u>Mandel</u> and <u>Hawaii</u>, but, to this Court's understanding, that does not necessarily mean that it is part of a retaliatory campaign or an instance of viewpoint discrimination in violation of the First Amendment.  As such, in the interests of completeness, the Court separately addresses the merits of Harvard's underlying constitutional claims, recognizing that the Proclamation has already failed the narrow review prescribed in <u>Mandel</u> and <u>Hawaii</u> and that this might be the end of the day for Defendants.  In so doing, the Court looks beyond the facially defective proclamation, as is typically contemplated for such claims, and as the Supreme Court assumed it could in applying rational basis review in <u>Hawaii</u>, <u>585 U.S. at 704</u>.  The Court notes for completeness that the same facts articulated supporting a finding of Free Speech and Petition Clause retaliation are, given those facial defects, more than sufficient for a finding that the Proclamation could not have been motivated by anything but animus.

would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two—that is, the adverse action was motivated at least in part by the plaintiff's protected conduct." Werner v. Therien, No. 99-cv-12497, 2005 WL 1000010, at *8 (D. Mass. Mar. 31, 2005) (quoting Thaddeus–X v. Blatter, 175 F.3d 378, 394 (6th Cir. 1999)).

On the first element, Harvard alleges that its refusal to meet the demands made by the government in the April 11 Letter, including that it cede control over its admissions and curriculum, constitutes the protected impetus for the alleged campaign of retaliatory conduct. [ECF No. 57 at 19–20]. Although "[a]cademic freedom [is] not a specifically enumerated constitutional right," Regents of Univ. of Cal. v. Bakke, 438 U.S. 265, 312 (1978), the courts' "responsibility to safeguard [educational institutions'] academic freedom [is] 'a special concern of the First Amendment,'" Regents of Univ. of Mich. v. Ewing, 474 U.S. 214, 226 (1985) (quoting Keyishian v. Bd. of Regents, 385 U.S. 589, 603 (1967)). "Academic freedom thrives not only on the independent and uninhibited exchange of ideas among teachers and students, but also . . . on autonomous decisionmaking by the academy itself." Id. at 603 n.12 (citations omitted). "A university ceases to be true to its own nature if it becomes the tool of Church or State or any sectional interest." Sweezy v. New Hampshire, 354 U.S. 234, 262 (1957) (Frankfurter, J., concurring).

"'[T]he four essential freedoms' of a university [are] to determine for itself on academic grounds who may teach, what may be taught, how it shall be taught, and who may be admitted to study." Bakke, 438 U.S. at 312 (quoting Sweezy, 354 U.S. at 263); see also Urofsky v. Gilmore, 216 F.3d 401, 412 (4th Cir. 2000) ("The Supreme Court . . . appears to have recognized . . . an institutional right of self-governance in academic affairs."). The April 11 Letter, on its face, was

aimed directly at these protected academic freedoms, as it clearly sought to control the views of

Harvard's faculty and students as well as the school's curricula and make them subject to

government approval.  The letter further requires Harvard to select an external party, also subject

to the government's approval, to audit all departments, fields, and teaching units to ensure

"viewpoint diversity," a term that is defined nowhere in the Letter.  [ECF No. 1-9 at 3–4].

Departments or fields found to lack such viewpoint diversity would be required to hire a "critical

mass" of new faculty "who will provide viewpoint diversity," again subject to the oversight of

the government, and "admit[] a critical mass of students who will provide viewpoint diversity."

[Id.]  Further, Harvard must select an external party, again subject to government approval, to

"audit" programs that "reflect ideological capture," a term not defined in the April 11 Letter, and

then to "make repairs."  [Id.]  These programs, as identified in the letter, include not just

programs focused on international human rights or religion, but also programs at the Graduate

School of Education, the Medical School, and the School of Public Health.  [Id.]  Thus, it is plain

that Harvard's refusal to acquiesce to these demands constitutes engagement in protected

conduct.  See Am. Fed'n of Gov't Emps., AFL-CIO v. Noem, No. 25-cv-00451, 2025 WL

1557270, at *17 (W.D. Wash. June 2, 2025).  Moreover, Harvard's public statements regarding

its refusal, including President Garber's April 14 letter, also constitute protected speech.  Trulock

v. Freeh, 275 F.3d 391, 404 (4th Cir. 2001) ("The First Amendment guarantees an individual the

right to speak freely, including the right to criticize the government and government officials.").

Defendants' sole argument to the contrary is that the only conduct at issue is Harvard's

rejection of the demands in the April 11 Letter, and they state in a conclusory fashion that

"rejection of an offer is not protected speech."  [ECF No. 67 at 27].  Even beyond the

disingenuousness of characterizing the April 11 Letter as an "offer," this view is overly

30

simplistic and fails to grapple with the facts as alleged.  Rather, it is also Harvard's ongoing self-governance and academic freedom <u>underlying</u> that rejection, as well as Harvard's public statements refusing to cede its academic freedom, that constitute the protected conduct, not simply the actual words of rejection.  Thus, Defendants' argument fails.

On the second element, there can be no dispute that the Proclamation constitutes adverse action, nor do Defendants even attempt to offer a compelling reason to conclude otherwise.  <u>See generally</u> [ECF No. 67].  On its face, the Proclamation describes the ability to host foreign students and faculty as a "privilege" that is being lost.  [ECF No. 54-7 at 2].  The loss of this privilege is an adverse action, particularly given the impact of the loss of that privilege on Harvard and its students and faculty.  <u>See, e.g.</u>, <u>Barton v. Clancy</u>, <u>632 F.3d 9, 29</u> (1st Cir. 2011) ("[T]he pertinent question . . . is whether the defendant's actions would deter 'a reasonably hardy individual[]' from exercising his constitutional rights." (citation omitted)); <u>Perry v. Sindermann</u>, <u>408 U.S. 593, 597</u> (1972) ("[T]his Court has made clear that even though a person has no 'right' to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons . . . [i]t may not deny a benefit to a person on a basis that infringes . . . his interest in freedom of speech.").  As articulated in Harvard's Amended Complaint, "[t]he sudden inability to maintain [international] students' enrollment jeopardizes ongoing research projects, damages Harvard's reputation as a world-class research institution, and deprives our nation of the benefits of . . . vital research projects."  [Am. Compl. ¶ 213].

The final element is the only one to which Defendants offer a serious dispute, and that is the causal connection between the April 11 Letter and the Proclamation.  Defendants contend

that "[t]he April 11 [L]etter and Harvard's rejection have no relation to the Proclamation";[10] "the gap in time undermines any link"; and the relevant parties are different.[11]  [ECF No. 67 at 28]. Defendants argue that the seven weeks between the April 11 Letter (or the April 14th response) and the Proclamation—issued June 4th—preclude any possible finding of a causal connection, "as courts 'typically allow no more than a few days to elapse between the protected activity and the adverse action.'"  [Id. at 28 (citing Kidwell v. Eisenhauer, 679 F.3d 957, 966 (7th Cir. 2012))].

      Defendants' reading of the record is so selective as to border on absurd.  Between the April 11 Letter and the Proclamation, there were very few days where the Administration did not attack Harvard in some form or another, including six Truth Social posts from the President himself, [Am. Compl. ¶¶ 122, 123, 132, 147, 182, 183];[12] several actual or threatened grant and funding freezes, [id. ¶¶ 120, 127, 134, 148, 182]; several iterations of the Administration's attempts to limit Harvard's ability to host international students and visitors, [id. ¶¶ 124–26 (two

---

[10] Defendants make a related argument that the April 11 Letter was focused on grants, rather than the Proclamation's broader concerns, thus weakening the causal connection between the two. [ECF No. 67 at 29].  This argument fails for the same reasons articulated infra—primarily, the numerous public statements from the Administration linking the April 11 Letter and the Proclamation.

[11] Defendants also recycle the arguments rejected above regarding the reasoning on the face of the Proclamation.  [ECF No. 67 at 33].  Moreover, even if the proffered justifications for the Proclamation are real, the Court notes that the retaliatory action need only be motivated "in part" by the protected First Amendment activity, Therien, 2005 WL 1000010, at *8, a hurdle easily cleared by Plaintiff on the factual record before this Court.

[12] These are of particular significance because Defendants claim that a lack of statements from the President make this a weaker case for showing a First Amendment violation than Hawaii. [ECF No. 67 at 31 ("In Hawaii, the President himself (or his direct advisors) made the cited statements, whereas, here, other government agencies took the various actions Harvard complains of." (emphasis in original))].  The Court's review of the record shows that both the President and his direct advisors made numerous statements attacking Harvard in the time between the April 14th and the Proclamation.

days after April 14th response, Secretary Noem sent a records request about SEVP that stated that "[f]ailure to comply with this Records Request will be treated as a voluntary withdrawal"), 158 (May 22 SEVP Revocation Letter), 188 (May 28 SEVP NOIW), 195–201 (State Department pilot vetting program targeting Harvard visitors)]; other investigation initiations, [id. ¶ 133 (investigation into Harvard's employment practices)]; and numerous other statements by President Trump and other officials in the Administration, as detailed supra. Defendants' countervailing argument that these assaults cannot constitute retaliation as they came from different parties and are therefore not attributable to any one source is equally puzzling, because that fact only serves to reinforce that the Administration has made a full court press against Harvard on many different fronts. Indeed, public reporting surfaced only days before the Proclamation was issued regarding a session convened by the President to "brainstorm additional punitive measures" against Harvard that included "officials from nearly a dozen agencies." [ECF No. 54-3 at 3; Am. Compl. ¶ 184]. Far from rebutting a finding of retaliation, the Administration's concerted campaign entirely supports such a finding. In summary, Defendants claim that "Harvard wants to [sic] the Court to take the massive and impermissible inference that all of these disparate actions are connected and designed to single out Harvard for its speech." [ECF No. 67 at 31]. But far from being a "massive and impermissible inference," [id.], to draw any other conclusion would require the Court to "blind [itself] to reality," Cox v. Murphy, No. 12-cv-11817, 2016 WL 4009978, at *10 (D. Mass. Feb. 12, 2016), namely that the government repeatedly, clearly, and unabashedly linked Harvard's refusal to accept the April 11 Letter's demands and the Proclamation.

        As a last gasp, Defendants argue that the Proclamation should get the "presumption of regularity" of government activity. See [ECF No. 67 at 28 (citing United States v. Chemical

Found., Inc., 272 U.S. 1, 14–15 (1926)].  Putting aside whether the text of § 1182(f) permits the Proclamation, the use of that text here is hardly regular.  As Harvard notes, it has never been used to target the conduct or actions of domestic entities.  [ECF No. 57 at 30].  And it has never been used to completely eliminate a legitimate university's ability to host international students. [ECF No. 52 at 18:12–14].  Thus, the Court will not apply any presumption of regularity to conduct that is so unusual and therefore irregular on its face.

      In sum, the causal link between the Proclamation and Harvard's April 14th rejection of the Administration's April 11 Letter could not be more evident.  Further, it is amply demonstrated by the words of the Administration itself.  On May 7, 2025, Secretary McMahon stated in an interview: "[A]re they vetting students who are coming in from outside of the country to make sure they're not activists?  Are they vetting professors that they're hiring to make sure that they're not teaching ideologies, but that they're teaching subject matter? . . . They've taken a very hard line, so we took a hard line back."  [Am. Compl. ¶ 149 (emphasis added)].  On May 28, 2025, White House spokesperson Harrison Fields stated: "The latest moves against Harvard are truly just scratching the surface . . . Harvard decided to litigate this on MSNBC, the now defunded NPR, and the ratings-disaster CNN instead of acting like adults like many of their competitors have done and engaging in fruitful conversations and actions that would have saved them from their self-inflicted demise."  [ECF No. 54-3 at 4].  Harvard is entitled under the Constitution to take a "hard line" when it comes to academic freedom, and it is

entitled to air its grievances with the government publicly without meeting its "demise." Thus,

Harvard is likely to succeed on the merits of its retaliation claim.[13]

### iii. Petition Clause Claim

The First Amendment protects the "right of the people . . . to petition the Government for

a redress of grievances." U.S. Const. amend. I. Harvard argues that "[t]he Proclamation violates

the Petition Clause by punishing Harvard for filing [a] lawsuit [with respect to the SEVP

Revocation Letter and the Proclamation] and having filed the Funding Case." [ECF No. 57 at

26].

The elements of a Petition Clause retaliation claim are identical to those of a free speech

retaliation claim. Stepnes v. Tennessen, No. 04-cv-00068, 2006 WL 2375645 at *9 (D. Minn.,

August 16, 2006) (reciting the elements for a retaliation claim, pursuant to the Petition Clause,

which are identical to the elements for a retaliation claim based upon the exercise of free

speech), aff'd, 267 Fed. App'x 481 (8th Cir. 2008). Defendants concede that "pursuing litigation

against the Government" is a "protected activity" under the Petition Clause. [ECF No. 67 at 34];

see also Borough of Duryea v. Guarnieri, 564 U.S. 379, 390 (2011) (treating a lawsuit against the

---

[13] Review of the constitutionality of presidential proclamations is not done through an APA challenge, and therefore whether the Proclamation is a "final agency action" is not at issue. Franklin v. Massachusetts, 505 U.S. 788, 796, 800–01 (1992). However, because the Court reaches the merits of Harvard's retaliation claim, it notes that other courts have found the ability to enjoin broad swaths of agency conduct that would ordinarily not meet the APA reviewability requirements when such conduct is part of a course of retaliation violating the First Amendment. See Wright v. U.S. Army, 307 F. Supp. 2d 1065, 1072 (D. Ariz. 2004) ("Unlike due process claims, First Amendment retaliation claims do not require a final agency action or a liberty or property entitlement. Rather, the action of which a plaintiff is complaining must only be sufficiently adverse to deter the exercise of First Amendment rights."); Duarte Nursery, Inc. v. U. S. Army Corps of Eng'rs, No. 13-cv-02095, 2016 WL 4717986 (E.D. Cal. June 10, 2016) ("The court concludes that where a party raises constitutional challenges to agency action the action at issue does not need to be 'final agency action.'").

government by employee as a "petition" for purposes of the Petition Clause). And, as articulated supra, there is no question that the Proclamation constitutes an adverse action. Thus, the primary question is whether "the adverse action was motivated at least in part by the plaintiff's protected conduct." Therien, 2005 WL 1000010, at *8.

Harvard again cites a variety of evidence supporting such a connection. In addition to the actions cited supra, a Truth Social post dated May 26, 2025—merely three days after this Court's entry of a TRO against the SEVP Revocation Letter—specifically references the present litigation. [Am. Compl. ¶ 183].[14] Two days later, President Trump said in a press conference, "Harvard has to understand the last thing I want to do is hurt them. They're hurting themselves. They're fighting."[15] Bloomberg Podcasts, Trump Says Harvard Must Show List of Foreign Students (Full Q&A), YouTube (May 28, 2025),

https://www.youtube.com/watch?v=L6yjpvZTbjA.

---

[14] Harvard cites a quote from a White House spokesperson following the May 28, 2025 "brainstorm" session in support of its position that the White House was criticizing it for "decid[ing] to litigate." [Am. Compl. ¶ 184]. The full quote from the spokesperson, Harrison Fields, was: "Harvard decided to litigate this on MSNBC, the now defunded NPR, and the ratings-disaster CNN instead of acting like adults like many of their competitors have done and engaging in fruitful conversations and actions that would have saved them from their self-inflicted demise." [ECF No. 54-3 at 4]. The context left out by Plaintiff makes clear that Fields is referring to "litigation" in the so-called "court of public opinion," rather than the literal litigation in this Court that is protected by the Petition Clause. Thus, although this quote does have significance as to the free speech retaliation claim, it is irrelevant for the Petition Clause claim.

[15] In addition to these events, at a public cabinet meeting on April 30, during an exchange between President Trump, Secretary McMahon, and Secretary Noem, Secretary McMahon stated about Harvard: "When we went back to them to say we'd welcome them back to the negotiating table, their response was a lawsuit . . . We're staying tough with them." [Am. Compl. ¶ 134]. Because this predates the initial complaint and TRO in the present case, this statement likely refers to the related case in this action, President and Fellows of Harvard College v. US Dep't of Health and Hum. Servs., No. 25-cv-11048. It nevertheless is probative of the Administration's attitude toward Harvard's decision to litigate.

36

In addition to these explicit references to the litigation, the timeline here leaves little room for doubt regarding the causal connection and supports Harvard's contention that the Proclamation was intended both to punish Harvard and, separately, to be an end run around this Court's prior TRO and subsequent preliminary injunction proceedings. Harvard filed its initial complaint and TRO motion on May 23, 2025. [ECF Nos. 1, 4]. The President criticized Harvard on Truth Social several times, including a reference to the litigation, on May 26. [Am. Comp. ¶¶ 182–83]. The parties had a status conference on May 27. [ECF No. 32]. DHS issued its official NOIW to Harvard on May 28. [ECF No. 49]. That same day, the President convened government officials from "nearly a dozen agencies" to brainstorm additional actions the Administration could take against Harvard. [ECF No. 54-3 at 4]. The next day, May 29, at the hearing on Harvard's preliminary injunction, the parties agreed to submit a joint proposed injunction against the SEVP Revocation Letter pending the NOIW proceedings. [ECF Nos. 50, 52]. The Proclamation was issued on June 4, one week after the brainstorming session and the evening before the parties' joint preliminary injunction proposal on the SEVP issue was due to be filed. [ECF No. 54-7].

Defendants make two arguments to the contrary. First, they claim that Harvard is arguing for "heightened scrutiny" of later federal action. [ECF No. 67 at 34]. This mischaracterizes Harvard's argument. Harvard does not argue that any governmental action against it should be scrutinized because it decided to sue the government; rather, Harvard cites specific instances of conduct from the Administration that evidence that the Proclamation was motivated, "at least in

part," Therien, 2005 WL 1000010, at *8,[16] by Harvard's decision to file a lawsuit.  [ECF No. 57 at 26].

 Second, Defendants reiterate the argument that Hawaii and Mandel forbid this Court from evaluating any of the above statements because they do not appear on the face of the Proclamation.  As the Court has explained supra, Hawaii mandated no such thing where the Proclamation is facially illegitimate, and assumed rational basis review was permissible even where the Proclamation is not facially illegitimate.  585 U.S. at 704–05.

 For these reasons, Harvard is likely to succeed on its Petition Clause claim.

iv. Viewpoint Discrimination

 Harvard's final First Amendment claim is for viewpoint discrimination[17] on two fronts. It argues that the April 11 Letter constitutes viewpoint discrimination because it requires "reform[s]" to achieve "viewpoint diversity."  [ECF No. 57 at 23–24].  This claim seems to be largely duplicative of the free speech retaliation claim.  Therefore, the Court focuses on Harvard's second contention, which is essentially that the Administration is discriminating

---

[16] Defendants, relying on Hartman v. Moore, 547 U.S. 250, 260–61 (2006), make the argument that "a plaintiff must plead and prove not only a retaliatory motive but also the absence of independent lawful reasons for the official action" to make a Petition Clause claim.  [ECF No. 67 at 34].  Defendants' reliance on Hartman is misplaced as that case specifically discussed a claim of retaliatory prosecution.  547 U.S. at 260–61 ("When the claimed retaliation for protected conduct is a criminal charge, . . . a constitutional tort action will differ from [a] standard case [because] the requisite causation between the defendant's retaliatory animus and the plaintiff's injury is usually more complex than it is in other retaliation cases.").  It is therefore inapplicable to the current case.

[17] Viewpoint-based discrimination is typically subject to strict scrutiny.  Bible Believers v. Wayne Cnty., 805 F.3d 228, 248 (6th Cir. 2015).  If, as Defendants argue, Hawaii is applicable, this claim is, as we have previously stated, reviewed under rational basis scrutiny.  See supra. For the reasons articulated supra, the policy is not rationally related to a legitimate state interest, and for the reasons infra, it is clearly motivated by viewpoint animus, and so it would fail under rational basis review as well as the heightened standard.

38

against it for perceived ideology that runs contrary to the favored views of the Administration. [Id. at 24].[18]

"One of the most egregious types of First Amendment violations is viewpoint-based discrimination. . . . Government actors may not discriminate against speakers based on viewpoint." Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1279–80 (11th Cir. 2004) (citations omitted). Nor may they "single[] out a subset of messages for disfavor based on the views expressed," Matal v. Tam, 582 U.S. 218, 248 (2017) (Kennedy, J., concurring), or "punish[] . . . organizations and their members merely because of their political beliefs and utterances," Joint Anti-Fascist Refugee Comm. v. McGrath, 341 U.S. 123, 143 (1951) (Black, J., concurring).

Vullo is instructive. In that case, the Superintendent of the New York Department of Financial Services, Maria Vullo, was highly critical of the National Rifle Association ("NRA") in the wake several high-profile shootings, and she subsequently coerced insurance companies to sever ties with the NRA to avoid investigations. 602 U.S. at 180–85. The Court held that the government cannot threaten or impose legal sanctions or other means of coercion to achieve suppression of disfavored speech. Id. at 180. Although "Vullo was free to criticize the NRA and pursue the conceded violations of New York insurance law," as a government official, she could not "attempt to coerce private parties in order to punish or suppress views that the government disfavors." Id. at 180, 187.

---

[18] Defendants, perhaps recognizing the weakness of the argument, devote just a scant paragraph in their briefing to the viewpoint discrimination argument, asserting that it "fails for the same reasons as [Harvard's] retaliation claims." [ECF No. 67 at 35].

The present case, although lacking the middlemen at issue in Vullo, presents precisely the same problem.  Many of the Administration's statements in the past three months about Harvard have specifically critiqued its—real or perceived—left-leaning orientation.  See [Am. Compl. ¶¶ 122 (Truth Social post stating: "Perhaps Harvard should lose its Tax Exempt Status and be Taxed as a Political Entity if it keeps pushing political, ideological, and terrorist inspired/supporting 'Sickness?'"), 123 (Truth Social post stating: "Harvard has been hiring almost all woke, Radical Left, idiots and 'birdbrains' [including former mayors Bill DeBlasio and Lori Lightfoot] . . . Many others, like these Leftist dopes, are teaching at Harvard, and because of that, Harvard can no longer be considered even a decent place of learning . . . and should no longer receive Federal Funds."), 127 (Press Release accompanying SEVP Records Request stating: "With anti-American, pro-Hamas ideology poisoning its campus and classrooms, Harvard's position as a top institution of higher learning is a distant memory. . . . This action follows President Donald J. Trump's decision to freeze $2.2 billion in federal funding to Harvard University, proposing the revocation of its tax-exempt status over its radical ideology."[19]), 132 (Truth Social Post stating: "Harvard is an Anti-Semitic, Far Left Institution . . . The place is a Liberal mess, allowing a certain group of crazed lunatics to enter and exit the classroom and spew fake ANGER AND HATE."), 134 (Public cabinet meeting where President Trump said Harvard is "scamming the public and hiring people like [former New York City Mayor Bill] DeBlasio and [former Chicago Mayor] Lori Lightfoot who are certainly two of the worst mayors in the history of our country, paying them a fortune on salary, and having them teach our children how to manage cities and how to manage government" and

---

[19] The full quote is from the cited exhibit, [ECF No. 1-17].

"[t]he students [Harvard] ha[s], the professors [Harvard] ha[s], the attitude [Harvard] ha[s], is not American"); ECF No. 1-21 at 2–3 (Letter from Secretary McMahon stating: "The Harvard Corporation, which is supposed to competently and professionally manage Harvard's vast academic, financial, and physical resources, is run by strongly left-leaning Obama political appointee Penny Pritzker, a Democrat operative, who is catastrophic and running the institution in a totally chaotic way.  Harvard alumnus and highly successful hedge fund manager Bill Ackman noted that, under her leadership, Harvard has become a 'political advocacy organization for one party.'")]; Secretary Kristi Noem (@Sec_Noem), X (Jun. 1, 2025 at 12:00 PM ET) (video of an interview on Fox News where Noem criticized Harvard because, among other things, "communist and Marxist ideologies were allowed" on campus), https://x.com/sec_noem/status/1929206429912600994?s=46&t=K9-SEzbtbhZp-Upq_A7fLg.

As Vullo makes clear, President Trump and his advisers are free to make statements like these criticizing Harvard for its perceived political viewpoints.  "What [they] cannot do, however, is use the power of the State to punish or suppress disfavored expression."  Vullo, 602 U.S. at 188.  And the evidence suggests they were doing precisely that, including with regard to the Proclamation.  See [Am. Compl. ¶ 127 (SEVP records request press release); ECF No. 54-3 at 4 (White House spokesperson just prior to issuance of Proclamation stating: "The latest moves against Harvard are truly just scratching the surface.")].  Therefore, Harvard is likely to succeed on the merits of its viewpoint discrimination claim.

v.    Equal Protection

The Fifth Amendment prohibits deprivation of life, liberty, or property without due process of law.  U.S. Const. amend. V.  This has been interpreted to require equal protection under the law at the federal level.  See Bolling v. Sharpe, 347 U.S. 497, 500 (1954).

Harvard's equal protection claim is a class-of-one claim, Swanson v. City of Chetek, 719 F.3d 780, 784 (7th Cir. 2013), that is largely coextensive with its retaliation claims, see [ECF No. 57 at 31–33].  Notably, a "plaintiff 'need only establish a likelihood of succeeding on the merits of any one of [its] claims'" for a preliminary injunction to be granted.  Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs, 826 F.3d 1030, 1040 (8th Cir. 2016) (quoting Am. Rivers v. U.S. Army Corps of Eng'rs, 271 F. Supp. 2d 230, 250 (D.D.C. 2003)).  Given the overlap, the Court reincorporates all of its prior reasoning, but otherwise leaves the Equal Protection claim for later proceedings.

### C.    Immediate and Irreparable Harm

"The loss of First Amendment freedoms unquestionably constitutes irreparable injury." Wagner v. City of Holyoke, 100 F. Supp. 2d 78, 82 (D. Mass. 2000), which could be the end of this Court's analysis.  Nevertheless, the Court notes that Harvard has identified a plethora of other immediate and irreparable harms that will result from the Proclamation.  In terms of immediacy, the Proclamation "comes just as summer students are arriving on campus and students slated to start in the fall are procuring visas and finalizing their travel arrangements." [Am. Compl. ¶ 9].  Harvard's inability to host these prospective visa holders would "halt important research, hamper the educational experience for students left without teachers or advisors, and deprive the community of medical care."  [Id. ¶ 213].  Additionally, "the loss of certification [would] irreparably harm[] Harvard's ability to compete with other institutions for the most qualified applicants at home and abroad."  [Id. ¶ 214].  And even international students and domestic students not affected by the Proclamation "have inquired about the possibility of transferring to another institution."  [Id. ¶ 221].  Coupled with the First Amendment violation, this is more than enough to satisfy the preliminary injunction standard.

### D.    Balance of Equities and Public Interest

It is axiomatic that "injunctions protecting First Amendment freedoms are always in the public interest." Wis. Right To Life, Inc. v. Barland, 751 F.3d 804, 830 (7th Cir. 2014) (quoting ACLU v. Alvarez, 679 F.3d 583, 590 (7th Cir. 2012)); U.S. Navy Seals 1–26 v. Biden, 27 F.4th 336, 353 (5th Cir. 2022); Pryor v. Sch. Dist. No. 1, 99 F.4th 1243, 1254 (10th Cir. 2024). Moreover, the Court notes that Harvard has specifically alleged significant harms to the public interest stemming from the loss of its international students, including consequences for STEM research and medical care in the community. [Am. Compl. ¶ 213]. And this is to say nothing of the impacts on the international students themselves, who are facing much disruption and uncertainty. [Id. ¶ 219]. As such, the Court finds that the balance of equities and public interest factors, which merge in a suit against the government, Nken, 556 U.S. at 435, easily favor Harvard.

### E.    Scope of the Injunction

The Court notes, as it did at oral argument, that President Trump is not a party to this case. Thus, Defendants are enjoined from implementing, enforcing, instituting, maintaining, or in any way giving force or effect to the Proclamation.

## IV.    CONCLUSION

By necessity, this order discusses some abstract legal concepts, but it bears reminding that, at its root, this case is about core constitutional rights that must be safeguarded: freedom of thought, freedom of expression, and freedom of speech, each of which is a pillar of a functioning democracy and an essential hedge against authoritarianism. It may be that many of us, having grown up in a culture of free speech and thought, have become complacent, but free speech, particularly in the academic arena, must be zealously defended and not taken for granted. "The

vigilant protection of constitutional freedoms is nowhere more vital than in . . . schools.  The classroom is peculiarly the 'marketplace of ideas.'  The Nation's future depends on leaders trained through wide exposure to that robust exchange of ideas which discovers truth 'out of a multitude of tongues, (rather) than through any kid of authoritative selection.'"  Tinker v. Des Moines Indep. Cmty. Sch. Dist., 393 U.S. 503, 512 (1969) (quoting Shelton v. Tucker, 364 U.S. 479, 487 (1960)).

Here, the government's misplaced efforts to control a reputable academic institution and squelch diverse viewpoints seemingly because they are, in some instances, opposed to this Administration's own views, threaten these rights.  To make matters worse, the government attempts to accomplish this, at least in part, on the backs of international students, with little thought to the consequences to them or, ultimately, to our own citizens.  As George Washington said, if freedom of speech is taken away, then "dumb and silent we may be led, like sheep to the slaughter."  George Washington, Address to the Officers of the Army (March 15, 1783), Founders Online, https://founders.archives.gov/documents/Washington/99-01-02-10840.  Accordingly, for the reasons sets forth above, Plaintiff's motion for a preliminary injunction is **GRANTED**.  Defendants and their officers, employees, servants, agents, appointees, and successors are hereby enjoined from implementing, instituting, maintaining, or giving effect to the Proclamation until a further order is issued by this Court.

**SO ORDERED.**

June 23, 2025

*/s/ Allison D. Burroughs*
ALLISON D. BURROUGHS
U.S. DISTRICT JUDGE

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| PRESIDENT AND FELLOWS OF HARVARD COLLEGE, | |
| *Plaintiff*, | |
| v. | Case No. 1:25-cv-11472-ADB |
| UNITED STATES DEPARTMENT OF HOMELAND SECURITY, *et al.*, | |
| *Defendants*. | |

## DEFENDANTS' NOTICE OF APPEAL TO THE U.S. COURT OF APPEALS FOR THE FIRST CIRCUIT

## NOTICE OF APPEAL TO THE U.S. COURT OF APPEALS
## FOR THE FIRST CIRCUIT

Notice is hereby given that the Defendants appeal to the United States Court of Appeals for the First Circuit from the Court's preliminary injunction order (ECF No. 75) entered in this action on June 23, 2025.

Dated: June 27, 2025                    Respectfully submitted,

BRETT SHUMATE
Assistant Attorney General
Civil Division

DREW ENSIGN
Deputy Assistant Attorney General
Office of Immigration Litigation
Civil Division

BRIDGET K. O'HICKEY
Counsel to the Assistant Attorney General
Civil Division

DAVID KIM
CATHERINE M. RENO
Senior Litigation Counsel
Office of Immigration Litigation
General Litigation and Appeals Section

*s/ Tiberius T. Davis*
TIBERIUS DAVIS
Counsel to the Assistant Attorney General
Civil Division
U.S. Department of Justice
P.O. Box 878, Ben Franklin Station
Washington, DC 20044-0878
(202) 514-2000
tiberius.davis@usdoj.gov

*Attorneys for Defendants*

1

**CERTIFICATE OF SERVICE**

I, Tiberius Davis, hereby certify that I served a true copy of the above document upon all

counsel of record via this court's electronic filing system and upon any non-registered participants

via first class mail.


Dated: June 27, 2025         /s/ *Tiberius Davis* _____
                                    TIBERIUS DAVIS
                                    Counsel to the Assistant Attorney General