Case No. 25-1627

---

# In the United States Court of Appeals
# For the First Circuit

---

**PRESIDENT AND FELLOWS OF HARVARD COLLEGE**,

*Plaintiff-Appellee,*

v.

**UNITED STATES DEPARTMENT OF HOMELAND SECURITY**, **KRISTI NOEM**, in her official capacity as Secretary of the United States Department of Homeland Security; **UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT**; **TODD LYONS**, in his official capacity as Acting Director of United States Immigration and Customs Enforcement; **STUDENT AND EXCHANGE VISITOR PROGRAM**; **JOHN DOE**, in their official capacity as Director of the Student and Exchange Visitor Program; **JAMES HICKS**, in his official capacity as Deputy Assistant Director of the Student and Exchange Visitor Program; **UNITED STATES DEPARTMENT OF JUSTICE**; **PAMELA BONDI**, in her official capacity as Attorney General of the United States; **UNITED STATES DEPARTMENT OF STATE**; **MARCO RUBIO**, in his official capacity as Secretary of the United States Department Of State,

*Defendants-Appellants.*

---

*On Appeal from the United States District Court for the District of Massachusetts; Judge Allison Burroughs, Case No. 1:25-cv-11472-ADB*

---

## BRIEF FOR DEFENDANTS-APPELLANTS

---

**BRETT A. SHUMATE**
Assistant Attorney General
Civil Division

**DREW ENSIGN**
Deputy Assistant Attorney
General
Office of Immigration Litigation
*(Additional Counsel listed below)*

**TIBERIUS T. DAVIS**
Counsel to the Assistant
Attorney General, Civil Division
U.S. Department of Justice
P.O. Box 878, Ben Franklin Station
Washington, D.C. 20044
Tel. 202-514-4357

*Counsel for Appellants*

**ELIZABETH HEDGES**
**BRIDGET K. O'HICKEY**
Counsel to the Assistant
Attorney General, Civil Division

**DAVID KIM**
**CATHERINE M. RENO**
Senior Litigation Counsel
Office of Immigration Litigation
General Litigation & Appeals
Section

**ANNE R. BURLEY**
Trial Attorney
Office of Immigration Litigation

# <u>TABLE OF CONTENTS</u>

Statement of Jurisdiction.............................................................................3

Statement of the Issues..............................................................................4

Statement of the Case ...............................................................................5

    I. Background and Legal Framework ....................................................5

        A. The Executive's Broad Authority ...............................................5

        B. The Student and Exchange Visitor Program ............................6

        C. The Situation at Harvard............................................................8

        D. The Proclamation .....................................................................11

        E. This Lawsuit .............................................................................12

    II. The district court's decision granting Harvard's preliminary
    injunction.............................................................................................14

Summary of the Argument .....................................................................18

Standard of Review .................................................................................21

Argument ..................................................................................................22

    I. The Proclamation fully complies with 8 U.S.C. § 1182(f), and the
    district court erred by speculating about its "motivations.".............22

        A. The President's expansive constitutional and statutory
        authority to suspend the entry of aliens is not subject to judicial
        second-guessing ...........................................................................22

        B. The Proclamation falls squarely within the authority granted
        by § 1182(f)…................................................................................25

    II. The Proclamation is facially valid................................................36

III. The Proclamation satisfies rational-basis review.. ...................... 45

IV. The district court erred in holding that Harvard is likely to succeed on its First Amendment claims".......................................... 53

V. The remaining preliminary-injunction factors weigh against Harvard.. ............................................................................. 57

    A. Harvard has not established that irreparable harm is likely... ....................................................................................... 57

    B. The balance of equities and public interest weigh against Harvard… ................................................................................ 60

Conclusion ............................................................................... 62

Certificate Of Compliance

Certificate Of Service

Addendum

# TABLE OF AUTHORITIES

## Cases

*Abbott v. Perez*, 585 U.S. 579 (2018) .......................................................... 61

*Abourezk v. Reagan*, 785 F.2d 1043 (D.C. Cir. 1986) .............................. 24

*Adams v. Vance*, 570 F.2d 950 (D.C. Cir. 1978) ...................................... 61

*Borough of Duryea v. Guarnieri*, 564 U.S. 379 (2011) ............................ 54

*Colindres v. U.S. Dep't of State*, 71 F.4th 1018 (D.C. Cir. 2023) ...... 38, 39

*Corp. Techs., Inc. v. Harnett*, 731 F.3d 6 (1st Cir. 2013) ........................ 21

*Abourezk v. Reagan*, 785 F.2d 1043 (D.C. Cir. 1986) (Ginsburg, J.), *aff'd by an equally divided Court*, 484 U.S. 1 (1987) (per curiam) (1987) .. 24

*Dep't of State v. Munoz*, 602 U.S. 899 (2024) .......................................... 38

*F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307 (1993) ....................... 45, 46

*FDA v. All. for Hippocratic Med.*, 602 U.S. 367 (2024) ........................... 58

*Fiallo v. Bell*, 430 U.S. 787 (1977) ................................................... passim

*Free Speech Coal., Inc. v. Paxton*, 145 S. Ct. 2291 (2025) ...................... 52

*Gattineri v. Town of Lynnfield*, 58 F.4th 512 (1st Cir. 2023) ..... 20, 54, 55

*Harisiades v. Shaughnessy*, 342 U.S. 580 (1952) .................................... 23

*Hartman v. Moore*, 547 U.S. 250 (2006) ..................................... 19, 54, 55

*Hartman*, 546 U.S. ................................................................................... 55

*Int'l Refugee Assistance Project v. Trump*, 961 F.3d 635 (4th Cir. 2020) ................................................................................................... 36, 42

*Kerry v. Din*, 576 U.S. 86 (2015) .............................................................. 24

*Kleindienst v. Mandel*, 408 U.S. 753 (1972) ................................... passim

*Maryland v. King*, 567 U.S. 1301 (2012) ................................................ 61

*Mirabella v. Villard*, 853 F.3d 641 (3d Cir. 2017) ............................ 56, 57

*New Comm Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1 (1st Cir. 2002) ..................................................................................... 21

*Nieves v. Bartlett*, 587 U.S. 391 (2019) ............................................... 54

*Nken v. Holder*, 556 U.S. 418 (2009) .................................................... 60

*Roe v. Dep't of Def.*, 947 F.3d 207 (4th Cir. 2020) ............................... 58

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12 (1st Cir. 1996) ............................................................................................... 57

*Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155 (1993) ...................... 60

*Sampson v. Murray*, 415 U.S. 61 (1974) ............................................... 58

*Starnes v. Butler Cnty. Ct. of Common Pleas, 50th Jud. Dist.*, 971 F.3d 416 (3d Cir. 2020) ......................................................................... 55

*Thaddeus-X v. Blatter*, 175 F.3d 378 (6th Cir. 1999) ........................... 55

*Trump v. CASA, Inc.*, 145 S. Ct. 2540 (2025) ....................................... 61

*Trump v. Hawaii*, 585 U.S. 667 (2018) ........................................... passim

*United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537 (1950) .. 23, 25

*W. Virginia v. Env't Prot. Agency*, 597 U.S. 697 (2022) ........................ 35

*Werner v. Therien*, No. 99-cv-12497-GAO, 2005 WL 1000010 (D. Mass. Mar. 31, 2005) .......................................................................... 54, 55

*Winter v. NRDC*, 555 U.S. 7 (2008) ....................................... 21, 27, 34, 57

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) ............. 23

## **Statutes**

8 U.S.C. § 1101(a)(4) ................................................................. 5

8 U.S.C. § 1101(a)(15)(F) ..................................................... 11, 28

8 U.S.C. § 1101(a)(15)(H) .................................................... 28, 33

8 U.S.C. § 1101(a)(15)(J) ........................................................ 11

8 U.S.C. § 1181 ....................................................................... 5

8 U.S.C. § 1182(a) .................................................................. 5

8 U.S.C. § 1182(a)(7)(A)(i) ...................................................... 5

8 U.S.C. § 1182(a)(7)(B)(i)(II) ................................................. 5

8 U.S.C. § 1182(f) ......................................................... passim

8 U.S.C. § 1184(b) ................................................................ 28

8 U.S.C. § 1185(d) ................................................................. 5

8 U.S.C. § 1201(g) ................................................................. 5

8 U.S.C. § 1201(h) ................................................................. 5

8 U.S.C. § 1201(i) ................................................................ 12

8 U.S.C. § 1203 ..................................................................... 5

8 U.S.C. § 1225(a) ................................................................. 5

8 U.S.C. § 1372 ................................................................. 7, 40

8 U.S.C. § 1762 ..................................................................... 8

28 U.S.C. § 1292(a)(1) ............................................................ 3

28 U.S.C. § 1294(1) ............................................................... 3

28 U.S.C. § 1331 .................................................................... 3

USA PATRIOT Act, Pub. L. No. 107-56 (2001) ........................................50

## **Rules**

1st Cir. R. 34.0 ....................................................................................... i

Fed. R. App. P. 4(a)(1)(B) ..................................................................... 3

Fed. R. App. P. 32(a)(5) ........................................................................ 63

Fed. R. App. P. 32(a)(6) ........................................................................ 63

Fed. R. App. P. 32(a)(7)(B) ................................................................... 63

## **Regulations**

8 C.F.R. § 214.2(f) .......................................................................... 6, 40

8 C.F.R. § 214.2(j) ................................................................................ 7

8 C.F.R. § 214.3 ................................................................................... 7

8 C.F.R. § 214.3(a)(1) .......................................................................... 7

8 C.F.R. § 214.3(a)(3) .......................................................................... 8

8 C.F.R. § 214.3(e)(4) ......................................................................... 13

8 C.F.R. § 214.3(g) .............................................................................. 7

8 C.F.R. § 214.3(g)(1) ..................................................................... 7, 50

8 C.F.R. § 214.3(g)(2) ......................................................................... 49

8 C.F.R. § 214.4(a)(2) .......................................................................... 8

8 C.F.R. § 214.4(a)(2)(i) ....................................................................... 8

8 C.F.R. § 214.4(d) ............................................................................. 13

## **Other Authorities**

80 Fed. Reg. 819 (Jan. 6, 2015) ................................................................. 31

83 Fed. Reg. 15937 (2018) ........................................................................ 53

85 Fed. Reg. 34353.............................................................................. 32, 41

85 Fed. Reg. 36139 (June 15, 2020) ........................................................ 31

90 Fed. Reg. 24493 (June 4, 2025) .................................................... 10, 11

## <u>REASONS WHY ORAL ARGUMENT SHOULD BE HEARD</u>

Under 1st Cir. R. 34.0, the Government requests oral argument. Oral argument is appropriate because this case raises significant issues about the level of judicial scrutiny applicable to discretionary Executive actions taken under a broad and express delegation from Congress to deny entry to a class of aliens "[w]henever" the Executive "finds that the entry of" the "class of aliens into the United States would be detrimental to the interests of the United States" 8 U.S.C. § 1182(f).

# **INTRODUCTION**

The district court enjoined a lawful exercise of the President's authority under 8 U.S.C. § 1182(f) on the theory that a facially neutral proclamation, grounded in national-security and program-integrity concerns, was animated by retaliatory animus against Harvard. That injunction rests on multiple legal errors and should be reversed.

Section 1182(f) vests the President with broad discretion to suspend the entry of aliens whenever he finds their admission detrimental to the interests of the United States. The Supreme Court has repeatedly confirmed that this authority is "sweeping," subject only to the requirement that the President identify a class of aliens and articulate a facially legitimate reason for their exclusion. *Trump v. Hawaii*, 585 U.S. 667, 684–88 (2018); *Kleindienst v. Mandel*, 408 U.S. 753, 770 (1972). The Proclamation here readily satisfies that standard. It identifies a defined class—foreign nationals seeking entry to the United States under F, M, and J visas to attend Harvard—and sets forth concrete findings of detriment tied to Harvard's repeated refusal to provide basic foreign student visa holder data required under law, its failure to monitor and

discipline known misconduct by foreign student visa holders, and its tolerance of undue foreign influence. Those reasons are facially legitimate and sufficient to sustain the Proclamation.

The district court's contrary conclusion rests on a legal error. Rather than apply the controlling framework laid out in *Hawaii* and *Mandel*, the court relied on inapposite precedents to justify unlawfully probing into the Executive's supposed motives. By doing so, the court completely displaced the President's judgment in critical contexts— foreign affairs, immigration, and national security—largely committed to his authority. The court also applied the incorrect legal standards to its analysis of Harvard's First Amendment claims. And its merits analysis of those claims was deficient in several respects. The court granted a preliminary injunction even though Harvard failed to establish a likelihood of success on any of its claims.

Nor do the other preliminary-injunction factors justify relief. Harvard cannot convert its speculative First Amendment claims into irreparable harm. Its other asserted institutional injuries are self-inflicted and could be cured by complying with lawful Department of Homeland Security (DHS) requests. Finally, the balance of equities and

the public interest overwhelmingly favor preserving the President's considered judgment in protecting national security and the integrity of the student-visa system.

This Court should reverse.

## STATEMENT OF JURISDICTION

The U.S. District Court for the District of Massachusetts had subject-matter jurisdiction under 28 U.S.C. § 1331 to review Plaintiff-Appellee's (Harvard) claims under the Immigration and Nationality Act (INA) and Administrative Procedure Act (APA). On June 23, 2025, the district court granted Harvard's request for a preliminary injunction and enjoined Defendants-Appellants ("the Government") from "implementing, enforcing, instituting, maintaining, or in any way giving force or effect to" the challenged Presidential Proclamation until the court issued a further order. Dist. Dkt. 75 at 43. On June 27, 2025, the Government timely appealed the decision. Fed. R. App. P. 4(a)(1)(B). This Court's jurisdiction arises under 28 U.S.C. § 1292(a)(1), which grants courts of appeals jurisdiction in appeals from interlocutory orders granting injunctions. Venue is proper in this Court because the decision came from a district court within this Circuit. 28 U.S.C. § 1294(1).

## STATEMENT OF THE ISSUES

1. Whether the district court erred in enjoining a presidential proclamation issued under 8 U.S.C. § 1182(f) on the ground that it was motivated by retaliatory animus toward Harvard, notwithstanding that the Proclamation satisfies the standard articulated in *Hawaii* and *Mandel* because it rests on facially legitimate national-security concerns.

2. Whether the district court improperly applied a heightened standard of review rather than rational-basis review—the maximum level of scrutiny even arguably available under *Hawaii*—to Harvard's First Amendment claims.

3. Whether the district court applied an erroneously lenient standard of causation to Harvard's First Amendment claims in lieu of the but-for causation that binding precedent demands.

4. Whether Harvard established irreparable harm where its alleged injuries are derivative of harms to students, temporary, and avoidable through compliance with lawful DHS data-reporting requests.

5. Whether the balance of equities and the public interest favor preserving the President's judgment in protecting national security and enforcing immigration laws.

## STATEMENT OF THE CASE

### I.    Background and Legal Framework

#### A.    The Executive's Broad Authority

Under the INA, ch. 477, 66 Stat. 163 (8 U.S.C. § 1101 et seq.), admission to the United States normally requires a valid visa or other travel document. *See* 8 U.S.C. §§ 1181, 1182(a)(7)(A)(i) and (B)(i)(II), 1203. A visa is typically necessary, but not sufficient, for admission; the alien still must be found admissible upon inspection at a port of entry. 8 U.S.C. §§ 1201(h), 1185(d), 1225(a); *see* 8 U.S.C. § 1101(a)(4) (visa application is distinct from application for admission).

The INA establishes myriad bases of inadmissibility and visa ineligibility. *See, e.g.*, 8 U.S.C. §§ 1182(a), 1201(g). Congress has also accorded the President broad authority to suspend or restrict the entry of aliens. Section 1182(f) provides in relevant part:

> Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as

immigrants or nonimmigrants, or impose on the entry of
aliens any restrictions he may deem to be appropriate.

"By its terms, § 1182(f) exudes deference to the President in every
clause." *Hawaii*, 585 U.S. at 684. The Supreme Court has thus "observed
that § 1182(f) vests the President with 'ample power' to impose entry
restrictions in addition to those elsewhere enumerated in the INA." *Id.*
Section 1185(a)(1) further grants the President broad authority to adopt
"reasonable rules, regulations, and orders" governing entry or removal of
aliens, "subject to such limitations and exceptions as [he] may prescribe."
Presidents have routinely invoked that authority to advance national-
security and foreign-policy objectives.

### B.    The Student and Exchange Visitor Program

An alien may be admitted to the United States in F, M, or J
nonimmigrant status to pursue a full-time academic or vocational
program or participate in a designated exchange visitor program. 8
C.F.R. § 214.2(f), (m), (j). A student seeking admission in F or M
nonimmigrant status must present a Form I-20, Certificate of Eligibility
for Nonimmigrant Student Status from "a school certified by the Student
and Exchange Visitor Program (SEVP) for attendance," and upon arrival
must attend "the school specified in the student's visa." 8 C.F.R.

6

§ 214.2(f)(1)(i)(A), (C), (m)(1)(i)(A); *see also* 8 C.F.R. § 214.2(j) (similar for J visas).

Any school wishing to enroll an F nonimmigrant student must first obtain SEVP certification. *See* 8 U.S.C. § 1372; 8 C.F.R. § 214.3(a)(1), (f)(1). Federal regulations set out the requirements for SEVP certification, including the types of nonimmigrant student records a school must keep and how long it must keep them. 8 C.F.R. § 214.3(g). Subsection (g)(1) of 8 C.F.R. § 214.3 states that the designated school official (DSO) "must make the information and documents required by this paragraph (g)(1) available, including academic transcripts, and must furnish them to DHS representatives upon request." It further notes that a "DHS officer may request any or all of the data in paragraphs (g)(1)(i) through (x) of this section on any individual student or class of students upon notice." 8 C.F.R. § 214.3(g)(1). Subsection (g)(2) covers reporting requirements regarding the obligation "to report within 21 days any change of the information contained in paragraph (g)(1) or the occurrence of the following events." Such events include "[a]ny disciplinary action taken by the school against the student as a result of" a criminal conviction and "any other notification request not covered by paragraph

7

(g)(1) of this section made by DHS with respect to the current status of the student." 8 C.F.R. § 214.3(g)(2)(ii)(D)–(E).

Consistent with SEVP's national-security mission, federal law requires schools to petition SEVP for recertification every two years to demonstrate ongoing eligibility to enroll nonimmigrant students and continued compliance with federal law. *See, e.g.*, 8 U.S.C. § 1762; 8 C.F.R. § 214.3(a)(3), (h)(2). SEVP may also conduct an out-of-cycle review at any time to verify full regulatory compliance. *See, e.g.*, 8 C.F.R. § 214.3(h)(3)(iii). SEVP continuously monitors certified schools. Under 8 C.F.R. § 214.4(a)(2), SEVP is authorized to deny a petition for recertification or withdraw a certified petition on notice, if the school is no longer entitled to certification for any valid and substantive reason, including those enumerated at 8 C.F.R. § 214.4(a)(2)(i)–(xix) (including failure to comply with the reporting requirements at 8 C.F.R. § 214.3(g)(1)–(2) and a school DSO's non-compliance with the regulations).

## C.    The Situation at Harvard

Following the brutal terrorist attack in Israel on October 7, 2023, pro-Palestine activists "disrupt[ed] classes in Harvard

Yard . . . defac[ed] . . . hostage posters around campus with antisemitic slogans . . . , and . . . post[ed] . . . a classic antisemitic cartoon on social media" that was "reshar[ed] . . . by Harvard Faculty and Staff for Justice in Palestine—ke[eping] many Jewish students on edge."[1] Activists also verbally harassed some Jewish students and vandalized Harvard's campus. Harvard Report at 25. "[B]etween October 7 and the April 24 formation of [an] encampment, Harvard failed to impose *any* formal discipline on any students."[2] As a Harvard task force found, "Harvard's response to the spring encampment protests fueled perceptions of inconsistency and a lack of transparency in its disciplinary processes, with some Schools declining to impose sanctions while others faced internal disagreements and reversals." Harvard Report at 117.

Additionally, "[c]rime rates at Harvard University—including violent crime rates—have drastically risen in recent years." Proclamation

---

[1] *Presidential Task Force on Combating Antisemitism and Anti-Israeli Bias*, HARV. U. 25 (Apr. 29, 2025) [hereinafter "Harvard Report"], https://www.harvard.edu/wp-content/uploads/2025/04/FINAL-Harvard-ASAIB-Report-4.29.25.pdf.

[2] *Harvard University Failed to Discipline Antisemitic Conduct Violations*, COMM. EDUC & WORKFORCE 1 (Sept. 23, 2024) [hereinafter "Committee Report"], https://edworkforce.house.gov/uploadedfiles/9.23.2024_harvard_disciplinary_final.pdf.

No. 10948, 90 Fed. Reg. 24493 (June 4, 2025) (Proclamation). Harvard's documented failure to discipline student misconduct sparked DHS concerns that "foreign adversaries and competitors" may "take advantage of" Harvard's lax environment and, "among other things, steal technical information and products, exploit expensive research and development to advance their own ambitions, and spread false information for political or other reasons." *Id.*

On April 16, 2025, Secretary of Homeland Security Noem sent Harvard a letter requesting disciplinary records and supporting evidence of misconduct relating to its nonimmigrant student visa holders. Appx.47–48. It highlighted Harvard's "failure to condemn antisemitism" and the resulting "hostile learning environment for Jewish students." Appx.47. After several letters, Harvard identified only one F-1 nonimmigrant student as having engaged in such conduct. Dist. Dkt. 1-24 at 1.

On May 22, 2025, Secretary Noem sent Harvard a letter revoking its SEVP certification and Exchange Visitor Program designation, noting Harvard's "refusal to comply with multiple [information] requests," as well as its "perpetuat[ion] [of] an unsafe campus environment that is

hostile to Jewish students." Appx.59–60. It detailed the information Harvard was required to provide to regain SEVP certification and Exchange Visitor Program designation. *Id.*

### D.     The Proclamation

On June 4, 2025, the President issued a Proclamation entitled "Enhancing National Security by Addressing Risks at Harvard University" (Proclamation). 90 Fed. Reg. 24493. It suspends "[t]he entry of any alien into the United States as a nonimmigrant to pursue a course of study at Harvard University under . . . 8 U.S.C. 1101(a)(15)(F) or 1101(a)(15)(M), or to participate in an exchange visitor program hosted by Harvard University under . . . 8 U.S.C. 1101(a)(15)(J)." 90 Fed. Reg. at 24495. "That suspension . . . expire[s], absent extension, 6 months after the date of th[e] proclamation." *Id.*

The Proclamation applies to aliens who enter (or attempt to enter) to begin attending Harvard as F or M nonimmigrants or participate in a Harvard exchange visitor program as J nonimmigrants after the Proclamation's date. *Id.* at 24495.[3] It commands the Secretary of State to

---

[3] Harvard is not currently certified to enroll M visa students.

consider, in his discretion, whether foreign nationals who currently attend Harvard and are in the United States per F, M, or J visas and otherwise meet the specified criteria should have their visas revoked under 8 U.S.C. § 1201(i). *Id.* It clarifies that the suspension and limitations in Section 1 do not apply to any alien who enters the United States to attend other universities through the SEVP or whose entry would be in the national interest, as determined by the Secretary of State, the Secretary of Homeland Security, or their designees. *Id.* Further, it requires, no later than 90 days after the Proclamation, the Attorney General and Secretary of Homeland Security to jointly submit to the President a recommendation on whether extending or renewing the suspension and limitation on entry is in the national interest. *Id.*

### E.    This Lawsuit

On May 23, 2025, Harvard filed a complaint challenging DHS's May 22, 2025, revocation of Harvard's SEVP certification and Exchange Visitor Program designation (Dist. Dkt. 1), and a motion seeking a temporary restraining order (TRO) of the revocation (Dist. Dkt. 4 at 1–3, 9 at 1–50). The district court granted the TRO the very same day. Dist. Dkt. 11 at 1.

On May 28, 2025, DHS sent Harvard a Notice of Intent to Withdraw (NOIW) identifying compliance issues warranting the withdrawal of Harvard's SEVP certification, including Harvard's failure to comply with reporting requirements and maintain a campus free from violence and antisemitism. Dist. Dkt. 49 at 2–5. The NOIW gave Harvard 30 days "to demonstrate compliance with all lawful requirements and overcome alleged deficiencies." Dist. Dkt. 49 at 2; *see* 8 C.F.R. § 214.3(e)(4). It warned that failure to timely respond would trigger withdrawal of Harvard's SEVP certification and bar an administrative appeal of that decision, per 8 C.F.R. § 214.4(d).[4] Dist. Dkt. 49 at 2.

On June 4, 2025, the President issued the Proclamation. 90 Fed. Reg. at 24493. The next day, Harvard filed an Amended Complaint, adding challenges to the Proclamation (Appx.120–220), and a TRO motion (Dist. Dkt. 56, 57). The court granted the motion the same day and on June 16, 2025, held a preliminary-injunction hearing. Dist. Dkt. 59, 60. In its opposition to the preliminary-injunction motion, the Government argued that the Proclamation was lawfully issued under the

---

[4] The May 28, 2025, NOIW supersedes the May 22, 2025, revocation letter. *See* Dist. Dkt. 86 (Motion to Dismiss) at 30.

President's expansive powers under 8 U.S.C. § 1182(f) and constitutional authority to exclude individual aliens or classes of aliens as the President deems appropriate. 1:25-cv-11472-ADB, Dist. Dkt. 67, at 8–16. The Government also argued that Harvard's statutory challenge to the Proclamation was not justiciable, that Harvard is unlikely to succeed on its First Amendment and equal protection claims, that Harvard did not show likely irreparable harm, and that the balance of equities and public interest weigh against Harvard. *Id.* at 9–10, 16–37.

On June 20, 2025, the district court preliminarily enjoined the Government from implementing DHS's May 22, 2025, revocation letter. Dist. Dkt. 73 at 1–3. On June 23, 2025, it preliminarily enjoined the Government from implementing the Proclamation. Dist. Dkt. 75 at 44.

## II. The district court's decision granting Harvard's preliminary injunction.

In its decision preliminarily enjoining the Proclamation, the district court considered the Government's formation of the Task Force to Combat Anti-Semitism (Task Force), subsequent investigation into antisemitic incidents at universities including Harvard, and review of Harvard's receipt of federal funding to be a "rhetorical" campaign against Harvard. Dist. Dkt. 75 at 2–6. Emphasizing its view of the First

14

Amendment context of Harvard's lawsuit, the district court found that the harm, the balance of hardships, and the public interest "all easily weigh in favor of an injunction." *Id.* at 13, 42–43. It therefore focused on whether Harvard established a likelihood of success on the merits. *Id.* at 13–42.

The district court rejected the Government's argument that *Fiallo v. Bell*, 430 U.S. 787 (1977), limited the court's reviewing power. *Id.* at 14. Specifically, the court held that *Fiallo* supported Congress's expansive power to regulate the entry of aliens and not the Executive's; thus, the court determined that *Fiallo* posed no impediment to review of the Government's compliance with the statutory scheme. *Id.* The district court also rejected the Government's reliance on *Hawaii*, finding that decision "far from dispositive." *Id.* at 15. It found that (unlike *Hawaii*) this case (1) does not involve the entry of aliens who could not be properly vetted prior to their entry; (2) involves a "class" of aliens defined by their plans to attend a particular university instead of by their connections to countries considered to be detrimental to the United States; and (3) is concerned with the conduct of aliens after admission. *Id.* at 16–18.

The district court then turned to the language of the statute. Although the court acknowledged that the statute does not define "class of aliens" and agreed that the term "class" can be construed broadly, it adopted Harvard's argument that it was legally meaningful that no prior proclamation defined a class by relationship with a specific domestic entity. *Id.* at 19. The court also accepted Harvard's view that § 1182(f)'s purpose is to regulate and influence conduct abroad rather than in the United States. *Id.* The district court read the Proclamation as intending not to restrict entry to the United States but instead to restrict entry to Harvard. Although not expressly holding that the Proclamation violates § 1182(f)—the court held only that it was "skeptical that, despite its breadth, § 1182(f) authorizes the Proclamation," *id.* at 20—the court stated that it was relying on what it viewed as the Proclamation's "unusual reading" of the statute in its "analysis of the *motivations* underlying the Proclamation." *Id.* at 18–19 (emphasis added).

The court then addressed Harvard's constitutional claims. *Id.* Harvard raised three First Amendment claims and one Fifth Amendment claim based on its perception that the President issued the Proclamation in retaliation for its exercise of academic freedom and public statements

16

supporting academic freedom. *Id.* at 21. Rejecting the Government's arguments, the district court decided that none of the Proclamation's justifications provide a rational, facially legitimate, and bona fide basis for the measures it implements and thus did not result from a justification independent of unconstitutional grounds. Thus, the court addressed the merits of the First Amendment claims. *Id.* at 21–27.

The court concluded that Harvard is likely to succeed on the merits of its First Amendment retaliation claim based on its perception of a causal link between the Proclamation and Harvard's rejection of a letter from various agencies dated April 11, 2025 (April 11 letter) offering Harvard potential solutions to some of its problems with antisemitism in order to continue to receive federal funding. *Id.* at 28–35. Relying on statements by public officials and the sequence of events, the district court also concluded that the Proclamation was intended to punish Harvard; thus, it concluded that Harvard is likely to succeed on its Petition Clause claim. *Id.* at 36–38. Similarly, the court determined that Harvard is likely to succeed on its viewpoint-discrimination claim because statements by government officials have critiqued Harvard's left-leaning orientation; thus, the court found government actions

involving Harvard to constitute punishment for its viewpoint. *Id.* at 38–41. The court did not reach the merits of Harvard's Fifth Amendment equal protection claim. *Id.* at 41–42.

The Government filed this timely appeal. Dist. Dkt. 77.

## SUMMARY OF THE ARGUMENT

The Proclamation is a lawful exercise of the President's authority under 8 U.S.C. § 1182(f) and should not have been enjoined. Section 1182(f) delegates to the President the power to suspend "the entry of any aliens or of any class of aliens" upon finding their admission detrimental to national interests. That determination is committed to the political branches, and it is not subject to judicial second-guessing. *See Hawaii*, 585 U.S. at 684–88. The Proclamation here fits squarely within § 1182(f)'s framework: it identifies a defined class—foreign nationals seeking to attend Harvard on F or J visas—sets forth findings of detriment tied to Harvard's chronic noncompliance with federal law, and suspends entry accordingly. That is all that § 1182(f) requires. The district court's speculation about motives, and its insistence that purpose-based classifications are impermissible, conflict with both the statute's plain text and *Hawaii*.

18

The Proclamation is also facially valid under *Kleindienst v. Mandel*, 408 U.S. 753 (1972), because it rests on legitimate, non-retaliatory grounds: Harvard's failure to cooperate with SEVP oversight, foreign entanglements, and related security concerns. None of these touch on protected expression, and each suffices under *Mandel*. The district court erred by converting this threshold inquiry into a probing policy review indistinguishable from heightened scrutiny when it dismissed the President's stated reasons as "pretextual." *Hawaii* discredits that approach: courts should not look behind a facially neutral proclamation grounded in national-security considerations. *See* 585 U.S. at 704.

Even under rational-basis review, the Proclamation stands. The only question should be whether the policy is plausibly related to legitimate objectives. *See id.* at 704–05. The Proclamation easily passes that test, citing specific national security risks tied to Harvard's conduct. The district court's demand for empirical proof and close tailoring imposes an impermissibly exacting standard.

The retaliation analysis fails for the same reason. To prevail, Harvard had to show that the Proclamation would not have issued "but for" retaliatory animus. *See Hartman v. Moore*, 547 U.S. 250, 260–61

(2006); *Gattineri v. Town of Lynnfield*, 58 F.4th 512, 515 (1st Cir. 2023). Relying on non-binding cases, the district court applied a laxer standard that allows a First Amendment claim to be predicated on actions with multiple motivations, only one of which may be arguably retaliatory. But binding precedent mandates but-for causation. The district court's finding of retaliation—made under an impermissibly lax causation standard—thus cannot stand. In addition, its merits analysis on each of the three First Amendment claims failed to hold Harvard to the high standard of likelihood of success.

Finally, the remaining preliminary-injunction factors weigh heavily against Harvard. Harvard has no basis to assert irreparable harm when it shows no likelihood of succeeding on the merits of its First Amendment claims. The other asserted harms are derivative of student injuries, temporary, or self-inflicted, and Harvard can end them by complying with lawful DHS requests. By contrast, the injunction imposes severe costs on the Executive, restricting a core Article II function and undermining the integrity of the student-visa system. The balance of equities and the public interest cut decisively against relief.

## STANDARD OF REVIEW

A district court assessing a preliminary injunction considers four factors: likelihood of success on the merits, irreparable harm, the balance of hardships, and the public interest. *Corp. Techs., Inc. v. Harnett*, 731 F.3d 6, 9 (1st Cir. 2013). Of these, likelihood of success on the merits is the "sine qua non": if the movant cannot show likely success, the other factors "become matters of idle curiosity." *New Comm Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002). The plaintiff has the burden to establish entitlement to preliminary relief. *See Winter v. NRDC*, 555 U.S. 7, 20 (2008).

This Court reviews the district court's ruling for abuse of discretion, examining legal conclusions de novo, factual findings for clear error, and the balancing of factors with deference. *See Corp. Techs.*, 731 F.3d at 10. An abuse of discretion occurs if the court makes a material error of law, ignores important considerations, relies on improper criteria, or plainly errs in weighing the factors. *See id.*

## ARGUMENT

**I.  The Proclamation fully complies with 8 U.S.C. § 1182(f), and the district court erred by speculating about its "motivations."**

The Proclamation satisfies the plain terms of 8 U.S.C. § 1182(f), which authorizes the President to suspend entry of any class of aliens upon finding their admission detrimental to the national interest. The district court did not hold otherwise. Instead, it questioned whether the Proclamation was genuinely an "entry" restriction, whether its rationale was pretextual, and whether the class it identified was properly drawn. Those are not inquiries § 1182(f) permits courts to undertake. *See Hawaii*, 585 U.S. at 703. The statute delegates such judgments to the President—*not* the Judiciary. Thus, judicial review of the Proclamation's validity under § 1182(f) is not available. And even if judicial review were appropriate, the court's strained analysis and aggressive, policy-laden second guessing cannot be reconciled with the statute's plain language or controlling precedent.

**A.  The President's expansive constitutional and statutory authority to suspend the entry of aliens is not subject to judicial second-guessing.**

The controlling background principle of this case is that exclusion of foreign nationals is a sovereign prerogative at the heart of the

22

Executive's power over foreign affairs and immigration. *See United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542 (1950). In keeping with that sovereign prerogative, Congress made an express delegation to the President in § 1182(f), which authorizes him to suspend "the entry of any aliens or of any class of aliens" whenever he "finds" that their entry "would be detrimental to the interests of the United States." 8 U.S.C. § 1182(f). That "express . . . authorization" ensures that the President's "authority is at its maximum." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson, J., concurring).

Deference to the Executive in this domain is required not only by statutory text but also the Constitution. The President's "right" to exclude aliens "stems not alone from legislative power but is *inherent* in the executive power to control the foreign affairs of the nation." *Knauff*, 338 U.S. at 542 (emphasis added). As the Supreme Court has repeatedly emphasized, "the political branches" possess near-plenary authority in the immigration context, and "any policy toward aliens" is "so exclusively entrusted to the political branches . . . as to be largely immune from judicial inquiry or interference." *Fiallo v. Bell*, 430 U.S. 787, 792, 798 (1977); *see also Harisiades v. Shaughnessy*, 342 U.S. 580, 588 (1952). In

23

particular, "[t]he conditions of entry for every alien, the particular classes of aliens that shall be denied entry altogether, the basis for determining such classification, the right to terminate hospitality to aliens, [and] the grounds on which such determination shall be based" are "wholly outside the power of" the courts "to control." *Fiallo*, 430 U.S. at 796 (citation omitted).

That principle applies with full force here. Sections 1182(f) and 1185(a) reflect Congress's decision to confer a "sweeping proclamation power" on the President to suspend entry and impose restrictions entirely within his discretion. *See Abourezk v. Reagan*, 785 F.2d 1043, 1049 n.2 (D.C. Cir. 1986) (Ginsburg, J.), *aff'd by an equally divided Court*, 484 U.S. 1 (1987) (per curiam). And the President's "broad power over the creation and administration of the immigration system" includes the authority to regulate discretionary benefits like visas. *See Kerry v. Din*, 576 U.S. 86, 106 (2015) (Kennedy, J., concurring in the judgment).

Section 1182(f) thus implements a fundamental attribute of sovereignty and is not subject to judicial override based on disagreement

24

with the President's policy judgment. *See Fiallo*, 430 U.S. at 792.[5] That principle alone is enough to foreclose Harvard's claims. Nothing in § 1182(f) suggests that the judiciary may second-guess an explicit invocation of Congress's broad grant of authority. And nothing in this case supports departing from the "long-established rule" that the political branches' decisions over aliens' entry are "subject only to narrow judicial review." *Id.* (internal quotation marks omitted).

### B. The Proclamation falls squarely within the authority granted by § 1182(f).

**1.** The Proclamation expressly invokes § 1182(f) and readily satisfies its terms. The President found that the continued admission of certain nonimmigrants would be detrimental to the national interest, citing specific national-security concerns about Harvard's chronic noncompliance with federal law such as rising crime, discrimination,

---

[5] The district court's only response to this was to claim that *Fiallo* only involved congressional authority, not executive. Dist. Dkt. 75 at 14. That misses the forest for the trees. The constitutional principle that the President has broad unreviewable authority over entry is well-established. *See Knauff*, 338 U.S. at 542. And the Supreme Court heavily relied on *Fiallo* is accessing the reviewability of the Proclamation in *Hawaii*. See 585 U.S. at 682, 701–03 (quoting *Fiallo*, 430 U.S. at 792 and finding question of justiciability "difficult"). In any event, Congress delegated this authority to the President, so the district court's distinction is hardly relevant here.

unrest, and foreign entanglements. 90 Fed. Reg. at 24493–94. He therefore suspended the entry of a defined class of aliens—foreign nationals seeking student or exchange visitor visas to attend Harvard. *Id.* at 24495.

This Court need look no further than *Hawaii* to see why the Proclamation satisfies § 1182(f). In *Hawaii*, the President had suspended entry by foreign nationals of several countries identified "as having deficient information-sharing practices and presenting national security concerns." 585 U.S. at 677–78. The Supreme Court upheld the proclamation because it satisfied the text of § 1182(f): it identified a class of aliens, made a finding of detriment to the national interest, and suspended entry on that basis. *Id.*

Likewise, the Proclamation here suspends entry for a class of aliens based on a finding of harm to national interest. Newly admitted Harvard students outside the United States are restricted from entering the country. The Proclamation does nothing more than that. "Class" is a broad concept with virtually infinite permutations. Thus, in *Hawaii*, the Supreme Court rejected arguments that the class had to be narrowly drawn or that it "must refer to a well-defined group of individuals who

26

share [some] common 'characteristic.'" *Id.* at 688. That, the Court found, would have amounted to "an unspoken tailoring requirement found nowhere in Congress's grant of authority to suspend entry of not only 'any class of aliens' but '*all* aliens.'" *Id.* at 688 (emphasis added).

Because § 1182(f) is "facially broad," the Proclamation likewise does "not exceed any textual limit on the President's authority." *Id.* (internal quotation marks omitted). The Proclamation identifies a class—foreign nationals seeking to enter on F or J visas to attend Harvard—and links that class to the President's finding of detriment: namely, that Harvard's persistent failure to monitor and discipline its foreign students has created risks to public safety and undermined visa integrity. That concern is just as cognizable as the concerns in *Hawaii*. Section 1182(f) entrusts the President with broad authority to make predictive judgments about the risks associated with admitting particular classes of aliens. That is precisely what he did here.

**2.** The district court found it "unusual" that the Proclamation's entry restrictions appear to be based on a student's "purpose of entry." *Id.* at 18–19. But the district court offered no textual basis for its categorical dismissal of purpose-based classifications and cited no

27

precedent suggesting that such classifications fall outside § 1182(f)'s scope. Nothing in the statute precludes the President from defining a class of aliens by the purpose of their entry or requires that the identified risk arise at the border or be traceable to the individual alien rather than to the host institution for which he applied to enter the United States.

Indeed, it would be odd if the statute did so: immigration statutes frequently tie admissibility to purpose of entry. For example, F visas are available only to aliens (and their spouses and minor children) entering for the purpose of temporarily pursuing a full course of study at a specified academic or language training school certified by Immigration and Customs Enforcement (ICE). *See* 8 U.S.C. § 1101(a)(15)(F). Other visa categories—such as H-1Bs, O-1s, and R-1s—likewise turn on specific entry purposes and sponsoring organizations. *See* 8 U.S.C. § 1101(a)(15)(H), (O), (R). Under the INA, visa eligibility and eligibility for entry into the United States are closely connected and involve parallel assessments that turn on the same basic criteria. *See* 8 U.S.C. § 1184(b) (requiring nonimmigrants to prove their eligibility both when applying for a visa and when seeking admission). The district court's holding

28

regarding "purpose" rests on a misunderstanding—if not a plain disregard—of this statutory background.

Precedent also supports the Government's interpretation. The proclamation at issue in *Hawaii* was defined by the purpose of entry: the same immigrant barred for business or tourism could enter on a different non-immigrant visa, as a permanent resident, or as an asylee. 585 U.S. at 685, 680. The district court characterized the class in *Hawaii* as having been defined by nationality. Dist. Dkt. 75 at 16–17. But the *Hawaii* proclamation's restrictions were not based on nationality alone. And, in any case, the Supreme Court confirmed that § 1182(f) vests the President with discretion to define the covered class based on any criteria he deems pertinent to the national interest. *Hawaii*, 585 U.S. at 684, 688.

The district court's other efforts to distinguish *Hawaii* highlight its misreading of § 1182(f). The court asserted that "the gravamen of the holding in *Hawaii* was that it was allowable for the President to restrict the entry of aliens into the United States who could not be properly vetted prior to their admission." Dist. Dkt. 75 at 16. But *Hawaii* did not hold that another country's deficient vetting protocols is a prerequisite to invoking § 1182(f) in all instances; it simply explained that that was the

basis for the President's finding in that case. *See* 585 U.S. at 685. Nothing in *Hawaii* suggests that § 1182(f) is limited to pre-entry threats or vulnerabilities, or that the President must ground his detriment finding in the inability to screen individuals while they are abroad. Instead, the *Hawaii* Court simply asked whether the President had provided "a sufficient national security justification" to survive a low level of scrutiny. *Id.* at 710. The Proclamation here reflects a similar concern related to national security more broadly: that foreign students, once admitted, will not be adequately monitored or disciplined because the host institution has demonstrated sustained noncompliance with federal law—including regulations, which continue to govern a foreign student's presence in the country even after admission. *See* 90 Fed. Reg. at 24494. That concern is plainly relevant to the national interest and no less valid because it arises after entry.

The district court also drew a distinction between restrictions on entry per se and restrictions "on entry related to the specific destination upon entry." Dist. Dkt. 75 at 17. Again, however, § 1182(f) does not turn on whether the President bars all visas from a particular country or suspends entry for a narrower class of people, such as those tied to an

institution or entry purpose. *See, e.g.*, 85 Fed. Reg. 36139 (June 15, 2020) (suspending entry for connection with International Criminal Court); 80 Fed. Reg. 819 (Jan. 6, 2015) (suspending entry for position with North Korea Worker's Party). The text is categorical: it authorizes the President to suspend "the entry of any aliens or any class of aliens" based on his finding of detriment to the national interest. 8 U.S.C. § 1182(f). *Hawaii* emphasized the breadth of that language, confirming that the statute "entrusts to the President the decisions whether and when to suspend entry," "whose entry to suspend," "for how long," and "on what conditions." 585 U.S. at 684. Nothing in that holding suggests that narrower suspensions—such as those based on the institution to be attended—are suspect or less entitled to deference. The President's determination that Harvard's persistent legal noncompliance justifies suspending the entry of foreign students it sponsors falls comfortably within § 1182(f)'s grant of authority. Whether the class is defined by nationality, purpose of entry, or by institutional affiliation, the President has identified a detriment to the national interest and acted accordingly. The district court's suggestion that a more tailored approach is somehow less justified than a "blanket ban" turns the logic of deference on its head.

The district court also missed the mark in stating that the purpose of § 1182(f) is "to regulate and influence conduct abroad, rather than at home." Dist. Dkt. 75 at 19. The statute says nothing of the sort. It does not limit the types of concerns the President may weigh or effects he may seek to prevent. And decades of precedent confirm that the power to regulate entry is a core sovereign function that deserves deference "across different contexts and constitutional claims." *Hawaii*, 585 U.S. at 703. Even in a case involving "a 'categorical' entry classification that discriminated on the basis of sex and legitimacy"—categories with an inarguably "domestic" component—the Supreme Court held that "'it is not the judicial role in cases of this sort to probe and test the justifications' of immigration policies." *Id.* at 703–04 (quoting *Fiallo*, 430 U.S. at 799). Similarly, the proclamation in *Hawaii* was concerned with national security and public safety after the aliens entered. Similarly, the President has previously suspended entry for Chinese F and J visa students for the purpose of conducting specific research *within* the United States. *See* 85 Fed. Reg. 34353. So employing 1182(f) to suspend entry for national security concerns that would arise after entry is hardly novel.

And as explained earlier, visa categories are defined based on the alien's plans for what to do once they are *in* this country. *See, e.g.*, 8 U.S.C. § 1101(a)(15)(H), (O), (R). As the Proclamation explains, the failure of an educational institution to meet its oversight obligations may "jeopardize the integrity of the entire United States student and exchange visitor visa system, compromise national security, and embolden other institutions to similarly disregard the rule of law." 90 Fed. Reg. at 24494. That is precisely the kind of detriment § 1182(f) empowers the President to address.

**3.** The Proclamation's supposed "intent" or potential downstream effects—which drew the district court's speculation, Dist. Dkt. 75 at 19—have no place in the analysis. *See Hawaii*, 585 U.S. at 688, 691 (rejecting reliance on inferred motives and legislative purpose). In *Hawaii*, the Supreme Court did not examine whether the President's concerns were empirically correct, and it did not require a heightened evidentiary showing. As the Court explained, such "a searching inquiry into the persuasiveness of the President's justifications [would have been] inconsistent with the broad statutory text and the deference traditionally accorded the President" in the immigration sphere. *Id.* at 686. "The sole

prerequisite set forth in § 1182(f)" was precisely what the President had announced—a finding that the entry of certain identified aliens "would be detrimental to the interests of the United States." *Id.* The district court agreed that President's determination that entry would be detrimental was sound—as it must. That should have been the end of the inquiry.

**4.** The district court did not explicitly hold that the Proclamation violated § 1182(f)—nor could it have consistent with *Hawaii*. In fact, the court conceded that the Government is "technically correct that the Proclamation has the effect of restricting entry." Dist. Dkt. 75 at 18. It also acknowledged that "class of aliens" "can be construed broadly" and did not question that the Proclamation contains an express presidential finding of detriment. *Id.* at 18–19.

Despite these areas of agreement with the Government, the district court found the Proclamation invalid because "no previous proclamation has ever defined 'class' by an alien's potential relationship with a specific domestic entity for the purpose of influencing that domestic entity's conduct." Dist. Dkt. 75 at 19. But neither the text of § 1182(f) nor any controlling precedent requires a proclamation to resemble prior proclamations. Moreover, the notion that a proclamation must track

historical practice cannot be squared with *Hawaii*'s recognition that entry restrictions may be justified "in the light of changing political and economic circumstances." 585 U.S. at 702 (internal quotation marks omitted); *see id.* at 693 (noting that "[t]he more ad hoc [plaintiffs'] account of executive action—to fit the history into their theory—the harder it becomes to see such a refined delegation in a statute that grants the President sweeping authority to decide whether to suspend entry, whose entry to suspend, and for how long").

The district court's vague invocation of the major questions doctrine, Dist. Dkt. 75 at 19, is similarly misplaced. Section 1182(f) has been in effect since 1952, and the President's inherent powers over foreign affairs and national security longer still. Nothing about the Proclamation reflects a drastic expansion of presidential power or evokes the types of sweeping economic regulations at issue in the Supreme Court's major questions cases. *See W. Virginia v. Env't Prot. Agency*, 597 U.S. 697, 721 (2022).

In issuing the Proclamation, the President exercised his judgment in exactly the manner Congress envisioned and as he was empowered to

do by the Constitution. The Proclamation falls well within the bounds of § 1182(f). This Court should uphold it on that basis.

## II. The Proclamation is facially valid.

The district court misapplied the governing standard to Harvard's constitutional claims. It should have held that Harvard has no likelihood of success on any of those claims, because the Proclamation is facially valid and easily passes rational-basis review. This Court should correct the district court's errors.

**1.** In evaluating any constitutional challenge to a proclamation under § 1182(f), a court should ask "only whether the policy is facially legitimate and bona fide." *Int'l Refugee Assistance Project v. Trump*, 961 F.3d 635, 651 (4th Cir. 2020) (*IRAP*) (emphasis removed) (quoting *Hawaii*, 585 U.S. at 704) (making clear that the *Kleindienst v. Mandel* standard always applies). If it is, then "courts will neither look behind" the Executive's justifications, nor test them "against the asserted constitutional interests of U.S. citizens" or anyone else. *Hawaii*, 585 U.S. at 703 (quoting *Mandel*, 408 U.S. at 754). Only if the Proclamation lacks facial validity should a court look at other evidence. *See IRAP*, 961 F.3d at 651. Even then, the court must apply, at most, "rational basis review,"

asking only whether "the entry policy is plausibly related to the Government's stated objective." *Hawaii*, 585 U.S. at 704–05 (only "assuming" reviewability to undertake rational-basis review).

The Proclamation rests on facially valid reasoning and satisfies *Mandel*. It says nothing about Harvard's speech or advocacy; indeed, the district court acknowledged that Harvard's constitutional claims "are based almost entirely on the factual record outside of the text of the Proclamation itself." Dist. Dkt. No 75 at 21. Instead, the Proclamation cites several reasonable national-security concerns, including Harvard's "entanglements with foreign countries, including our adversaries," citing "more than $150 million from China alone" and Harvard's "repeated[] host[ing] and train[ing of] members of a Chinese Communist Party paramilitary organization." 90 Fed. Reg. at 24494. It also references rising campus crime and discrimination in admissions practices. *Id*. And, centrally, the Proclamation points to Harvard's failure to adequately respond to information requests related to SEVP compliance.

That explanation satisfies *Mandel*. In *Mandel*, the Supreme Court rejected a First Amendment challenge brought by professors who wished to hear from a foreign journalist who was denied entry because he

"advocate[d] the economic, governmental, and international doctrines of world communism." 408 U.S. at 756, 769. Even though the Supreme Court agreed the denial of entry burdened the First Amendment rights of American citizens, it held that the Government offered a "facially legitimate and bona fide reason"—the journalist's abuse of the visa process—and that it would therefore "neither look behind the exercise of that discretion, nor test it by balancing its justification against [] First Amendment interests." *Id.* at 770.

Much more recently, in *Hawaii*, the Supreme Court reaffirmed *Mandel*. There, the Court upheld a travel ban challenged under the First Amendment for allegedly targeting Muslims, noting that a "conventional application of *Mandel*, asking only whether the policy is facially legitimate and bona fide, would put an end to [its] review." *Hawaii*, 585 U.S. at 704. Courts have also applied *Mandel* review to reject constitutional challenges that a spouse's visa was denied with merely a statutory citation for reasoning. *See Dep't of State v. Munoz*, 602 U.S. 899, 908 (2024); *Colindres v. U.S. Dep't of State*, 71 F.4th 1018, 1024 (D.C. Cir. 2023). If the Supreme Court upheld exclusions based on such brief

reasoning by a consular officer, then the thorough explanation of the Proclamation by the President himself should easily pass muster.

**2.** Even without the other reasons, the SEVP concerns alone provide a facially legitimate basis for the Proclamation. As the Proclamation explains, Harvard "refused the recent requests of the DHS for information about foreign students' known illegal activity, known dangerous and violent activity, . . . and whether those activities occurred on campus," as well as other related data. 90 Fed. Reg. at 24493 (internal quotation marks omitted). The limited information Harvard did provide "was so deficient that the DHS could not evaluate whether it should take further actions" to address the underlying threats. *Id.* If Harvard were to cooperate with federal inquiries and mitigate the security risks it poses, the Proclamation makes clear that the entry restrictions could be lifted. *Id.* (requiring the restrictions to remain in effect "[u]ntil such time as the university shares the information that the Federal Government requires to safeguard national security and the American public"). In short, the entry restrictions are targeted to the concerns they address. Harvard's persistent unwillingness to comply with its obligations to SEVP is the reason the Proclamation suspends entry for foreign students pursuing

visas to study at Harvard and not for students attending other institutions. That reason and targeting are valid.

The structure of the SEVP reinforces the point. SEVP certification is not an unregulated authorization to admit international students at will, but a closely regulated grant of federal approval to enroll nonimmigrants on F and M visas, subject to oversight and compliance obligations. *See* 8 U.S.C. § 1372; 8 C.F.R. §§ 214.3, 214.4. In that regulatory scheme, schools act as gatekeepers, sponsoring visa applicants and tracking their status. *See* 8 C.F.R. § 214.2(f), (m) (requiring documentation from an SEVP-certified school to obtain an F or M visa and, subsequently, attendance at "the school specified in the student's visa"); 8 C.F.R. § 214.3(g)(setting forth recordkeeping and reporting requirements for "any change" of relevant student information, including any "disciplinary action taken by the school against the student as a result of" a criminal conviction). When a school fails to meet those obligations, the government may justifiably conclude that it cannot be trusted to continue acting in this gatekeeping role. That is precisely what happened with Harvard. The Proclamation's entry restrictions align with the particular risks that Harvard poses.

40

**3.** The other stated rationales also support the Proclamation's validity. The text refers to Harvard's "entanglements with foreign countries, including our adversaries," citing "more than $150 million from China alone" and Harvard's "repeated[] host[ing] and train[ing of] members of a Chinese Communist Party paramilitary organization." 90 Fed. Reg. at 24494. Similar concerns have justified previous restrictions on F and J visas. *See* 85 Fed. Reg. 34353. This Proclamation also references rising campus crime and discrimination in admissions practices. *Id.* Each of these is a facially legitimate ground for concern, and none implicates protected expression. They easily clear *Mandel*'s low bar.

**4.** The district court largely sidestepped examination of the facial reasons for the Proclamation and went straight to its assumptions about the underlying motives behind it. The court did not engage with *Mandel* on its own terms, instead concluding—almost in passing—that the Proclamation was "neither facially legitimate nor bona fide" for the same reasons it purportedly failed rational-basis review. Dist. Dkt. 75 at 23 n.5. That is not how *Mandel* analysis works, and it is not how courts should review presidential decisions under § 1182(f).

41

The district court also erred by testing the rationales in isolation and asking whether they were tailored to support the policy. *See* Dist. Dkt. 75 at 24–27 (holding that the Proclamation fails *Mandel* in part because it lacks "statistics" showing "that the rise in crime is correlated with a rise in the percentage of international students of Harvard"). That is not the *Mandel* standard. Nor is it rational-basis review. Instead, it resembles intermediate scrutiny—precisely the sort of probing assessment into "the sufficiency of the [President's] findings" that *Mandel* and *Hawaii* disclaim. *See Hawaii*, 585 U.S. at 669, 686 (rejecting "searching inquiry into the persuasiveness of the President's justifications"). That error led the district court to speculate that the President's stated reasons were "pretextual," Dist. Dkt. 75 at 27—a conclusion that has no place in *Mandel*'s narrow inquiry. Even under the rational-basis standard the Supreme Court applied in *Hawaii*, there is no requirement that each justification match the scope of the President's order perfectly. *See Hawaii*, 585 U.S. at 706 ("[T]he Court hardly ever strikes down a policy as illegitimate under rational basis scrutiny."); *IRAP*, 961 F.3d at 652 (proclamation supported by rational basis where there was at least a discernible relationship to legitimate state interests).

42

Under the district court's overly stringent approach, even the Executive policies upheld in *Mandel* and *Hawaii* would fall. In *Mandel*, the visa denial was based on the alien's prior political speech and was explained in a letter to his counsel that expressly referenced that speech—circumstances that might have led the district court here to find a cognizable retaliation claim. 408 U.S. at 756–59. Yet the *Mandel* Court upheld the denial as facially legitimate and bona fide, refusing to second-guess the Executive's stated rationale. *Hawaii* applied the same principle. There, the plaintiffs argued that the proclamation was tainted by "religious animus," pointing to various statements by the President about a so-called "Muslim ban." 585 U.S. at 699–700. But the Supreme Court emphasized that the proclamation itself "sa[id] nothing about religion," applied to a range of countries—several of which were not Muslim-majority—and was justified on national-security grounds supported by an interagency review. *Id.* at 706–07. The Court made clear that it would not invalidate a facially neutral national-security policy based on pre-promulgation presidential statements. *Id.* at 699–710. *Mandel* and *Hawaii* dictate the same result here.

**5.** Although the district court relied in part on the press release accompanying the Proclamation, Dist. Dkt. 75 at 27—"assum[ing]" without any citation to authority that it could consider the "press release as part of the Proclamation," *id.* at 27 n.8—that document is not part of the Proclamation, *see Hawaii*, 585 U.S. at 705 (describing statements made outside the challenged proclamation as "extrinsic evidence"). Regardless, the press release, like the Proclamation, makes no reference to protected speech. The reference to Harvard's "demonstrated history of concerning foreign ties and radicalism" appears in a paragraph focused on the justifications provided in the Proclamation itself—i.e., foreign entanglements, rising campus crime and disciplinary failures, a disregard of reporting requirements, and discriminatory conduct by foreign students. Appx.255. In context, "radicalism" relates to all of those security risks—not Harvard's ideology or protected speech.

At bottom, Harvard's disagreement with the Proclamation's policy choices does not render it facially invalid. The Proclamation identifies legitimate national security concerns, applies to a narrow class of visa

applicants, and ties the entry restriction to Harvard's specific conduct. That is more than enough to satisfy *Mandel*.[6]

## III. The Proclamation satisfies rational-basis review.

Even if the Court were to look past the facial validity of the Proclamation—which it should not—the Court should apply rational-basis review, which the Proclamation easily passes. The only inquiry in rational-basis review is whether the policy is "plausibly related" to a legitimate objective. *Hawaii*, 585 U.S. at 704–05. This standard is satisfied as long as the policy can "reasonably be understood to result from a justification independent of unconstitutional grounds." *Hawaii*, 585 U.S. at 705 (footnote omitted). A law passes rational basis review "if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *F.C.C. v. Beach Commc'ns, Inc.*, 508

---

[6] The district court opined that "the limited review prescribed by *Hawaii* is arguably inapplicable" because greater scrutiny "may" apply to "governmental action" that is "aimed at influencing the conduct of a domestic entity." ECF 75 at 23 n.6. Again, no basis exists in controlling authority for slicing up § 1182(f) based on how action thereunder affects domestic entities. That statement by the district court reveals again how its fixation on the "domestic" effect of the Proclamation tainted its entire analysis of a straightforward exercise of the Executive's control over the admission of aliens.

U.S. 307, 313-14 (1993). "This standard of review is a paradigm of judicial restraint." *Id.* Not surprisingly, "the Court hardly ever strikes down a policy as illegitimate under rational basis scrutiny." *Hawaii*, 585 U.S. at 705.

The district court applied the wrong level of scrutiny. Therefore, its entire analysis of the constitutional claims is incorrect, and the preliminary injunction cannot stand on the basis of the district court's constitutional analysis. This Court should reverse even if it determines that review of the Proclamation is appropriate beyond analyzing its facial validity (which it should not, as discussed in the previous section).

**1.** Rational-basis review is satisfied because the Proclamation is grounded in national-security concerns stemming from Harvard's noncompliance with federal law—including its failure to address rising crime and discriminatory conduct on its campus and to maintain proper oversight over its foreign students—and in Harvard's almost complete non-responsiveness to DHS's inquiries about matters relating to these concerns. *See* 90 Fed. Reg. at 24493–95. Although the district court rejected the Proclamation's rationales as "pretextual," it is not a court's role to express a view on the soundness of executive policy or demand a

46

perfect match between such a policy and its justifications. *See Hawaii*, 585 U.S. at 705–10. Rather, the court should ask whether the policy can be reasonably understood as resulting from a justification independent of unconstitutional grounds. *See id.* Simply put, if a "relationship to legitimate state interests" can be "discern[ed]," or the policy explained by something other than animus, a rational basis exists. *Id.* at 706 (internal quotation marks omitted). Here, the Proclamation clears that low bar by providing specific national-security reasons connected to the students whose entry it restricts.

**2.** Shunning rational-basis review in favor of some more searching level of scrutiny, the district court held that the Proclamation "quite obviously" has no grounding in its stated concerns. Dist. Dkt. 75 at 24. But the court barely addressed the main basis for the proclamation—that Harvard did not supply adequate information in response to SEVP requests to ensure the university is properly monitoring and disciplining its international students. *See* 90 Fed. Reg. at 24493-94. This valid justification on its own sufficiently explains the scope of the Proclamation. *See Hawaii*, 585 U.S. at 708. And without addressing it, the court could not properly analyze Harvard's First Amendment claim.

47

The district court also erred by parsing out the concerns discussed in the Proclamation and attempting to show why each is insufficient to justify the entry policy. No authority justifies that approach: instead, the various reasons work together to support the Proclamation. They should not be viewed in isolation. Taken together, the other concerns discussed in the Proclamation underscore why Harvard's deficient response to the SEVP requests poses such a risk to the national interest.

**3.** In any case, the district court improperly demanded a close means-end fit of the sort foreign to rational-basis review. First, the district court asserted that the Proclamation does not "tie" an increase in crime "to the number of international students at Harvard." Dist. Dkt. 75 at 24. But the Proclamation need not make that specific connection as long as it is "expressly premised on legitimate purposes"—of which preventing crime is one. *Hawaii*, 585 U.S. at 706. And although the district court criticized the Proclamation for "provid[ing] no rationale for why the Administration needs Harvard to disclose any alleged crimes committed by international students," Dist. Dkt. 75 at 24, that disregards the fact that Harvard is required by federal regulations to report, among other things, "[a]ny disciplinary action taken by the school against a

student as a result of the student being convicted of a crime" and "any other notification request . . . made by DHS with respect to the current status of the student." 8 C.F.R. § 214.3(g)(2)(ii)(D)-(E). Harvard's basic reporting failures raise serious national security concerns that Havard is unable or unwilling to properly host, monitor, discipline, and report on its foreign students. The Administration does not need to articulate a separate rationale.

Moreover, information about convictions of state crimes for students of a specific school is not as easily accessible to the federal government as the district court believed. Though the district court suggested that the FBI's compilation of national crime data meant that the federal government should already have access to the desired information, a school's participation is necessary to ensure the integrity of data collected. In addition, universities like Harvard have access to data on misconduct that may not have been formally charged or disciplined. This is part of the reason the regulations require schools with SEVP certifications to update the Government on "[a]ny disciplinary action taken by the school against the student as a result of" a criminal conviction. 8 C.F.R. § 214.3(g)(2). Simply put, the government has

discretion to determine that information from schools about crimes committed by their nonimmigrant students is crucial for national security and immigration enforcement. *See* USA PATRIOT Act, Pub. L. No. 107-56 (2001) (codified in part at 8 U.S.C. § 1372) (directing the Attorney General to fully implement and expand the foreign student monitoring program); 8 C.F.R. § 214.3(g)(1)–(2)(ii)(D).

Second, although the district court was dismissive of concerns over Chinese exploitation of the student visa program, those concerns are just one manifestation of Harvard's many issues with monitoring international students. *See* 90 Fed. Reg. at 24494. That the Proclamation is not limited to nonimmigrant students from China does not mean the Proclamation is impermissibly overbroad. *See Hawaii*, 585 U.S. at 688 (rejecting the argument that a class was "overbroad" because it imposed "an unspoken tailoring requirement found nowhere in Congress's grant of authority to suspend entry of not only 'any class of aliens' but 'all aliens.'"). Again, the Proclamation's scope reflects the President's interrelated concerns regarding Harvard's flouting of federal law—not just with respect to Chinese influence. *See* 90 Fed. Reg. at 24494.

50

The discriminatory conduct that has taken place on Harvard's campus is yet another example of Harvard's failure to act as a trustworthy steward of international students. *See* 90 Fed. Reg. at 24494. *See generally* Harvard Report, *supra* note 1, at 25 (detailing harassment of Israeli and Jewish students). In that respect, it should not be surprising that the Proclamation is not limited to Chinese students. Almost every other nation has higher rates of antisemitism than the United States, for instance, and the Executive has the authority to limit the entry points for such harmful ideology and activism from outside this country. *See The ADL Global 100: Index of Antisemitism*, ADL, https://www.adl.org/adl-global-100-index-antisemitism (last visited Aug. 5, 2025). The district court's glossing over that authority betrays once again that it was imposing its own policy judgment in place of the President's.

Third, the concerns about the admission of students from non-egalitarian nations provide another facially valid reason that supports—but need not independently justify—the Proclamation. *See* 90 Fed. Reg. at 24494. As the Proclamation makes explicit, Harvard has "continue[d] to flout the civil rights of its students and faculty, triggering multiple

Federal investigations," including discrimination in admissions "so blatant that the Supreme Court decision ending the practice nationwide bears Harvard's name." *Id.* In that larger context, Harvard's admission of students from non-egalitarian nations stands out as particularly troubling, and the President was well within his authority to find that it would "*further compound*" the discrimination taking place on Harvard's watch to allow students from such countries to enter the United States to attend the university. *Id.* And, once again, the fit between the rationale and the policy does not have to be perfect. *See Free Speech Coal., Inc. v. Paxton*, 145 S. Ct. 2291, 2318 (2025) (even intermediate security does not require a perfect fit, the policy can be over and underinclusive).

In sum, the district court demanded an improperly close fit between the entry restrictions and the President's reasons for issuing the Proclamation. Such an inquiry transgresses the boundaries of rational-basis review, which requires only a *plausible* relationship between policy and stated objective. The district court's overly narrow view of the Proclamation missed parallels between this case and *Hawaii*. Like the travel ban there, the Proclamation here *is carefully* tailored: it is time-limited, contains exceptions, and provides that the entry restrictions can

be lifted once the information-sharing deficiencies have been rectified to safeguard national security. *Compare* Presidential Proclamation No. 9723, 83 Fed. Reg. 15937 (2018), *with* 90 Fed. Reg. at 24493. More fundamentally, both cases involve "a Presidential directive, neutral on its face, addressing a matter within the core of executive responsibility." *Hawaii*, 585 U.S. at 702. And while some "extrinsic evidence" may be considered under rational-basis review, it is ultimately "the authority of the Presidency itself" that drives (and sets appropriate limits on) the analysis of the policy, rather than a plaintiff's or court's "perception of its effectiveness and wisdom." *Id.* at 702, 705, 707.

The Proclamation satisfies rational-basis review.

## IV.  The district court erred in holding that Harvard is likely to succeed on its First Amendment claims.

In addition to misapplying rational-basis review, the district court fumbled its analysis of Harvard's substantive First Amendment retaliation theory by applying the wrong causation standard. Similar defects are fatal to the district court's analysis of the First Amendment viewpoint-discrimination claim. Thus, regardless of the outcome on the level of scrutiny that the Court applies, it should reverse the district

court's holding that Harvard is likely to succeed on its First Amendment claims.

To prove retaliation, the plaintiff has the burden to establish "but-for" causation between its constitutionally protected conduct and the alleged retaliatory action. *See, e.g.*, *Nieves v. Bartlett*, 587 U.S. 391, 398 (2019); *Hartman*, 547 U.S. at 260–61; *Gattineri*, 58 F.4th at 515. This rule applies to claims for alleged retaliation based both on speech and on the exercise of the right to petition the government. *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 388 (2011) (noting that although the rights of speech and petition are "not identical," they "share substantial common ground"); *see also* U.S. Const. Amend. I. Thus, the Government addresses both of Harvard's retaliation claims (speech and petition) together.

The district court applied an incorrect standard of law to the causation element for Harvard's retaliation claims. In asserting that the adverse action need only be motivated "in part" by the protected activity, the court relied solely on an unpublished case not binding on this Court. Dist. Dkt. 75 at 29 (quoting *Werner v. Therien*, No. 99-cv-12497-GAO, 2005 WL 1000010 (D. Mass. Mar. 31, 2005)). That unpublished case in turn rested upon an equally non-binding case from the Sixth Circuit

decided in 1999. *See id.* (citing, in turn, *Thaddeus-X v. Blatter*, 175 F.3d 378 (6th Cir. 1999)). While relying on those non-binding authorities, the district court largely overlooked the controlling precedent of *Hartman* and *Gattineri*. Those cases make clear that a retaliation claim requires assessing whether the Proclamation would have been issued regardless of Harvard's response to the April 11 letter, or "independently of any retaliatory animus." *See Hartman,* 547 U.S. at 260–61; *Gattineri*, 58 F.4th at 515.

In the face of controlling case law, the district court simply asserted that *Hartman* is inapplicable because it addressed a claim of retaliatory prosecution. Dist. Dkt. 75 at 38 n.16; *see Hartman*, 546 U.S. at 260–61. To the contrary, however, *Hartman* states that "*[l]ike any other plaintiff* charging official retaliatory action, the plaintiff in a retaliatory-prosecution claim must prove the elements of retaliatory animus as the cause of injury," which includes a showing "that the action would have been taken anyway, independently of any retaliatory animus." *Hartman*, 546 U.S. at 260-61 (emphasis added). Indeed, *Hartman* has been repeatedly applied in First Amendment retaliation cases arising in the civil context. *See, e.g.*, *Starnes v. Butler Cnty. Ct. of Common Pleas, 50th*

*Jud. Dist.*, 971 F.3d 416, 430 (3d Cir. 2020) (citing *Hartman* in the context of a civil claim); *Mirabella v. Villard*, 853 F.3d 641, 652 (3d Cir. 2017) (same). The district court thus erred in rejecting many of the Government's arguments on the basis that the *Hartman* standard is inapplicable.

Because the district court employed an incorrect standard and did not consider whether the Proclamation would have been promulgated absent alleged retaliatory motives, the court had no basis to conclude that Harvard proved likelihood of success on its retaliation claim. At a minimum, the district court's preliminary-injunction ruling must be overturned where its core finding—that the Proclamation was motivated by retaliatory animus—derived from a fundamentally mistaken rubric, one that abandoned the rigorous but-for cause standard in favor of inapposite, non-binding, and far more lenient authority. The district court's analysis of the First Amendment speech retaliation claim also colored its analysis of the petition retaliation claim and the viewpoint-discrimination claim. *See* Dist. Dkt. 75 at 35–36 (stating that "[t]he elements of a Petition Clause retaliation claim are identical to those of a free speech retaliation claim" and applying the same lenient causation

standard), 38 (stating that the viewpoint-discrimination claim is "largely duplicative of the free speech retaliation claim"). Thus, the court's determination that those claims were likely to succeed on the merits must be reversed as well.[7]

## V. The remaining preliminary-injunction factors weigh against Harvard.

### A. Harvard has not established that irreparable harm is likely.

To obtain injunctive relief, a plaintiff must show that it is "likely to suffer irreparable harm in the absence of preliminary relief." *Winter*, 555 U.S. at 20. The irreparable-harm factor requires a showing of "a substantial injury that is not accurately measurable or adequately compensable by money damages." *Ross-Simons of Warwick, Inc. v.*

---

[7] The Government maintains that the remainder of the district court's analysis of the First Amendment claims was incorrect, but for purposes of this appeal, it focuses on the court's use of the wrong causation standard, which infected the entire analysis. And though the district court did not rule on the equal protection claim, it characterized that claim as "largely coextensive with [Harvard's] retaliation claims." Dist. Dkt. 75 at 42. Thus, any of the district court's analysis that extends to the equal protection claim is incorrect for the same reasons as its analysis on the First Amendment claims. *See id.* ("[T]he Court reincorporates all its prior reasoning, but otherwise leaves the Equal Protection claim for later proceedings.").

*Baccarat, Inc.*, 102 F.3d 12, 19 (1st Cir. 1996). "Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of [an injunction] are not enough." *Roe v. Dep't of Def.*, 947 F.3d 207, 228 (4th Cir. 2020), *as amended* (Jan. 14, 2020) (citation omitted); *accord Sampson v. Murray*, 415 U.S. 61, 90 (1974). Harvard has not carried its burden.

The district court held that "[t]he loss of First Amendment freedoms unquestionably constitutes irreparable injury." Dist. Dkt. 75 at 42. But that conclusion rests on the mistaken premise that Harvard is likely to prevail on its First Amendment claims. Because Harvard cannot succeed on the merits of those claims, *see supra* Argument I, II, III, its asserted First Amendment injuries cannot constitute irreparable harm.

The district court also credited Harvard's assertions that Harvard's "inability to host . . . prospective visa holders would 'halt important research, hamper the educational experience for students left without teachers or advisors, and deprive the community of medical care.'" Dist. Dkt. 75 at 42 (quoting Am. Compl. ¶ 213). But those hypothetical future harms would be injuries to individuals, not to Harvard itself. *Cf. FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 402 (2024) (Thomas, J.,

58

concurring) (reasoning that "no party should be permitted to obtain an injunction in favor of nonparties"). And in any event, the Proclamation is time-limited: it will expire, absent extension, six months from issuance. 90 Fed. Reg. at 24495. Harvard has not explained how temporary limits on entry for one summer and one fall semester could constitute irreparable harm. Nor has it acknowledged that the suspension would be lifted immediately if Harvard provided the data DHS has lawfully—and repeatedly—requested. 90 Fed. Reg. at 24494.

The district court also credited Harvard's claim that the Proclamation amounts to the loss of certification and would "'irreparably harm[ ] Harvard's ability to compete with other institutions for the most qualified applicants at home and abroad,'" and that "even international students and domestic students not affected by the Proclamation 'have inquired about the possibility of transferring.'" Dist. Dkt. 75, at 21. Yet the Proclamation does not decertify Harvard's SEVP authorization. It merely suspends entry of *new* F, M, or J students for a limited period. And Harvard can prevent enrollment effects by admitting more students—including many of the most talented students already present in this country.

The district court erred in holding that Harvard has shown irreparable harm.

## B.    The balance of equities and public interest weigh against Harvard.

The district court likewise erred in holding that "the balance of equities and public interest factors . . . easily favor Harvard." Dist. Dkt. 75 at 43. Where the Government is the defendant, these factors "merge." *Nken v. Holder*, 556 U.S. 418, 435 (2009). And here they weigh decisively against injunctive relief.

By challenging the Proclamation, Harvard seeks to block an exercise of the President's broad authority under § 1182(f) to suspend the entry of aliens whose entry he determined would be detrimental to the nation's interests. The Supreme Court has recognized that even a single sentence may suffice to justify such an exercise of discretion. *Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 164 n.13 (1993). Here, the President cited Harvard's "refus[al] to uphold its legal obligations . . . , the consequences [of which] ripple far beyond the campus," "compromis[ing] national security" and "jeopardiz[ing] the integrity of the entire United States student and exchange visitor visa system." 90 Fed. Reg. at 24494. Those are quintessential national interests, and an

60

injunction severely impedes the Executive's ability to safeguard them. As the D.C. Circuit has explained, such relief "deeply intrudes into the core concerns of the executive branch." *Adams v. Vance*, 570 F.2d 950, 954 (D.C. Cir. 1978). And while Harvard has failed to show irreparable harm, the government suffers irreparable harm when it is "enjoined by a court from effectuating statutes enacted by representatives of its people"—as the Proclamation does. *See Trump v. CASA, Inc.*, 145 S. Ct. 2540, 2562 (2025) (quoting *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers)); *Abbott v. Perez*, 585 U.S. 579, 602 n.17 (2018) (state's "inability to enforce its duly enacted [redistricting] plans clearly inflicts irreparable harm on" it). Every day an injunction is in place, the President loses valuable time to implement his policies.

Finally, the injunction carries serious precedential costs. If left standing, it would invite institutions to disregard their obligations under SEVP and assume that litigation could be used to delay or block any enforcement. That outcome would embolden other institutions to disregard federal law, weakening the Government's ability to protect the integrity of the student visa system.

The district court erred in concluding that the equities and public interest favor Harvard.

## CONCLUSION

For the reasons explained above, the Court should reverse and should vacate the district court's preliminary-injunction order.

Respectfully submitted,

**BRETT A. SHUMATE**
Assistant Attorney General
Civil Division

**DREW C. ENSIGN**
Deputy Assistant Attorney
General
Office of Immigration Litigation

**ELIZABETH HEDGES**
**BRIDGET K. O'HICKEY**
Counsel to the Assistant
Attorney General
Civil Division

**DAVID KIM**
**CATHERINE M. RENO**
Senior Litigation Counsel
**ANNE R. BURLEY**
Trial Attorney
Office of Immigration Litigation
General Litigation and Appeals
Section

*/s/ Tiberius T. Davis*
**TIBERIUS T. DAVIS**
Counsel to the Assistant
Attorney General
Civil Division
P.O. Box 878, Ben Franklin
Station
Washington, D.C. 20044

Dated: August 25, 2025

62

## **CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 11,966 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Word in fourteen-point Times New Roman.

## **CERTIFICATE OF SERVICE**

I certify that on August 25, 2025, I electronically filed the foregoing Brief for Respondent with the Clerk of Court for the United States Court of Appeals for the First Circuit using the appellate CM/ECF system. I also certify that opposing counsel are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/ Tiberius Davis*
TIBERIUS DAVIS
Counsel to the Assistant Attorney
General
Civil Division
P.O. Box 878, Ben Franklin Station
Washington, DC 20044

**ADDENDUM**

# TABLE OF CONTENTS

Memorandum and Order Granting Preliminary Injunction, Dkt. No. 75 (June 23, 2025) ...................................................... A1

Pertinent Statutes and Regulations ..................................................... A45

    8 U.S.C. § 1182(f) ........................................................................ A45

    8 U.S.C. § 1185(a) ....................................................................... A45

    8 C.F.R. §§ 214.2(f)(1)–(3) ........................................................ A46

    8 C.F.R. § 214.2(j) ....................................................................... A48

    8 C.F.R. § 214.3(g) ...................................................................... A53

    8 C.F.R. § 214.3(h) ...................................................................... A57

    8 C.F.R. § 214.4 ........................................................................... A62

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| PRESIDENT AND FELLOWS OF<br>HARVARD COLLEGE, | * | |
| | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No. 25-cv-11472-ADB |
| | * | |
| UNITED STATES DEPARTMENT OF<br>HOMELAND SECURITY, et al., | * | |
| | * | |
| | * | |
| Defendants. | * | |

**MEMORANDUM AND ORDER**

BURROUGHS, D.J.

Plaintiff, the President and Fellows of Harvard College ("Plaintiff" or "Harvard"), seeks a preliminary injunction enjoining the United States Department of Homeland Security, Kristi Noem, United States Immigration and Customs Enforcement, Todd Lyons, Student and Exchange Visitor Program, James Hicks, United States Department of Justice, Pamela Bondi, United States Department of State, and Marco Rubio (collectively, "Defendants") from implementing or enforcing a presidential proclamation entitled "Enhancing National Security by Addressing Risks at Harvard University" (the "Proclamation"). The Proclamation suspends "the entry of any alien into the United States as a nonimmigrant to pursue a course of study at Harvard University under § 101(a)(15)(F) or § 101(a)(15)(M) of the INA, 8 U.S.C. §§ 1101(a)(15)(F) or 1101(a)(15)(M), or to participate in an exchange visitor program hosted by Harvard University under § 101(a)(15)(J) of the INA, 8 U.S.C. § 1101(a)(15)(J)."

In sum, Plaintiff alleges that the Proclamation is unlawful under the governing statute, 8 U.S.C. § 1182(f) and further asserts that, even if otherwise lawful under the statute, the

Proclamation must be enjoined because it is part of an unconstitutional course of retaliatory conduct directed at Harvard in response to its exercise of its First Amendment rights, is unconstitutional viewpoint discrimination, and violates Harvard's equal protection rights. Defendants respond that the Proclamation is a proper use of the President's broad legal authority to exclude aliens or classes of aliens, the Proclamation is unrelated to Harvard's First Amendment-protected activity, and the Proclamation does not violate Harvard's equal protection rights. For the foregoing reasons, Plaintiff's motion for a preliminary injunction is **<u>GRANTED</u>**.

## I.    BACKGROUND

### A.    Factual Background

In considering a preliminary injunction, "[t]he Court may accept as true 'well-pleaded allegations [in the complaint] and uncontroverted affidavits.'" <u>Am. Inst. for Foreign Study, Inc. v. Fernandez-Jimenez</u>, 468 F. Supp. 3d 414, 419 (D. Mass. 2020) (quoting <u>Rohm & Haas Elec. Materials, LLC v. Elec. Cirs.</u>, 759 F. Supp. 2d 110, 114 n.2 (D. Mass. 2010)), <u>aff'd</u>, 6 F.4th 120 (1st Cir. 2021). "Exhibits attached to the complaint are properly considered part of the pleading for all purposes." <u>Costa v. Zurich Am. Ins. Co.</u>, No. 23-cv-11594, 2024 WL 1093002, at *1 (D. Mass. Mar. 13, 2024).

#### 1.    The Administration's Rhetorical Campaign Against Harvard

On October 7, 2023, Hamas, a Palestinian terrorist organization, conducted a violent attack on Israeli citizens. [ECF No. 54 ("Amended Complaint" or "Am. Compl.") ¶ 109]. This has led to an ongoing war between Israel and Hamas, and since October 7, many universities have experienced large-scale protests against the war. [<u>Id.</u>]

On February 3, 2025, the government announced the formation of the Task Force to Combat Anti-Semitism (the "Task Force"). [Am. Compl. ¶¶ 17, 111]. On February 28, 2025,

the Task Force announced that it was investigating ten universities regarding antisemitic incidents in the wake of these protests.  [Id. ¶ 113].  On March 31, 2025, the Task Force sent Harvard a memorandum indicating its intent to review approximately $8.7 billion in federal research grants because Harvard had failed to "curb or combat anti-Semitic harassment."  [Id. ¶ 114].   A few days later, on April 3, Harvard received an additional letter from the General Services Administration ("GSA"), the Department of Health and Human Services ("HHS"), and the Department of Education ("DoE") setting forth reforms "the government view[ed] as necessary for Harvard to implement to remain a responsible recipient of federal taxpayer dollars."  [Id. ¶ 115].

The April 3 memorandum was superseded by a letter, dated April 11, 2025 (the "April 11 Letter"), which dictated specific conditions required for Harvard to "maintain [its] financial relationship with the federal government."  [Am. Compl. ¶ 116 (alteration omitted)].  These conditions included, among other things:

- "reducing the power held by faculty (whether tenured or untenured) and administrators more committed to activism than scholarship";

- "reform[ing] its recruitment, screening, and admissions of international students to prevent admitting students hostile to the American values and institutions inscribed in the U.S. Constitution and Declaration of Independence";

- "commission[ing] an external party, which shall satisfy the federal government as to its competence and good faith, to audit the student body, faculty, staff, and leadership for viewpoint diversity, such that each department, field, or teaching unit must be individually viewpoint diverse";

3

A3

- "[reforming e]very department or field found to lack viewpoint diversity . . . by hiring a critical mass of new faculty within that department or field who will provide viewpoint diversity";

- "[reforming] every teaching unit found to lack viewpoint diversity . . . by admitting a critical mass of students who will provide viewpoint diversity";

- "commission[ing] an external party, which shall satisfy the federal government as to its competence and good faith, to audit [certain] programs and departments that most fuel antisemitic harassment or reflect ideological capture";

- "shutter[ing] all diversity, equity, and inclusion (DEI) programs, offices, committees, positions, and initiatives, under whatever name, and stop[ing] all DEI-based policies, including DEI-based disciplinary or speech control policies, under whatever name [and] demonstrat[ing] that it has done so to the satisfaction of the federal government"; and

- "end[ing] support and recognition of those student groups or clubs that engaged in anti-Semitic activity since October 7th, 2023, including the Harvard Palestine Solidarity Committee, Harvard Graduates [sic] Students 4 Palestine, Law Students 4 Palestine, Students for Justice in Palestine, and the National Lawyers Guild."

[ECF No. 1-9 at 2–6].

On April 14, Harvard President Alan Garber wrote a letter to the Harvard Community repudiating the demands made in the April 11 Letter.  [Am. Compl. ¶ 118].  His letter rebuked the "direct governmental regulation of the 'intellectual conditions' at Harvard" and stated, among other things, that the April 11 Letter went "beyond the power of the federal

4

A4

government[,] violate[d] Harvard's First Amendment rights[,] exceed[ed] the statutory limits of

the government's authority," and "threaten[ed] [Harvard's] values as a private institution devoted

to the pursuit, production, and dissemination of knowledge." [ECF No. 1-10 at 2–3].  President

Garber's letter ultimately forcefully rejected the April 11 Letter's "assertions of power,

unmoored from the law, to control teaching and learning at Harvard and to dictate how [it]

operate[s]."  [Id. at 3].

The Administration reacted quickly and relentlessly.  Within hours of President Garber's

letter denouncing the Administration's conduct and demands, the Task Force announced a multi-

billion-dollar grant funding freeze.  [Am. Compl. ¶ 120].  By the next day, President Trump had

joined the conversation, posting on his social media website, Truth Social: "Perhaps Harvard

should lose its Tax Exempt Status and be Taxed as a Political Entity if it keeps pushing political,

ideological, and terrorist inspired/supporting 'Sickness?'  Remember, Tax Exempt Status is

totally contingent on acting in the PUBLIC INTEREST!"  [Id. ¶ 122].  He followed this on April

16 with a longer Truth Social post aimed at Harvard's views, its faculty and their views, and

presumed political leanings, stating in part:

> [Harvard] hired, from New York (Bill D) and Chicago (Lori L), at ridiculously high
> salaries/fees, two of the WORST and MOST INCOMPETENT mayors in the
> history of our Country, to "teach" municipal management and government.  These
> two Radical Left fools left behind two cities that will take years to recover from
> their incompetence and evil. Harvard has been hiring almost all woke, Radical Left,
> idiots and "birdbrains" who are only capable of teaching FAILURE to students and
> so-called "future-leaders." . . . Many others, like these Leftist dopes, are teaching
> at Harvard, and because of that, Harvard can no longer be considered even a decent
> place of learning, and should not be considered on any list of the World's Greatest
> Universities or Colleges. Harvard is a JOKE, teaches Hate and Stupidity, and
> should no longer receive Federal Funds.

[Id. ¶ 123].

Within hours of the President's Truth Social post, Secretary of Homeland Security Kristi Noem sent a letter to Harvard regarding the Student Exchange Visitor Program ("SEVP"), which is discussed in more detail infra, demanding voluminous documents from Harvard and threatening to revoke Harvard's ability to host international students if Harvard did not comply with a set demands, all seemingly outside of the usual regulatory process. [Am. Compl. ¶ 124]. This letter was accompanied by a press release that tied the demand for information and accompanying threats to Harvard's alleged adoption of "radical ideology" and permissive approach to "anti-American, pro-Hamas ideology poisoning its campus and classrooms." [ECF No. 1-17 at 2]. The press release also directly tied the SEVP compliance issue to the Administration's prior actions against Harvard and the President's Truth Social posts, stating: "This action follows President Donald J. Trump's decision to freeze $2.2 billion in federal funding to Harvard University, proposing the revocation of its tax-exempt status over its radical ideology." [Id.]

The Administration's focus on Harvard continued. On April 20, 2025, the Administration threatened to revoke an additional $1 billion of funding. [Am. Compl. ¶ 131]. And on April 24, 2025, President Trump again took to Truth Social, writing that:

> Harvard is an Anti-Semitic, Far Left Institution, as are numerous others, with students being accepted from all over the World that want to rip our Country apart. The place is a Liberal mess, allowing a certain group of crazed lunatics to enter and exit the classroom and spew fake ANGER AND HATE. It is truly horrific! Now, since our filings began they act like they are all "American Apple Pie." Harvard is a threat to Democracy.

[Id. ¶ 132].

The President reiterated many of his criticisms at a public cabinet meeting on April 30, 2025, where he stated that Harvard was "scamming the public and hiring people like DeBlasio and Lori Lightfoot who are certainly two of the worst mayors in the history of our country,

paying them a fortune on salary, and having them teach our children how to manage cities and how to manage government."  [Am. Compl. ¶ 134 (alterations omitted)].  And during an exchange between DoE Secretary Linda McMahon, President Trump, and Secretary Noem at the same meeting, Secretary McMahon stated: "When we went back to [Harvard] to say we'd welcome them back to the negotiating table, their response was a lawsuit . . . We're staying tough with them."  [Id.]  President Trump replied that "[t]he students they have, the professors they have, the attitude they have, is not American."  [Id. (emphasis omitted)].

On May 2, 2025, President Trump again threatened Harvard's 501(c)(3) status on Truth Social.  [Am. Compl. ¶ 147].  Three days later, on May 5, 2025, Secretary McMahon sent a letter to Harvard stating it would no longer receive federal grants, stating specifically:

> [Harvard's] incomprehensible failure becomes more understandable after reviewing Harvard's management.  The Harvard Corporation, which is supposed to competently and professionally manage Harvard's vast academic, financial, and physical resources, is run by strongly left-leaning Obama political appointee Penny Pritzker, a Democrat operative, who is catastrophic and running the institution in a totally chaotic way.  Harvard alumnus and highly successful hedge fund manager Bill Ackman noted that, under her leadership, Harvard has become a "political advocacy organization for one party." . . . [Universities] should not be incubators of discrimination that encourage resentment and instill grievance and racism into our wonderful young Americans.

[ECF No. 1-21 at 2–3].  Secretary McMahon's letter went on to reiterate the Administration's commitment to the demands set forth in the April 11 Letter, stating that the "priorities have not changed."  [Id. at 3–4].  Secretary McMahon in an interview two days later asked, presumably rhetorically, "Are they vetting professors that they're hiring to make sure that they're not teaching ideologies, but that they're teaching subject matter?"  [Am. Compl. ¶ 149].

As discussed further infra, on May 22, 2025, after much back and forth regarding the earlier records requests, the Department of Homeland Security ("DHS") sent Harvard a notice that it was revoking Harvard's SEVP certification, effective immediately (the "SEVP Revocation

Letter"). [Am. Comp. ¶¶ 150–58]. The following day, Harvard filed a complaint as well as a motion for a TRO against the enforcement of the SEVP Revocation Letter with this Court, [ECF No. 4], which the Court granted the same day, [ECF No. 11]. The Court also scheduled a status conference for May 27, 2025, [ECF No. 12], and a preliminary injunction hearing for May 29, 2025, [ECF No. 13].

On May 26, 2025, the day before the scheduled status conference, President Trump posted twice more on Truth Social about possibly cutting an additional $3 billion of funding to Harvard and referencing the present litigation. [Am. Compl. ¶¶ 182–83]. Public reports surfaced a few days later that, on May 28, 2025, the evening before this Court's preliminary injunction hearing, the White House convened government officials from "nearly a dozen agencies" to brainstorm additional actions the Administration could take against Harvard. [ECF No. 54-3 at 3]. At a press conference that day, President Trump said that "Harvard is treating our country with great disrespect and all they're doing is getting in deeper and deeper and deeper." [Id.]. Offering comment on the meeting to Politico, White House spokesperson Harrison Fields stated that "Harvard decided to litigate this on MSNBC, the now defunded NPR, and the ratings-disaster CNN instead of acting like adults like many of their competitors have done and engaging in fruitful conversations and actions that would have saved them from their self-inflicted demise." [Id. at 4]. Shortly thereafter, on June 1, 2025, Secretary Noem echoed these sentiments, posting on X a video of an interview on Fox News where she criticized Harvard because, among other things, "communist and Marxist ideologies were allowed" on

campus.  Secretary Kristi Noem (@Sec_Noem), X (Jun. 1, 2025 at 12:00 PM ET),

https://x.com/sec_noem/status/1929206429912600994?s=46&t=K9-SEzbtbhZp-Upq_A7fLg.[1]

2.   <u>Regulatory Background Governing International Students</u>

Concurrently with the escalating rhetoric, the Administration and Harvard have gone

several rounds on Harvard's ability to host international students, leading to the present

proceedings.  Because this case requires an understanding of the relevant regulatory scheme and

procedural history of this issue, a discussion of the same follows.

"Enacted in 1952, the [Immigration and Nationality Act ('INA')] governs noncitizens'

entrance into and removal from the United States."  <u>Lopez v. Att'y Gen.</u>, 49 F.4th 231, 232 (3d

Cir. 2022) (citing 8 U.S.C. §§ 1101–1537).  Under the INA, admission to the United States

normally requires a valid visa or other travel document.  <u>See</u> 8 U.S.C. §§ 1181, 1182(a)(7)(A)(i)

and (B)(i)(II), 1203.  One type of visa, an F-1 visa, can be granted to

> an alien having a residence in a foreign country which he has no intention of
> abandoning, who is a bona fide student qualified to pursue a full course of study
> and who seeks to enter the United States temporarily and solely for the purpose
> of pursuing such a course of study . . . at an established college [or] university .
> . . particularly designated by him and approved by the Attorney General . . . .

<u>Id.</u> § 1101(a)(15)(F)(i).

This is known as the SEVP, and the process for such approval by the Attorney General is

governed by regulation and called "SEVP Certification."  8 C.F.R. § 214.3(f).  To qualify for

initial certification and subsequent biennial certification, a school must demonstrate that it meets

four basic criteria: 1) it is "a bona fide school," 2) it is "an established institution of learning or

other recognized place of study," 3) it possesses the facilities, personnel, and finances to conduct

---

[1] "We think we may take judicial notice of such official statements made by the head of one of
the branches of the executive department."  <u>Heath v. Wallace</u>, 138 U.S. 573, 584 (1891).

9

instruction, and 4) it actually engages in that instruction.  Id. § 214.3(a)(3)(i)(A)–(D), (h)(2); see also 8 U.S.C. § 1762 (mandating biennial review).  As particularly relevant to the present dispute, it must also demonstrate that it complies with recordkeeping mandates under 8 C.F.R. § 214.3(g).

Outside of the biennial certification process, the government may withdraw a school's certification, but it must serve the school with a Notice of Intent to Withdraw ("NOIW"), which can only be issued "if SEVP determines that a school reviewed out-of-cycle has failed to sustain eligibility or has failed to comply with the [compliance criteria]."  8 C.F.R. § 214.3(e)(4).  The school then has 30 days to answer the allegations, submit evidence, and request a "telephonic interview in support of its response."  Id. § 214.4(b).  The effect of withdrawing a school from the program is that the school can no longer host international students.  Id. § 214.4(h)(i)(1).

Another type of visa called a "J visa" operates similarly.  This is a class of visas for foreign citizens who are approved to participate in an exchange visitor program in the United States, see 8 U.S.C. § 1101(a)(15)(J), and includes students, professors, and research scholars, 22 C.F.R. § 62.4.  To participate, an institution must be designated as an "Exchange Visitor Program sponsor" by the State Department.  Id. §§ 62.3, 62.5.  Although the criteria for revocation of such a designation are broader than for F-1 visas, including if a school runs "its program in such a way as to undermine the foreign policy objectives of the United States, compromise the national security interests of the United States, or bring the Department or the Exchange Visitor Program into notoriety or disrepute," [Am. Compl. ¶ 95 (citing 22 C.F.R. § 62.50(a))], the relevant regulations still require a 30-day notice of intent to revoke and include procedural steps that must be taken prior to revocation, 22 C.F.R. § 62.50(d).

In addition to the statutory provisions and implementing regulations cited above, the INA separately confers on the President the power to suspend or restrict the entry of aliens. Section 1182(f) of Title 8 provides:

> Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate.

### 3. Harvard's Ability to Host International Students

As referenced supra, on April 16, 2025, Secretary Noem sent Harvard's International Office ("HIO") a letter requesting information within ten business days of receipt about each student visa holder. [Am. Compl. ¶ 15]. On April 30, 2025 and again on May 14, 2025, Harvard provided information it claims was responsive to the request. [Id. ¶ 16]. On May 22, 2025, DHS sent Harvard the SEVP Revocation Letter. [Id.]

The following day, Harvard filed its complaint and TRO Motion against the enforcement of the SEVP Revocation Letter with this Court, [ECF No. 4]. After granting the TRO, the Court scheduled a hearing for May 29, 2025. [ECF No. 13]. That morning, prior to the hearing, DHS filed a copy of a NOIW issued to Harvard. [ECF No. 49]. At the hearing, Defendants represented that the SEVP Revocation Letter would not be in force while the NOIW proceedings took place. [ECF No. 52 at 15:11–16]. Defendants nevertheless resisted an "overbroad" injunction against enforcement of the SEVP Revocation Letter, admitting that "there might be other legal avenues or things that the government might consider." [ECF No. 52 at 15:12–13].[2]

---

[2] The Court asked the parties to submit joint or individual proposed orders reflecting their agreement that the SEVP program would not be terminated while the NOIW process was taking

Those "other legal avenues" materialized on June 4, 2025, when the President issued the Proclamation, which bars F-1 and M visas for "any alien . . . to pursue a course of study at Harvard University" and J-1 visas for "any alien . . . to participate in an exchange visitor program hosted by Harvard University," pursuant to 8 U.S.C. § 1182(f). The Proclamation cites a purported rise in crime rates at Harvard, Harvard's receipt of funds from China and other foreign governments, and Harvard's admission of students from "non-egalitarian" countries. [ECF No. 54-7 at 3–4]. The press release accompanying the Proclamation reiterated these justifications and referenced Harvard's "demonstrated history of . . . radicalism." [ECF No. 54-8 at 2].

Harvard filed a motion for another TRO, this time to enjoin the implementation of the proclamation on June 5, [ECF No. 56], which was granted the same day, [ECF No. 59]. Defendants filed an opposition on June 14, [ECF No. 67], and a hearing was held on June 16. Harvard filed a reply on June 17, [ECF No. 72]. This opinion follows.

## II.    PRELIMINARY INJUCTION LEGAL STANDARD

When deciding whether to grant a motion for preliminary injunction, courts must consider four factors: "(i) the movant's likelihood of success on the merits of its claims; (ii) whether and to what extent the movant will suffer irreparable harm if the injunction is withheld; (iii) the balance of hardships as between the parties; and (iv) the effect, if any, that an injunction (or the withholding of one) may have on the public interest." Corp. Techs., Inc. v. Harnett, 731 F.3d 6, 9 (1st Cir. 2013). The First Circuit has held that these four factors "are not entitled to equal weight in the decisional calculus." Id. Rather, the movant's likelihood of success on the

---

its course. The parties submitted different versions of the Order and on June 20, 2025, the Court entered the more limited order proposed by Defendants. [ECF No. 73].

merits "is the main bearing wall of the four-factor framework." Id. at 10 (citation omitted).

"[P]roving likelihood of success on the merits is the 'sine qua non' of a preliminary injunction."

Arborjet, Inc. v. Rainbow Treecare Sci. Advancements, Inc., 794 F.3d 168, 173 (1st Cir. 2015)

(quoting New Comm Wireless Servs., Inc. v. SprintCom, Inc., 287 F.3d 1, 9 (1st Cir. 2002)).

Therefore, "[i]f the moving party cannot demonstrate that [they are] likely to succeed in [their]

quest, the remaining factors become matters of idle curiosity." Id. (quoting New Comm

Wireless Servs., 287 F.3d at 9). Likewise, the balance of hardships and public interest factors

"merge when the Government is the opposing party." Nken v. Holder, 556 U.S. 418, 435

(2009). As the moving party, Plaintiff bears the burden of satisfying each of these four elements.

See Nieves-Marquez v. Puerto Rico, 353 F.3d 108, 120 (1st Cir. 2003). Preliminary injunctions

function to "preserve the relative positions of the parties until a trial on the merits can be held."

Univ. of Tex. v. Camenisch, 451 U.S. 390, 395 (1981). As a result, "findings of fact and

conclusions of law made by a court granting a preliminary injunction are not binding at trial on

the merits." Id. (first citing Indus. Bank of Wash. v. Tobriner, 405 F.2d 1321, 1324 (D.C. Cir.

1968); and then citing Hamilton Watch Co. v. Benrus Watch Co., 206 F.2d 738, 742 (2d Cir.

1963)). The granting of a preliminary injunction is "an 'extraordinary and drastic remedy' that

'is never awarded as of right.'" Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc.,

645 F.3d 26, 32 (1st Cir. 2011) (quoting Munaf v. Geren, 553 U.S. 674, 689–90 (2008)).

In the First Amendment context in particular, the balance of equities and irreparable harm

are inextricably linked to the merits. Moreover, the Court finds here that the harm, the balance

of hardships and the public interest all easily weigh in favor of an injunction, and therefore it will

focus its attention on the likelihood of success on the merits.

## III.     DISCUSSION

### A.     Justiciability

As an initial matter, Defendants claim that Plaintiff's statutory claims are not justiciable because, under the Supreme Court's precedent <u>Fiallo v. Bell</u>, 430 U.S. 787 (1977), the President has a "'sweeping proclamation power' to suspend entry of aliens and impose restrictions wholly in [his] discretion."  [ECF No. 67 at 15 (quoting <u>Abourezk v. Reagan</u>, 785 F.2d 1043, 1049 n.2 (D.C. Cir. 1986) (R.B. Ginsburg, J.))].

The Court finds Defendants' reliance on <u>Fiallo</u> to be misplaced.  Although it is true that <u>Fiallo</u> "underscore[s] the limited scope of judicial inquiry into immigration <u>legislation</u>," 430 U.S. at 792 (emphasis added), the section of <u>Fiallo</u> upon which Defendants rely is discussing <u>Congress's</u> power to regulate the entry of aliens, not the power of the Executive to do so.  <u>See id.</u> ("This Court has repeatedly emphasized that over no conceivable subject is the legislative power of <u>Congress</u> more complete than it is over the admission of aliens. . . . And we observed recently that in the exercise of its broad power over immigration and naturalization, <u>Congress</u> regularly makes rules that would be unacceptable if applied to citizens." (emphasis added) (citation modified)).  Given, then, "the strong presumption that Congress intends judicial review of administrative action," <u>Smith v. Berryhill</u>, 587 U.S. 471, 483 (2019) (quoting <u>Bowen v. Mich. Acad. of Family Physicians</u>, 476 U.S. 667, 670 (1986)), the Court finds Defendants' sweeping assertions to be insufficient.  Although the scope of review may be "limited," the Court sees no reason why that review cannot include ensuring the Administration's compliance with the statutory scheme, particularly where the dispute implicates core constitutional concerns distinct from the statutory analysis.

14

A14

### B. Likelihood of Success on the Merits

#### 1. Compliance with the INA

Harvard's first argument is statutory—namely, that the Proclamation exceeds the President's authority under 8 U.S.C. § 1182(f). Defendants disagree and maintain that the President's authority is sufficiently broad under § 1182(f) that the Proclamation fits squarely into it.

As stated supra, the President may issue a proclamation restricting the entry of aliens "[w]henever [he] finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States." 8 U.S.C. § 1182(f). The Supreme Court last addressed the framework for analyzing "national security directive[s] regulating the entry of aliens abroad" during President Trump's previous term in Trump v. Hawaii, 585 U.S. 667 (2018). Id. at 702. Defendants argue that Hawaii is dispositive to the case at hand, as, per the holding in Hawaii, it is clear that "§ 1182(f) grants the President broad discretion" and "exudes deference to the President in every clause." Id. at 683–84; see [ECF No. 67 at 13–14]. Plaintiff counters that, even given Hawaii, the Proclamation nonetheless exceeds the President's authority under 8 U.S.C. § 1182(f). [ECF No. 57 at 27–31; ECF No. 72 at 13–18].

Defendants are correct that § 1182(f) and Hawaii establish broad presidential discretion, "vest[ing] the President with 'ample power' to impose entry restrictions in addition to those elsewhere enumerated in the INA." 585 U.S. at 684 (quoting Sale v. Haitian Ctrs. Council, Inc., 509 U.S. 155, 187 (1992)). That said, Plaintiff is also correct that the facts in Hawaii are readily distinguishable from those currently before the Court, making the precedent far from dispositive. The Court briefly summarizes some of those factual differences to give context to the analysis that follows.

15

A15

First, the gravamen of the holding in <u>Hawaii</u> was that it was allowable for the President to restrict the entry of aliens into the United States who could not be properly vetted prior to their admission.  585 U.S. at 685 ("[T]he President found that it was in the national interest to restrict entry of aliens who could not be vetted with adequate information—both to protect national security and public safety, and to induce improvement by their home countries.").  Here, there is no dispute that the students seeking entry can be properly vetted prior to admission; in fact, the DHS and Department of State-administered programs, already highly regulated, are currently considering heightened vetting for visa applicants—piloting this heightened vetting with students coming to Harvard, [Am. Compl. ¶ 22].  The Proclamation itself contains no language indicating a concern with the vetting that underlies the granting of these visas.  Rather, the Administration in this action, per the terms of the Proclamation, is concerned about what happens <u>after</u> the applicants enter.  The Proclamation identifies the problem as a risk created by Harvard's failure to collect and share the information sought by the government, not a risk directly posed by the international people seeking admission, unlike in <u>Hawaii</u>.[3]

Second, the "class" the presidential proclamation in <u>Hawaii</u> sought to bar from entry was defined by nationality, and the detriment to the United States was directly linked to that characteristic.  585 U.S. at 685 ("The Proclamation therefore crafted country-specific restrictions that would be most likely to encourage cooperation given each country's distinct circumstances, while securing the Nation 'until such time as improvements occur.' (citation modified)).  In upholding the proclamation at issue, the <u>Hawaii</u> Court found that "the word 'class' comfortably encompasses a group of people linked by nationality."  <u>Id.</u> at 688.  Here, the Proclamation's

---

[3] Harvard maintains that it has adequately responded to the Administration's requests for information, but that dispute is not currently before the Court.

relevant "class" is defined as students intending to go to Harvard. [ECF No. 54-7]. Per the Proclamation, if the students elected to attend a different school, they would no longer fall within the Proclamation's class and would therefore not be subject to the Proclamation. [Id.] It is far from clear that Hawaii's class definition would as comfortably encompass a group of people linked not by nationality but by their intent to attend a particular school once admitted to this country. Further, Defendants notably assert no risk or detriment at the time of entry, no risk or detriment directly associated with the students themselves, and, indeed, no international risk at all. In other words, the only articulated risk or detriment arises from a domestic institution's purported conduct, not from the risks posed by the visa holders, which is distinct from the circumstances in Hawaii.

Third, Hawaii involved a blanket ban on entry for broad, categorical purposes and not a ban on entry related to the specific destination upon entry. 585 U.S. at 679–80 (proclamation banned all visas, immigrant and nonimmigrant business and tourist visas, or just immigrant visas depending on country). Here, the Administration does not generally object to the entry of the students, but rather is concerned solely with where they are going once admitted. [ECF No. 54-7]. As the Supreme Court stated in Hawaii, the statute "enables the President to 'suspend the entry of all aliens or any class of aliens' whenever he 'finds' that their entry 'would be detrimental to the interests of the United States.'" 585 U.S. 683 (quoting 8 U.S.C. § 1182(f)). In the instant case, the President has arguably (and, very specifically) not found that the entry would be detrimental, given that these students are allowed to enter—provided that they do not attend Harvard.

This all said, the Court's statutory analysis, although informed by Hawaii, must focus on the statute itself. By its terms, the statute, as relevant here, requires: (1) a finding; (2) that the

17

A17

entry into the United States; (3) of any aliens or class of aliens; (4) would be detrimental to the interests of the United States.  8 U.S.C. § 1182(f).

In arguing that the Proclamation exceeds the authority granted by § 1182(f), Harvard first asserts that the President has not made the predicate "finding" of "detriment[]" to the United States.  [ECF No. 57 at 28–29].  The statute is silent as to what constitutes a presidential "finding," and, in the absence of statutory guidance, Harvard's argument is largely foreclosed by Hawaii and therefore unavailing.  In Hawaii, the Supreme Court indicated that the premise that the statute required a "finding with sufficient detail to enable judicial review" was questionable and rejected a request for a "searching inquiry into the persuasiveness of the President's justifications."  585 U.S. at 686.  Absent any countervailing indication that it should, the Court likewise declines to undertake such a searching inquiry here.

Second, Harvard argues that the Proclamation is impermissibly targeted at a domestic entity's conduct, rather than at any foreign nationals or entities, contrary to both the text and purpose of the statute.  [ECF No. 72 at 14–18].  Specifically, as a textual matter, Harvard argues that the President cannot define the terms "entry" and "class" as used in the statute with respect to a visa applicant's purpose of attending "a particular destination [within the United States]." [ECF No. 72 at 15–16].

Regarding "entry," Defendants are technically correct that the Proclamation has the effect of restricting entry as the types of visas at issue here are only valid for the purpose of attendance at one particular institution, and entry would not be allowed if attendance at that institution was foreclosed.  [ECF No. 67 at 17].  Nevertheless, the Court agrees with Harvard that, although the SEVP program properly limits entry to those with student visas, it is an unusual reading of § 1182(f) to restrict that entry based solely on the student's purpose of entry, that is, to attend

Harvard. Thus, while the Proclamation may have the effect of restricting entry, its intent is not to restrict entry but rather to allow entry so long as that entry is not to attend Harvard. This seems to be a perversion of the language and purpose of the statute. The Court will not, however, base its decision solely on this reading of "entry," but will factor it into its analysis of the motivations underlying the Proclamation.

With regard to "class of aliens," Defendants argue that the statute provides no definition of the term, and therefore purpose of entry is a proper characteristic on which to base a class. [ECF No. 67 at 16]. Defendants here claim that the class at issue is defined as a group of aliens attending Harvard. Although the Court agrees that the term "class" can be construed broadly, the Court also recognizes and gives weight to Harvard's argument that no previous proclamation has ever defined "class" by an alien's potential relationship with a specific domestic entity for the purpose of influencing that domestic entity's conduct. See Kelsey Y. Santamaria, Calvin Gibson & Hillel R. Smith, Cong. Rsch. Serv., LSB10458, Presidential Authority to Suspend Entry of Aliens Under 8 U.S.C. § 1182(f) (2024) (listing previous invocations of authority under § 1182(f)). "[J]ust as established practice may shed light on the extent of power conveyed by general statutory language, so the want of assertion of power by those who presumably would be alert to exercise it, is equally significant in determining whether such power was actually conferred." West Virginia v. EPA, 597 U.S. 697, 725 (2022) (citation omitted); see also Biden v. Nebraska, 600 U.S. 477, 501 (2023) (no authority to cancel student loans where the "Secretary has never previously claimed powers of this magnitude under the . . . Act").

Harvard likewise presents a compelling argument as to the purpose of the statute, which Defendants do not significantly rebut; that is, that the statute's purpose is to regulate and influence conduct abroad, rather than at home. [ECF No. 72 at 16–17]. In Hawaii, the Court

19

A19

recognized that the statute gave the President "flexible authority to suspend entry <u>based on foreign policy interests</u>."  585 U.S. at 696 (emphasis added).  And other courts have similarly expressed skepticism that the President's authority under § 1182(f) is as extensive when it is aimed at domestic policy as opposed to foreign policy or national security.  <u>Nat'l Ass'n of Mfrs. v. U.S. Dep't of Homeland Sec.</u>, 491 F. Supp. 3d 549, 563 (N.D. Cal. 2020) ("Indeed, there must be some measure of constraint on Presidential authority in the domestic sphere in order not to render the executive an entirely monarchical power in the immigration context, an area within clear legislative prerogative."), <u>appeal dismissed as moot</u>, No. 20-17132, 2021 WL 1652646, at *1 (9th Cir. Apr. 8, 2021).

Given its many unprecedented features, the Court is skeptical that, despite its breadth, § 1182(f) authorizes the Proclamation.  Although this could end the inquiry, in the interest of a complete record, the Court reaches the parties' constitutional arguments.[4]

---

[4] Harvard makes one other statutory argument: it argues that the Proclamation, by demanding additional records from Harvard, conflicts with the part of the statute governing the SEVP program by setting forth additional reporting requirements beyond what is required by the implementing regulations.  [ECF No. 72 at 18 (citing 8 U.S.C. § 1372(c) and 8 C.F.R. § 214.3(g))].  Defendants respond that "Section 1182(f) is an independent grant of authority that allows the President to restrict entry irrespective of agency-level reporting frameworks."  [ECF No. 67 at 19].  Here, the Court agrees with the Defendants that the Proclamation does not conflict with § 1372 to the extent that the Proclamation is otherwise lawful.  <u>See Hawaii</u>, 585 U.S. at 689.  Taking the proclamation at issue in <u>Hawaii</u> as an example, if entry was lawfully restricted for aliens from certain countries, it seems implausible that the ability of the President to restrict the entry of these aliens could be overridden by DHS's ability to admit them pursuant to the SEVP.  Likewise here; the Court's other doubts about the legality of the Proclamation notwithstanding, it seems contrary to the statutory scheme that regulations governing DHS's discretionary ability to grant SEVP visas would override the President's broad authority under § 1182(f).

2. <u>Constitutional Claims</u>

Harvard asserts three First Amendment claims and one Fifth Amendment claim, all of which are based almost entirely on the factual record outside of the text of the Proclamation itself. <u>See</u> [Am. Compl. ¶¶ 281–91, 300–06; ECF No. 57 at 18–27, 31–33]. These claims rest on the contention that the Administration issued the Proclamation in retaliation for Harvard's exercise of academic freedom and its public statements committing to the same, [ECF No. 57 at 19–20]; that the Administration issued the Proclamation in retaliation for Harvard deciding to litigate the validity of the Administration's funding cuts and the SEVP Revocation Letter, [<u>id.</u> at 25–27]; and that the Administration is discriminating against Harvard for having perceived viewpoints that are disfavored by the Administration, [<u>id.</u> at 23–25]. Harvard also asserts a "class-of-one" equal protection claim under the Fifth Amendment. [<u>Id.</u> at 31–33]. In Harvard's view, even a lawful action is rendered unlawful if done in violation of the First and Fifth Amendments, and those inquiries are independent of the legality of the Proclamation under the relevant statutory authority. [ECF No. 72 at 6, 10].

Defendants argue that under Supreme Court precedent in <u>Hawaii</u> and <u>Mandel</u>, the Court may not look at the factual record outside the text of the Proclamation in deciding whether the Proclamation violates the First or Fifth Amendments. [ECF No. 67 at 21–24]. They also aver that the record insufficiently supports a finding of retaliation for either Harvard's speech or its decisions to litigate against the Administration, [<u>id.</u> at 26–35], and that it likewise does not support a finding of viewpoint discrimination or an equal protection violation, [<u>id.</u> at 35–38].

i.     <u>Application of the Hawaii/Mandel Standard</u>

The Court turns first to the applicable standard of review for Harvard's constitutional claims. In <u>Hawaii</u>, the Supreme Court recognized that, "although foreign nationals seeking

21

admission have no constitutional right to entry, this Court has engaged in a circumscribed judicial inquiry when the denial of a visa allegedly burdens the constitutional rights of a U.S. citizen." 585 U.S. at 703. That said, "'when the Executive exercises [power over admission of aliens] negatively on the basis of a facially legitimate and bona fide reason, the courts will neither look behind the exercise of that discretion, nor test it by balancing its justification' against the asserted constitutional interests of U.S. citizens." Id. (quoting Kleindienst v. Mandel, 408 U.S. 753, 770 (1972)).

Defendants argue that, under this framework, Harvard's constitutional claims fail because the Proclamation is "facially legitimate" and therefore the "deferential framework" set out in Hawaii and Mandel precludes the Court from "look[ing] behind" the reasoning set out in the Proclamation itself. [ECF No. 67 at 21]. Harvard disagrees and points out that, unlike Hawaii and Mandel, the Proclamation is aimed at directly regulating a domestic entity, rather than incidentally burdening the rights of U.S. citizens, and therefore a "deferential framework" is inapplicable. [ECF No. 72 at 9].

The Court notes that, if the Proclamation is in fact unlawful under § 1182(f), the Hawaii/Mandel framework would be irrelevant. See Hawaii, 585 U.S. at 703 (requiring "facially legitimate and bona fide reason" for exercise of "delegated power" (citation modified)). Assuming, as it does for its constitutional analysis, that the broad language of § 1182(f) authorizes the Proclamation, the Court nevertheless need not do much to distinguish Hawaii,[5] as

---

[5] The Court focuses its analysis on Hawaii as it is the Supreme Court's most recent guidance on the issues at hand. In Hawaii, the Supreme Court noted that a "conventional application of Mandel, asking only whether the policy is facially legitimate and bona fide, would put an end" to its review but then proceeded to engage in a rational basis review and look outside the four corners of the proclamation to do so, at the government's invitation. 585 U.S. at 704–05. As a

the Proclamation falls squarely within the type of action that would be impermissible even under

Hawaii's deferential review.[6]  There, the Supreme Court, in reviewing the Establishment Clause

challenge to the proclamation at issue, ultimately decided that it would "uphold the policy so

long as it [could] reasonably be understood [as] result[ing] from a justification independent of

unconstitutional grounds," and went on to apply rational basis scrutiny.  Id. at 705.  The Court

then stated:

> Given the standard of review, it should come as no surprise that the Court hardly
> ever strikes down a policy as illegitimate under rational basis scrutiny.  On the
> few occasions where we have done so, a common thread has been that the laws
> at issue lack any purpose other than a "bare . . . desire to harm a politically
> unpopular group." . . . [The government action in such cases was] "divorced
> from any factual context from which we could discern a relationship to

---

result, it is unclear to this Court whether Hawaii affirmed, overruled, refined, or built additional
layers into Mandel.  See, e.g., Int'l Refugee Assistance Project v. Trump, 961 F.3d 635, 648 (4th
Cir. 2020) (applying Hawaii and Mandel separately, and noting that "[w]hile important
differences exist between the two standards, they are both 'highly constrained' forms of judicial
review" (quoting Hawaii, 585 U.S. at 704)).  To the extent this Court, before engaging in
Hawaii's rational basis review (including evidence extraneous to the text of the Proclamation), is
required to find that the Proclamation fails Mandel, the Court so finds for the reasons articulated
herein in Section II.B, which, for clarity, show that the Proclamation is neither facially legitimate
nor bona fide.  See Kerry v. Din, 576 U.S. 86, 105 (2015) (Kennedy, J., concurring in the
judgment) (interpreting Mandel as allowing courts to "look behind" the face of the government's
decision based on "an affirmative showing of bad faith").

[6] The Court believes that the level of scrutiny that a governmental action receives may be greater
when aimed at influencing the conduct of a domestic entity, even if the action relies on the
"authority of the political branches over admission."  Hawaii, 585 U.S. at 703; see Holder v.
Humanitarian L. Project, 561 U.S. 1, 34 (2010) ("Our precedents, old and new, make clear that
concerns of national security and foreign relations do not warrant abdication of the judicial role.
We do not defer to the Government's reading of the First Amendment, even when such interests
are at stake. . . . [T]he Government's authority and expertise in these matters do not
automatically trump the Court's own obligation to secure the protection that the Constitution
grants to individuals." (internal quotation and citation omitted)).  Therefore, the limited review
prescribed by Hawaii is arguably inapplicable, and the Proclamation should receive the level of
review normally afforded to the claims at issue in the First Amendment context.  Stilwell v. City
of Williams, 831 F.3d 1234, 1250 (9th Cir. 2016) ("It is well established that First Amendment
claims . . . that allege retaliation following speech on a matter of public concern, are reviewed
with heightened scrutiny.").

23

legitimate state interests," and "its sheer breadth [was] so discontinuous with the reasons offered for it" that the initiative seemed "inexplicable by anything but animus."

Hawaii, 585 U.S. at 705–06 (first quoting Dep't of Agric. v. Moreno, 413 U.S. 528, 534 (1973); and then quoting Romer v. Evans, 517 U.S. 620, 632, 635 (1996)).  Such is the case here: the Proclamation quite obviously has no "legitimate grounding" in its stated concerns, and it is "inexplicable by anything but animus."  Id. at 706 (citation omitted).

The purported justifications in the Proclamation are threefold.  First, the Proclamation cites "[c]rime rates at Harvard University," which it claims "have drastically risen in recent years."  [ECF No. 54-7 at 3].  But, other than citing an alleged failure by Harvard to turn over certain data, the Proclamation does nothing to tie these higher crime rates to the number of international students at Harvard.  The Proclamation does not state, for example, that the rise in crime is correlated with a rise in the percentage of international students of Harvard, nor does it cite any evidence whatsoever that international students are committing these crimes, statistics which, presumably, would be available to the federal government if they exist.  Indeed, it is telling that, when describing this alleged problem in its brief, Defendants do not cite to any records or statistics kept by any of the myriad of federal law enforcement agencies tasked with collecting such data, but instead cite to an article by the Harvard Crimson, a college student newspaper, presumably without access to the data available to the executive branch.  Contrast [ECF No. 67 at 33 n.10], with, e.g., Press Release, Federal Bureau of Investigation, FBI Releases 2023 Crime in the Nation Statistics (Sept. 23, 2024), https://www.fbi.gov/news/press-releases/fbi-releases-2023-crime-in-the-nation-statistics.  Equally perplexing is the fact that the Proclamation provides no rationale for why the Administration needs Harvard to disclose any alleged crimes committed by international students, when, again, this information should be

easily accessible to the Executive given that it is the State Department that issues the relevant

visas, see, e.g., 8 U.S.C. § 1372(a)(3)(A), and any convictions would be matters of public record.

This purported justification, then, is completely "divorced from any factual context from which

we could discern a relationship to legitimate state interests."  Hawaii, 585 U.S. at 706 (quoting

Romer, 517 U.S. at 635).

Next, the Proclamation cites Harvard's "entanglements with foreign countries, including

our adversaries."  [ECF No. 54-7 at 4].  It specifically takes issue with Harvard's alleged receipt

of $150 million from China, stating that, "[i]n exchange, Harvard has, among other things,

repeatedly hosted and trained members of a Chinese Communist Party paramilitary

organization," and "Harvard researchers have also partnered with China-based individuals on

research that could advance China's military modernization."  [Id.]  The Proclamation, however,

bans "entry of any alien . . . as a nonimmigrant to pursue a course of study at Harvard

University."  [Id. at 5 (emphasis added)].  It does not ban members of the cited Chinese

Communist Party paramilitary organization, or even all students from China.  This is a textbook

example of where the "sheer breadth" of the ban is "discontinuous with the reasons offered for

it."  Hawaii, 585 U.S. at 706 (quoting Romer, 517 U.S. at 632).[7]

Finally, the Proclamation states that Harvard "flout[s] the civil rights of its students and

faculty" by "admit[ting] students from non-egalitarian nations, including nations that seek the

destruction of the United States and its allies, or the extermination of entire peoples."  [ECF No.

54-7 at 4].  But again, the Proclamation is not limited to students from such "non-egalitarian

---

[7] The same logic applies to any justification on the basis of anti-Israeli or antisemitic bias, which,
although not cited in the text of the Proclamation, appears frequently in the record.  The
Proclamation does not make exceptions for Jewish or Israeli students.  [ECF No. 54-7].

nations."  Nor does the Proclamation explain why having such students educated at other universities, as is plainly allowed under the Proclamation, see [id. at 5], is any different from them attending Harvard, where their admission would, under the Proclamation's theory, equally flout the civil rights of the students and faculty at the other universities.  Here again, the "sheer breadth" of the ban is "discontinuous with the reasons offered for it."  Hawaii, 585 U.S. at 706 (quoting Romer, 517 U.S. at 632).

The examples used by the Court in Hawaii are illustrative.  A policy that the Court cited as failing rational basis review involved "a local zoning ordinance that required a special permit for group homes for the intellectually disabled, but not for other facilities such as fraternity houses or hospitals."  Hawaii, 585 U.S. at 705.  The Court held that the city's stated concerns regarding "'legal responsibility' and 'crowded conditions' rested on 'an irrational prejudice'" against the intellectually disabled," rather than any rational basis for believing that a group home for the intellectually disabled would pose a special threat to the city's legitimate interests.  Id. (quoting City of Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432, 448–50 (1985)).  Likewise here, the purported concern about students from "non-egalitarian nations" attending Harvard but not other universities, for example, makes little sense in the context of the justifications offered by the Proclamation.  And disallowing only international students despite a lack of any justification tying them to the purported rise in crime at Harvard certainly constitutes an "irrational prejudice."

The differences between this case and the proclamation upheld in Hawaii are stark.  The constitutional concern at issue in Hawaii was the purported disfavoring of a particular religion, i.e. Islam.  Id. at 697.  There, despite the allegations that the proclamation at issue in Hawaii was a "Muslim ban," id. at 700 (citation omitted), "[t]he text sa[id] nothing about religion," id. at

706.  And in fact, only "five of the seven nations . . . included in the Proclamation ha[d] Muslim-majority populations" and "the policy cover[ed] just 8% of the world's Muslim population and [wa]s limited to countries that were previously designated by Congress or prior administrations as posing national security risks."  Id.  That could not be further from the case in front of us.  The alleged target of the constitutional concern here is Harvard, and the Proclamation both expressly targets Harvard and, by its terms, exclusively impacts Harvard.  [ECF No. 54-7 at 5].  If this were not enough, the press release accompanying the Proclamation cites Harvard's "demonstrated history of . . . radicalism," disabusing the Court of any notion that the Proclamation is facially neutral.[8]  [ECF No. 54-8 at 2].  All told, it is difficult, if not impossible, to conclude that the reasons offered in support of the Proclamation are anything other than pretextual.

Having decided that the Proclamation's justifications do not provide a rational—or, as noted supra, a facially legitimate and bona fide—basis for the measures implemented in the Proclamation, and that the Proclamation therefore cannot "be reasonably understood to result from a justification independent of unconstitutional grounds," Hawaii, 585 U.S. at 705, the Court turns to the merits of Harvard's constitutional claims.[9]

---

[8] The Court assumes that it may treat the accompanying press release as part of the Proclamation for the purposes of the Hawaii/Mandel analysis, as it would defy logic if the President could avoid constitutionality concerns by saying things in a press release to avoid scrutiny. Nevertheless, the cited statement in the press release is not dispositive to this opinion.

[9] In proceeding to the merits of Harvard's constitutional claims, the Court notes that it is uncertain whether Harvard must actually demonstrate that it meets each of the elements of its claims, or whether it is sufficient that Harvard show that the Proclamation is "inexplicable by anything but animus," Hawaii, 585 U.S. at 706 (citation omitted), given that, as the Court has already explained, the Proclamation is "divorced from any factual context from which [the Court] could discern a relationship to legitimate state interests" and "discontinuous with the reasons offered for it," id. (citation omitted).  In Hawaii, the Supreme Court concluded that the

      ii.  <u>Freedom of Speech Retaliation</u>

  Harvard's first constitutional claim is premised on the idea that the Proclamation was issued to retaliate against Harvard for its exercise of its right to free speech protected under the First Amendment.  [ECF No. 57 at 19–23].  Plaintiff argues that "[t]he Proclamation unlawfully retaliates against Harvard for its refusal to allow the federal government to control its academic decisionmaking."  [<u>Id.</u> at 19].  Defendants rejoin that this assertion is "groundless" and that the government merely "does not trust Harvard to vet and monitor incoming foreign students the way other universities might."  [ECF No. 67 at 33–34].

  "[T]he First Amendment prohibits government officials from relying on the 'threat of invoking legal sanctions and other means of coercion . . . to achieve the suppression' of disfavored speech."  <u>Nat'l Rifle Ass'n of Am. v. Vullo</u>, 602 U.S. 175, 176 (2024) (quoting <u>Bantam Books, Inc. v. Sullivan</u>, 372 U.S. 58, 67 (1963)).  Importantly, "a government official cannot directly or indirectly coerce a private party to punish or suppress disfavored speech on her behalf."  <u>Id.</u> at 177.  Against that backdrop, the elements of a retaliation claim are that "(1) the plaintiff engaged in protected conduct; (2) an adverse action was taken against the plaintiff that

---

proclamation survived rational basis review, and did not separately analyze the merits of the plaintiffs' Establishment Clause claim.  Here, the Proclamation fails <u>Mandel</u> and <u>Hawaii</u>, but, to this Court's understanding, that does not necessarily mean that it is part of a retaliatory campaign or an instance of viewpoint discrimination in violation of the First Amendment.  As such, in the interests of completeness, the Court separately addresses the merits of Harvard's underlying constitutional claims, recognizing that the Proclamation has already failed the narrow review prescribed in <u>Mandel</u> and <u>Hawaii</u> and that this might be the end of the day for Defendants.  In so doing, the Court looks beyond the facially defective proclamation, as is typically contemplated for such claims, and as the Supreme Court assumed it could in applying rational basis review in <u>Hawaii</u>, 585 U.S. at 704.  The Court notes for completeness that the same facts articulated supporting a finding of Free Speech and Petition Clause retaliation are, given those facial defects, more than sufficient for a finding that the Proclamation could not have been motivated by anything but animus.

would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two—that is, the adverse action was motivated at least in part by the plaintiff's protected conduct." Werner v. Therien, No. 99-cv-12497, 2005 WL 1000010, at *8 (D. Mass. Mar. 31, 2005) (quoting Thaddeus–X v. Blatter, 175 F.3d 378, 394 (6th Cir. 1999)).

On the first element, Harvard alleges that its refusal to meet the demands made by the government in the April 11 Letter, including that it cede control over its admissions and curriculum, constitutes the protected impetus for the alleged campaign of retaliatory conduct. [ECF No. 57 at 19–20]. Although "[a]cademic freedom [is] not a specifically enumerated constitutional right," Regents of Univ. of Cal. v. Bakke, 438 U.S. 265, 312 (1978), the courts' "responsibility to safeguard [educational institutions'] academic freedom [is] 'a special concern of the First Amendment,'" Regents of Univ. of Mich. v. Ewing, 474 U.S. 214, 226 (1985) (quoting Keyishian v. Bd. of Regents, 385 U.S. 589, 603 (1967)). "Academic freedom thrives not only on the independent and uninhibited exchange of ideas among teachers and students, but also . . . on autonomous decisionmaking by the academy itself." Id. at 603 n.12 (citations omitted). "A university ceases to be true to its own nature if it becomes the tool of Church or State or any sectional interest." Sweezy v. New Hampshire, 354 U.S. 234, 262 (1957) (Frankfurter, J., concurring).

"'[T]he four essential freedoms' of a university [are] to determine for itself on academic grounds who may teach, what may be taught, how it shall be taught, and who may be admitted to study." Bakke, 438 U.S. at 312 (quoting Sweezy, 354 U.S. at 263); see also Urofsky v. Gilmore, 216 F.3d 401, 412 (4th Cir. 2000) ("The Supreme Court . . . appears to have recognized . . . an institutional right of self-governance in academic affairs."). The April 11 Letter, on its face, was

aimed directly at these protected academic freedoms, as it clearly sought to control the views of

Harvard's faculty and students as well as the school's curricula and make them subject to

government approval. The letter further requires Harvard to select an external party, also subject

to the government's approval, to audit all departments, fields, and teaching units to ensure

"viewpoint diversity," a term that is defined nowhere in the Letter. [ECF No. 1-9 at 3–4].

Departments or fields found to lack such viewpoint diversity would be required to hire a "critical

mass" of new faculty "who will provide viewpoint diversity," again subject to the oversight of

the government, and "admit[] a critical mass of students who will provide viewpoint diversity."

[Id.] Further, Harvard must select an external party, again subject to government approval, to

"audit" programs that "reflect ideological capture," a term not defined in the April 11 Letter, and

then to "make repairs." [Id.] These programs, as identified in the letter, include not just

programs focused on international human rights or religion, but also programs at the Graduate

School of Education, the Medical School, and the School of Public Health. [Id.] Thus, it is plain

that Harvard's refusal to acquiesce to these demands constitutes engagement in protected

conduct. See Am. Fed'n of Gov't Emps., AFL-CIO v. Noem, No. 25-cv-00451, 2025 WL

1557270, at *17 (W.D. Wash. June 2, 2025). Moreover, Harvard's public statements regarding

its refusal, including President Garber's April 14 letter, also constitute protected speech. Trulock

v. Freeh, 275 F.3d 391, 404 (4th Cir. 2001) ("The First Amendment guarantees an individual the

right to speak freely, including the right to criticize the government and government officials.").

     Defendants' sole argument to the contrary is that the only conduct at issue is Harvard's

rejection of the demands in the April 11 Letter, and they state in a conclusory fashion that

"rejection of an offer is not protected speech." [ECF No. 67 at 27]. Even beyond the

disingenuousness of characterizing the April 11 Letter as an "offer," this view is overly

simplistic and fails to grapple with the facts as alleged.  Rather, it is also Harvard's ongoing self-

governance and academic freedom underlying that rejection, as well as Harvard's public

statements refusing to cede its academic freedom, that constitute the protected conduct, not

simply the actual words of rejection.  Thus, Defendants' argument fails.

On the second element, there can be no dispute that the Proclamation constitutes adverse

action, nor do Defendants even attempt to offer a compelling reason to conclude otherwise.  See

generally [ECF No. 67].  On its face, the Proclamation describes the ability to host foreign

students and faculty as a "privilege" that is being lost.  [ECF No. 54-7 at 2].  The loss of this

privilege is an adverse action, particularly given the impact of the loss of that privilege on

Harvard and its students and faculty.  See, e.g., Barton v. Clancy, 632 F.3d 9, 29 (1st Cir. 2011)

("[T]he pertinent question . . . is whether the defendant's actions would deter 'a reasonably hardy

individual[]' from exercising his constitutional rights." (citation omitted)); Perry v. Sindermann,

408 U.S. 593, 597 (1972) ("[T]his Court has made clear that even though a person has no 'right'

to a valuable governmental benefit and even though the government may deny him the benefit

for any number of reasons . . . [i]t may not deny a benefit to a person on a basis that infringes . . .

his interest in freedom of speech.").  As articulated in Harvard's Amended Complaint, "[t]he

sudden inability to maintain [international] students' enrollment jeopardizes ongoing research

projects, damages Harvard's reputation as a world-class research institution, and deprives our

nation of the benefits of . . . vital research projects."  [Am. Compl. ¶ 213].

The final element is the only one to which Defendants offer a serious dispute, and that is

the causal connection between the April 11 Letter and the Proclamation.  Defendants contend

that "[t]he April 11 [L]etter and Harvard's rejection have no relation to the Proclamation";[10] "the

gap in time undermines any link"; and the relevant parties are different.[11]  [ECF No. 67 at 28].

Defendants argue that the seven weeks between the April 11 Letter (or the April 14th response)

and the Proclamation—issued June 4th—preclude any possible finding of a causal connection,

"as courts 'typically allow no more than a few days to elapse between the protected activity and

the adverse action.'"  [Id. at 28 (citing Kidwell v. Eisenhauer, 679 F.3d 957, 966 (7th Cir.

2012))].

　　　　Defendants' reading of the record is so selective as to border on absurd.  Between the

April 11 Letter and the Proclamation, there were very few days where the Administration did not

attack Harvard in some form or another, including six Truth Social posts from the President

himself, [Am. Compl. ¶¶ 122, 123, 132, 147, 182, 183];[12] several actual or threatened grant and

funding freezes, [id. ¶¶ 120, 127, 134, 148, 182]; several iterations of the Administration's

attempts to limit Harvard's ability to host international students and visitors, [id. ¶¶ 124–26 (two

---

[10] Defendants make a related argument that the April 11 Letter was focused on grants, rather than the Proclamation's broader concerns, thus weakening the causal connection between the two. [ECF No. 67 at 29].  This argument fails for the same reasons articulated infra—primarily, the numerous public statements from the Administration linking the April 11 Letter and the Proclamation.

[11] Defendants also recycle the arguments rejected above regarding the reasoning on the face of the Proclamation.  [ECF No. 67 at 33].  Moreover, even if the proffered justifications for the Proclamation are real, the Court notes that the retaliatory action need only be motivated "in part" by the protected First Amendment activity, Therien, 2005 WL 1000010, at *8, a hurdle easily cleared by Plaintiff on the factual record before this Court.

[12] These are of particular significance because Defendants claim that a lack of statements from the President make this a weaker case for showing a First Amendment violation than Hawaii. [ECF No. 67 at 31 ("In Hawaii, the President himself (or his direct advisors) made the cited statements, whereas, here, other government agencies took the various actions Harvard complains of." (emphasis in original))].  The Court's review of the record shows that both the President and his direct advisors made numerous statements attacking Harvard in the time between the April 14th and the Proclamation.

days after April 14th response, Secretary Noem sent a records request about SEVP that stated
that "[f]ailure to comply with this Records Request will be treated as a voluntary withdrawal"),
158 (May 22 SEVP Revocation Letter), 188 (May 28 SEVP NOIW), 195–201 (State Department
pilot vetting program targeting Harvard visitors)]; other investigation initiations, [id. ¶ 133
(investigation into Harvard's employment practices)]; and numerous other statements by
President Trump and other officials in the Administration, as detailed supra.  Defendants'
countervailing argument that these assaults cannot constitute retaliation as they came from
different parties and are therefore not attributable to any one source is equally puzzling, because
that fact only serves to reinforce that the Administration has made a full court press against
Harvard on many different fronts.  Indeed, public reporting surfaced only days before the
Proclamation was issued regarding a session convened by the President to "brainstorm additional
punitive measures" against Harvard that included "officials from nearly a dozen agencies."
[ECF No. 54-3 at 3; Am. Compl. ¶ 184].  Far from rebutting a finding of retaliation, the
Administration's concerted campaign entirely supports such a finding.  In summary, Defendants
claim that "Harvard wants to [sic] the Court to take the massive and impermissible inference that
all of these disparate actions are connected and designed to single out Harvard for its speech."
[ECF No. 67 at 31].  But far from being a "massive and impermissible inference," [id.], to draw
any other conclusion would require the Court to "blind [itself] to reality,"  Cox v. Murphy, No.
12-cv-11817, 2016 WL 4009978, at *10 (D. Mass. Feb. 12, 2016), namely that the government
repeatedly, clearly, and unabashedly linked Harvard's refusal to accept the April 11 Letter's
demands and the Proclamation.

As a last gasp, Defendants argue that the Proclamation should get the "presumption of
regularity" of government activity.  See [ECF No. 67 at 28 (citing United States v. Chemical

33

Found., Inc., 272 U.S. 1, 14–15 (1926))]. Putting aside whether the text of § 1182(f) permits the Proclamation, the use of that text here is hardly regular. As Harvard notes, it has never been used to target the conduct or actions of domestic entities. [ECF No. 57 at 30]. And it has never been used to completely eliminate a legitimate university's ability to host international students. [ECF No. 52 at 18:12–14]. Thus, the Court will not apply any presumption of regularity to conduct that is so unusual and therefore irregular on its face.

In sum, the causal link between the Proclamation and Harvard's April 14th rejection of the Administration's April 11 Letter could not be more evident. Further, it is amply demonstrated by the words of the Administration itself. On May 7, 2025, Secretary McMahon stated in an interview: "[A]re they vetting students who are coming in from outside of the country to make sure they're not activists? Are they vetting professors that they're hiring to make sure that they're not teaching ideologies, but that they're teaching subject matter? . . . They've taken a very hard line, so we took a hard line back." [Am. Compl. ¶ 149 (emphasis added)]. On May 28, 2025, White House spokesperson Harrison Fields stated: "The latest moves against Harvard are truly just scratching the surface . . . Harvard decided to litigate this on MSNBC, the now defunded NPR, and the ratings-disaster CNN instead of acting like adults like many of their competitors have done and engaging in fruitful conversations and actions that would have saved them from their self-inflicted demise." [ECF No. 54-3 at 4]. Harvard is entitled under the Constitution to take a "hard line" when it comes to academic freedom, and it is

entitled to air its grievances with the government publicly without meeting its "demise." Thus, Harvard is likely to succeed on the merits of its retaliation claim.[13]

### iii.    Petition Clause Claim

The First Amendment protects the "right of the people . . . to petition the Government for a redress of grievances." U.S. Const. amend. I.  Harvard argues that "[t]he Proclamation violates the Petition Clause by punishing Harvard for filing [a] lawsuit [with respect to the SEVP Revocation Letter and the Proclamation] and having filed the Funding Case." [ECF No. 57 at 26].

The elements of a Petition Clause retaliation claim are identical to those of a free speech retaliation claim. Stepnes v. Tennessen, No. 04-cv-00068, 2006 WL 2375645 at *9 (D. Minn., August 16, 2006) (reciting the elements for a retaliation claim, pursuant to the Petition Clause, which are identical to the elements for a retaliation claim based upon the exercise of free speech), aff'd, 267 Fed. App'x 481 (8th Cir. 2008).  Defendants concede that "pursuing litigation against the Government" is a "protected activity" under the Petition Clause. [ECF No. 67 at 34]; see also Borough of Duryea v. Guarnieri, 564 U.S. 379, 390 (2011) (treating a lawsuit against the

---

[13] Review of the constitutionality of presidential proclamations is not done through an APA challenge, and therefore whether the Proclamation is a "final agency action" is not at issue.  Franklin v. Massachusetts, 505 U.S. 788, 796, 800–01 (1992).  However, because the Court reaches the merits of Harvard's retaliation claim, it notes that other courts have found the ability to enjoin broad swaths of agency conduct that would ordinarily not meet the APA reviewability requirements when such conduct is part of a course of retaliation violating the First Amendment.  See Wright v. U.S. Army, 307 F. Supp. 2d 1065, 1072 (D. Ariz. 2004) ("Unlike due process claims, First Amendment retaliation claims do not require a final agency action or a liberty or property entitlement.  Rather, the action of which a plaintiff is complaining must only be sufficiently adverse to deter the exercise of First Amendment rights."); Duarte Nursery, Inc. v. U. S. Army Corps of Eng'rs, No. 13-cv-02095, 2016 WL 4717986 (E.D. Cal. June 10, 2016) ("The court concludes that where a party raises constitutional challenges to agency action the action at issue does not need to be 'final agency action.'").

government by employee as a "petition" for purposes of the Petition Clause). And, as articulated <u>supra</u>, there is no question that the Proclamation constitutes an adverse action. Thus, the primary question is whether "the adverse action was motivated at least in part by the plaintiff's protected conduct." Therien, 2005 WL 1000010, at *8.

Harvard again cites a variety of evidence supporting such a connection. In addition to the actions cited supra, a Truth Social post dated May 26, 2025—merely three days after this Court's entry of a TRO against the SEVP Revocation Letter—specifically references the present litigation. [Am. Compl. ¶ 183].[14] Two days later, President Trump said in a press conference, "Harvard has to understand the last thing I want to do is hurt them. They're hurting themselves. They're fighting."[15] Bloomberg Podcasts, Trump Says Harvard Must Show List of Foreign Students (Full Q&A), YouTube (May 28, 2025), https://www.youtube.com/watch?v=L6yjpvZTbjA.

---

[14] Harvard cites a quote from a White House spokesperson following the May 28, 2025 "brainstorm" session in support of its position that the White House was criticizing it for "decid[ing] to litigate." [Am. Compl. ¶ 184]. The full quote from the spokesperson, Harrison Fields, was: "Harvard decided to litigate this on MSNBC, the now defunded NPR, and the ratings-disaster CNN instead of acting like adults like many of their competitors have done and engaging in fruitful conversations and actions that would have saved them from their self-inflicted demise." [ECF No. 54-3 at 4]. The context left out by Plaintiff makes clear that Fields is referring to "litigation" in the so-called "court of public opinion," rather than the literal litigation in this Court that is protected by the Petition Clause. Thus, although this quote does have significance as to the free speech retaliation claim, it is irrelevant for the Petition Clause claim.

[15] In addition to these events, at a public cabinet meeting on April 30, during an exchange between President Trump, Secretary McMahon, and Secretary Noem, Secretary McMahon stated about Harvard: "When we went back to them to say we'd welcome them back to the negotiating table, their response was a lawsuit . . . We're staying tough with them." [Am. Compl. ¶ 134]. Because this predates the initial complaint and TRO in the present case, this statement likely refers to the related case in this action, President and Fellows of Harvard College v. US Dep't of Health and Hum. Servs., No. 25-cv-11048. It nevertheless is probative of the Administration's attitude toward Harvard's decision to litigate.

36

In addition to these explicit references to the litigation, the timeline here leaves little
room for doubt regarding the causal connection and supports Harvard's contention that the
Proclamation was intended both to punish Harvard and, separately, to be an end run around this
Court's prior TRO and subsequent preliminary injunction proceedings.  Harvard filed its initial
complaint and TRO motion on May 23, 2025.  [ECF Nos. 1, 4].  The President criticized Harvard
on Truth Social several times, including a reference to the litigation, on May 26.  [Am. Comp.
¶¶ 182–83].  The parties had a status conference on May 27.  [ECF No. 32].  DHS issued its
official NOIW to Harvard on May 28.  [ECF No. 49].  That same day, the President convened
government officials from "nearly a dozen agencies" to brainstorm additional actions the
Administration could take against Harvard.  [ECF No. 54-3 at 4].  The next day, May 29, at the
hearing on Harvard's preliminary injunction, the parties agreed to submit a joint proposed
injunction against the SEVP Revocation Letter pending the NOIW proceedings.  [ECF Nos. 50,
52].  The Proclamation was issued on June 4, one week after the brainstorming session and the
evening before the parties' joint preliminary injunction proposal on the SEVP issue was due to
be filed.  [ECF No. 54-7].

Defendants make two arguments to the contrary.  First, they claim that Harvard is arguing
for "heightened scrutiny" of later federal action.  [ECF No. 67 at 34].  This mischaracterizes
Harvard's argument.  Harvard does not argue that any governmental action against it should be
scrutinized because it decided to sue the government; rather, Harvard cites specific instances of
conduct from the Administration that evidence that the Proclamation was motivated, "at least in

part," Therien, 2005 WL 1000010, at *8,[16] by Harvard's decision to file a lawsuit.  [ECF No. 57 at 26].

Second, Defendants reiterate the argument that Hawaii and Mandel forbid this Court from evaluating any of the above statements because they do not appear on the face of the Proclamation.  As the Court has explained supra, Hawaii mandated no such thing where the Proclamation is facially illegitimate, and assumed rational basis review was permissible even where the Proclamation is not facially illegitimate.  585 U.S. at 704–05.

For these reasons, Harvard is likely to succeed on its Petition Clause claim.

### iv.    Viewpoint Discrimination

Harvard's final First Amendment claim is for viewpoint discrimination[17] on two fronts. It argues that the April 11 Letter constitutes viewpoint discrimination because it requires "reform[s]" to achieve "viewpoint diversity."  [ECF No. 57 at 23–24].  This claim seems to be largely duplicative of the free speech retaliation claim.  Therefore, the Court focuses on Harvard's second contention, which is essentially that the Administration is discriminating

---

[16] Defendants, relying on Hartman v. Moore, 547 U.S. 250, 260–61 (2006), make the argument that "a plaintiff must plead and prove not only a retaliatory motive but also the absence of independent lawful reasons for the official action" to make a Petition Clause claim.  [ECF No. 67 at 34].  Defendants' reliance on Hartman is misplaced as that case specifically discussed a claim of retaliatory prosecution.  547 U.S. at 260–61 ("When the claimed retaliation for protected conduct is a criminal charge, . . . a constitutional tort action will differ from [a] standard case [because] the requisite causation between the defendant's retaliatory animus and the plaintiff's injury is usually more complex than it is in other retaliation cases.").  It is therefore inapplicable to the current case.

[17] Viewpoint-based discrimination is typically subject to strict scrutiny.  Bible Believers v. Wayne Cnty., 805 F.3d 228, 248 (6th Cir. 2015).  If, as Defendants argue, Hawaii is applicable, this claim is, as we have previously stated, reviewed under rational basis scrutiny.  See supra. For the reasons articulated supra, the policy is not rationally related to a legitimate state interest, and for the reasons infra, it is clearly motivated by viewpoint animus, and so it would fail under rational basis review as well as the heightened standard.

against it for perceived ideology that runs contrary to the favored views of the Administration. [Id. at 24].[18]

"One of the most egregious types of First Amendment violations is viewpoint-based discrimination. . . . Government actors may not discriminate against speakers based on viewpoint." Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1279–80 (11th Cir. 2004) (citations omitted). Nor may they "single[] out a subset of messages for disfavor based on the views expressed," Matal v. Tam, 582 U.S. 218, 248 (2017) (Kennedy, J., concurring), or "punish[] . . . organizations and their members merely because of their political beliefs and utterances," Joint Anti-Fascist Refugee Comm. v. McGrath, 341 U.S. 123, 143 (1951) (Black, J., concurring).

Vullo is instructive. In that case, the Superintendent of the New York Department of Financial Services, Maria Vullo, was highly critical of the National Rifle Association ("NRA") in the wake several high-profile shootings, and she subsequently coerced insurance companies to sever ties with the NRA to avoid investigations. 602 U.S. at 180–85. The Court held that the government cannot threaten or impose legal sanctions or other means of coercion to achieve suppression of disfavored speech. Id. at 180. Although "Vullo was free to criticize the NRA and pursue the conceded violations of New York insurance law," as a government official, she could not "attempt to coerce private parties in order to punish or suppress views that the government disfavors." Id. at 180, 187.

---

[18] Defendants, perhaps recognizing the weakness of the argument, devote just a scant paragraph in their briefing to the viewpoint discrimination argument, asserting that it "fails for the same reasons as [Harvard's] retaliation claims." [ECF No. 67 at 35].

39

The present case, although lacking the middlemen at issue in <u>Vullo</u>, presents precisely the same problem. Many of the Administration's statements in the past three months about Harvard have specifically critiqued its—real or perceived—left-leaning orientation. See [Am. Compl. ¶¶ 122 (Truth Social post stating: "Perhaps Harvard should lose its Tax Exempt Status and be Taxed as a Political Entity if it keeps pushing political, ideological, and terrorist inspired/supporting 'Sickness?'"), 123 (Truth Social post stating: "Harvard has been hiring almost all woke, Radical Left, idiots and 'birdbrains' [including former mayors Bill DeBlasio and Lori Lightfoot] . . . Many others, like these Leftist dopes, are teaching at Harvard, and because of that, Harvard can no longer be considered even a decent place of learning . . . and should no longer receive Federal Funds."), 127 (Press Release accompanying SEVP Records Request stating: "With anti-American, pro-Hamas ideology poisoning its campus and classrooms, Harvard's position as a top institution of higher learning is a distant memory. . . . This action follows President Donald J. Trump's decision to freeze $2.2 billion in federal funding to Harvard University, proposing the revocation of its tax-exempt status over its radical ideology."[19], 132 (Truth Social Post stating: "Harvard is an Anti-Semitic, Far Left Institution . . . The place is a Liberal mess, allowing a certain group of crazed lunatics to enter and exit the classroom and spew fake ANGER AND HATE."), 134 (Public cabinet meeting where President Trump said Harvard is "scamming the public and hiring people like [former New York City Mayor Bill] DeBlasio and [former Chicago Mayor] Lori Lightfoot who are certainly two of the worst mayors in the history of our country, paying them a fortune on salary, and having them teach our children how to manage cities and how to manage government" and

---

[19] The full quote is from the cited exhibit, [ECF No. 1-17].

"[t]he students [Harvard] ha[s], the professors [Harvard] ha[s], the attitude [Harvard] ha[s], is not American"); ECF No. 1-21 at 2–3 (Letter from Secretary McMahon stating: "The Harvard Corporation, which is supposed to competently and professionally manage Harvard's vast academic, financial, and physical resources, is run by strongly left-leaning Obama political appointee Penny Pritzker, a Democrat operative, who is catastrophic and running the institution in a totally chaotic way.  Harvard alumnus and highly successful hedge fund manager Bill Ackman noted that, under her leadership, Harvard has become a 'political advocacy organization for one party.'")]; Secretary Kristi Noem (@Sec_Noem), X (Jun. 1, 2025 at 12:00 PM ET) (video of an interview on Fox News where Noem criticized Harvard because, among other things, "communist and Marxist ideologies were allowed" on campus), https://x.com/sec_noem/status/1929206429912600994?s=46&t=K9-SEzbtbhZp-Upq_A7fLg.

As Vullo makes clear, President Trump and his advisers are free to make statements like these criticizing Harvard for its perceived political viewpoints.  "What [they] cannot do, however, is use the power of the State to punish or suppress disfavored expression."  Vullo, 602 U.S. at 188.  And the evidence suggests they were doing precisely that, including with regard to the Proclamation.  See [Am. Compl. ¶ 127 (SEVP records request press release); ECF No. 54-3 at 4 (White House spokesperson just prior to issuance of Proclamation stating: "The latest moves against Harvard are truly just scratching the surface.")].  Therefore, Harvard is likely to succeed on the merits of its viewpoint discrimination claim.

v.    Equal Protection

The Fifth Amendment prohibits deprivation of life, liberty, or property without due process of law.  U.S. Const. amend. V.  This has been interpreted to require equal protection under the law at the federal level.  See Bolling v. Sharpe, 347 U.S. 497, 500 (1954).

41

A41

Harvard's equal protection claim is a class-of-one claim, <u>Swanson v. City of Chetek</u>, 719 F.3d 780, 784 (7th Cir. 2013), that is largely coextensive with its retaliation claims, <u>see</u> [ECF No. 57 at 31–33].  Notably, a "plaintiff 'need only establish a likelihood of succeeding on the merits of any one of [its] claims'" for a preliminary injunction to be granted.  <u>Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs</u>, 826 F.3d 1030, 1040 (8th Cir. 2016) (quoting <u>Am. Rivers v. U.S. Army Corps of Eng'rs</u>, 271 F. Supp. 2d 230, 250 (D.D.C. 2003)).  Given the overlap, the Court reincorporates all of its prior reasoning, but otherwise leaves the Equal Protection claim for later proceedings.

### C.    Immediate and Irreparable Harm

"The loss of First Amendment freedoms unquestionably constitutes irreparable injury." <u>Wagner v. City of Holyoke</u>, 100 F. Supp. 2d 78, 82 (D. Mass. 2000), which could be the end of this Court's analysis.  Nevertheless, the Court notes that Harvard has identified a plethora of other immediate and irreparable harms that will result from the Proclamation.  In terms of immediacy, the Proclamation "comes just as summer students are arriving on campus and students slated to start in the fall are procuring visas and finalizing their travel arrangements." [Am. Compl. ¶ 9].  Harvard's inability to host these prospective visa holders would "halt important research, hamper the educational experience for students left without teachers or advisors, and deprive the community of medical care."  [<u>Id.</u> ¶ 213].  Additionally, "the loss of certification [would] irreparably harm[] Harvard's ability to compete with other institutions for the most qualified applicants at home and abroad."  [<u>Id.</u> ¶ 214].  And even international students and <u>domestic</u> students not affected by the Proclamation "have inquired about the possibility of transferring to another institution."  [<u>Id.</u> ¶ 221].  Coupled with the First Amendment violation, this is more than enough to satisfy the preliminary injunction standard.

### D.    Balance of Equities and Public Interest

It is axiomatic that "injunctions protecting First Amendment freedoms are always in the public interest." <u>Wis. Right To Life, Inc. v. Barland</u>, 751 F.3d 804, 830 (7th Cir. 2014) (quoting <u>ACLU v. Alvarez</u>, 679 F.3d 583, 590 (7th Cir. 2012)); <u>U.S. Navy Seals 1–26 v. Biden</u>, 27 F.4th 336, 353 (5th Cir. 2022); <u>Pryor v. Sch. Dist. No. 1</u>, 99 F.4th 1243, 1254 (10th Cir. 2024). Moreover, the Court notes that Harvard has specifically alleged significant harms to the public interest stemming from the loss of its international students, including consequences for STEM research and medical care in the community.  [Am. Compl. ¶ 213].  And this is to say nothing of the impacts on the international students themselves, who are facing much disruption and uncertainty.  [<u>Id.</u> ¶ 219].  As such, the Court finds that the balance of equities and public interest factors, which merge in a suit against the government, <u>Nken</u>, 556 U.S. at 435, easily favor Harvard.

### E.    Scope of the Injunction

The Court notes, as it did at oral argument, that President Trump is not a party to this case.  Thus, Defendants are enjoined from implementing, enforcing, instituting, maintaining, or in any way giving force or effect to the Proclamation.

## IV.    CONCLUSION

By necessity, this order discusses some abstract legal concepts, but it bears reminding that, at its root, this case is about core constitutional rights that must be safeguarded: freedom of thought, freedom of expression, and freedom of speech, each of which is a pillar of a functioning democracy and an essential hedge against authoritarianism.  It may be that many of us, having grown up in a culture of free speech and thought, have become complacent, but free speech, particularly in the academic arena, must be zealously defended and not taken for granted.  "The

vigilant protection of constitutional freedoms is nowhere more vital than in . . . schools.  The classroom is peculiarly the 'marketplace of ideas.'  The Nation's future depends on leaders trained through wide exposure to that robust exchange of ideas which discovers truth 'out of a multitude of tongues, (rather) than through any kid of authoritative selection.'"  Tinker v. Des Moines Indep. Cmty. Sch. Dist., 393 U.S. 503, 512 (1969) (quoting Shelton v. Tucker, 364 U.S. 479, 487 (1960)).

Here, the government's misplaced efforts to control a reputable academic institution and squelch diverse viewpoints seemingly because they are, in some instances, opposed to this Administration's own views, threaten these rights.  To make matters worse, the government attempts to accomplish this, at least in part, on the backs of international students, with little thought to the consequences to them or, ultimately, to our own citizens.  As George Washington said, if freedom of speech is taken away, then "dumb and silent we may be led, like sheep to the slaughter."  George Washington, Address to the Officers of the Army (March 15, 1783), Founders Online, https://founders.archives.gov/documents/Washington/99-01-02-10840.  Accordingly, for the reasons sets forth above, Plaintiff's motion for a preliminary injunction is **GRANTED**.  Defendants and their officers, employees, servants, agents, appointees, and successors are hereby enjoined from implementing, instituting, maintaining, or giving effect to the Proclamation until a further order is issued by this Court.

SO ORDERED.

June 23, 2025                                                    */s/ Allison D. Burroughs*
                                                                ALLISON D. BURROUGHS
                                                                U.S. DISTRICT JUDGE

**PERTINENT STATUTES AND REGULATIONS**

## 8 U.S.C. § 1182(f) Suspension of entry or imposition of restrictions by President

Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate. Whenever the Attorney General finds that a commercial airline has failed to comply with regulations of the Attorney General relating to requirements of airlines for the detection of fraudulent documents used by passengers traveling to the United States (including the training of personnel in such detection), the Attorney General may suspend the entry of some or all aliens transported to the United States by such airline.

## 8 U.S.C. § 1185(a) Restrictions and prohibitions

Unless otherwise ordered by the President, it shall be unlawful--

(1) for any alien to depart from or enter or attempt to depart from or enter the United States except under such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President may prescribe;

(2) for any person to transport or attempt to transport from or into the United States another person with knowledge or reasonable cause to believe that the departure or entry of such other person is forbidden by this section;

(3) for any person knowingly to make any false statement in an application for permission to depart from or enter the United States with intent to induce or secure the granting of such permission either for himself or for another;

(4) for any person knowingly to furnish or attempt to furnish or assist in furnishing to another a permit or evidence of permission

to depart or enter not issued and designed for such other person's use;

(5) for any person knowingly to use or attempt to use any permit or evidence of permission to depart or enter not issued and designed for his use;

(6) for any person to forge, counterfeit, mutilate, or alter, or cause or procure to be forged, counterfeited, mutilated, or altered, any permit or evidence of permission to depart from or enter the United States;

(7) for any person knowingly to use or attempt to use or furnish to another for use any false, forged, counterfeited, mutilated, or altered permit, or evidence of permission, or any permit or evidence of permission which, though originally valid, has become or been made void or invalid.

**8 C.F.R. § 214.2(f)** Students in colleges, universities, seminaries, conservatories, academic high schools, elementary schools, other academic institutions, and in language training programs.

(1) Admission of student—

(i) Eligibility for admission. A nonimmigrant student may be admitted into the United States in nonimmigrant status under section 101(a)(15)(F) of the Act, if:

(A) The student presents a Form I–20 or successor form issued in the student's name by a school certified by the Student and Exchange Visitor Program (SEVP) for attendance by F–1 foreign students;

(B) The student has documentary evidence of financial support in the amount indicated on the Form I–20 or successor form;

(C) For students seeking initial admission only, the student intends to attend the school specified in the student's visa (or, where the student is exempt from the requirement for a visa, the school indicated on the Form I–20 or successor form); and

(D) In the case of a student who intends to study at a public secondary school, the student has demonstrated that he or she has reimbursed the local educational agency that administers the school for the full, unsubsidized per capita cost of providing education at the school for the period of the student's attendance.

(ii) Form I–20 or successor form requirements at the port-of-entry. When an F–1 student applies for admission with a complete Form I–20 or successor form, the inspecting officer will:

(A) Transcribe the student's admission number from Form I–94 onto the student's Form I–20 or successor form (for students seeking initial admission only);

(B) Endorse the Form I–20 or successor form; and

(C) Return the Form I–20 or successor form to the student.

(iii) Use of the Student and Exchange Visitor Information System (SEVIS). Schools must issue a Form I–20 or successor form in SEVIS to any current student requiring a reportable action (e.g., extension of stay, practical training, and requests for employment authorization), or to any alien who must obtain a new nonimmigrant student visa.

(2) Student maintenance of Form I–20 or successor form. An F–1 student is expected to retain for safekeeping the initial Form I–20 or successor form bearing the admission number and any subsequent Form I–20 issued to them. Should the student lose their current Form I–20 or successor form, a replacement copy bearing the same information as the lost copy, including any endorsement for employment and notations, should be issued by the designated school official (DSO) as defined in § 214.3(l)(1).

(3) Admission of the spouse and minor children of an F–1 student. The spouse and minor children accompanying an F–1 student are eligible for admission in F–2 status if the student is admitted in F–1 status. The spouse and minor children following-to-join an F–1 student are eligible for admission to the United States in F–2 status if they are able to demonstrate that the F–1 student has been admitted and is, or will be within 30 days, enrolled in a full course of study, or engaged in approved practical training following

completion of studies. In either case, at the time they seek admission, the eligible spouse and minor children of an F–1 student must individually present a Form I–20 or successor form in the name of each F–2 dependent issued by a school certified by SEVP for attendance by F–1 students. A new Form I–20 or successor form is required for a dependent where there has been any substantive change in the F–1 student's current information.

**8 C.F.R. § 214.2(j)** Exchange aliens—

(1) General—

(i) Eligibility for admission. A nonimmigrant exchange visitor and his or her accompanying spouse and minor children may be admitted into the United States in J–1 and J–2 classifications under section 101(a)(15)(J) of the Act, if the exchange visitor and his or her accompanying spouse and children each presents a SEVIS Form DS–2019 issued in his or her own name by a program approved by the Department of State for participation by J–1 exchange visitors. Prior to August 1, 2003, if exigent circumstances are demonstrated, the Service will allow the dependent of an exchange visitor possessing a SEVIS Form DS–2019 to enter the United States using a copy of the exchange visitor's SEVIS Form DS–2019. However, where the exchange visitor presents a properly completed Form DS–2019, Certificate of Eligibility for Exchange Visitor (J–1) Status, which was issued to the J–1 exchange visitor by a program approved by the Department of State for participation by exchange visitors and which remains valid for the admission of the exchange visitor, the accompanying spouse and children may be admitted on the basis of the J–1's non-SEVIS Form DS–2019.

(ii) Admission period. An exchange alien, and J–2 spouse and children, may be admitted for a period up to 30 days before the report date or start of the approved program listed on Form DS–2019. The initial admission of an exchange visitor, spouse and children may not exceed the period specified on Form DS–2019, plus a period of 30 days for the purposes of travel or for the period designated by the Commissioner as provided in paragraph

(j)(1)(vi) of this section. Regulations of the Department of State published at 22 CFR part 62 give general limitations on the stay of the various classes of exchange visitors. A spouse or child may not be admitted for longer than the principal exchange visitor.

(iii) Readmission. An exchange alien may be readmitted to the United States for the remainder of the time authorized on Form I–94, without presenting Form IAP–66, if the alien is returning from a visit solely to foreign contiguous territory or adjacent islands after an absence of less than 30 days and if the original Form I–94 is presented. All other exchange aliens must present a valid Form IAP–66. An original Form IAP–66 or copy three (the pink copy) of a previously issued form presented by an exchange alien returning from a temporary absence shall be retained by the exchange alien for re-entries during the balance of the alien's stay.

(iv) Extensions of Stay. If an exchange alien requires an extension beyond the initial admission period, the alien shall apply by submitting a new Form DS–2019 which indicates the date to which the alien's program is extended. The extension may not exceed the period specified on Form DS–2019, plus a period of 30 days for the purpose of travel. Extensions of stay for the alien's spouse and children require, as an attachment to Form DS–2019, Form I–94 for each dependent, and a list containing the names of the applicants, dates and places of birth, passport numbers, issuing countries, and expiration dates. An accompanying spouse or child may not be granted an extension of stay for longer than the principal exchange alien.

(v) Employment.

(A) The accompanying spouse and minor children of a J–1 exchange visitor may accept employment only with authorization by the Immigration and Naturalization Service. A request for employment authorization must be made on Form I–765, Application for Employment Authorization, with fee, as required by the Service, to the district director having jurisdiction over the J–1 exchange visitor's temporary residence in the United States. Income from the spouse's or

A49

dependent's employment may be used to support the family's customary recreational and cultural activities and related travel, among other things. Employment will not be authorized if this income is needed to support the J–1 principal alien.

(B) J–2 employment may be authorized for the duration of the J–1 principal alien's authorized stay as indicated on Form I–94 or a period of four years, whichever is shorter. The employment authorization is valid only if the J–1 is maintaining status. Where a J–2 spouse or dependent child has filed a timely application for extension of stay, only upon approval of the request for extension of stay may he or she apply for a renewal of the employment authorization on a Form I–765 with the required fee.

(vi) Extension of duration of status. The Commissioner may, by notice in the Federal Register, at any time she determines that the H–1B numerical limitation as described in section 214(g)(1)(A) of the Act will likely be reached prior to the end of a current fiscal year, extend for such a period of time as the Commissioner deems necessary to complete the adjudication of the H–1B application, the duration of status of any J–1 alien on behalf of whom an employer has timely filed an application for change of status to H–1B. The alien, in accordance with 8 CFR part 248, must not have violated the terms of his or her nonimmigrant stay and is not subject to the 2–year foreign residence requirement at 212(e) of the Act. Any J–1 student whose duration of status has been extended shall be considered to be maintaining lawful nonimmigrant status for all purposes under the Act, provided that the alien does not violate the terms and conditions of his or her J nonimmigrant stay. An extension made under this paragraph also applies to the J–2 dependent aliens.

(vii) Use of SEVIS. At a date to be established by the Department of State, the use of the Student and Exchange Visitor Information System (SEVIS) will become mandatory for designated program sponsors. After that date, which will be announced by publication in the Federal Register, all designated

program sponsors must begin issuance of the SEVIS Form DS–2019.

(viii) Current name and address. A J–1 exchange visitor must inform the Service and the responsible officer of the exchange visitor program of any legal changes to his or her name or of any change of address, within 10 days of the change, in a manner prescribed by the program sponsor. A J–1 exchange visitor enrolled in a SEVIS program can satisfy the requirement in 8 CFR 265.1 of notifying the Service by providing a notice of a change of address within 10 days to the responsible officer, who in turn shall enter the information in SEVIS within 21 days of notification by the exchange visitor. A J–1 exchange visitor enrolled at a non-SEVIS program must submit a change of address to the Service, as provided in 8 CFR 265.1, within 10 days of the change. Except in the case of an exchange visitor who cannot receive mail where he or she resides, the address provided by the exchange visitor must be the actual physical location where the exchange visitor resides rather than a mailing address. In cases where an exchange visitor provides a mailing address, the exchange visitor program must maintain a record of, and must provide upon request from the Service, the actual physical location where the exchange visitor resides.

(2) Special reporting requirement. Each exchange alien participating in a program of graduate medical education or training shall file Form I–644 (Supplementary Statement for Graduate Medical Trainees) annually with the Service attesting to the conditions as specified on the form. The exchange alien shall also submit Form I–644 as an attachment to a completed Form DS–2019 when applying for an extension of stay.

(3) Alien in cancelled programs. When the approval of an exchange visitor program is withdrawn by the Director of the United States Information Agency, the district director shall send a notice of the withdrawal to each participant in the program and a copy of each such notice shall be sent to the program sponsor. If the exchange visitor is currently engaged in activities authorized by the cancelled program, the participant is authorized to remain in the United States to engage in those activities until expiration

of the period of stay previously authorized. The district director shall notify participants in cancelled programs that permission to remain in the United States as an exchange visitor, or extension of stay may be obtained if the participant is accepted in another approved program and a Form DS–2019, executed by the new program sponsor, is submitted. In this case, a release from the sponsor of the cancelled program will not be required.

(4) Eligibility requirements for section 101(a)(15)(J) classification for aliens desiring to participate in programs under which they will receive graduate medical education or training—

(i) Requirements. Any alien coming to the United States as an exchange visitor to participate in a program under which the alien will receive graduate medical education or training, or any alien seeking to change nonimmigrant status to that of an exchange visitor on Form I–506 for that purpose, must have passed parts of I and II of the National Board of Medical Examiners Examination (or an equivalent examination as determined by the Secretary of Health and Human Services), and must be competent in oral and written English, and shall submit a completely executed and valid Form DS–2019.

(ii) Exemptions. From January 10, 1978 until December 31, 1983, any alien who has come to or seeks to come to the United States as an exchange visitor to participate in an accredited program of graduate medical education or training, or any alien who seeks to change nonimmigrant status for that purpose, may be admitted to participate in such program without regard to the requirements stated in subparagraphs (A) and (B)(ii)(I) of section 212(j)(1) of the Act if a substantial disruption in the health services provided by such program would result from not permitting the alien to participate in the program: Provided that the exemption will not increase the total number of aliens then participating in such programs to a level greater than that participating on January 10, 1978.

(5) Remittance of the fee. An alien who applies for J–1 nonimmigrant status in order to commence participation in a Department of State-designated exchange visitor program is

A52

required to pay the SEVIS fee to DHS, pursuant to 8 CFR 214.13, except as otherwise provided in that section.

**8 C.F.R. § 214.3(g)** Recordkeeping and reporting requirements—

(1) Student records. An SEVP–certified school must keep records containing certain specific information and documents relating to each F–1 or M–1 student to whom it has issued a Form I–20 or successor form, while the student is attending the school and until the school notifies SEVP, in accordance with the requirements of paragraphs (g)(1) and (2) of this section, that the student is no longer pursuing a full course of study at that school. Student information not required for entry in SEVIS may be kept in the school's student system of records, but must be accessible to DSOs. The school must keep a record of having complied with the reporting requirements for at least three years after the student is no longer pursuing a full course of study at that school. The school must maintain records on the student in accordance with paragraphs (g)(1) and (2) of this section if a school recommends reinstatement for a student who is out of status. The school must maintain records on the student for three years from the date of the denial if the reinstatement is denied. The DSO must make the information and documents required by this paragraph (g)(1) available, including academic transcripts, and must furnish them to DHS representatives upon request. Schools must maintain and be able to provide an academic transcript or other routinely maintained student records that reflect the total, unabridged academic history of the student at the institution, in accordance with paragraph (g)(1)(iv) of this section. All courses must be recorded in the academic period in which the course was taken and graded. The information and documents that the school must keep on each student are as follows:

(i) Identification of the school, to include name and full address.

(ii) Identification of the student, to include name while in attendance (record any legal name change), date and place of birth, country of citizenship, and school's student identification number.

(iii) Current address where the student and his or her dependents physically reside. In the event the student or his or her dependents cannot receive mail at such physical residence, the school must provide a mailing address in SEVIS. If the mailing address and the physical address are not the same, the school must maintain a record of both mailing and physical addresses and provide the physical location of residence of the student and his or her dependents to DHS upon request.

(iv) Record of coursework. Identify the student's degree program and field of study. For each course, give the periods of enrollment, course identification code and course title; the number of credits or contact hours, and the grade; the number of credits or clock hours, and for credit hour courses the credit unit; the term unit (semester hour, quarter hour, etc.). Include the date of withdrawal if the student withdrew from a course. Show the grade point average for each session or term. Show the cumulative credits or clock hours and cumulative grade point average. Narrative evaluation will be accepted in lieu of grades when the school uses no other type of grading.

(v) Record of transfer credit or clock hours accepted. Type of hours, course identification, grades.

(vi) Academic status. Include the effective date or period if suspended, dismissed, placed on probation, or withdrawn.

(vii) Whether the student has been certified for practical training, and the beginning and end dates of certification.

(viii) Statement of graduation (if applicable). Title of degree or credential received, date conferred, program of study or major.

(ix) Termination date and reason.

(x) The documents referred to in paragraph (k) of this section.

Note to paragraph (g)(1): A DHS officer may request any or all of the data in paragraphs (g)(1)(i) through (x) of this section on any individual student or class of students upon notice. This notice will be in writing if requested by the school. The school will have three work days to respond to any request for information concerning an individual student, and ten work days to respond to any request for

information concerning a class of students. The school will respond orally on the same day the request for information is made if DHS requests information on a student who is being held in custody, and DHS will provide a written notification that the request was made after the fact, if the school so desires. DHS will first attempt to gain information concerning a class of students from DHS record systems.

(2) Reporting changes in student and school information.

(i) Schools must update SEVIS with the current information within 21 days of a change in any of the information contained in paragraphs (f)(1) and (h)(3) of this section.

(ii) Schools are also required to report within 21 days any change of the information contained in paragraph (g)(1) or the occurrence of the following events:

(A) Any student who has failed to maintain status or complete his or her program;

(B) A change of the student's or dependent's legal name or U.S. address;

(C) Any student who has graduated early or prior to the program end date listed on SEVIS Form I–20;

(D) Any disciplinary action taken by the school against the student as a result of the student being convicted of a crime; and

(E) Any other notification request not covered by paragraph (g)(1) of this section made by DHS with respect to the current status of the student.

(F) For F–1 students authorized by USCIS to engage in a 24–month extension of OPT under 8 CFR 214.2(f)(10)(ii)(C):

(1) Any change that the student reports to the school concerning legal name, residential or mailing address, employer name, or employer address; and

(2) The end date of the student's employment reported by a former employer in accordance with 8 CFR 214.2(f)(10)(ii)(C)(6).

(iii) Each term or session and no later than 30 days after the deadline for registering for classes, schools are required to report the following registration information:

(A) Whether the student has enrolled at the school, dropped below a full course of study without prior authorization by the DSO, or failed to enroll;

(B) The current address of each enrolled student; and

(C) The start date of the student's next session, term, semester, trimester, or quarter. For initial students, the start date is the "program start date" or "report date." (These terms are used interchangeably.) The DSO may choose a reasonable date to accommodate a student's need to be in attendance for required activities at the school prior to the actual start of classes when determining the report date on the Form I–20. Such required activities may include, but are not limited to, research projects and orientation sessions. The DSO may not, however, indicate a report date more than 30 days prior to the start of classes. The next session start date is the start of classes for continuing students.

(D) Adjustment to the program completion date. Any factors that influence the student's progress toward program completion (e.g., deferred attendance, authorized drop below, program extension) must be reflected by making an adjustment updating the program completion date.

(3) Administrative correction of a student's record. In instances where technological or computer problems on the part of SEVIS cause an error in the student's record, the DSO may request the SEVIS system administrator, without fee, to administratively correct the student's record.

(4) [Redesignated as subsection (g)(3) by 73 FR 55698]

A56

**8 C.F.R. § 214.3(h)** SEVP certification, recertification, out-of-cycle review, and oversight of schools—

(1) Certification. A school seeking SEVP certification for attendance by nonimmigrants under section 101(a)(15)(F) or 101(a)(15)(M) of the Act must use SEVIS to file an electronic petition (which compiles the data for the Form I–17) and must submit the nonrefundable certification petition fee on-line.

(i) Filing a petition. The school must access the SEVP website at https://www.ice.gov/sevis to file a certification petition in SEVIS. The school will be issued a temporary SEVIS user ID and password in order to access SEVIS to complete and submit an electronic Form I–17. The school must submit the proper nonrefundable certification petition fee as provided in 8 CFR 103.7(d)(2).

(ii) Site visit, petition adjudication and school notification. SEVP will conduct a site visit for each petitioning school and its additional schools or campuses. SEVP will contact the school to arrange the site visit. The school must comply with and complete the visit within 30 days after the date SEVP contacts the school to arrange the visit, or the petition for certification will be denied as abandoned. DSOs and school officials that have signed the school's Form I–17 petition must be able to demonstrate to DHS representatives how they obtain access to the regulations cited in the certification petition as part of the site visit. Paper or electronic access is acceptable. DSOs must be able to extract pertinent citations within the regulations related to their requirements and responsibilities. SEVP will serve a notice of approval and SEVIS will be updated to reflect the school's certification if SEVP authorizes the school's certification petition.

(iii) Certification denial. SEVP will serve a notice of denial in accordance with paragraph (f)(2) of this section if a school's petition for certification is denied.

(2) Recertification. Schools are required to file a completed petition for SEVP recertification before the school's certification expiration date, which is 2 years from the date of their previous SEVP certification or recertification expiration date. The school

must submit the proper nonrefundable recertification petition fee as provided in 8 CFR 103.7(d)(2). SEVP will review a petitioning school's compliance with the recordkeeping, retention, and reporting, and other requirements of paragraphs (f), (g), (j), (k), and (l) of this section, as well as continued eligibility for certification, pursuant to paragraph (a)(3) of this section.

(i) Filing of petition for recertification. Schools must submit a completed Form I–17 (including any supplements and bearing signatures of all officials) using SEVIS. SEVP will notify all DSOs of a previously certified school 180 days prior to the school's certification expiration date that the school may submit a petition for recertification. A school may file its recertification petition at any time after receipt of this notification. A school must submit a complete recertification petition package, as outlined in the submission guidelines, by its certification expiration date. SEVP will send a notice of confirmation of complete filing or rejection to the school upon receipt of any filing of a petition for recertification.

(A) Notice of confirmation assures a school of uninterrupted access to SEVIS while SEVP adjudicates the school's petition for recertification. A school that has complied with the petition submission requirements will continue to have SEVIS access after its certification expiration date while the adjudication for recertification is pending. The school is required to comply with all regulatory recordkeeping, retention and reporting, and other requirements of paragraphs (f), (g), (j), (k), and (l) of this section during the period the petition is pending.

(B) Notice of rejection informs a school that it must take prompt corrective action in regard to its recertification petition prior to its certification expiration date to ensure that its SEVIS access will not be terminated and its petition for recertification will be accepted for adjudication.

(ii) Consequence of failure to petition. SEVP will serve an NOIW to the school 30 days prior to a school's certification expiration date. SEVP will no longer accept a petition for recertification

A58

from the school and will immediately withdraw the school's certification if the school does not petition for recertification, abandons its petition, or does not submit a complete recertification petition package by the certification expiration date, in accordance with the automatic withdrawal criteria in 8 CFR 214.4(a)(3). The school must comply with 8 CFR 214.4(i) upon withdrawal.

(iii) School recertification process—

(A) General. School recertification reaffirms the petitioning school's eligibility for SEVP certification and the school's compliance with recordkeeping, retention, reporting and other requirements of paragraphs (f), (g), (j), (k), and (l) of this section since its previous certification.

(B) Compliance. Assessment by SEVP of a school petitioning for recertification will focus primarily on overall school compliance, but may also include examination of individual DSO compliance as data and circumstances warrant. Past performance of these individuals, whether or not they continue to serve as principal designated school officials (PDSOs) or DSOs, will be considered in any petition for recertification of the school.

(C) On-site review for recertification. All schools are subject to on-site review, at the discretion of SEVP, in conjunction with recertification. The school must comply with and complete an on-site review within 30 days of the notification by a DHS representative of a school that it has been selected for an on-site review for recertification, or the petition for recertification will be denied as abandoned, resulting in the school's withdrawal from SEVIS.

(iv) Recertification approval. SEVP will serve a notice of approval if a school's petition for recertification is approved. The date of the subsequent recertification review will be two years after the school's certification expiration date from this petition cycle.

(v) Recertification denial. SEVP will serve a notice of denial if a school's petition for recertification is denied, in accordance with 8 CFR 103.3(a)(1)(i).

(vi) Adjustment of certification expiration date. Schools eligible for recertification before March 25, 2009 will, at a minimum, have their certification expiration date extended to March 25, 2009. SEVP may extend the certification expiration date beyond this date during the first cycle of recertification.

(3) Out-of-cycle review and oversight of SEVP–certified schools.

(i) SEVP will determine if out-of-cycle review is required upon receipt in SEVIS of any changes from an SEVP–certified school to its Form I–17 information. The Form I–17 information that requires out-of-cycle review when changed includes:

(A) Approval for attendance of students (F/M/both);

(B) Name of school system; name of main campus;

(C) Mailing address of the school;

(D) Location of the school;

(E) School type;

(F) Public/private school indicator;

(G) Private school owner name;

(H) The school is engaged in;

(I) The school operates under the following Federal, State, Local or other authorization;

(J) The school has been approved by the following national, regional, or state accrediting association or agency;

(K) Areas of study;

(L) Degrees available from the school;

(M) If the school is engaged in elementary or secondary education;

(N) If the school is engaged in higher education;

(O) If the school is engaged in vocational or technical education;

(P) If the school is engaged in English language training;

(Q) Adding or deleting campuses;

(R) Campus name;

(S) Campus mailing address; and

(T) Campus location address.

(ii) SEVP may request a school to electronically update all Form I–17 fields in SEVIS and provide SEVP with documentation supporting the update. The school must complete such updates in SEVIS and submit the supporting documentation to SEVP within 10 business days of the request from SEVP.

(iii) SEVP may review a school's certification at any time to verify the school's compliance with the recordkeeping, retention, reporting and other requirements of paragraphs (f), (g), (j), (k), and (l) of this section to verify the school's continued eligibility for SEVP certification pursuant to paragraph (a)(3) of this section. SEVP may initiate remedial action with the school, as appropriate, and may initiate withdrawal proceedings against the school pursuant to 8 CFR 214.4(b) if noncompliance or ineligibility of a school is identified.

(iv) On-site review. SEVP–certified schools are subject to on-site review at any time. SEVP will initiate withdrawal proceedings against a certified school, pursuant to 8 CFR 214.4(b), if the certified school selected for on-site review prior to its certification expiration date fails to comply with and complete the review within 30 days of the date SEVP contacted the school to arrange the review.

(v) Notice of Continued Eligibility. SEVP will serve the school a notice of continued eligibility if, upon completion of an out-of-cycle review, SEVP determines that the school remains eligible for certification. Such notice will not change the school's previously-determined certification expiration date unless specifically notified by SEVP.

(vi) Withdrawal of certification. SEVP will institute withdrawal proceedings in accordance with 8 CFR 214.4(b) if, upon completion of an out-of-cycle review, SEVP determines that a school or its programs are no longer eligible for certification.

(vii) Voluntary withdrawal. A school can voluntarily withdraw from SEVP certification at any time or in lieu of complying with an out-of-cycle review or request. Failure of a school to comply with an out-of-cycle review or request by SEVP will be treated as a voluntary withdrawal. A school must initiate voluntary withdrawal by sending a request for withdrawal on official school letterhead to SEVP.

## 8 C.F.R. § 214.4 Denial of certification, denial of recertification, or withdrawal of SEVP certification.

(a) General—

(1) Denial of certification. The petitioning school will be notified of the reasons and its appeal rights if a petition for certification is denied, in accordance with the provisions of 8 CFR 103.3(a)(1)(iii). A petitioning school denied certification may file a new petition for certification at any time.

(2) Denial of recertification or withdrawal on notice. The school must wait at least one calendar year from the date of denial of recertification or withdrawal on notice before being eligible to petition again for SEVP certification if a school's petition for recertification is denied by SEVP pursuant to § 214.3(h)(2)(v), or its certification is withdrawn on notice pursuant to paragraph (b) of this section. Eligibility to re-petition will be at the discretion of the Director of SEVP. SEVP certification of a school or school system for the attendance of nonimmigrant students, pursuant to sections 101(a)(15)(F) and/or 101(a)(15)(M) of the Immigration and Nationality Act, will be withdrawn on notice subsequent to out-of-cycle review, or recertification denied, if the school or school system is determined to no longer be entitled to certification for any valid and substantive reason including, but not limited to, the following:

(i) Failure to comply with 8 CFR 214.3(g)(1) without a subpoena.

(ii) Failure to comply with 8 CFR 214.3(g)(2).

(iii) Failure of a DSO to notify SEVP of the attendance of an F–1 transfer student as required by 8 CFR 214.2(f)(8)(ii).

(iv) Failure of a DSO to identify on the Form I–20 or successor form which school within the system the student must attend, in compliance with 8 CFR 214.3(k).

(v) Willful issuance by a DSO of a false statement, including wrongful certification of a statement by signature, in connection with a student's school transfer or application for employment or practical training.

(vi) Conduct on the part of a DSO that does not comply with the regulations.

(vii) The designation as a DSO of an individual who does not meet the requirements of 8 CFR 214.3(l)(1).

(viii) Failure to provide SEVP with the school's Form I–17 bearing the names, titles, and signatures of DSOs as required by 8 CFR 214.3(l)(2).

(ix) Failure to submit statements of DSOs as required by 8 CFR 214.3(l)(3).

(x) Issuance of Form I–20 or successor form to students without receipt of proof that the students have met scholastic, language, or financial requirements as required by 8 CFR 214.3(k)(2).

(xi) Issuance of Form I–20 or successor form to aliens who will not be enrolled in or carry full courses of study, as defined in 8 CFR 214.2(f)(6) or 214.2(m)(9).

(xii) Failure to operate as a bona fide institution of learning.

(xiii) Failure to employ adequate qualified professional personnel.

(xiv) Failure to limit advertising in the manner prescribed in 8 CFR 214.3(j).

(xv) Failure to maintain proper facilities for instruction.

(xvi) Failure to maintain accreditation or licensing necessary to qualify graduates as represented in the school's Form I–17.

(xvii) Failure to maintain the physical plant, curriculum, and teaching staff in the manner represented in the Form I–17.

(xviii) Failure to comply with the procedures for issuance of Form I–20 or successor form as set forth in 8 CFR 214.3(k).

(xix) Failure of a DSO to notify SEVP of material changes, such as changes to the school's name, address, or curricular changes that represent material change to the scope of institution offerings (e.g., addition of a program, class or course for which the school is issuing Form I–20 or successor form, but which does not have Form I–17 approval), as required by 8 CFR 214.3(f)(1).

(3) Automatic withdrawal. A school that is automatically withdrawn and subsequently wishes to enroll nonimmigrant students in the future may file a new petition for SEVP certification at any time. The school must use the certification petition procedures described in § 214.3(h) to gain access to SEVIS for submitting its petition. Past compliance with the recordkeeping, retention, reporting and other requirements of 8 CFR 214.3(f), (g), (j), (k), and (l), and with the requirements for transition of students under paragraph (i) of this section will be considered in the evaluation of a school's subsequent petition for certification. SEVP certification will be automatically withdrawn:

(i) As of the date of termination of operations, if an SEVP–certified school terminates its operations.

(ii) As of a school's certification expiration date, if an SEVP–certified school does not submit a completed recertification petition in the manner required by 8 CFR 214.3(h)(2).

(iii) Sixty days after the occurrence of the change of ownership if the school failed to update its information in accordance with § 214.3(h)(1) or properly file a new petition, SEVP will review the petition if the school properly files such petition to determine whether the school still meets the eligibility requirements of § 214.3(a)(3) and is still in compliance with the recordkeeping, retention, reporting and other requirements of § 214.3(f), (g), (j), (k), and (l). SEVP will review the petition if the school properly files such petition to determine whether the school still meets the eligibility requirements of 8 CFR 214.3(a)(3) and is still in compliance with the recordkeeping, retention, reporting and other requirements of 8 CFR 214.3(f), (g), (j), (k), and (l). SEVP

will institute withdrawal proceedings in accordance with paragraph (b) of this section if, upon completion of the review, SEVP finds that the school is no longer eligible for certification, or is not in compliance with the recordkeeping, retention, reporting and other requirements of § 214.3(f), (g), (j), (k), and (l), or failed to file a new petition within the allowable 60–day timeframe.

(iv) If an SEVP–certified school voluntarily withdraws from its certification.

(b) Withdrawal on notice. SEVP will initiate an out-of-cycle review and serve the school with an NOIW if SEVP has information that a school or school system may no longer be entitled to SEVP certification prior to the school being due for its two-year recertification. The NOIW will inform the school of:

(1) The grounds for withdrawing SEVP certification.

(2) The 30–day deadline from the date of the service of the NOIW for the school to submit sworn statements, and documentary or other evidence, to rebut the grounds for withdrawal of certification in the NOIW. An NOIW is not a means for the school to submit evidence that it should have previously submitted as a part of its established reporting requirements.

(3) The school's right to submit a written request (including e-mail) within 30 days of the date of service of the NOIW for a telephonic interview in support of its response to the NOIW.

(c) Assistance of counsel. The school or school system shall also be informed in the notice of intent to withdraw certification that it may be assisted or represented by counsel of its choice qualified under part 292 of this chapter, at no expense to the Government, in preparation of its answer or in connection with the interview.

(d) Allegations admitted or no answer filed. If the school or school system admits all of the allegations in the notice of intent to withdraw certification, or if the school or school system fails to file an answer within the 30–day period, SEVP will withdraw the certification previously granted and notify the designated school official of the decision. No appeal of SEVP's decision will be accepted

A65

if all allegations are admitted or no answer is filed within the 30–day period.

(e) Allegations denied. If the school or school system denies the allegations in the notice of intent to withdraw certification, then the school or school system shall, in its answer, provide all information or evidence on which the answer is based.

(f) Interview requested.

(1) If in its answer to the notice of intent to withdraw certification the school or school system requests an interview, the school or school system will be given notice of the date set for the interview.

(2) A summary of the information provided by the school or school system at the interview will be prepared and included in the record. At the discretion of SEVP, the interview may be recorded.

(g) Decision. The decision of SEVP will be in accordance with 8 CFR 103.3(a)(1).

(h) Appeals. A school may file an appeal of a denial or withdrawal no later than 15 days after the service of the decision by ICE. The appeal must state the reasons and grounds for contesting the denial or withdrawal. The appeal must be accompanied by the fee as provided in 8 CFR 103.7(d)(15).

(i) Operations at a school when SEVP certification is relinquished or withdrawn, or whose recertification is denied and on the SEVIS access termination date—

(1) General. A school whose certification is relinquished or withdrawn, or whose recertification is denied may, at SEVP discretion, no longer be able to create Initial student records or issue new Form I–20, Certificate of Eligibility for Nonimmigrant Student Status, or successor form, for initial attendance. Schools must comply with the instructions given in the notice of withdrawal or denial with regard to management of status for their Initial and continuing F and/or M students. All other SEVIS functionality, including event reporting for students, will remain unchanged until the school's SEVIS access termination date. The school must continue to comply with the recordkeeping,

retention, reporting and other requirements of 8 CFR 214.3(f), (g), (j), (k), and (l) until its SEVIS access termination date.

(2) SEVIS access termination. In determining the SEVIS access termination date, SEVP will consider the impact that such date will have upon SEVP, the school, and the school's nonimmigrant students in determining the SEVIS access termination date. In most situations, SEVP will not determine a SEVIS access termination date for that school until the appeals process has concluded and the denial or withdrawal has been upheld unless a school whose certification is withdrawn or whose recertification is denied is suspected of criminal activity or poses a potential national security threat. The school will no longer be able to access SEVIS, and SEVP will automatically terminate any remaining Active SEVIS records for that school on the SEVIS access termination date.

(3) Legal obligations and ramifications for a school and its DSOs when a school is having SEVP certification denied or withdrawn. Schools are obligated to their students to provide the programs of study to which they have committed themselves in the students' application for enrollment and acceptance process. Schools are obligated to the U.S. government to comply with the recordkeeping, retention, reporting and other requirements contained in 8 CFR 214.3. With any new petition for SEVP certification, SEVP will consider the extent to which a school has fulfilled these obligations to students and the U.S. government during any previous period of SEVP certification.