No. 25-1627

# IN THE UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT

PRESIDENT AND FELLOWS OF HARVARD COLLEGE,

Plaintiffs-Appellees,

v.

UNITED STATES DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, in their official capacity as Secretary of the United States Department of Homeland Security; UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT; TODD LYONS, in their official capacity as Acting Director of United States Immigration and Customs Enforcement; STUDENT AND EXCHANGE VISITOR PROGRAM; JOHN DOE, in their official capacity as Director of the Student and Exchange Visitor Program; JAMES HICKS, in their official capacity as Deputy Assistant Director of the Student and Exchange Visitor Program; UNITED STATES DEPARTMENT OF JUSTICE; PAMELA BONDI, in their official capacity as Attorney General of the United States; UNITED STATES DEPARTMENT OF STATE; MARCO RUBIO, in their official capacity as Secretary of the United States Department of State,

Defendants-Appellants.

On Appeal from the United States District Court
for the District of Massachusetts

**BRIEF FOR *AMICUS CURIAE* FEDERATION FOR AMERICAN IMMIGRATION REFORM IN SUPPORT OF DEFENDANTS-APPELLANTS AND REVERSAL**

MATT A. CRAPO
CHRISTOPHER J. HAJEC
DAVID L. JAROSLAV
Federation for American Immigration Reform
25 Massachusetts Ave., NW, Suite 330
Washington, DC 20001
Phone: (202) 328-7004
mcrapo@irli.org

Attorneys for *Amicus Curiae*
Federation for American Immigration Reform

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, *amicus curiae* Federation for American Immigration Reform makes the following disclosures:

1) For non-governmental corporate parties please list all parent corporations: None.

2) For non-governmental corporate parties please list all publicly held companies that hold 10% or more of the party's stock: None.

DATED: September 2, 2025                Respectfully submitted,

                                        s/ Matt Crapo

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT

TABLE OF AUTHORITIES ................................................................................... ii

INTEREST OF *AMICUS CURIAE* ........................................................................ 1

SUMMARY OF ARGUMENT ............................................................................... 2

ARGUMENT ........................................................................................................... 2

  I.   The President has inherent constitutional authority to exclude aliens from the United States ............................................................................... 2

  II.  The Proclamation and actions by executive officials to carry it out were alike presidential actions taken pursuant to core presidential authority, and consequently immune from being enjoined ............................................... 4

CONCLUSION ........................................................................................................ 8

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

### CASES

*Chicago & Southern Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103 (1948).3

*Dalton v. Specter*, 511 U.S. 462 (1994)................................................................7

*Detroit Int'l Bridge Co. v. Gov't of Can.*, 189 F. Supp. 3d 85 (D.D.C. 2016)...........7

*Franklin v. Massachusetts*, 505 U.S. 788 (1992) ...................................................6

*Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475 (1867).........................................4, 5

*Nishimura Ekiu v. United States*, 142 U.S. 651 (1892) ..........................................3

*Nixon v. Fitzgerald*, 457 U.S. 731 (1982)..............................................................6

*Trump v. United States*, 603 U.S. 593 (2024)........................................................6

*Tulare Cty. v. Bush*, 185 F. Supp. 2d 18 (D.D.C. 2001)..........................................7

*United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537 (1950).........................3

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952)..........................3, 6

### STATUTES

8 U.S.C. § 1182(f)................................................................................................3, 4

8 U.S.C. § 1185(a)(1)...........................................................................................3, 4

### CONSTITUTIONAL PROVISIONS

U.S. Const. art. II, § 1, cl. 1 ...................................................................................4

# INTEREST OF *AMICUS CURIAE*

*Amicus curiae* Federation for American Immigration Reform (FAIR) is a nonprofit corporation and membership organization that was founded in 1979 and has its principal p lace of business in Washington, D.C.[1] FAIR's mission is to inform the public about the effects of both unlawful and lawful immigration, and to defend American citizens, American workers, and the nation's environment by limiting overall immigration, enhancing border security, and ending illegal immigration. In short, FAIR seeks to protect all Americans against the substantial harms of mass migration by attaining strongly enforced, patriotic immigration reform. To that end, FAIR has been involved in more 100 legal cases since 1980, either as a party or as *amicus curiae,* in which it has consistently defended American interests against illegal immigration into the United States.

The decision in this case will likely have a substantial impact on the tools available to the executive branch of the federal government in dealing efficiently, fairly, and safely with an illegal alien population estimated to exceed 18 million people in the United States. *Amicus* FAIR has direct and vital interests in

---

[1] All parties have consented to the filing of this *amicus* brief by Federation for American Immigration Reform. No counsel for any party authored this brief in whole or in part and no person or entity, other than *amicus curiae*, its members, or its counsel, has contributed money that was intended to fund preparing or submitting the brief.

defending the executive branch's authority to address the current illegal alien crisis.

## SUMMARY OF ARGUMENT

The President has inherent authority under the Constitution to exclude aliens from the United States, apart from and in addition to any related power granted to him by Congress. This authority is of a piece with his core constitutional power to conduct foreign policy. The Supreme Court has long held that enjoining discretionary presidential exercises of such power would violate the separation of powers. Once President Trump issued his Proclamation, moreover, actions taken by executive officials to carry it out became presidential actions, equally immune from injunction. Because the District Court erred in determining that Plaintiffs were likely to succeed on the merits, this Court should vacate the District Court's injunction.

## ARGUMENT

### I. The President has inherent constitutional authority to exclude aliens from the United States.

There is no question that the United States has a right inherent in its sovereignty to defend itself from foreign dangers by controlling the admission of aliens. "It is an accepted maxim of international law that every sovereign nation has the power, as inherent in sovereignty, and essential to self-preservation, to forbid the entrance of foreigners within its dominions, or to admit them only in

such cases and upon such conditions as it may see fit to prescribe." *Nishimura Ekiu v. United States*, 142 U.S. 651, 659 (1892). It is also well-established that the President has independent authority in the areas of foreign policy and national security. *See, e.g., Chicago & Southern Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 109 (1948) ("The President . . . possesses in his own right certain powers conferred by the Constitution on him as Commander-in-Chief and as the Nation's organ in foreign affairs"); *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542-43 (1950) ("The exclusion of aliens is a fundamental act of sovereignty … inherent in [both Congress and] the executive department of the sovereign"); *see also id.* at 542 ("When Congress prescribes a procedure concerning the admissibility of aliens, it is *not* dealing alone with a legislative power. It is implementing *an inherent executive power*.") (emphases added).

Therefore, Congress, by enacting 8 U.S.C. §§ 1182(f) and 1185(a)(1), has acknowledged the President's inherent authority to exclude aliens in the nation's interest and bolstered that authority with its own, rather than delegating to the President discretion to exercise authority he would not already possess. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952). As Justice Jackson elaborated in his concurrence in *Youngstown*, *id.* at 635-37 (footnote omitted):

> When the President acts pursuant to an express or implied authorization of Congress, his authority is at its maximum, for it includes all that he possesses in his own right plus all that Congress can delegate. In these circumstances, and in these only, may he be said (for what it may be

3

> worth) to personify the federal sovereignty. If his act is held unconstitutional under these circumstances, it usually means that the Federal Government as an undivided whole lacks power. [An executive action] executed by the President pursuant to an Act of Congress would be supported by the strongest of presumptions and the widest latitude of judicial interpretation, and the burden of persuasion would rest heavily upon any who might attack it.

It follows that the President's inherent constitutional power to exclude aliens could not be a nullity even were it exercised outside of the precise form of its implementation by Congress in 8 U.S.C. §§ 1182(f) or 1185(a)(1). Because the President's Proclamation was pursuant to an act of Congress implementing that inherent power, his authority to act was at its apogee.

## II. The Proclamation and actions by executive officials to carry it out were alike presidential actions taken pursuant to core presidential authority, and consequently immune from being enjoined.

The Constitution of the United States vests all federal executive power in the President. *See* U.S. Const. art. II, § 1, cl. 1. Therefore, courts have long held that to enjoin the President's discretionary rather than purely ministerial acts is a judicial intrusion on the separation of powers. The Supreme Court first explained this distinction at length in *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475 (1867), in refusing to enjoin Andrew Johnson from enforcement of the Reconstruction Acts:

> A ministerial duty, the performance of which may, in proper cases, be required of the head of a department, by judicial process, is one in respect to which nothing is left to discretion. It is a simple, definite duty, arising under conditions admitted or proved to exist, and imposed by law.

      The case of *Marbury v. Madison, Secretary of State*, furnishes an illustration. A citizen had been nominated, confirmed, and appointed a justice of the peace for the District of Columbia, and his commission had been made out, signed, and sealed. Nothing remained to be done except delivery, and the duty of delivery was imposed by law on the Secretary of State. It was held that the performance of this duty might be enforced by mandamus issuing from a court having jurisdiction.

      So, in the case of *Kendall, Postmaster-General, v. Stockton & Stokes*, an act of Congress had directed the Postmaster-General to credit Stockton & Stokes with such sums as the Solicitor of the Treasury should find due to them; and that officer refused to credit them with certain sums, so found due. It was held that the crediting of this money was a mere ministerial duty, the performance of which might be judicially enforced.

      In each of these cases nothing was left to discretion. There was no room for the exercise of judgment. The law required the performance of a single specific act; and that performance, it was held, might be required by mandamus.

      Very different is the duty of the President in the exercise of the power to see that the laws are faithfully executed, and among these laws the acts named in the bill. By the first of these acts he is required to assign generals to command in the several military districts, and to detail sufficient military force to enable such officers to discharge their duties under the law. By the supplementary act, other duties are imposed on the several commanding generals, and these duties must necessarily be performed under the supervision of the President as commander-in-chief. The duty thus imposed on the President is in no just sense ministerial. It is purely executive and political.

      An attempt on the part of the judicial department of the government to enforce the performance of such duties by the President might be justly characterized, in the language of Chief Justice Marshal, as "an absurd and excessive extravagance."

      (….)

      The Congress is the legislative department of the government; the President is the executive department. Neither can be restrained in its action by the judicial department; though the acts of both, when performed, are, in proper cases, subject to its cognizance.

*Id.* at 498-500 (footnotes omitted).

Expanding on the same rationale, the Court in *Nixon v. Fitzgerald*, 457 U.S. 731 (1982), held that the President "is entitled to absolute immunity from damages liability predicated on his official acts. We consider this immunity a functionally mandated incident of the President's unique office, rooted in the constitutional tradition of the separation of powers and supported by our history." *Id.* at 749. Likewise, in *Franklin v. Massachusetts*, 505 U.S. 788 (1992), the Court again stressed that "[w]hile injunctive relief against executive officials like the Secretary of Commerce is within the courts' power, *see Youngstown Sheet & Tube Co. v. Sawyer*, *supra*, the District Court's grant of injunctive relief against the President himself is extraordinary, and should have raised judicial eyebrows." *Id.* at 802. Relying on this same recognition of, and deference to, the President's unique position, the Supreme Court recently held that the President enjoys immunity even from criminal prosecution "for exercising his core constitutional powers, and he is entitled to at least presumptive immunity from prosecution for his official acts." *Trump v. United States*, 603 U.S. 593, 600 (2024).

Because Presidents must almost always act through subordinates, actions by subordinate officials to carry out an executive order such as the Proclamation obviously must share in the immunity from injunction of the order itself. Whether an action of a subordinate official is that of the President or merely that of the subordinate official for purposes of immunity from injunction is analogous to

6

whether an action is presidential or agency action for purposes of the Administrative Procedure Act ("APA"). As the Supreme Court stated in construing the APA in *Dalton v. Specter*, 511 U.S. 462, 477 (1994), "[w]here a statute … commits decisionmaking to the discretion of the President, judicial review of the President's decision is not available [under the APA]."

The U.S. District Court for the District of Columbia has persuasively explained the distinction between presidential and agency action for purposes of APA reviewability:

> [A]n unreviewable presidential action must involve the exercise of discretionary authority vested in the President; an agency acting on behalf of the President is not sufficient by itself. Since the Constitution vests the powers of the Executive Branch in one unitary chief executive officer, *i.e.*, the President, an agency always acts on behalf of the President. Nonetheless, there is a difference between actions involving discretionary authority delegated by Congress to the President and actions involving authority delegated by Congress to an agency. Courts lack jurisdiction to review an APA challenge in the former circumstances, regardless of whether the President or the agency takes the final action. However, "[w]hen the challenge is to an action delegated to an agency head but directed by the President, a different situation obtains: then, the President effectively has stepped into the shoes of an agency head, and the review provisions usually applicable to that agency's action should govern." Elena Kagan, *Presidential Administration*, 114 Harv. L. Rev. 2245, 2351 (2001).

*Detroit Int'l Bridge Co. v. Gov't of Can.*, 189 F. Supp. 3d 85, 101-04 (D.D.C. 2016). *See also, e.g., Tulare Cty. v. Bush*, 185 F. Supp. 2d 18, 28 (D.D.C. 2001) ("A court has subject-matter jurisdiction to review an agency action under the APA only when a final agency action exists. Because the President is not a federal

7

agency within the meaning of the APA, presidential actions are not subject to review pursuant to the APA.") (citing *Dalton*, 511 U.S. at 470) (other internal citations omitted).

Once President Trump issued his Proclamation, actions by other executive officials to carry it out became presidential actions clothed in his maximum authority. They became an exercise of the President's core constitutional powers, as well as his delegated powers, and as such immune from injunction. The District Court abused its discretion by granting a preliminary injunction against any of these presidential actions.

## CONCLUSION

For the foregoing reasons, the judgment of the District Court should be reversed.

Dated: September 2, 2025         Respectfully submitted,

s/ Matt Crapo
MATT A. CRAPO
CHRISTOPHER J. HAJEC
DAVID L. JAROSLAV
Federation for American Immigration Reform
25 Massachusetts Ave., NW, Suite 330
Washington, DC 20001
(202) 232-5590
mcrapo@irli.org
chajec@irli.org
djaroslav@irli.org

Counsel for *Amicus Curiae*
Federation for American Immigration Reform

# CERTIFICATE OF COMPLIANCE

1.      The foregoing brief complies with the type-volume limitation of Fed. Fed. R. App. P. 29(a)(5) because:

This brief contains 2,058 words, including footnotes, but excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

This brief has been prepared in a proportionally spaced typeface using Microsoft Word 365 in Times New Roman 14-point font.

DATED: September 2, 2025        Respectfully submitted,

                                                      s/ Matt Crapo

# CERTIFICATE OF SERVICE

I certify that on September 2, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the First Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

s/ Matt Crapo