No. 25-01627

## UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

PRESIDENT AND FELLOWS OF HARVARD COLLEGE,

*Plaintiff - Appellee,*

v.

UNITED STATES DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, in the official capacity as Secretary of the United States Department of Homeland Security; UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT; TODD LYONS, in the official capacity as Acting Director of United States Immigration and Customs Enforcement; STUDENT AND EXCHANGE VISITOR PROGRAM; JOHN DOE, in the official capacity as Director of the Student and Exchange Visitor Program; JAMES HICKS, in the official capacity as Deputy Assistant Director of the Student and Exchange Visitor Program; UNITED STATES DEPARTMENT OF JUSTICE; PAMELA BONDI, in the official capacity as Attorney General of the United States; UNITED STATES DEPARTMENT OF STATE; MARCO RUBIO, in the official capacity as Secretary of the United States Department of State,

*Defendants - Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

**BRIEF OF FORMER SENIOR GOVERNMENT OFFICIALS AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFF-APPELLEE AND AFFIRMANCE**

Harold Hongju Koh
Sonia Mittal
Peter Gruber Rule of Law Clinic
Yale Law School
127 Wall Street, P.O. Box 208215
New Haven, CT 06520-8215
(203) 432-4932
harold.koh@ylsclinics.org
sonia.mittal@yale.edu

Dated: September 4, 2025

Joel G. Beckman
Michael Paris
Joshua E. Goldstein
Nystrom Beckman & Paris LLP
One Marina Park Drive, 15th Fl.
Boston, MA 02210
(617) 778-9100
jbeckman@nbparis.com
mparis@nbparis.com
jgoldstein@nbparis.com
*Counsel for Amici Curiae*

## **<u>TABLE OF CONTENTS</u>**

TABLE OF AUTHORITIES……...……………………………………………… 3

INTEREST OF *AMICI CURIAE*……………………………………………12

SUMMARY OF ARGUMENT…..……………………………………………15

ARGUMENT………………………………………………………………...16

I.   THE REVOCATION IS AN UNCONSTITUTIONAL EXTRAJUDICIAL PUNISHMENT OF HARVARD. ....................................................................16

    A. The Constitution Bars the Executive from Imposing Unilateral Extrajudicial Punishment...........................................................................16

    B. The President's Coordinated Attacks Against Harvard and Its International Students Are Part of an Unconstitutional and Punitive Executive Campaign.....................................................................................23

II.  THE HARM TO NATIONAL SECURITY CAUSED BY BANNING INTERNATIONAL STUDENTS IS FURTHER EVIDENCE OF PUNITIVE PURPOSE.................................................................................................29

    A. International Students Are Critical to U.S. National Security and Technological Superiority. .....................................................................29

    B. Restricting International Student Enrollment Directly Benefits America's Adversaries and Strategic Competitors. ..................................................34

    C. Legitimate Security Concerns Can Be, and Until Now Consistently Have Been, Addressed Through Targeted Measures, Not Blanket Prohibitions. . ...................................................................................................................37

CONCLUSION………………………………………………………….40

CERTIFICATE OF COMPLIANCE……………………………………...42

CERTIFICATE OF SERVICE ...............................................................43

ADDENDUM ...........................................................................................47

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*Al-Aulaqi v. Panetta*, 35 F. Supp. 3d 56 (D.D.C. 2014) ...........................................22

*Amiri v. Kelly*, No. 17-CV-12188, 2018 WL 623652 (E.D. Mich. Jan. 30, 2018)..22

*Cooperativa Multiactiva de Empleados de Distribuidores de Drogas v. Newcomb*, Civ. Action No. 98–0949, slip op. (D.D.C. Mar. 29, 1999), *aff'd* 221 F.3d 195 (D.C. Cir. 2000) ....................................................................................................21

*Cummings v. Missouri*, 71 U.S. 277 (1866)...................................................... 18, 19

*Davies v. Young*, No. 12-CV-02794-MSK-KMT, 2013 WL 5450308 (D. Colo. Sept. 30, 2013).......................................................................................................22

*Dehainaut v. Pena*, 32 F.3d 1066 (7th Cir. 1994) ...................................................21

*Garner v. Jones,* 529 U.S. 244 (2000) .....................................................................22

*Jamaica Ash & Rubbish Removal Co. v. Ferguson*, 85 F. Supp. 2d 174 (E.D.N.Y. 2000) .....................................................................................................................22

*Jenner & Block LLP v. United States Dep't of Just.*, No. 1:25-cv-00916 (JDB), Mem. Op. & Order (D.D.C. May 23, 2025).................................................. 12, 13

*Joint Anti-Fascist Refugee Committee v. McGrath*, 341 U.S. 123 (1951) .............20

*Kadi v. Geithner*, 42 F. Supp. 3d 1 (D.D.C. 2012) ..................................................22

*Korte v. Off. of Personnel Mgmt.*, 797 F.2d 967 (Fed. Cir. 1986)...........................21

*Kovac v. Wray*, No. 3:18-CV-00110-X, 2020 WL 6545913 (N.D. Tex. Nov. 6, 2020) .....................................................................................................................22

*Lynce v. Mathis*, 519 U.S. 433 (1997) .....................................................................17

*Marbury v. Madison*, 5 U.S. 137 (1803)...................................................................16

*Marshall v. Sawyer*, 365 F.2d 105 (9th Cir. 1966) ..................................................21

*Myers v. United States*, 272 U.S. 52 (1926) ............................................................16

*N.Y. Times v. United States*, 403 U.S. 713 (1971)...................................................22

*Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425 (1977)................................. 17, 26, 27

*Paradissiotis v. Rubin*, 171 F.3d 983 (5th Cir. 1999)..............................................21

*Perkins Coie LLP v. United States Dep't of Just.*, No. CV 25-716 (BAH), 2025 WL 1276857 (D.D.C. May 2, 2025).............................................................................22

*Peters v. Hobby*, 349 U.S. 331 (1955)....................................................................20

*Scheerer v. United States Att'y Gen.*, 513 F.3d 1244 (11th Cir. 2008) ..................21

*SEC v. Jarkesy*, 603 U.S. 109 (2024)......................................................................15

*Selective Serv. Sys. v. Minn. Pub. Int. Rsch. Grp.*, 468 U.S. 841 (1984) ...............27

*Ullmann v. United States*, 350 U.S. 422 (1956) ................................................ 21, 27

*United States v. Brown*, 381 U.S. 437 (1965).........................................................16

*United States v. Lovett*, 328 U.S. 303 (1946) .........................................................26

*Walmer v. United States Dep't of Defense*, 52 F.3d 851 (10th Cir. 1995)..............21

*Wieman v. Updegraff*, 344 U.S. 183 (1952) ...........................................................26

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952)............................14

## **OTHER AUTHORITIES**

Alan Blinder, *As Trump Attacks Universities, Some Are Agreeing to Negotiate*, N.Y. TIMES (Aug. 1, 2025), https://www.nytimes.com/article/trump-university-college.html [perma.cc/BJK3-TWXB]...................................................................25

Alex Leary, Lingling Wei, & Alexander Ward, *Trump Says He Discussed Trade, Rare Earths in Call with China's Xi*, WALL ST. J. (June 5, 2025), https://www.wsj.com/world/china/trump-xi-speak-amid-trade-tensions-7e637978 [perma.cc/XMY2-KZAQ] ...................................................................................39

Ana Swanson, *New China Trade 'Deal' Takes U.S. Back to Where it Started*, N.Y. TIMES (June 11, 2025), https://www.nytimes.com/2025/06/11/us/politics/us-china-trade-deal-trump.html?smid=nytcore-ios-share&referringSource=articleShare [perma.cc/Y85H-Y5W4]...........................39

Bill Priestap, Assistant Director, Counterintelligence Division, Fed. Bureau of Investigation, *Student Visa Integrity: Protecting Educational Opportunity and National* Security, Before the S. Judiciary Comm., Subcomm. on Border Security and Immigration (June 6, 2018), https://www.fbi.gov/news/speeches-and-testimony/student-visa-integrity-protecting-educational-opportunity-and-national-security [perma.cc/55WK-98KX].........................................................38

Boris Granovskiy & Jill H. Wilson, *Foreign STEM Students in the United States*, Cong. Rsch. Serv., IF11347 (Nov. 1, 2019), https://www.congress.gov/crs-product/IF11347 [perma.cc/BQ28-RM7M].........................................................31

Cecilia Esterline, *Previously Unreported Data: The U.S. Lost 45,000 College Grads to Canada's High-Skill Visa from 2017 to 2021* (Niskanen Ctr., Mar. 14, 2023), https://www.niskanencenter.org/previously-unreported-data-the-u-s-lost-45000-college-grads-to-canadas-high-skill-visa-from-2017-to-2021 [perma.cc/52EQ-PQ56].........................................................................35

Christopher Wray, Director, Fed. Bureau of Investigation, *Responding Effectively to the Chinese Economic Espionage Threat* (Feb. 6, 2020), https://www.fbi.gov/news/speeches-and-testimony/responding-effectively-to-the-chinese-economic-espionage-threat [perma.cc/N9VT-EYEY]....................38

CITY UNIV. OF HONG KONG, *CityUHK Welcomes Global Talents and Pioneers of Innovation* (Press Release, May 23, 2025), https://www.cityu.edu.hk/media/press-release/2025/05/23/cityuhk-welcomes-global-talents-and-pioneers-innovation [perma.cc/9FPF-W43D].......................36

Danielle Cave, *As Trump Sacks Scientists, Australia Should Hire Them. US Drain Is Our Brain Gain* (Austl. Strat. Pol'y Inst., Mar. 7, 2025), https://www.aspistrategist.org.au/as-trump-sacks-scientists-australia-should-hire-them-us-drain-is-our-brain-gain [perma.cc/LPW9-J3A5]...................................34

DEP'T OF HEALTH & HUM. SERVS., *Joint Task Force to Combat Anti-Semitism Statement on Additional Harvard Actions* (Press Release, May 13, 2025), https://www.hhs.gov/press-room/anti-semitism-task-force-statement-on-additional-harvard-grants.html [perma.cc/52RP-7CTL]......................................28

DEP'T OF HOMELAND SEC., *Harvard University Loses Student and Exchange Visitor Program Certification for Pro-Terrorist Conduct* (Press Release, May 22, 2025), https://www.dhs.gov/news/2025/05/22/harvard-university-loses-student-and-exchange-visitor-program-certification-pro [perma.cc/NC4M-74D8] .............................................................................................................. 23, 29

Doc Louallen, *Harvard Student Fears Visa Loss as Trump Administration Targets International Enrollment*, ABC NEWS (May 29, 2025), https://abcnews.go.com/US/harvard-student-fears-visa-loss-trump-administration-targets/story?id=122308499 [perma.cc/7A5M-MTLX]..............27

Erica Pandey, *The Great Poaching: America's Brain Drain Begins*, AXIOS (June 7, 2025), https://www.axios.com/2025/06/07/us-science-brain-drain [perma.cc/DF6S-F25J] ........................................................................................35

F.J. Stimson, *The Constitution and the People's Liberties*, 184 N. AM. L. REV. 508 (1907)........................................................................................... 18-19

FUTURE OF DEF. TASK FORCE, *Future of Defense Task Force Report 2020* (Sept. 23, 2020), at 17, https://houlahan.house.gov/uploadedfiles/future-of-defense-task-force-final-report-2020.pdf [perma.cc/8HY8-B98K] ...................................32

Greg Lukianoff, *Trump's Attacks Threaten Much More Than Harvard*, THE ATLANTIC (May 30, 2025), https://www.theatlantic.com/ideas/archive/2025/05/trump-harvard-higher-education-law/682985 [perma.cc/6DQY-QSRJ]...................................................25

HONG KONG UNIV. OF SCI. & TECH., *HKUST Opens Doors to Harvard Students Amid Global Academic Shifts* (Press Release, May 23, 2025), https://hkust.edu.hk/news/hkust-opens-doors-harvard-students-amid-global-academic-shifts [perma.cc/352H-6MAR] ..........................................................36

Jacob Reynolds, *The Rule of Law and the Origins of the Bill of Attainder Clause*, 18 ST. THOMAS L. REV. 177 (2005)..................................................................18

Jennifer Jett & Peter Guo, *Blocked from Harvard, the World's Star Students Weigh Staying in Asia and Europe*, NBCNEWS (May 27, 2025), https://www.nbcnews.com/world/asia/harvard-international-student-ban-trump-china-europe-rcna209044 [perma.cc/266B-49CD]..............................................35

Jeremy Neufeld, *STEM Immigration Is Critical to American National Security* (Inst. for Progress, Mar. 30, 2022), https://ifp.org/wp-content/uploads/STEM-Immigration-Competition.pdf [perma.cc/TF8P-Z3R6].......................................30

Joseph Nye, *Soft Power and Higher Education* (Educause, Jan. 1, 2005), https://library.educause.edu/-/media/files/library/2005/1/ffp0502s-pdf [perma.cc/4F9X-WA5Z] ....................................................................34

KAGGLE, *Kaggle's State of Data Science and Machine Learning 2019*, https://www.kaggle.com/kaggle-survey-2019 [perma.cc/S9NJ-BJLX] ..............31

Kate Zernike, *U.S. Scientists Warn That Trump's Cuts Will Set Off a Brain Drain*, N.Y. TIMES (June 3, 2025), https://www.nytimes.com/2025/06/03/us/trump-federal-spending-grants-scientists-leaving.html [perma.cc/R3UM-8VBN]........34

Laurence Tribe (@tribelaw), X (May 27, 2025), https://x.com/tribelaw/status/1927348853734289622 [https://perma.cc/ENR5-HAUF]..............................................................................................19

Matthew Steilen, *Bills of Attainder*, 53 HOUSTON L. REV. 767 (2016) ...................18

Maureen Martin, Supplemental Declaration, *President & Fellows of Harvard Coll. v. United States Dep't of Homeland Sec.*, No. 25-cv-11472-FDS (D. Mass. filed May 28, 2025), https://storage.courtlistener.com/recap/gov.uscourts.mad.285083/gov.uscourts.mad.285083.46.0.pdf [perma.cc/75S5-4CKW]........................................................37

Michael T. Nietzel, *Britain Opens Up Its Visas for Graduates of World's Top Universities*, FORBES (May 31, 2022), https://www.forbes.com/sites/michaelnietzel/2022/05/31/britain-opens-up-its-visas-for-graduates-of-worlds-top-universities [perma.cc/NSA9-SLZR]............35

Miranda Jeyaretnam, *These Asian Universities Are Seeking to Attract Harvard Transfers as Trump Targets International Students*, TIME (May 27, 2025), https://time.com/7288747/trump-harvard-international-students-transfer-universities-asia-hong-kong-japan [perma.cc/5BWU-RGF4] ..............................36

NAT'L CTR. FOR SCI. & ENG'G STAT., *Most U.S.-Trained Science and Engineering Doctorate Recipients on Temporary Visas Remain in the United States*, NSF 25-325 (Feb. 24, 2025), https://ncses.nsf.gov/pubs/nsf25325 [perma.cc/RES7-REZ3] ..................................................................................................31

NAT'L SCI. BD., *International STEM Talent is Crucial for a Robust U.S. Economy*, (2022) https://www.nsf.gov/nsb/sei/one-pagers/NSB-International-STEM-Talent-2022.pdf [perma.cc/XJ86-5JPF] .................................................................32

NAT'L SEC. COMM'N ON A.I., *The Talent Competition*, in *Final Report* ch. 10 (Mar. 1, 2021), https://reports.nscai.gov/final-report/chapter-10 [perma.cc/PT5U-WXJ4]......................................................................................................................34

NAT'L SEC. COUN., *United States Strategic Approach to The People's Republic of China* (2020), https://trumpwhitehouse.archives.gov/wp-content/uploads/2020/05/U.S.-Strategic-Approach-to-The-Peoples-Republic-of-China-Report-5.24v1.pdf [perma.cc/34NG-4LC8].............................................39

Neal Riley, *Trump Suggests that Harvard University Cap International Student Enrollment at 15% and "Show Us Their Lists,"* CBS NEWS (May 29, 2025), https://www.cbsnews.com/boston/news/trump-harvard-university-international-student-cap [perma.cc/LAR7-YCPQ] ..................................................................25

Nick Hillman, *HEPI Soft-Power Index 2024: The US Pulls Further Away, While the UK Stands Still and France Slips Back* (Higher Educ. Pol'y Inst., Oct. 10, 2024), https://www.hepi.ac.uk/2024/10/10/the-us-pulls-further-away-in-the-latest-soft-power-index-while-the-uk-stands-still-and-france-slips-back [perma.cc/36BN-QKLJ] .......................................................................................33

Noah Feldman, *Harvard Is Fighting for Much More Than Foreign Students*, BLOOMBERG (May 23, 2025), https://www.bloomberg.com/opinion/articles/2025-05-23/harvard-trump-fight-is-bigger-than-just-foreign-student-enrollment [perma.cc/4EY9-2U3G]................23

President Donald J. Trump (@realDonaldTrump), TRUTH SOCIAL (Apr. 16, 2025), https://truthsocial.com/@realDonaldTrump/posts/114347313852363347 [perma.cc/FW9W-5E53] ......................................................................................27

President Donald J. Trump (@realDonaldTrump), TRUTH SOCIAL (Apr. 24, 2025) ................................................................................................................................23

Rachel Hoff & Reed Kessler, *STEMming the Crisis: Immigration and the U.S. National Security Talent Base*, WAR ON THE ROCKS (Apr. 1, 2024), https://warontherocks.com/2024/04/stemming-the-crisis-immigration-and-the-u-s-national-security-talent-base [perma.cc/A6L3-HKD6]....................................34

RONALD REAGAN PRES. FOUND. & INST., *National Security Innovation Base Report Card* (Mar. 2025), https://www.reaganfoundation.org/cms/assets/1741105896-nsib-2025-feb26-web-1.pdf [perma.cc/46DJ-8C79] ...........................................30

Sandip K. Sureka & James C. Witte, *Immigrant Nobel Laureates: U.S. Higher Education Infrastructure in a Global Context* (Inst. Immigr. Rsch., Dec. 2024), https://d101vc9winf8ln.cloudfront.net/documents/51466/original/Nobel_Report_2024_Sandip_Web_Version_Final121124.pdf [perma.cc/W6EV-3DNF]..........32

SEMICONDUCTOR INDUS. ASS'N & OXFORD ECON., *Chipping Away: Assessing and Addressing the Labor Market Gap Facing the U.S. Semiconductor Industry* (Jul. 25, 2023), https://www.semiconductors.org/chipping-away-assessing-and-addressing-the-labor-market-gap-facing-the-u-s-semiconductor-industry [perma.cc/PKU4-V85U]...................................................................................30

Stanford E. Lehmberg, *Parliamentary Attainder in the Reign of Henry VIII*, 18 HIST. J. 675 (1975).................................................................................18

Stephanie Saul, *Trump Suggests Giving Trade Schools Money Taken from Harvard*, N.Y. TIMES (May 26, 2025), https://www.nytimes.com/2025/05/26/us/harvard-trump-trade-schools.html [perma.cc/TL3M-R8QN]..................................................................................25

Stephanie Saul & Alan Blinder, *Trump Officials Press Case Against Harvard, and Add a New Investigation*, N.Y. TIMES (Aug. 8, 2025), https://www.nytimes.com/2025/08/08/us/trump-harvard-patent-investigation-international-students.html [perma.cc/R4B7-VDZM] ........................................23

Stuart Anderson, *Immigrant Entrepreneurs and U.S. Billion-Dollar Companies* (Nat'l Found. for Am. Pol'y, July 2022), https://nfap.com/wp-content/uploads/2022/07/2022-BILLION-DOLLAR-STARTUPS.NFAP-Policy-Brief.2022.pdf [perma.cc/VBD2-VZ73] ...........................................................33

Sujai Shivakumar & Charles Wessner, *Semiconductors and National Defense: What Are the Stakes?* (Ctr. for Strat. & Int'l Stud., June 8, 2022),

https://www.csis.org/analysis/semiconductors-and-national-defense-what-are-stakes [perma.cc/GS53-PB2G]................................................................30

TAIWAN SEMICONDUCTOR MFG. CO., *TSMC Annual Report 2020 (I)* (Mar. 12, 2021), https://investor.tsmc.com/static/annualReports/2020/english/pdf/e_all.pdf [perma.cc/LWZ3-ZVVJ] ...................................................................31

THE FEDERALIST NO. 44 (James Madison) (Clinton Rossiter ed., 1961) ............... 17

THE FEDERALIST NO. 47 (James Madison) (Clinton Rossiter ed., 1961) ...............15

THE FEDERALIST NO. 69 (Alexander Hamilton) (Clinton Rossiter ed., 1961) ........19

THE FEDERALIST NO. 78 (Alexander Hamilton) (Clinton Rossiter ed., 1961)........17

THE WHITE HOUSE, *Enhancing National Security by Addressing Risks at Harvard University* (June 4, 2025), https://www.whitehouse.gov/presidential-actions/2025/06/enhancing-national-security-by-addressing-risks-at-harvard-university [perma.cc/92HU-2V96]............................................. 23, 26

Thomas B. Edsall, *JD Vance Wanted to 'Aggressively Attack' American Universities. His Wish Has Been Trump's Command*, N.Y. TIMES (June 3, 2025), https://www.nytimes.com/2025/06/03/opinion/harvard-trump-vance.html [perma.cc/97A4-64PR]............................................................................28

U.S. DEP'T OF DEF., *Fiscal Year 2020 Industrial Capabilities Report to Congress* (2020), https://media.defense.gov/2021/Jan/14/2002565311/-1/-1/0/FY20-industrial-capabilities-report.pdf [https://perma.cc/3C46-WRPR] .....................30

YLSROLC (@ylsrolc), *International Students Make America Stronger and Shape Our World*, INSTAGRAM (May 30, 2025), https://www.instagram.com/p/DKSANNkNn4D [perma.cc/83XZ-S5N5].........33

## TREATISES

Laurence H. Tribe, *American Constitutional Law* (1st ed. 1978) ..........................19

## CONSTITUTIONAL PROVISIONS

U.S. CONST. amend. I...........................................................................................22

U.S. CONST. art. I, § 7, cl. 2 ...........................................................................19

U.S. CONST. art. I, § 9, cl. 3 ...................................................................... 16, 17, 19

U.S. CONST. art. I, § 10 ...............................................................................17

U.S. CONST. art. II, § 3 ................................................................................16

**INTEREST OF AMICI CURIAE**

Amici curiae are former national security, foreign policy, intelligence, legal, and other public officials who have worked on national security matters at the most senior levels of the United States Government.[1] Amici have held the highest security clearances and served in senior leadership positions across seven presidential administrations, both Democratic and Republican.[2]

In Amici's view, the Administration's recent summary bar against international students studying at Harvard University is premised on false legal and factual claims. The false legal claim is that the Executive Branch may lawfully punish a leading university and its students through repeated extrajudicial sanctions, without due process, simply because it disapproves of how the university exercises its academic freedom. Amici submit that, in their long experience, such a retributive campaign is unprecedented and dangerous. As Judge Bates recently recognized in his opinion granting a permanent injunction against a parallel Executive Order punishing the Jenner & Block law firm, the government's "order invokes no valid national security concern and . . . any gestures towards national security merely

---

[1] A complete list of signatories can be found in the Addendum.
[2] In accordance with Rule 29(a)(4)(E) of the Federal Rules of Appellate Procedure, Amici state that no counsel for a party to this case authored this brief in whole or in part; no party or counsel for a party contributed monetarily to the preparation or submission of any portion of this brief; and no person other than counsel for amici curiae contributed money that was intended to fund preparing or submitting the brief.

provide cover for a punitive, retributive, ad hominem order" that the Executive Branch has no legal authority to issue. *Jenner & Block LLP v. United States Dep't of Just.*, No. 1:25-cv-00916 (JDB), Mem. Op. & Order (D.D.C. May 23, 2025), at 24 (cleaned up).

The Administration's false factual claim is that after centuries of international students studying productively at our leading universities, their continued presence at Harvard now poses a national security threat. Amici submit that the opposite is true: in an age where technological dominance determines national security, keeping the doors of our leading universities open to international students is vital to protecting America's national security.

As former government officials, Amici regard the judiciary's traditional deference to the Executive on legitimate matters of national security and foreign affairs as vital to the proper functioning of our government. That deference is a function of the Executive's special capacities in national security and foreign affairs and the "presumption of regularity" that courts indulge when reviewing executive actions generally. But if courts are to afford such deference, they may reasonably demand that the Executive confine its invocation of those interests to circumstances that genuinely threaten national security. Neither Supreme Court precedent nor historical practice supports the Executive's conduct here: targeting a U.S. university with retaliatory measures and punitive bills of attainder, while subjecting its

international students to collateral punishment, merely because the institution holds views contrary to those of the President.

Precisely *because* judicial deference is warranted when legitimate matters of national security are at stake, Amici urge that no such deference be afforded to a transparent attempt to invoke "national security" as cover for a nakedly punitive, retaliatory, ad hominem order. Such a sweeping "presidential claim to power . . . must be scrutinized with caution, for what is at stake is the equilibrium established by our constitutional system." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 638 (1952) (Jackson, J., concurring). By using a fictitious claim of national security to engage in retaliation, Appellants threaten that established equilibrium and jeopardize the Executive's ability to invoke judicial deference in future cases where national security is genuinely implicated.

## SUMMARY OF ARGUMENT

If our Constitution has any bedrock principle, it is that America has no king. As James Madison wrote: "The accumulation of all powers, legislative, executive, and judiciary, in the same hands . . . [is] the very definition of tyranny." THE FEDERALIST NO. 47, at 301 (James Madison) (Clinton Rossiter ed., 1961). Our Constitution empowers no single branch of government to unilaterally target ideological or political opponents for retribution and retaliation. Such actions violate the Constitution's separation of powers and prohibition against extrajudicial punishment, which is reinforced in the specific and absolute ban against bills of attainder. The Framers took pains not to "concentrate the roles of prosecutor, judge, and jury in the hands of the Executive Branch." *SEC v. Jarkesy*, 603 U.S. 109, 140 (2024). Yet the Executive's retributive "campaign of attainder" against Harvard unconstitutionally seizes for the President the roles of prosecutor, judge, jury, and legislator of punishment.

The Administration's words and actions make clear that sanctioning Harvard serves a constitutionally forbidden punitive purpose. The Administration's transparently pretextual invocation of national security reinforces this conclusion. This arbitrary and retaliatory campaign serves no valid national security purpose and instead creates a self-inflicted national security injury.

15

## ARGUMENT

I.   **THE REVOCATION IS AN UNCONSTITUTIONAL EXTRAJUDICIAL PUNISHMENT OF HARVARD.**

### A. The Constitution Bars the Executive from Imposing Unilateral Extrajudicial Punishment.

By its structure and text, the Constitution prohibits unilateral retributive punishment by any single branch of government. The Constitution evinces this commitment through the separation of powers. The Framers understood that "if a given policy can be implemented only by a combination of legislative enactment, judicial application, and executive implementation, no man or group of men will be able to impose its unchecked will." *United States v. Brown*, 381 U.S. 437, 443 (1965). Thus, "[i]f there is a principle in our Constitution . . . more sacred than another, it is that which separates the Legislative, Executive and Judicial powers." *Myers v. United States*, 272 U.S. 52, 116 (1926).

Accordingly, the Constitution carefully divides the powers necessary to punish. The legislature must legislate generally and prospectively. *See* U.S. CONST. art. I, § 9, cl. 3. The Executive must "take Care" that the laws are executed. U.S. CONST. art. II, § 3. And the power to "say what the law is" and apply it in particular cases is reserved to the judicial branch alone. *Marbury v. Madison*, 5 U.S. 137 (1803). The Constitution requires all three branches to act in order to punish, to ensure that penalties flow from the execution of law and not from arbitrary executive caprice.

The Constitution's absolute prohibition on bills of attainder crystallizes this commitment to rule by generally applicable laws. The ban on bills of attainder holds such significance in our constitutional structure that it is enshrined in the Constitution not once, but twice. *See* U.S. CONST. art. I, § 9, cl. 3 ("No Bill of Attainder . . . shall be passed [by the Congress]"); U.S. CONST. art. I, § 10 ("No State shall . . . pass any Bill of Attainder . . . ."). The Court has long recognized that the prohibition on bills of attainder is "an important ingredient of the doctrine of 'separation of powers,' one of the organizing principles of our system of government." *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 469 (1977).

The Constitution's absolute ban on bills of attainder reflects the Framers' deep concern with preventing the government from "singling out disfavored persons and meting out summary punishment for past conduct." *Lynce v. Mathis*, 519 U.S. 433, 440 n.12 (1997). The Framers viewed bills of attainder as "contrary to the first principles of the social compact" and erected the Bill of Attainder Clauses as "additional fences against th[is] danger[]" and an "added" "constitutional bulwark in favor of [individual liberty]." THE FEDERALIST NO. 44, at 282 (James Madison) (Clinton Rossiter ed., 1961). As Hamilton cautioned, "there is no liberty if the power of judging be not separated from the legislative *and executive* powers." THE FEDERALIST NO. 78, at 466 (Clinton Rossiter ed., 1961) (emphasis added) (citation omitted).

17

The prohibition against bills of attainder prevents the political branches from "pronounc[ing] upon the guilt of the party without any of the forms or safeguards of trial" to stifle political opponents. *Cummings v. Missouri*, 71 U.S. 277, 323 (1866). Indeed, for the English monarchs, bills of attainder long served as a favored tool for dispatching perceived enemies of the Crown without the rigors of judicial trial. Henry VIII, for instance, together with his Parliament, attainted 130 persons, most of them (96) for treason. Stanford E. Lehmberg, *Parliamentary Attainder in the Reign of Henry VIII*, 18 HIST. J. 675, 701 (1975). Surely, these troubling historical episodes were front of mind for the delegates at the Constitutional Convention. *See* Jacob Reynolds, *The Rule of Law and the Origins of the Bill of Attainder Clause*, 18 ST. THOMAS L. REV. 177, 202 (2005).

The explicit ban against bills of attainder thus affirms that the power to punish individuals and entities, with due process of law, rests in the exclusive authority of the judicial branch. Although the prohibitions on bills of attainder sit in Article I, the Framers surely did not intend by that placement to silently authorize the Executive to do alone what Congress and the President, acting together, could not. Indeed, in the three hundred years preceding the American Revolution, the King could not unilaterally pass a bill of attainder.[3] F.J. Stimson, *The Constitution and the People's*

---

[3] The House of Lords, for example, refused to pass a bill of attainder introduced by Henry VIII until Sir Thomas More was removed from the list of those attainted. *See* Matthew Steilen, *Bills of Attainder*, 53 HOUSTON L. REV. 767, 801 (2016).

*Liberties*, 184 N. AM. L. REV. 508, 512 (1907). Given that the President's authority was "in substance much inferior to" "that of the king of Great Britain," the Framers would have rebelled at the thought that they silently granted the President a unilateral extrajudicial power to punish that even King George III did not possess. THE FEDERALIST NO. 69, at 417-18 (Alexander Hamilton) (Clinton Rossiter ed., 1961). *See id*. at 422-23 (discussing "striking" "contrast" between powers of President and British monarch).

The Constitution's structure reinforces this understanding. Congress and the President act together to pass legislation. U.S. CONST. art. I, § 7, cl. 2. And the Constitution explicitly prohibits the two political branches, acting together in this way, from passing bills of attainder. U.S. CONST. art. I, § 9, cl. 3. If the President cannot issue a bill of attainder when acting with Congress, then surely he cannot unilaterally issue the same bill of attainder by executive order. As the Supreme Court emphasized in *Cummings*, the "inhibition [on bills of attainder is] leveled at the *thing*, not the name"; "what cannot be done directly cannot be done indirectly." 71 U.S. at 325 (emphasis added).[4]

---

[4] Therefore, "the ban on bills of attainder is understood not to prohibit trial by a particular *body* but rather to prohibit trial by legislative *method* . . . ." Laurence H. Tribe, *American Constitutional Law* (1st ed. 1978), at 500 (calling this the "fundamental reason" why constitutional ban on bills of attainder extends to the executive) (cleaned up). *See also* Laurence Tribe (@tribelaw), X (May 27, 2025), https://x.com/tribelaw/status/1927348853734289622 [https://perma.cc/ENR5-

Supreme Court Justices have echoed this sentiment. During the McCarthy era, in *Joint Anti-Fascist Refugee Committee v. McGrath*, the Court reviewed challenges to executive actions involving named organizations and individuals designated as Communist by an executive "Loyalty Review Board." 341 U.S. 123 (1951). This Board, established by President Truman by executive order, had authority to remove government employees upon findings of disloyalty. *Id*. at 127. Justice Black noted in concurrence that the Framers "wisely withheld authority" from the political branches to issue "condemnations and blacklists as a substitute for imposition of legal types of penalties by courts following trial and conviction in accordance with procedural safeguards of the Bill of Rights." 341 U.S. at 144–45. It was unfathomable, Justice Black explained, that "the authors of the Constitution . . . inadvertently endowed the executive with power to engage in the same tyrannical practices that had made the bill [of attainder] such an odious institution." *Id.* at 144.

In a second Loyalty Review Board case, *Peters v. Hobby*, Justices Black and Douglas filed separate concurrences arguing the Court should have addressed whether the Loyalty Board's orders constituted unconstitutional bills of attainder. 349 U.S. 331, 349–50, 350-53 (1955). Justice Douglas argued that had Congress

HAUF] ("Trump's cancellation of all of Harvard's federal contracts . . . erases any doubt that he is trying to punish Harvard with a Bill of Attainder that the Constitution would forbid as a usurpation of Judicial Power even if Congress went along.").

rather than the Loyalty Board "condemned" the petitioner and "made [him] ineligible for government employment," it would clearly be an unconstitutional bill of attainder. *Id*. at 352. Justice Douglas added: "An administrative agency—the creature of Congress—certainly cannot exercise powers that Congress itself is barred from asserting"; i.e., what the Executive cannot do *with* Congress, it cannot do *without it*. *Id.* As Justice Douglas put it in *Ullmann v. United States*, "the prohibition of Bills of Attainder place[s] beyond the pale the imposition of infamy or outlawry by *either the Executive or the Congress*." 350 U.S. 422, 451 n.5 (1956) (Douglas, J., dissenting) (emphasis added). Because "an argument can be made for analyzing each case *functionally* rather than structurally," the Seventh Circuit has similarly reasoned, executive policies functionally equivalent to legislative enactments should be subject to bill of attainder analysis. *Dehainaut v. Pena*, 32 F.3d 1066, 1071 (7th Cir. 1994).[5]

---

[5] Other lower courts have left open the question of whether the constitutional prohibition on bills of attainder extends to the Executive. *See*, *e.g.*, *Paradissiotis v. Rubin*, 171 F.3d 983, 988–89 (5th Cir. 1999); *Scheerer v. United States Att'y Gen.*, 513 F.3d 1244, 1253 n.9 (11th Cir. 2008); *Walmer v. United States Dep't of Defense*, 52 F.3d 851, 855 (10th Cir. 1995); *Cooperativa Multiactiva de Empleados de Distribuidores de Drogas v. Newcomb*, Civ. Action No. 98–0949, slip op. at 10 (D.D.C. Mar. 29, 1999), *aff'd* 221 F.3d 195 (D.C. Cir. 2000). Two circuit courts have declined to apply the Bill of Attainder Clause to executive actions, but did not address the question of whether a particular executive action violated the separation of powers. *See Marshall v. Sawyer*, 365 F.2d 105, 111 (9th Cir. 1966); *cf. Korte v. Off. of Personnel Mgmt.*, 797 F.2d 967, 972 (Fed. Cir. 1986). A handful of district courts have suggested, with similarly scant analysis, that the prohibition on bills of

By its terms, the First Amendment similarly restrains only Congress. U.S. CONST. amend. I ("Congress shall make no law . . . ."). But courts have long rightly understood that the President may not unilaterally restrict the freedom of speech, because the President cannot alone do what the President and Congress cannot do together. *See*, *e.g.*, *N.Y. Times v. United States*, 403 U.S. 713, 713-14 (1971) (unanimously applying First Amendment to purely executive conduct: seeking to prevent publication of Pentagon Papers). The same logic applies here: an absolute constitutional prohibition against bills of attainder that constrains Congress acting with the President must also constrain the President acting alone.

---

attainder is limited to the legislature. *See Al-Aulaqi v. Panetta*, 35 F. Supp. 3d 56, 82 (D.D.C. 2014); *Kovac v. Wray*, No. 3:18-CV-00110-X, 2020 WL 6545913, at \*3 (N.D. Tex. Nov. 6, 2020); *Davies v. Young*, No. 12-CV-02794-MSK-KMT, 2013 WL 5450308, at \*12 (D. Colo. Sept. 30, 2013); *Amiri v. Kelly*, No. 17-CV-12188, 2018 WL 623652, at \*13 (E.D. Mich. Jan. 30, 2018); *Jamaica Ash & Rubbish Removal Co. v. Ferguson*, 85 F. Supp. 2d 174, 184 (E.D.N.Y. 2000); *Kadi v. Geithner*, 42 F. Supp. 3d 1, 42 (D.D.C. 2012); *cf. Garner v. Jones,* 529 U.S. 244 (2000) (finding that an action taken by the Executive Branch constituted a violation of the Bill of Attainder Clause's textual neighbor in Art. I, § 10, the Ex Post Facto Clause); *see also Perkins Coie LLP v. United States Dep't of Just.*, No. CV 25-716 (BAH), 2025 WL 1276857, at \*44 n.36 (D.D.C. May 2, 2025) ("The scope of the bills of attainder prohibition and application of this prohibition to unilateral presidential action not otherwise authorized by Congress, is worth further study and consideration.").

**B. The President's Coordinated Attacks Against Harvard and Its International Students Are Part of an Unconstitutional and Punitive Executive Campaign.**

This case shows that the constitutional prohibition on bills of attainder is not just a legal abstraction. For months, the Trump Administration has engaged in a mounting campaign against Harvard of "punishment first, proof later" based on multiple, disconnected allegations: Harvard's supposed national security threat,[6] antisemitism,[7] collusion with the Chinese Communist Party,[8] "evil[] . . . anti-Americanism,"[9] "threat to Democracy,"[10] patent non-compliance,[11] and "crazed luna[cy],"[12] to name just a few. With respect to each of these claims, Harvard, as the

---

[6] THE WHITE HOUSE, *Enhancing National Security by Addressing Risks at Harvard University* (June 4, 2025), https://www.whitehouse.gov/presidential-actions/2025/06/enhancing-national-security-by-addressing-risks-at-harvard-university [perma.cc/92HU-2V96].

[7] DEP'T OF HOMELAND SEC., *Harvard University Loses Student and Exchange Visitor Program Certification for Pro-Terrorist Conduct* (Press Release, May 22, 2025), https://www.dhs.gov/news/2025/05/22/harvard-university-loses-student-and-exchange-visitor-program-certification-pro [perma.cc/NC4M-74D8].

[8] *Id.*

[9] *See* Noah Feldman, *Harvard Is Fighting for Much More Than Foreign Students*, BLOOMBERG (May 23, 2025), https://www.bloomberg.com/opinion/articles/2025-05-23/harvard-trump-fight-is-bigger-than-just-foreign-student-enrollment [perma.cc/4EY9-2U3G] (quoting Letter from Kristi Noem, U.S. Dep't of Homeland Sec., to Maureen Martin (May 22, 2025)).

[10] President Donald J. Trump (@realDonaldTrump), TRUTH SOCIAL (Apr. 24, 2025).

[11] *See* Stephanie Saul & Alan Blinder, *Trump Officials Press Case Against Harvard, and Add a New Investigation*, N.Y. TIMES (Aug. 8, 2025), https://www.nytimes.com/2025/08/08/us/trump-harvard-patent-investigation-international-students.html [perma.cc/R4B7-VDZM].

[12] *Id.* ("The place is a Liberal mess, allowing a certain group of crazed lunatics to enter and exit the classroom and spew fake ANGER AND HATE.").

target of the Government's wrath, is presumed guilty—even though no actual crime has been alleged nor any opportunity to establish innocence provided—and then punished by an Executive that has arrogated unto itself the roles of judge, jury, and executioner.

The Trump Administration's actions against Harvard constitute precisely the kind of campaign of unilateral executive extrajudicial punishment that the Constitution was designed to prohibit. Recent steps—the Presidential proclamation barring international students from Harvard and revoking Harvard University's SEVP certification—form just one facet of a coordinated assault on this institution in particular and on higher education as a whole. By her preliminary injunction on June 23, Judge Burroughs enjoined the government from implementing and enforcing this recent attack on Harvard.

The intent of this escalating barrage of conduct is clear: to punish Harvard and to threaten and intimidate other academic institutions who might similarly refuse to bow to the Administration's demands. Indeed, the Administration previewed and tested this strategy in its earlier confrontation with Columbia University—with the critical difference that Columbia acquiesced to the Administration's demands. The Administration has threatened dozens of other colleges with grant freezes unless

they comply with similar ultimata, creating a systematic pattern of coercion across higher education.[13]

The Administration's punitive crusade culminated in increasingly brazen assertions of executive control over Harvard's core academic decisions. President Trump announced that Harvard should cap foreign students at 15%, inserting himself directly into the university's admissions process.[14] On May 22, 2025, DHS revoked Harvard's SEVP certification—which had allowed the University to enroll international students under the F-1 visa program. After issuance of the Temporary Restraining Order regarding the Administration's revocation of Harvard's SEVP certification, the campaign continued on June 5, 2025, when President Trump issued a proclamation to restrict foreign student visas at Harvard University. The proclamation suspended for six months the entry of any foreign national seeking to study or participate in exchange programs at Harvard and directed the State

---

[13] *See* Greg Lukianoff, *Trump's Attacks Threaten Much More Than Harvard*, THE ATLANTIC (May 30, 2025), https://www.theatlantic.com/ideas/archive/2025/05/trump-harvard-higher-education-law/682985 [perma.cc/6DQY-QSRJ]. *See also* Alan Blinder, *As Trump Attacks Universities, Some Are Agreeing to Negotiate*, N.Y. TIMES (Aug. 1, 2025), https://www.nytimes.com/article/trump-university-college.html [perma.cc/BJK3-TWXB].
[14] Stephanie Saul, *Trump Suggests Giving Trade Schools Money Taken from Harvard*, N.Y. TIMES (May 26, 2025), https://www.nytimes.com/2025/05/26/us/harvard-trump-trade-schools.html [perma.cc/TL3M-R8QN]; Neal Riley, *Trump Suggests that Harvard University Cap International Student Enrollment at 15% and "Show Us Their Lists,"* CBS NEWS (May 29, 2025), https://www.cbsnews.com/boston/news/trump-harvard-university-international-student-cap [perma.cc/LAR7-YCPQ].

Department to consider revoking academic or exchange visas of current Harvard students who meet the proclamation's criteria.[15] For the first time in American history, a sitting president claimed unilateral executive authority to target a specific university's international student enrollment—a naked attempt to achieve through presidential fiat what a federal court had just enjoined.

These coordinated attacks against Harvard meet each of the Supreme Court's articulated tests for assessing whether non-judicial action inflicts unconstitutional executive punishment, i.e., "punishment traditionally judged to be prohibited by the Bill of Attainder Clause," *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 475 (1977). The Administration's campaign against Harvard bears all three hallmarks of prohibited punishment: (1) "punitive confiscation of property by the sovereign," *id.* at 474, (2) "stigmatiz[ing] reputation," *United States v. Lovett*, 328 U.S. 303, 314 (1946), and (3) imposing "a badge of infamy" aimed at "stifl[ing] the flow of democratic expression and controversy." *See Wieman v. Updegraff*, 344 U.S. 183, 191 (1952).

The wholesale stripping of more than two billion dollars of government contracts and funding eligibility is nothing if not punitive confiscation. The concomitant effort to prevent Harvard from enrolling international students will

---

[15] *Enhancing National Security by Addressing Risks at Harvard University*, *supra* note 6.

"definitely weaken Harvard's international influence and reputation." [16] These actions, coupled with the President's relentless public attacks on Harvard, [17] demonstrate that the Government is pursuing an "imposition of infamy" upon a disfavored institution. *Ullmann*, 350 U.S. at 451 n.5.

The Administration's attacks on Harvard plainly "fall[] within the historical meaning of legislative punishment." *Selective Serv. Sys. v. Minn. Pub. Int. Rsch. Grp.*, 468 U.S. 841, 852 (1984). Nor can they "reasonably . . . be said to further nonpunitive legislative purposes." *Nixon*, 433 U.S. at 475-76. The Administration has offered no plausible justification for its actions other than punishment: the coordinated attacks on Harvard do not further legitimate interests, are done without statutory authority, and are contrary to extant regulations. Moreover, the Administration's repeatedly shifting justifications reveal the pretextual nature of these purported rationales. As Amici argue below, when policy is driven by

---

[16] Doc Louallen, *Harvard Student Fears Visa Loss as Trump Administration Targets International Enrollment*,
ABC NEWS (May 29, 2025), https://abcnews.go.com/US/harvard-student-fears-visa-loss-trump-administration-targets/story?id=122308499 [perma.cc/7A5M-MTLX].
[17] For example, the President has attacked Harvard as a "Far Left Institution," a "Liberal mess," filled with "Radical Left fools," "radicalized lunatics," and "all woke, Radical Left, idiots." @realDonaldTrump, TRUTH SOCIAL (Apr. 16, 2025), https://truthsocial.com/@realDonaldTrump/posts/114347313852363347 [perma.cc/FW9W-5E53].

retribution rather than legitimate policy interests, executive actions undermine rather than advance our national security interests.

Third, the attacks on Harvard amount to unconstitutional "punishment" because the record clearly evinces an "intent to punish." *Nixon*, 433 U.S. at 478. The President's public statements leave no doubt that his real motive is punitive retribution. For President Trump, punishment is simply "what [Harvard] deserve[s]."[18] "Every time [Harvard] fights they lose another $250 million."[19] When asked how his conflict with Harvard would end, he responded, "Harvard's got to behave themselves."[20] Likewise, the Administration's Task Force to Combat Anti-Semitism has described the President as leading a "multi-agency move to cut funding to Harvard."[21] Homeland Secretary Kristi Noem expressly stated that the

---

[18] The other elected member of the Trump Administration shares this view. In 2021, then-Senator, now-Vice President Vance encouraged "aggressively attack[ing] the universities in this country" and declared that "professors are the enemy." *See* Thomas B. Edsall, *JD Vance Wanted to 'Aggressively Attack' American Universities. His Wish Has Been Trump's Command*, N.Y. TIMES (June 3, 2025), https://www.nytimes.com/2025/06/03/opinion/harvard-trump-vance.html [perma.cc/97A4-64PR].

[19] Riley, *supra* note 14.

[20] *Id.*

[21] DEP'T OF HEALTH & HUM. SERVS., *Joint Task Force to Combat Anti-Semitism Statement on Additional Harvard Actions* (Press Release, May 13, 2025), https://www.hhs.gov/press-room/anti-semitism-task-force-statement-on-additional-harvard-grants.html [perma.cc/52RP-7CTL].

Administration's goal is to make an example of Harvard to "serve as a warning to all universities and academic institutions across the country."[22]

## II. THE HARM TO NATIONAL SECURITY CAUSED BY BANNING INTERNATIONAL STUDENTS IS FURTHER EVIDENCE OF PUNITIVE PURPOSE.

The Administration's aim is punishment, not protecting national security. In Amici's long experience, it is the Administration's damaging actions—not Harvard's—that threaten U.S. national security. In swerving between explanations to justify this revocation,[23] the Administration has failed to create any administrative record to substantiate its allegations, nor given Harvard any opportunity to rebut them. The President's punitive actions serve no valid national security interest; to the contrary, Appellants' actions have already caused, and will cause, grievous harm to the national security interests of the United States.

### A. International Students Are Critical to U.S. National Security and Technological Superiority.

The United States confronts a shortage of domestic talent in the science, technology, engineering, and mathematics (STEM) fields that underpin U.S. national security and global technological leadership. The Department of Defense itself has concluded that the defense industrial base faces growing challenges, warning that "the workforce on which a defense industrial renaissance would depend

---

[22] *Harvard University Loses*, *supra* note 7.
[23] *Id.*

has become . . . an endangered species."[24] Current talent pipeline shortages create

vulnerabilities to the United States' competitive geopolitical posture.[25] By 2030, the

nation is projected to face a deficit of approximately 1.4 million computer science

and engineering professionals.[26] The semiconductor industry—a backbone of

modern defense systems—faces a projected shortfall of 67,000 STEM workers by

2030.[27] Furthermore, 82 percent of companies across the defense industrial base

report difficulty finding qualified STEM workers.[28]

Key technologies essential to national security require workers with advanced

STEM degrees.[29] More than 50 percent of the workforce at the world's leading

---

[24] U.S. DEP'T OF DEF., *Fiscal Year 2020 Industrial Capabilities Report to Congress* (2020), at 9, https://media.defense.gov/2021/Jan/14/2002565311/-1/-1/0/FY20-industrial-capabilities-report.pdf [https://perma.cc/3C46-WRPR].

[25] RONALD REAGAN PRES. FOUND. & INST., *National Security Innovation Base Report Card* (Mar. 2025), at 8, https://www.reaganfoundation.org/cms/assets/1741105896-nsib-2025-feb26-web-1.pdf [perma.cc/46DJ-8C79].

[26] SEMICONDUCTOR INDUS. ASS'N & OXFORD ECON., *Chipping Away: Assessing and Addressing the Labor Market Gap Facing the U.S. Semiconductor Industry* (Jul. 25, 2023), at 5, https://www.semiconductors.org/chipping-away-assessing-and-addressing-the-labor-market-gap-facing-the-u-s-semiconductor-industry [perma.cc/PKU4-V85U].

[27] *Id.*; Sujai Shivakumar & Charles Wessner, *Semiconductors and National Defense: What Are the Stakes?* (Ctr. for Strat. & Int'l Stud., June 8, 2022), https://www.csis.org/analysis/semiconductors-and-national-defense-what-are-stakes [perma.cc/GS53-PB2G].

[28] Jeremy Neufeld, *STEM Immigration Is Critical to American National Security* (Inst. for Progress, Mar. 30, 2022), at 5, https://ifp.org/wp-content/uploads/STEM-Immigration-Competition.pdf [perma.cc/TF8P-Z3R6].

[29] *Id.* at 1, 7, 8.

semiconductor manufacturers hold advanced degrees,[30] and over 70 percent of the data science workforce critical to artificial intelligence development possess advanced degrees.[31]

International students provide the talent necessary to address these shortfalls. Most international recipients of science and engineering doctoral degrees from U.S. academic institutions remain in the country after graduation, ensuring sustained contributions to American technological capacity and U.S. national security.[32] Seventy-two percent of foreign doctoral students remain in the United States ten years after earning their degrees, including 90 percent of Chinese students—providing long-term benefits to American technological capacity.[33]

In fields directly relevant to national security—including artificial intelligence, quantum computing, and advanced semiconductors—the United States depends heavily on international talent in STEM.[34] Sixty percent of Ph.D.-level computer and

---

[30] TAIWAN SEMICONDUCTOR MFG. CO., *TSMC Annual Report 2020 (I)* (Mar. 12, 2021), at 93, https://investor.tsmc.com/static/annualReports/2020/english/pdf/ e_all.pdf [perma.cc/LWZ3-ZVVJ].

[31] KAGGLE, *Kaggle's State of Data Science and Machine Learning 2019*, at 7, https://www.kaggle.com/kaggle-survey-2019 [perma.cc/S9NJ-BJLX].

[32] NAT'L CTR. FOR SCI. & ENG'G STAT., *Most U.S.-Trained Science and Engineering Doctorate Recipients on Temporary Visas Remain in the United States*, NSF 25-325 (Feb. 24, 2025), https://ncses.nsf.gov/pubs/nsf25325 [perma.cc/RES7-REZ3].

[33] Boris Granovskiy & Jill H. Wilson, *Foreign STEM Students in the United States*, Cong. Rsch. Serv., IF11347 (Nov. 1, 2019), at 2, https://www.congress.gov/crs-product/IF11347 [perma.cc/BQ28-RM7M].

[34] Neufeld, *supra* note 28, at 1.

mathematical scientists, who lead the development of artificial intelligence and computing technologies, were born outside the United States.[35] Fully half of the advanced degree holders working in America's defense industrial base are foreign-born.[36]

American lawmakers have repeatedly recognized the strategic importance of this talent pipeline. In 2020, the bipartisan House Armed Services Committee's Future of Defense Task Force described STEM immigrants' contributions to U.S. leadership as "staggering."[37] This assessment reflects a broader pattern of international talent driving American innovation: immigrants were involved in the development of around 30 percent of U.S. patents in strategic industries in recent years[38] and account for 35 percent of American Nobel Prize winners.[39] The economic impact is equally substantial. One quarter of America's billion-dollar

[35] NAT'L SCI. BD., *International STEM Talent is Crucial for a Robust U.S. Economy*, (2022), at 1, https://www.nsf.gov/nsb/sei/one-pagers/NSB-International-STEM-Talent-2022.pdf [perma.cc/XJ86-5JPF].

[36] Neufeld, *supra* note 28, at 2.

[37] FUTURE OF DEF. TASK FORCE, *Future of Defense Task Force Report 2020* (Sept. 23, 2020), at 17, https://houlahan.house.gov/uploadedfiles/future-of-defense-task-force-final-report-2020.pdf [perma.cc/8HY8-B98K].

[38] Connor O'Brien & Adam Ozimek, *Immigrant Inventors Are Crucial for American National and Economic Security*, ECON. INNOVATION GRP. (May 21, 2024), https://eig.org/immigrants-patents [perma.cc/U7XC-2686].

[39] Sandip K. Sureka & James C. Witte, *Immigrant Nobel Laureates: U.S. Higher Education Infrastructure in a Global Context* (Inst. Immigr. Rsch., Dec. 2024), at 2, https://d101vc9winf8ln.cloudfront.net/documents/51466/original/Nobel_Report_2024_Sandip_Web_Version_Final121124.pdf [perma.cc/W6EV-3DNF].

startup companies were founded or co-founded by former international students.[40] In Amici's experience, these companies represent critical sectors—all essential to national security and economic competitiveness.

The national security impact of international students is not limited to those who remain in the United States after graduation. Amici have consistently witnessed how the recruitment of international students by premier U.S. colleges and universities enhances America's ability to build alliances and project soft power. Those who return to their home countries after studying in the United States frequently assume positions of global leadership and influence. As of 2024, seventy currently serving world leaders received their higher education in the United States—significantly more than any other nation.[41] This educational diplomatic pipeline provides the United States with an invaluable instrument of soft-power

---

[40] Stuart Anderson, *Immigrant Entrepreneurs and U.S. Billion-Dollar Companies* (Nat'l Found. for Am. Pol'y, July 2022), at 3, https://nfap.com/wp-content/uploads/2022/07/2022-BILLION-DOLLAR-STARTUPS.NFAP-Policy-Brief.2022.pdf [perma.cc/VBD2-VZ73].

[41] Nick Hillman, *HEPI Soft-Power Index 2024: The US Pulls Further Away, While the UK Stands Still and France Slips Back* (Higher Educ. Pol'y Inst., Oct. 10, 2024), https://www.hepi.ac.uk/2024/10/10/the-us-pulls-further-away-in-the-latest-soft-power-index-while-the-uk-stands-still-and-france-slips-back [perma.cc/36BN-QKLJ]; *see also* Image posted by YLSROLC (@ylsrolc), *International Students Make America Stronger and Shape Our World*, INSTAGRAM (May 30, 2025), https://www.instagram.com/p/DKSANNkNn4D [perma.cc/83XZ-S5N5].

influence, diplomatic relationships, and opportunities to promote democratic values worldwide.[42]

## B. Restricting International Student Enrollment Directly Benefits America's Adversaries and Strategic Competitors.

By attacking our institutions of higher learning and barring international enrollment, the Administration threatens America's position in the global competition for talent in science and engineering.[43] America's competitors have already aggressively been positioning themselves to win this race, exploiting various Administration actions as a "once-in-a-century brain gain opportunity."[44] China has instituted targeted programs to recruit foreign researchers.[45] Our allies' efforts to do

---

[42] Joseph Nye, *Soft Power and Higher Education* (Educause, Jan. 1, 2005), https://library.educause.edu/-/media/files/library/2005/1/ffp0502s-pdf [perma.cc/4F9X-WA5Z].

[43] *See* NAT'L SEC. COMM'N ON A.I., *The Talent Competition*, in *Final Report* ch. 10 (Mar. 1, 2021) https://reports.nscai.gov/final-report/chapter-10 [perma.cc/PT5U-WXJ4].

[44] Danielle Cave, *As Trump Sacks Scientists, Australia Should Hire Them. US Drain Is Our Brain Gain* (Austl. Strat. Pol'y Inst., Mar. 7, 2025), https://www.aspistrategist.org.au/as-trump-sacks-scientists-australia-should-hire-them-us-drain-is-our-brain-gain [perma.cc/LPW9-J3A5].

[45] *See*, *e.g.*, Kate Zernike, *U.S. Scientists Warn That Trump's Cuts Will Set Off a Brain Drain*, N.Y. TIMES (June 3, 2025), https://www.nytimes.com/2025/06/03/us/trump-federal-spending-grants-scientists-leaving.html [perma.cc/R3UM-8VBN] (reporting that after American Nobel laureate Ardem Patapoutian's federal grant was frozen, he received an offer from China to relocate anywhere in the country with 20 years of guaranteed funding); Rachel Hoff & Reed Kessler, *STEMming the Crisis: Immigration and the U.S. National Security Talent Base*, WAR ON THE ROCKS (Apr. 1, 2024), https://warontherocks.com/2024/04/stemming-the-crisis-immigration-and-the-u-s-

---

the same will continue to intensify as a result of the Trump Administration barring international students from Harvard. The European Commission, for example, recently launched a $570 million "Choose Europe" initiative designed to attract STEM talent away from the U.S.[46] The United Kingdom has a similar program targeting graduates of elite universities.[47] Canada's high-skilled express visa system has drawn over 1,000 American-trained applicants since 2023.[48] In Amici's view, cutting off the influx of international students will cause permanent harm to the nation's ability to lead in an increasingly competitive global race for talent.[49]

---

national-security-talent-base [perma.cc/A6L3-HKD6] (noting "China poaches talent" by offering postdoctoral researchers higher salaries and grants than are offered in U.S.).

[46] Jennifer Jett & Peter Guo, *Blocked from Harvard, the World's Star Students Weigh Staying in Asia and Europe*, NBCNEWS (May 27, 2025), https://www.nbcnews.com/world/asia/harvard-international-student-ban-trump-china-europe-rcna209044 [perma.cc/266B-49CD].

[47] Michael T. Nietzel, *Britain Opens Up Its Visas for Graduates of World's Top Universities*, FORBES (May 31, 2022), https://www.forbes.com/sites/michaeltnietzel/2022/05/31/britain-opens-up-its-visas-for-graduates-of-worlds-top-universities [perma.cc/NSA9-SLZR].

[48] Cecilia Esterline, *Previously Unreported Data: The U.S. Lost 45,000 College Grads to Canada's High-Skill Visa from 2017 to 2021* (Niskanen Ctr., Mar. 14, 2023), https://www.niskanencenter.org/previously-unreported-data-the-u-s-lost-45000-college-grads-to-canadas-high-skill-visa-from-2017-to-2021 [perma.cc/52EQ-PQ56].

[49] Marcia McNutt, president of the National Academy of Sciences, warns: "This is such a race for being the science powerhouse that you never fully recover . . . . You might accelerate back up to 60, but you can't make up for those years when you were at a standstill while the competition was racing ahead." Erica Pandey, *The Great Poaching: America's Brain Drain Begins*, AXIOS (June 7, 2025), https://www.axios.com/2025/06/07/us-science-brain-drain [perma.cc/DF6S-F25J].

Foreign governments quickly moved to capitalize on the Administration's counterproductive policy to rescind Harvard's authorization to enroll international students. One Hong Kong official declared that the territory's "doors are wide open" to "any students who face discrimination and unfair treatment in the U.S."[50] Hong Kong's Secretary of Education announced on social media that "the Education Bureau ha[d] immediately contacted local universities to call on them to take proactive action."[51] The response was swift and coordinated. Five Hong Kong universities extended "unconditional" offers to Harvard students and offer holders.[52] Universities in Japan, Macau, and Malaysia made similar targeted invitations.[53] The damage is already materializing. Harvard representatives report that many international students have sought advice on transferring due to "profound fear,

---

[50] *Id.*

[51] Miranda Jeyaretnam, *These Asian Universities Are Seeking to Attract Harvard Transfers as Trump Targets International Students*, TIME (May 27, 2025), https://time.com/7288747/trump-harvard-international-students-transfer-universities-asia-hong-kong-japan [perma.cc/5BWU-RGF4].

[52] HONG KONG UNIV. OF SCI. & TECH., *HKUST Opens Doors to Harvard Students Amid Global Academic Shifts* (Press Release, May 23, 2025), https://hkust.edu.hk/news/hkust-opens-doors-harvard-students-amid-global-academic-shifts [perma.cc/352H-6MAR]; CITY UNIV. OF HONG KONG, *CityUHK Welcomes Global Talents and Pioneers of Innovation* (Press Release, May 23, 2025), https://www.cityu.edu.hk/media/press-release/2025/05/23/cityuhk-welcomes-global-talents-and-pioneers-innovation [perma.cc/9FPF-W43D]; Jeyaretnam, *supra* note 51.

[53] Jeyaretnam, *supra* note 51.

36

concern, and confusion."[54] They cannot risk transferring to other American universities that could soon face similar enrollment bans. The Administration's policy has thus triggered what America's competitors and adversaries have spent years and billions trying to achieve: a large-scale diversion of elite talent away from American universities.

### C. Legitimate Security Concerns Can Be, and Until Now Consistently Have Been, Addressed Through Targeted Measures, Not Blanket Prohibitions.

Amici have devoted decades of their lives to addressing legitimate national security concerns regarding foreign espionage. But even when expressly tasked with countering these threats, Amici have consistently and explicitly rejected the kind of overbroad blanket student restrictions being imposed here as counterproductive to U.S. interests. Public intelligence reports and testimony from senior U.S. intelligence officials confirm that Chinese efforts to steal innovation-related intellectual property have reached unprecedented levels that far exceed traditional espionage. Yet even so, then-FBI Director Christopher Wray explicitly cautioned against overly broad exclusions in remarks about these exact threats:

> Confronting this threat effectively does not mean we shouldn't do business with the Chinese. It does not mean we shouldn't host Chinese visitors. *It does not mean we shouldn't welcome Chinese*

---

[54] Maureen Martin, Supplemental Declaration, *President & Fellows of Harvard Coll. v. United States Dep't of Homeland Sec.*, No. 25-cv-11472-FDS (D. Mass. filed May 28, 2025), https://storage.courtlistener.com/recap/gov.uscourts.mad.285083/ gov.uscourts.mad.285083.46.0.pdf [perma.cc/75S5-4CKW].

*students* . . . . What it does mean is that when China violates our criminal laws and international norms, we're not going to tolerate it.[55]

The FBI's Assistant Director for Counterintelligence during President Trump's first term similarly emphasized that while foreign adversary threats to academic institutions are real and growing, "America both wants and needs" international scholars "to continue to come," noting that "[t]he vast majority of the international scholars who come to these campuses each year" "make our strong academic institutions even stronger."[56] Deploying wholesale bans where circumstances demand individualized investigation accompanied by due process undermines American national security interests.

President Trump plainly has made no considered decision that foreign students as a whole—even Chinese students—present a national security threat. After a phone call with Chinese President Xi on June 4, 2025, President Trump said of Chinese students: "Chinese students are coming—no problem. It's our honor to have them, frankly. We want to have foreign students, but we want them to be

---

[55] Christopher Wray, *Responding Effectively to the Chinese Economic Espionage Threat* (Feb. 6, 2020), https://www.fbi.gov/news/speeches-and-testimony/responding-effectively-to-the-chinese-economic-espionage-threat [perma.cc/N9VT-EYEY].

[56] Bill Priestap, *Student Visa Integrity: Protecting Educational Opportunity and National* Security, Before the S. Judiciary Comm., Subcomm. on Border Security and Immigration (June 6, 2018), https://www.fbi.gov/news/speeches-and-testimony/student-visa-integrity-protecting-educational-opportunity-and-national-security [perma.cc/55WK-98KX].

checked."[57] On June 11, he added, "we will provide to China what was agreed to, including Chinese students using our colleges and universities (which has always been good with me!)."[58] Of course, that is not what his orders against Harvard allow.

To be sure, no person who poses a legitimate security concern should be granted access to sensitive national security information. But in Amici's experience, the U.S. government possesses ample tools for addressing serious counter-intelligence concerns without resorting to crude blanket exclusions. These tools and careful vetting processes have been relied upon for years by leaders of both Democratic and Republican administrations.[59] Furthermore, national security professionals have at their disposal multifaceted approaches to strengthen vetting processes. These include adjustments to visa policies and enhanced screening

---

[57] Alex Leary, Lingling Wei, & Alexander Ward, *Trump Says He Discussed Trade, Rare Earths in Call with China's Xi*, WALL ST. J. (June 5, 2025), https://www.wsj.com/world/china/trump-xi-speak-amid-trade-tensions-7e637978 [perma.cc/XMY2-KZAQ].

[58] Ana Swanson, *New China Trade 'Deal' Takes U.S. Back to Where it Started*, N.Y. TIMES (June 11, 2025), https://www.nytimes.com/2025/06/11/us/politics/us-china-trade-deal-trump.html?smid=nytcore-ios-share&referringSource=articleShare [perma.cc/Y85H-Y5W4].

[59] *See*, *e.g.*, NAT'L SEC. COUN., *United States Strategic Approach to The People's Republic of China* (2020), at 10, https://trumpwhitehouse.archives.gov/wp-content/uploads/2020/05/U.S.-Strategic-Approach-to-The-Peoples-Republic-of-China-Report-5.24v1.pdf [perma.cc/34NG-4LC8] ("The United States strongly supports the principles of open academic discourse and welcomes international students and researchers conducting legitimate academic pursuits; we are improving processes to screen out the small minority of Chinese applicants who attempt to enter the United States under false pretenses or with malign intent.").

measures, methods for protecting sensitive information, monitoring of research activities, educational programs and disclosure policies, and the extensive security clearance process and compartmentalized access to classified information designed to mitigate threats from both foreign and domestic sources. These proven existing mechanisms allow the government to identify and address such concerns while preserving the benefits that international talent brings to both U.S. national security and the broader economy. In sum, targeted approaches enhance U.S. national security interests; wholesale exclusions like the punitive sanctions here simply undermine them.

## **CONCLUSION**

Appellants' actions have no basis in law or fact. The President is not a king, entitled to punish perceived enemies by whim. He has no constitutional or statutory authority to issue the unilateral extrajudicial punishments imposed here. Those punitive actions do not serve, but rather undermine, our national security interests, which are far better addressed by applying proven existing administrative techniques.

For all of the foregoing reasons, Amici submit that this Court should affirm the District Court's grant of a preliminary injunction prohibiting the Appellants from implementing or enforcing the presidential proclamation entitled "Enhancing National Security by Addressing Risks at Harvard University."

Respectfully Submitted,

Counsel for Amici Curiae,

*/s/ Joel G. Beckman*
Joel G. Beckman (CA #16595)
Michael Paris (CA #64383)
Joshua E. Goldstein
NYSTROM BECKMAN & PARIS LLP
One Marina Park Dr., 15th Fl.
Boston, MA  02210
(617) 778-9100
jbeckman@nbparis.com
mparis@nbparis.com
jgoldstein@nbparis.com


Harold Hongju Koh[60]
Sonia Mittal
Peter Gruber Rule of Law Clinic[61]
Yale Law School
127 Wall Street, P.O. Box 208215
New Haven, CT  06520-8215
(203) 432-4932
harold.koh@ylsclinics.org
sonia.mittal@yale.edu


Dated: September 4, 2025

---

[60] Law student interns Matthew Botvinick, Jun Luke Foster, Fred Halbhuber, Inbar Pe'er, and Brady Worthington contributed to this brief's drafting under supervision by counsel for Amici.

[61] This brief sets forth the position of the signatories, as represented by counsel and law student members of the Peter Gruber Rule of Law Clinic, but does not purport to state the views of Yale Law School or Yale University.

## **<u>CERTIFICATE OF COMPLIANCE</u>**

1. This document complies with the type-volume limits of Fed. R. App. P. 32(a)(7) and Fed. R. App. P. 29(a)(5) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 6,492 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2024 in 14-point Times New Roman.

Dated: September 4, 2025              */s/ Joel G. Beckman*
                                      Joel G. Beckman
                                      *Counsel for Amici Curiae*

## <u>CERTIFICATE OF SERVICE</u>

I, hereby certify that on September 4, 2025, I electronically filed the foregoing document with the United States Court of Appeals for the First Circuit by using the CM/ECF system.  I certify that the following parties or their counsel of record are registered as ECF Filers and that they will be served by the CM/ECF system:

Andrianna Kastanek
Jenner & Block LLP
353 N. Clark Street
Chicago, IL  60654
akastanek@jenner.com

Ian Heath Gershengorn
Ishan Bhabba
Lauren J. Hartz
Jenner & Block LLP
1099 New York Ave., NW, Suite 900
Washington, DC 20001
igershengorn@jenner.com
ibhabha@jenner.com
lhartz@jenner.com

*Attorneys for President and Fellows of Harvard College*

Danielle Kerker Goldstein
Lehotsky Keller Cohn LLP
3280 Peachtree Road NE
Atlanta, GA  30305
danielle@llkcfirm.com

Joshua Paul Morrow
Lehotsky Keller Cohn LLP
408 W. 11th Street, 5th Floor
Austin, TX  78701
josh@lkefirm.com

Scott Allen Keller
Shannon Grammel Denmark
Steven Paul Lehotsky
Jacob Richards
Serena M. Orloff
Lehotsky Keller Cohn LLP
200 Massachusetts Ave. NWQ
Washington, DC 20001
scott@lkefirm.com
shannon@lkefirm.com
steve@lkefirm.com
jacob@lkefirm.com
serena@lkefirm.com

Katherine Yarger
Lehotsky Keller Cohn LLP
700 Colorado Blvd., Unit 407
Denver, CO 80206
katie@lkefirm.com

*Attorneys for President and Fellows
of Harvard College*


Robert K. Hur
King & Spalding LLP
1700 Pennsylvania Ave NW, Ste.
200
Washington DC 20006
rhur@kslaw.com

*Attorneys for President and Fellows
of Harvard College*


Tiberius T. Davis
Elizabeth Hedges
Bridget K. O'Hickey
Brett a. Shumate
Attorney General, Civil Division
U.S. Department of Justice
PO Box 878, Ben Franklin Station
Washington, DC 20044
Tiberius.davis@usdoj.com

David Kim
Catherine M. Reno
Senior Litigation Counsel
Office of Immigration Litigation
General Litigation & Appeals
Section

William A. Burck
Quinn Emanuel Urquhart & Sullivan
1301 I Street NW, Suite 900
Washington, DC 20005
williamburck@quinnemanuel.com

*Attorneys for President and Fellows
of Harvard College*


Tiberius T. Davis
Elizabeth Hedges
Bridget K. O'Hickey
Brett A. Shumate
Attorney General, Civil Division
U.S. Department of Justice
PO Box 878, Ben Franklin Station
Washington, DC 20044
Tiberius.davis@usdoj.com

David Kim
Catherine M. Reno
Senior Litigation Counsel
Office of Immigration Litigation
General Litigation & Appeals
Section

Drew Ensign
Deputy Assistant Attorney General
Office of Immigration Litigation

Anne R. Burley
Trial Attorney
Office of Immigration Litigation

*Attorney for United States Department of Homeland Security, Kristi Noem, in her official capacity as Secretary of the United States Department of Homeland Security, United States Immigration and Customs Enforcement, Todd Lyons, in his official capacity as Acting Director of United States Immigration and Customs Enforcement, Student and Exchange Visitor Program, John Doe, in their official capacity as Director of the Student and Exchange Visitor Program, James Hicks, in his official capacity as Deputy Assistant Director of the Student and Exchange Visitor Program, United States Department of Justice, Pamela Bondi, in her official capacity as Attorney General of the United States, United States Department of State, Marco Rubio, in his official capacity as Secretary of the United States Department of State*

Drew Ensign
Deputy Assistant Attorney General
Office of Immigration Litigation

Anne R. Burley
Trial Attorney
Office of Immigration Litigation

*Attorney for United States Department of Homeland Security, Kristi Noem, in her official capacity as Secretary of the United States Department of Homeland Security, United States Immigration and Customs Enforcement, Todd Lyons, in his official capacity as Acting Director of United States Immigration and Customs Enforcement, Student and Exchange Visitor Program, John Doe, in their official capacity as Director of the Student and Exchange Visitor Program, James Hicks, in his official capacity as Deputy Assistant Director of the Student and Exchange Visitor Program, United States Department of Justice, Pamela Bondi, in her official capacity as Attorney General of the United States, United States Department of State, Marco Rubio, in his official capacity as Secretary of the United States Department of State*

Tasha J. Bahal
One Ashburton Place
Boston, MA 02108
*Attorney for Commonwealth of Massachusetts*

/s/ Joel G. Beckman
Joel G. Beckman (CA #16595)

# ADDENDUM

**ADDENDUM**
**TABLE OF CONTENTS**

List of *Amici Curiae* ............................................................................Add 1

# LIST OF *AMICI CURIAE*

**Donald Ayer**: Deputy Attorney General (1989-1990); Principal Deputy Solicitor General (1986-1988); U.S. Attorney, Eastern District of California (1982-1986)

**John B. Bellinger III**: Legal Adviser, U.S. Department of State (2005-2009); Senior Associate Counsel to the President and Legal Adviser, National Security Council (2001-2005)

**Gregory Craig**: Counsel to the President (2009-2010); Assistant to the President and Special Counsel (1998-1999)

**Ambassador John C. Danforth**: U.S. Ambassador to the United Nations (2004-2005); U.S. Senator from Missouri (1976-1995)

**Ambassador Nancy H. Ely-Raphel**: Senior Advisor to the Secretary of State (2001-2003); U.S. Ambassador to Slovenia (1998-2001)

**Stuart Gerson**: Acting Attorney General of the United States (1993); Assistant Attorney General (Civil) (1989-1993)

**Secretary Chuck Hagel**: Secretary of Defense (2013-2015); Co-Chairman, President's Intelligence Advisory Board (2009-2013); U.S. Senator from Nebraska (1997-2009)

**Avril Haines**: Director of National Intelligence (2021-2025); Assistant to the President and Principal Deputy National Security Advisor (2015-2017)

**Conrad K. Harper**: Legal Adviser, U.S. Department of State (1993-1996)

**General Michael Hayden**: Director of the Central Intelligence Agency (2006-2009); Principal Deputy Director of National Intelligence (2005-2006); Director of National Security Agency (1999-2005)

**Peter Keisler**: Acting Attorney General (2007); Assistant Attorney General (Civil) (2003-2007)

**Alan Kreczko**: Legal Adviser, National Security Council (1992-1997)

**Judge J. Michael Luttig**: United States Court of Appeals, Fourth Circuit (1991-2006); Assistant Attorney General OLC (1990-1991)

**Secretary Denis McDonough**: Secretary of Department of Veterans Affairs (2021-2025); White House Chief of Staff (2013-2017); Principal Deputy National Security Adviser (2010-2013)

**Trevor Morrison**: Chair, Public Interest Declassification Board (2016-2018); Associate Counsel to the President (2009); Attorney Advisor, Office of Legal Counsel, U.S. Department of Justice (2000-2001)

**Ambassador Thomas R. Pickering**: U.S. Ambassador to United Nations (1989-1992); U.S. Ambassador to Russia (1993-1996); U.S. Ambassador to India (1993-1996) U.S. Ambassador to Israel (1985-1988); U.S. Ambassador to Jordan (1974-1978); Undersecretary of State for Political Affairs (1997-2000)

**Alan Charles Raul**: Associate Counsel to President Reagan (1986-1988); General Counsel, Office of Management and Budget (1988-1989); Vice Chairman of the Privacy and Civil Liberties Oversight Board (2006-2008)

**Ambassador Susan E. Rice**: National Security Advisor (2013-2017); U.S. Ambassador to the United Nations (2009-2013)

**Nicholas Rostow**: General Counsel and Senior Policy Adviser to the U.S. Permanent Representative to the United Nations (2001-05); Special Assistant to the President for National Security Affairs and Legal Adviser, National Security Council (1987-93)

**Wendy Sherman**: Deputy Secretary of State (2021-2023); Undersecretary for Political Affairs, U.S. Department of State (2011-2015)

**Judge Abraham D. Sofaer**: Legal Adviser, U.S. Department of State (1985-1990); United States District Court, Southern District of New York (1979-1985)