No. 25-1627

## UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

PRESIDENT AND FELLOWS OF HARVARD COLLEGE,

*Plaintiff-Appellee*,

v.

UNITED STATES DEPARTMENT OF HOMELAND SECURITY, ET AL.,

*Defendants-Appellants*.

On Appeal from the United States District Court for the District of Massachusetts

## BRIEF FOR PLAINTIFF-APPELLEE

ISHAN BHABHA
IAN HEATH GERSHENGORN
LAUREN J. HARTZ
JENNER & BLOCK LLP
1099 New York Ave. NW, Suite 900
Washington, DC 20001

ANDRIANNA KASTANEK
JENNER & BLOCK LLP
353 N Clark St.
Chicago, IL 60654

PAUL D. CLEMENT
 *Counsel of Record*
JAMES Y. XI
JEFFREY C. THALHOFER
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com

January 12, 2026

*Counsel for Plaintiff-Appellee*
*(Additional Counsel on Inside Cover)*

Steven P. Lehotsky
Scott A. Keller
Serena M. Orloff
Shannon G. Denmark
Jacob B. Richards
LEHOTSKY KELLER COHN LLP
200 Massachusetts Ave. NW, Suite 700
Washington, DC 20001

Katherine C. Yarger
LEHOTSKY KELLER COHN LLP
700 Colorado Blvd., #407
Denver, CO 80206

Joshua P. Morrow
LEHOTSKY KELLER COHN LLP
408 W. 11th St., 5th Floor
Austin, TX 78701

Danielle K. Goldstein
LEHOTSKY KELLER COHN LLP
3280 Peachtree Rd. NE
Atlanta, GA 30305

William A. Burck
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
1300 I St. NW, Suite 900
Washington, DC 20005

Robert K. Hur
KING & SPALDING LLP
1700 Pennsylvania Ave. NW, Suite 900
Washington, DC 20006

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................... iii

INTRODUCTION ................................................................................. 1

STATEMENT OF THE CASE................................................................ 5

      A.    Legal Background................................................................ 5

      B.    Factual Background and Procedural History................................. 9

SUMMARY OF ARGUMENT .............................................................. 21

ARGUMENT ..................................................................................... 25

I.     Harvard Is Likely To Succeed On Its First Amendment Claims............ 25

      A.    The Proclamation Violates the First Amendment ....................... 25

            1.    The Proclamation discriminates based on viewpoint............................................................... 25

            2.    The Proclamation is retaliation for protected activity ................................................................. 29

            3.    The Proclamation violates the Petition Clause ................. 32

      B.    The Government's Contrary Arguments Lack Merit................... 33

            1.    The government's waived causation argument is meritless................................................................. 33

            2.    No deference is merited under *Hawaii* or *Mandel*, and the Proclamation cannot withstand even deferential review .............................................. 35

II.    Harvard Is Likely To Succeed On Its Statutory Claims ...................... 45

      A.    The Proclamation Violates Section 1182(f) .............................. 45

      B.    Harvard's Statutory Challenge is Justiciable.............................. 53

III.   The Other Preliminary Injunction Factors Favor Harvard .................... 54

     A.     Harvard Will Be Irreparably Harmed Absent an
           Injunction ........................................................................54

     B.     The Balance of the Equities and the Public Interest
           Favor Harvard ..................................................................55

CONCLUSION ..................................................................................56

## TABLE OF AUTHORITIES

**Cases**

*Aref v. Lynch,*
    833 F.3d 242 (D.C. Cir. 2016)...........................................................31

*Asociacion de Educacion Privada de P.R., Inc. v. Garcia-Padilla,*
    490 F.3d 1 (1st Cir. 2007)............................................................ 30, 34

*Blackwell Coll. of Bus. v. Att'y Gen.,*
    454 F.2d 928 (D.C. Cir. 1971).........................................................7, 8

*Borough of Duryea v. Guarnieri,*
    564 U.S. 379 (2011)........................................................................32

*Brown v. Yost,*
    133 F.4th 725 (6th Cir. 2025) ..........................................................56

*Buckley v. Valeo,*
    424 U.S. 1 (1976)...............................................................................3

*Carmack v. Virginia,*
    837 F.App'x 178 (4th Cir. 2020) .......................................................34

*Citizens United v. FEC,*
    558 U.S. 310 (2010).........................................................................25

*D.B. ex rel. Elizabeth B. v. Esposito,*
    675 F.3d 26 (1st Cir. 2012)..............................................................30

*Dep't of Com. v. New York,*
    588 U.S. 752 (2019).........................................................................44

*Fiallo v. Bell,*
    430 U.S. 787 (1977).........................................................................43

*Hartman v. Moore,*
    547 U.S. 250 (2006)............................................................. 30, 35, 39

*Healy v. James,*
    408 U.S. 169 (1972).........................................................................30

*Herguan Univ. v. ICE*,
   258 F.Supp.3d 1058 (N.D. Cal. 2017) ................................................................8

*Hou. Cmty. Coll. Sys. v. Wilson*,
   595 U.S. 468 (2022) .........................................................................................39

*K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist.*,
   710 F.3d 99 (3d Cir. 2013) ..............................................................................56

*Kent v. Dulles*,
   357 U.S. 116 (1958) .........................................................................................50

*Kerry v. Din*,
   576 U.S. 86 (2015) ...........................................................................................44

*Keyishian v. Bd. of Regents of Univ. of N.Y.*,
   385 U.S. 589 (1967) ................................................................................... 22, 26

*Kleindienst v. Mandel*,
   408 U.S. 753 (1972) ............................................................... 3, 36, 37, 44

*Korematsu v. United States*,
   323 U.S. 214 (1944) .........................................................................................53

*Libby v. Fecteau*,
   784 F.Supp.3d 272 (D. Me. 2025) ...................................................................39

*Loper Bright Enters. v. Raimondo*,
   603 U.S. 369 (2024) .........................................................................................54

*M'Culloch v. Maryland*,
   17 U.S. (4 Wheat.) 316 (1819) ........................................................................49

*Moody v. NetChoice, LLC*,
   603 U.S. 707 (2024) .................................................................... 3, 27, 28

*Murthy v. Missouri*,
   603 U.S. 43 (2024) ...........................................................................................26

*N.Y. Progress & Prot. PAC v. Walsh*,
   733 F.3d 483 (2d Cir. 2013) ............................................................................56

*Nat'l Rifle Ass'n of Am. v. Vullo*,
  602 U.S. 175 (2024)................................................................ 3, 20, 26, 34

*Nieves v. Bartlett*,
  587 U.S. 391 (2019)................................................................35

*Nken v. Holder*,
  556 U.S. 418 (2009)................................................................55

*Pietersen v. U.S. Dep't of State*,
  138 F.4th 552 (D.C. Cir. 2025)................................................53

*R.A.V. v. City of St. Paul*,
  505 U.S. 377 (1992)................................................................33

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
  566 U.S. 639 (2012)................................................................46

*Regents of Univ. of Mich. v. Ewing*,
  474 U.S. 214 (1985)................................................................ 29, 30

*Roman Cath. Diocese of Brooklyn v. Cuomo*,
  592 U.S. 14 (2020)................................................................ 54, 55

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
  515 U.S. 819 (1995)................................................................ 22, 25

*Sale v. Haitian Ctrs. Council, Inc.*,
  509 U.S. 155 (1993)................................................................ 36, 53

*Texans for Free Enter. v. Tex. Ethics Comm'n*,
  732 F.3d 535 (5th Cir. 2013)................................................56

*Texas v. Johnson*,
  491 U.S. 397 (1989)................................................................26

*Trump v. Hawaii*,
  585 U.S. 667 (2018)................................................................ *passim*

*United States v. Rahimi*,
  602 U.S. 680 (2024)................................................................49

*Util. Air Regul. Grp. v. EPA,*
  573 U.S. 302 (2014) ............................................................... 50

*West Virginia v. EPA,*
  597 U.S. 697 (2022) ............................................................... 49

*W. Va. State Bd. of Educ. v. Barnette,*
  319 U.S. 624 (1943) ...................................................... 22, 29

*W. Va. Univ. Hosps., Inc. v. Casey,*
  499 U.S. 83 (1991) ................................................................ 46

*Youngstown Sheet & Tube Co. v. Sawyer,*
  343 U.S. 579 (1952) ......................................................... 4, 40

*Zivotofsky ex rel. Zivotofsky v. Clinton,*
  566 U.S. 189 (2012) ............................................................... 54

## Constitutional Provision

U.S. Const. amend. I .......................................................... 5, 32

## Statutes

8 U.S.C. §1101(a)(15) ........................................................... 6, 8

8 U.S.C. §1182(f) ................................................. 18, 45, 47, 50

8 U.S.C. §1185(a) .................................................................. 18

8 U.S.C. §1185(a)(1) .............................................................. 19

8 U.S.C. §1372(a)(1) .............................................................. 49

8 U.S.C. §1372(c)(5) .............................................................. 48

20 U.S.C. §1232g .................................................................. 14

## Rules

8 C.F.R. §103.3(a)(1) .............................................................. 7

8 C.F.R. §214.1(h) ................................................................ 14

8 C.F.R. §214.2(f) ................................................................... 6

8 C.F.R. §214.3(a)(1) ..............................................................................6

8 C.F.R. §214.3(a)(3) ...........................................................................6, 7

8 C.F.R. §214.3(e)(4) ..............................................................................7

8 C.F.R. §214.3(g) .................................................................................48

8 C.F.R. §214.3(g)(1) .............................................................................14

8 C.F.R. §214.3(h)(2) ..............................................................................7

8 C.F.R. §214.3(h)(3) ..............................................................................7

8 C.F.R. §214.4(a)(2) ...........................................................................7, 8

8 C.F.R. §214.4(b)(1) ..............................................................................7

8 C.F.R. §214.4(b)-(e) .............................................................................7

8 C.F.R. §214.4(g) ..................................................................................7

8 C.F.R. §214.4(h) ..................................................................................7

8 C.F.R. §214.4(*i*)(1) ..............................................................................8

22 C.F.R. §62.3 ......................................................................................8

22 C.F.R. §62.4 ......................................................................................8

22 C.F.R. §62.5 ......................................................................................8

22 C.F.R. §62.50(d) ................................................................................8

22 C.F.R. §62.50(d)(1) ............................................................................9

22 C.F.R. §62.50(d)(2) ............................................................................9

**Other Authorities**

A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal Texts* (2012) ....................................................................................................49

HHS, *Joint Task Force to Combat Anti-Semitism Statement on Additional Harvard Actions* (May 13, 2025), https://perma.cc/99B4-AG8Z ....................15

vii

President Donald Trump Taking Questions in the Oval Office
    (Newsmax, aired May 28, 2025, 12:42 PM ET),
    https://perma.cc/ZUC6-3SP6 ................................................................ 17, 31, 32

Proclamation No. 8697, *Suspension of Entry as Immigrants and*
    *Nonimmigrants of Persons Who Participate in Serious Human Rights*
    *and Humanitarian Law Violations and Other Abuses*,
    76 Fed. Reg. 49,277 (Aug. 4, 2011) .................................................................50

The Federalist No. 37 (James Madison) (Clinton Rossiter ed., 1961) ...................49

# INTRODUCTION

This case involves a particularly dangerous element of an unprecedented, all-of-government campaign to punish Harvard for its perceived viewpoints and protected First Amendment activity:  The misuse of the President's entry-suspension power to punish a domestic institution by allowing the admission of international students as long as they study anywhere but Harvard.

The government launched its multi-front punitive campaign with a zero-funding policy that purported to terminate billions of dollars in research funding already awarded to Harvard researchers on a competitive basis, while promising that no future grants will be forthcoming—from *any* agency.  It next instituted a "pilot" program of enhanced vetting for international students and researchers applicable only to Harvard.  It threatened to revoke Harvard's tax-exempt status and to seize its patents, and it applied pressure to revoke Harvard's accreditation.  And as a prelude to the action on appeal, the government unsuccessfully tried to revoke Harvard's decades-old authorization to sponsor international student visas.  After the district court enjoined that decision because it failed to comply with substantive and procedural protections that safeguard the significant reliance interests of domestic institutions like Harvard, the White House convened a session to "brainstorm additional punitive measures" for Harvard, and five days later President Trump issued the unprecedented Proclamation here.

Sidestepping the district court's injunction, the Proclamation purports to bar the entry of students from around the globe destined for Harvard, and only Harvard. To be clear, not a single international visa holder is categorically denied entry to the country; the same students from the same countries would be perfectly free to enter the country if only they picked a different school. Indeed, the Proclamation emphasizes that it does not suspend entry "to any alien who enters the United States to attend other universities." Appx.111.

This extraordinary singling out by multiple agencies would ordinarily justify a searching inquiry into the motivations for these individually unprecedented and collectively crippling government actions. But here the government has laid bare its motivations and list of grievances. The government believes that Harvard "lack[s] viewpoint diversity"; that Harvard's faculty are "almost all woke, Radical Left, idiots" who are "more committed to activism than scholarship"; and that Harvard has fostered an "anti-American, Pro-Hamas ideology" on campus. Appx.32, 34, 45, 51. To address this perceived problem, the government has purported to, *inter alia*, ban students from every nation, including Israel, who have voluntarily decided to pursue studies at Harvard. And to end this concerted campaign of sanctions, the government has demanded that, *inter alia*, Harvard readjust the mix of viewpoints on campus more to the government's liking.

It is thus no surprise that the district court enjoined the Proclamation. "At the heart of the First Amendment's Free Speech Clause is the recognition that viewpoint discrimination is uniquely harmful to a free and democratic society." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 187 (2024). And "in case after case," the Supreme Court "has barred the government from forcing a private speaker to present views it wished to spurn in order to rejigger the expressive realm." *Moody v. NetChoice, LLC*, 603 U.S. 707, 733 (2024). The Proclamation (and the broader campaign of which it is a part) is an unabashed attack on Harvard meant to punish its perceived viewpoints and retaliate against its protected speech. But as the Supreme Court has made clear time and again, the First Amendment does not begin to tolerate government efforts to "restrict the speech of some elements of our society in order to enhance the relative voice of others." *Buckley v. Valeo*, 424 U.S. 1, 48-49 (1976) (per curiam). Nor does it tolerate efforts to punish litigants for petitioning the courts.

The government has no persuasive defense of its actions. Because the government's viewpoint discrimination, retaliation, and interference with academic freedom are so unmistakable, the government barely bothers to deny those problems (e.g., assigning a scant two sentences to defending its viewpoint discrimination). Instead, the government contends that the deference owed it in the foreign affairs context under cases like *Kleindienst v. Mandel*, 408 U.S. 753 (1972), and *Trump v.*

*Hawaii*, 585 U.S. 667 (2018), justifies its discriminatory and retaliatory attack on a domestic institution. That appeal to deference ignores both the context of those cases (not to mention their holdings) and the unprecedented nature of the Proclamation at issue here. The President enjoys deference when he exercises foreign affairs and related authorities vis-à-vis the vast external realm, but when he trains those same authorities on domestic entities in contexts where domestic laws (up to and including the Constitution) constrain him, those pleas for deference are misplaced. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 641-46 (1952) (Jackson, J., concurring). Few doctrines are "more sinister and alarming than that a President whose conduct of foreign affairs is so largely uncontrolled" could "vastly enlarge his mastery over the internal affairs of the country" through his own say-so. *Id.* at 642. That is true even when the executive acts for the best of reasons, and it is true *a fortiori* when it engages in the cardinal sin of viewpoint discrimination. Moreover, deference to the President's delegated authority under 8 U.S.C. §1182(f) (the cited basis for the Proclamation) presupposes a proper invocation of that authority. The Proclamation fails that standard, as it does not bar the entry of a single alien and defies the statute by defining a "class of aliens" by reference only to their affiliation with a domestic institution.

The government casts the Proclamation as an ordinary application of a "fundamental attribute of sovereignty"—the power to exclude aliens. Br.24. But

the whole point of the Constitution is to constrain the sovereign, especially when it targets domestic entities for disfavored treatment based on viewpoint. Congress plainly can enact laws to exclude aliens from hostile nations. But Congress just as plainly "shall make no law ... abridging the freedom of speech." U.S. Const. amend. I. The government cannot plausibly reconcile that command with an effort to use the power of exclusion to target and punish a single domestic institution for its perceived viewpoint. Nor is there any basis for deference when granting relief would not require the admission of a single foreign national that the executive would like to categorically exclude. Every great power of government can be abused. The powers granted by §1182 are no exception. This Court should affirm.

## STATEMENT OF THE CASE

### A.    Legal Background.

The Student and Exchange Visitor Program ("SEVP") is administered by U.S. Immigration and Customs Enforcement, a subagency of the U.S. Department of Homeland Security. It allows international students to study at American colleges and universities on nonimmigrant F-1 visas. SEVP eligibility and revocation is governed by a detailed statutory and regulatory scheme. The same is true of the Exchange Visitor Program ("EVP") and J-1 visas, administered by the U.S. Department of State. These elaborate regulatory schemes are detailed for a reason: schools have substantial reliance interests in participation, as do the students they

sponsor.  So if the government wants to revoke certification, it needs a valid, substantive reason.  And, even then, it must give notice and an opportunity to be heard—and submit to judicial review.

***Student and Exchange Visitor Program certification and withdrawal***.  The Immigration and Nationality Act and its implementing regulations govern the F-1 visa program—a program for international students pursuing full-time academic studies in the United States.  *See* 8 C.F.R. §214.2(f).  To qualify for an F-1 visa, a noncitizen must (1) "hav[e] a residence in a foreign country which he has no intention of abandoning"; (2) be "a bona fide student qualified to pursue a full course of study"; and (3) "seek[] to enter the United States temporarily and solely for the purpose of pursuing such a course of study … at an established college, university, … or other academic institution … particularly designated by him and approved by the Attorney General."  8 U.S.C. §1101(a)(15)(F)(i).  And a school must "agree[] to report to the Attorney General the termination of attendance of each nonimmigrant student," *id.*, plus "file a petition for certification" establishing that it (A) is "a bona fide school"; (B) is "an established institution of learning or other recognized place of study"; (C) "[p]ossesses the necessary facilities, personnel, and finances to conduct instruction in recognized courses"; and (D) "[i]s, in fact, engaged in instruction in those courses." 8 C.F.R. §214.3(a)(1), (a)(3)(i)(A)-(D).  Schools must establish that they still meet these criteria (and recordkeeping and reporting

mandates) biennially.  *Id.* §214.3(a)(3)(ii)(A)-(B).  If DHS denies recertification, it must provide its "specific reasons for denial" in writing.   *Id.*  §§103.3(a)(1)(i), 214.3(h)(2)(v).  Any denial is subject to both administrative review under 8 C.F.R. §103.3 and judicial review under the APA.  *See Blackwell Coll. of Bus. v. Att'y Gen.*, 454 F.2d 928, 933-34 (D.C. Cir. 1971).

Outside this biennial recertification process, DHS can terminate a school's certification only through "withdraw[al] on notice subsequent to out-of-cycle review." 8 C.F.R. §214.4(a)(2).  This "out-of-cycle review" process authorizes DHS to request information verifying a school's continued eligibility and its compliance with recordkeeping and reporting requirements. 8 C.F.R. §214.3(h)(3)(iii).  If a school violates these requirements, DHS may serve the school with a "Notice of Intent to Withdraw," *id.* §214.3(e)(4), which must state "the grounds" for DHS's action.  *Id.* §214.4(b)(1).  The school then has 30 days to answer, submit evidence, and request a "telephonic interview." *Id.* §214.4(b)-(e).  DHS's ultimate withdrawal decision must be based on a "valid and substantive reason," *id.* §214.4(a)(2), that involves either one of nineteen enumerated violations of eligibility, recordkeeping, and reporting requirements, *id.* §214.4(a)(2)(i)-(xix), or comparable misconduct. DHS must issue a written decision explaining "the specific reasons" for its withdrawal determination.  *Id.* §103.3(a)(1)(i); *see id.* §214.4(g).  A school may appeal that decision.  *Id.* §214.4(h).

7

A school that loses its SEVP certification is immediately barred from sponsoring F-1 visas for new international students, *see* 8 C.F.R. §214.4(*i*)(1), and prohibited from seeking recertification for one year, *id.* §214.4(a)(2). Eligibility to re-petition is "at the discretion of the Director of SEVP." *Id.* By all accounts, decertification is exceedingly rare. There are only two reported cases appealed to federal courts—each involving serious misconduct and noncompliance with the SEVP regulations. *See Blackwell*, 454 F.2d at 933, 937-39 (minimal classroom attendance and failure to timely report in 77% of cases); *Herguan Univ. v. ICE*, 258 F.Supp.3d 1058, 1058-59 (N.D. Cal. 2017) (visa fraud scheme). There are no reported cases involving any of the nation's top-ranked institutions or its most established hosts of F-1 visa students. Nor are there reported cases involving religious schools or other schools with distinct perceived viewpoints.

***The J-Visa program.*** The J-visa provides another nonimmigrant visa option for students and scholars approved to participate in an exchange visitor program in the United States. 8 U.S.C. §1101(a)(15)(J); 22 C.F.R. §62.4. To sponsor J-1 visas, an institution must be designated as an EVP sponsor by the State Department. 22 C.F.R. §§62.3, 62.5. State may revoke a sponsor's EVP designation only upon written notice based on a violation of EVP regulations or other proscribed activity. 22 C.F.R. §62.50(d). Upon such a finding, the regulations afford sponsors 30 days' notice and an opportunity to be heard before revocation takes effect. 22 C.F.R.

§62.50(d)(1).  That notice must "specify the grounds for the proposed sanction and its effective date, advise the sponsor of its right to oppose the proposed sanction, and identify the procedures for submitting a statement of opposition thereto."  *Id.*  The sponsor may then submit a statement, which stays the revocation's effective date pending administrative appeal.  22 C.F.R. §62.50(d)(2)(i)-(ii).

### B.     Factual Background and Procedural History.

#### 1.     Harvard's longstanding participation in the SEVP and EVP programs

Harvard has been continuously certified to host F-1 visa holders since 1954. Appx.66.  It has also long been certified to host exchange visitors on J-1 visas.  *See* Appx.67.   Harvard hosts more than 5,000 F-1 visa students hailing from 143 countries, *see* Appx.65, sponsors over 2,000 recent graduates through the "Optional Practical Training" program, *see id.*, and welcomes numerous exchange visitors on J-1 visas, many of whom are students, *see* Appx.66.  Harvard's F-1 visa students are enrolled across Harvard's 13 schools and make up over a quarter of Harvard's student population.  *Id.*

To date, tens of thousands of international students have studied at Harvard under the F-1 and J-1 visa programs, *see* Appx.76, just as thousands of Harvard's American students have studied abroad through other countries' comparable programs, *see* Appx.29.  These international students contribute in immeasurable ways to Harvard's academic environment (including by enriching their American

classmates' experience) and to Harvard's research advancements by publishing pioneering scholarship, supporting scientific research, and inventing groundbreaking technologies. Harvard has expended significant resources over decades to enroll and support these international students, *see* Appx.76, 80 including through the Harvard International Office, which has 25 full-time employees and an annual budget of over $3 million. *See* Appx.72.

### 2. The government's campaign to punish Harvard for its views

1. On February 3, 2025, the Administration formed a multi-agency Task Force to Combat Antisemitism. A few weeks later, the Task Force announced that it was targeting ten major universities for investigation, including Harvard. On March 31, Harvard received a letter advising that the government was investigating Harvard's "potential infractions and dereliction of duties to curb or combat anti-Semitic harassment." D.Ct.Dkt.1-7 at 2. That investigation did not stay focused on the experience of Jewish students on Harvard's campus or Harvard's compliance with the requirements of Title VI, but instead metastasized into an all-of-government assault on Harvard with an undisguised intention to punish Harvard for its perceived views and to force Harvard to conform its views and academic offerings to those favored by the government.

In early April, the government sent Harvard long lists of demands and insisted that Harvard accept those demands to retain $8.7 billion in federal research grants

that had previously been awarded to Harvard researchers through rigorous and competitive processes with all manner of procedural and substantive checks. The government sent Harvard a letter on April 3 alleging that Harvard had "failed to protect American students and faculty from antisemitic violence and harassment in addition to other alleged violations of Title VI and Title VII." D.Ct.Dkt.1-8 at 2. It described "several broad, non-exhaustive areas of reform that the government views as necessary for Harvard to implement to remain a responsible recipient of federal taxpayer dollars," including that "[p]rograms and departments that fuel antisemitic harassment must be reviewed and necessary changes made to address bias, improve viewpoint diversity, and end ideological capture." *Id.*

On April 11, the government sent Harvard a second letter that "incorporate[d] and supersed[ed]" the April 3 letter and made new, far-reaching demands for Harvard to retain federal funding. Appx.32. Those demands included: (1) "commission[ing] an external party, which shall satisfy the federal government as to its competence and good faith, to audit the student body, faculty, staff, and leadership for viewpoint diversity, such that each department, field, or teaching unit must be individually viewpoint diverse"; (2) for departments, fields, and teaching units found to "lack viewpoint diversity," "hiring a critical mass of new faculty" and "admitting a critical mass of students" to provide the government's preferred balance of viewpoint diversity; and (3) "reform[ing] and restructuring" governance;

11

"reducing the power held by students and untenured faculty," as well as "the power held by faculty … more committed to activism than scholarship."  Appx.32-34.

Harvard rejected those demands on April 14, 2025.  In a letter to the government, Harvard explained that "[n]either Harvard nor any other private university can allow itself to be taken over by the federal government."  D.Ct.Dkt.1-11 at 3.  The April 11 Letter "present[ed] demands that, in contravention of the First Amendment, invade university freedoms long recognized by the Supreme Court," and so Harvard explained that it "[wa]s not prepared to agree to demands that go beyond the lawful authority of this or any administration" and "w[ould] not accept the government's terms."  *Id*. at 2-3.  That same day, Harvard President Alan Garber explained in a message to the Harvard community that "[a]lthough some of the demands outlined by the government are aimed at combating antisemitism, the majority represent direct governmental regulation of the 'intellectual conditions' at Harvard."  Appx.38.  He explained that Harvard "do[es] not take lightly [its] moral duty to fight antisemitism," noting the steps Harvard had already taken and would continue to take.  Appx.39.  Ultimately, President Garber made clear that "[n]o government—regardless of which party is in power—should dictate what private universities can teach, whom they can admit and hire, and which areas of study and inquiry they can pursue."  *Id.*

Just hours after Harvard rejected the government's demands, the government

froze "$2.2 billion in multi-year grants and $60M in multi-year contract value to Harvard University," citing "the troubling entitlement mindset that is endemic in our nation's most prestigious universities and colleges." Appx.41. But the funding freeze was just the beginning. The government also initiated investigations into Harvard and threatened Harvard's "Tax Exempt Status," Appx.43. President Trump did not disguise the motivations behind these unprecedented actions; he inveighed that Harvard should "be Taxed as a Political Entity if it keeps pushing political, ideological, and terrorist inspired/supporting 'Sickness[].'" *Id*. The next day, the President again took aim at Harvard's perceived viewpoints, condemning Harvard's faculty as "almost all woke, Radical Left, idiots and 'birdbrains' who are only capable of teaching FAILURE." Appx.45.

2. That same day, Secretary of Homeland Security Kristi Noem sent Harvard a letter giving Harvard yet another unprecedented ultimatum: produce eight categories of information on each of Harvard's thousands of F-1 visa students within 10 business days or forfeit Harvard's Student and Exchange Visitor Program certification. Appx.47-48. This one-of-a-kind demand was accompanied by a DHS press release expressly linking it to Harvard's perceived viewpoints. The press release announced that DHS had sent Harvard a "scathing letter" because Harvard had allowed "anti-American, pro-Hamas ideology" to "poison[] its campus and classrooms." Appx.51. The press release linked the records request to the

government's broader viewpoint-discriminatory attacks, explaining the records request "follows President Donald J. Trump's decision to freeze $2.2 billion in federal funding to Harvard University, proposing the revocation of its tax-exempt status over its radical ideology." *Id.*

On April 30, Harvard responded to the records request by producing the responsive materials the University was required to maintain and report under 8 C.F.R. §214.3(g)(1), the only authority DHS invoked. Appx.47. Similarly, when DHS sent Harvard an email reiterating four of the eight requests—then clarifying in response to Harvard's question that it was requesting records pursuant to "all our authorities contained in 8 C.F.R. §214," not only §214.3(g)(1), D.Ct.Dkt.1-23 at 2— Harvard responded by producing further responsive information within the scope of §214. DHS regulations entitle the government to certain limited information about Harvard's international students. Schools have competing obligations, however: the Family Educational Rights and Privacy Act, 20 U.S.C. §1232g, and its implementing regulations specifically prohibit Harvard from producing educational records to the government unless they fall into the categories delineated in §214.3(g). *See* 8 C.F.R. §214.1(h).

The onslaught continued from all corners of government. On April 17, the Department of Education sent a records request for information regarding Harvard's foreign funding. Appx.159-60. On April 20, the Administration threatened to pull

an additional $1 billion in federal funding. Appx.160. Five days later, the Chair of the EEOC filed a charge opening an investigation into Harvard's employment practices. *Id.* On May 2, the President threatened to revoke Harvard's Section 501(c)(3) status. On May 5, the Secretary of Education, purportedly speaking for the entire federal government, announced an "end of new grants for the University." Appx.57. She announced that "Harvard should no longer seek GRANTS from the federal government, since none will be provided," and that "Harvard will cease to be a publicly funded institution." Appx.56. In addition to a litany of seemingly unrelated complaints, the letter expressed the government's displeasure with the mix of viewpoints in Harvard's governance. On May 13, Harvard received a Civil Investigative Demand regarding its admissions practices. That same day, the Federal Task Force issued a press release claiming "Harvard University has repeatedly failed to confront the pervasive race discrimination and anti-Semitic harassment plaguing its campus," and stating that "[t]he Task Force fully supports the Trump Administration's multi-agency move to cut funding to Harvard."[1]

### 3. DHS's revocation of Harvard's certification and Harvard's lawsuit

On May 22, without further engaging with Harvard about its responses to the

---

[1] HHS, *Joint Task Force to Combat Anti-Semitism Statement on Additional Harvard Actions* (May 13, 2025), https://perma.cc/99B4-AG8Z.

document requests, DHS revoked Harvard's SEVP certification based on purported non-compliance with those requests.   DHS said it had revoked Harvard's certification "to send a clear signal to Harvard and all universities that want to enjoy the privilege of enrolling foreign students, that the Trump Administration will enforce the law and root out the evils of anti-Americanism and antisemitism in society and campuses."   Appx.59.   DHS claimed that the revocation meant that Harvard could no longer host individuals on F or J visas (despite the latter program's being administered by the State Department).   *Id*.

The next day, Harvard sought a TRO against the revocation notice. D.Ct.Dkt.9.  Harvard argued that the revocation notice was part of the government's campaign to punish Harvard for its perceived viewpoints and refusal to submit to government oversight of the faculty it hires, the students it admits, and the courses it teaches.  Harvard also argued that the revocation notice was unlawful under the governing statute and DHS regulations.

### 4. The district court's first TRO and the government's attempts to subvert it by issuing the Proclamation

The district court granted Harvard's motion for a TRO on May 23, D.Ct.Dkt.11, and indicated at a May 29 hearing that it would grant Harvard's motion for a preliminary injunction, D.Ct.Dkt.50.  At that hearing, the government opposed a preliminary injunction, arguing that the case was moot because the night before the hearing—at 11:48 pm—the government issued a Notice of Intent to Withdraw,

16

a belated and half-hearted nod towards the process that the governing regulations required in the first instance. *See* D.Ct.Dkts.49, 52. Despite the issuance of the belated Notice of Intent to Withdraw, Secretary Noem did not withdraw (and still has not withdrawn) the revocation notice.

Meanwhile, on May 28, President Trump candidly remarked that Harvard was "hurting [itself]" by "fighting"—in other words, by exercising its constitutional right of petition to challenge the Administration's actions in court. He noted that "Columbia has been … very, very bad …. But they're working with us on finding a solution." Harvard, however, "wants to fight. They want to show how smart they are, and they're getting their ass kicked." The President continued, "every time [Harvard] fight[s], they lose another $250 million." "All they're doing is getting in deeper and deeper and deeper."[2]

Consistent with those remarks, and also on May 28, the government set about "brainstorm[ing] additional punitive measures" against Harvard—by convening the heads of more than a dozen agencies. Appx.100. The Secretary of State announced on May 30 a "pilot" program of "[e]nhanced vetting" of foreign students that singled out Harvard as the sole target. Appx.94-95. (The State Department cited the same rationales as DHS's Notice of Intent to Withdraw, Appx.97.) Then, on June 4—

---

[2] President Donald Trump Taking Questions in the Oval Office at 0:54, 5:10-6:19 (Newsmax, aired May 28, 2025, 12:42 PM ET), https://perma.cc/ZUC6-3SP6.

while the revocation notice was frozen by the district court's TRO pending issuance of a preliminary injunction, with the "[s]tatus quo to remain in place," D.Ct.Dkt.50—President Trump issued a Proclamation entitled "Enhancing National Security by Addressing Risks at Harvard University," which prohibits foreign nationals from across the globe from entering the United States to study or research at Harvard—and only Harvard. Appx.108. The Proclamation also directs the Secretary of State to consider whether the visas of "foreign nationals who currently attend Harvard University" should be revoked. Appx.111.

The Proclamation cites Harvard's response to document requests and various other domestic grievances, regarding everything from Harvard's admissions policies to the crime rate near Harvard's campus. The Proclamation's fact sheet highlights Harvard's perceived viewpoint, complaining that Harvard has a "history of ... radicalism" and has admitted "radicalized lunatics." Appx.116-17. Despite these domestic grievances, the Proclamation primarily invokes Section 212(f) of the Immigration and Nationality Act, 8 U.S.C. §1182(f), which authorizes the President to "suspend the entry" of "all aliens or any class of aliens" when their entry "would be detrimental to the interests of the United States." *Id.* It also cites Section 215(a) of the Act, 8 U.S.C. §1185(a), which provides that "[u]nless otherwise ordered by the President, it shall be unlawful … for any alien to depart from or enter or attempt to depart from or enter the United States except under such reasonable rules,

18

regulations, and orders, and subject to such limitations and exceptions as the President may prescribe."  8 U.S.C. §1185(a)(1).[3]

### 5.    The irreparable harm caused by the government's lawless action

The Proclamation was self-evidently intended to end-run the first TRO, and Harvard again sought preliminary relief.  D.Ct.Dkt.57.  Harvard explained that the Proclamation would preclude it from hosting new admittees planning to enroll.  *Id.* at 10.  And Harvard would be forced to dramatically shrink or reconfigure its incoming classes in just weeks.  *Id.*  The Proclamation also jeopardized the status of Harvard's thousands of existing international visa holders by directing the Secretary of State to consider revoking their visas.  *Id.*  Harvard's international students are roommates, classmates, and friends of their American counterparts.  They enrich the educational environment for all at Harvard.  They also serve as teaching fellows for undergraduate students, as research assistants, and as clinical trainees—so their loss would harm Harvard; its American undergraduate, graduate, and professional students; and important ongoing scientific and medical research.  *Id.* at 10-11.  The Harvard professors and researchers who hold J-1 visas are likewise invaluable to

---

[3] By its terms, the Proclamation's entry suspension expires "6 months after the date of this proclamation."  Appx.111.  The Proclamation was dated June 4, 2025, meaning it expired by its terms on December 4, 2025.  The executive has taken no action to extend the Proclamation or to suggest to this Court that its appeal has become moot.

Harvard's educational and research missions.

### 6. The district court's preliminary injunction against the Proclamation's implementation

The district court granted a TRO, D.Ct.Dkt.59, and, subsequently, a preliminary injunction, D.Ct.Dkt.75. The court had little trouble concluding that the Proclamation was likely invalid for viewpoint discrimination. The court noted the litany of ideological attacks by the President and other officials, explaining that while the government is "free to make statements like these criticizing Harvard for its perceived political viewpoints," it is not free to "use the power of the State to punish or suppress disfavored expression." A.41 (quoting *Vullo*, 602 U.S. at 188). For similar reasons, the court found the Proclamation likely illegal as retaliation for protected conduct. That protected conduct included "Harvard's ongoing self governance and academic freedom underlying" its rejection of the government's demands to micromanage Harvard, "as well as Harvard's public statements refusing to cede its academic freedom." A.31. The causal connection between Harvard's protected conduct and the Proclamation, the court reasoned, was evident from "the Administration's concerted campaign": "[b]etween the April 11 Letter and the Proclamation, there were very few days where the Administration did not attack Harvard in some form or another." A.32. Harvard also demonstrated a likelihood of success on its claims under the Petition Clause. A.35-38. Finally, the district court rejected the government's attempt to shield the Proclamation from scrutiny

20

under *Mandel* and *Hawaii*. The court reasoned that such deference applies only if the Proclamation properly invoked §1182(f), which it did not. The court also held that, even if those deferential standards applied, the Proclamation would flunk them because it "quite obviously has no 'legitimate grounding' in its stated concerns, and it is 'inexplicable by anything but animus.'" A.22-24 (quoting *Hawaii*, 585 U.S. at 706); *see* A.22 n.5.

The court also found Harvard likely to succeed on its claim that the Proclamation exceeds the authority vested in the President under §1182(f) to restrict the entry of a class of aliens. The court explained that "while the Proclamation may have the effect of restricting entry, its intent is not to restrict entry but rather to allow entry so long as that entry is not to attend Harvard" which "seems to be a perversion of the language and purpose of the statute." A.19. And while "the term 'class' can be construed broadly … no previous proclamation has ever defined 'class' by an alien's potential relationship with a specific domestic entity for the purpose of influencing that domestic entity's conduct." *Id.* That history (until now) was a logical fit with the statute's purpose: "to regulate and influence conduct abroad, rather than at home." *Id.*

## SUMMARY OF ARGUMENT

As the district court correctly held, the Proclamation likely violates the First Amendment. Indeed, the Proclamation violates the First Amendment several times

over, as it is viewpoint discriminatory, retaliatory, and an open affront to academic freedom. As the Supreme Court has explained time and again, viewpoint discrimination is the cardinal First Amendment sin. *See Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). That principle takes on special importance here, because the First Amendment "does not tolerate laws that cast a pall of orthodoxy over the classroom." *Keyishian v. Bd. of Regents of Univ. of N.Y.*, 385 U.S. 589, 603 (1967). "[I]f there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). The constitutional affront is surely greater when the viewpoint discrimination, retaliation, and attempt to impose academic orthodoxy come directly from the President of the United States.

The Proclamation discriminates based on Harvard's perceived viewpoint in at least two ways. First, as the government's steady stream of invective and parallel punitive measures make plain, the government has singled Harvard out for adverse action based on Harvard's purported "anti-American" and "Leftist" viewpoints. Second, the Proclamation punishes Harvard for standing firm to protect academic freedom and for refusing to let the government curate the mix of viewpoints on campus. Yet "[h]owever imperfect the private marketplace of ideas," the government may not "itself decid[e] when speech [i]s imbalanced, and then coerc[e]

speakers to provide more of some views or less of others." *Moody*, 603 U.S. at 733. For similar reasons, the Proclamation constitutes illegal retaliation for protected speech. As with its viewpoint discrimination, the government has been clear and consistent that the Proclamation—and the broader war on Harvard—is retaliation for Harvard's refusal to let the government superintend the views expressed on campus. Similarly, the government—including the President—has all but admitted that the Proclamation violates the Petition Clause by punishing Harvard for filing lawsuits challenging elements of the government's war on Harvard.

The district court correctly rejected the government's appeal to the kind of deference applicable to foreign affairs generally and to the admission of aliens in particular. That deference assumes that the executive is using its congressionally delegated exclusion power with a focus on minimizing threats from abroad. But when the executive employs those tools to target a single domestic institution for its perceived viewpoints or as an explicit sanction for failing to satisfy the government's (pretextual) demands for documents, then appeals to deference are fundamentally misplaced. Applying such deference would provide carte blanche for the executive to use its foreign affairs powers to violate domestic law, up to and including the Bill of Rights.

Deference also presumes compliance with the underlying immigration laws, and the district court was right to be "skeptical," A.20, that the Proclamation

comports with §1182(f).  It is true that a "class" of aliens may be defined in many ways.  But the Proclamation picks one that the statute rules out.  By reverse-engineering a "class of aliens" to target a disfavored domestic institution, the Proclamation divorces the so-called "class" of aliens to which it applies from the other statutory terms that inform its meaning—namely, the President's authority to limit entry.  The entire point of §1182(f) is to give the President the authority to suspend entry of a class of aliens upon finding that the *entry* of the class would be detrimental.  Yet the Proclamation does not suspend the entry of a single alien, let alone any class of aliens; anyone can come into the country under the Proclamation as long as they do not attend Harvard.  Indeed, the Proclamation goes out of its way to clarify that it does not apply to the same students if they attend other universities. Nothing in §1182(f) gives the President the authority to suspend aliens from attending Harvard, yet that is the only thing the Proclamation accomplishes.  That textual conclusion is confirmed by the statute's structure and the history of its use. No prior president has wielded §1182(f) in this way.

Finally, the district court correctly held that the remaining preliminary injunction factors favor Harvard.  The government essentially concedes that irreparable harm is established by a First Amendment violation.  And it either waves away or ignores other indisputable harms, including to ongoing research and to Harvard's reputation.  Likewise, the public interest and balance of the equities

unquestionably favor stopping an unprecedented assault on fundamental First Amendment values.

The Proclamation is an unprecedented mix of constitutional vices. It violates a multitude of core First Amendment principles, combining viewpoint discrimination, retaliation for speech and petitioning, and an unprecedented effort to override academic freedom. But, equally damning, it misuses a tool of foreign policy to single out a domestic institution for punishment. This Proclamation cannot stand. The district court was correct to enjoin it, and that decision should be affirmed.

## ARGUMENT

### I.    Harvard Is Likely To Succeed On Its First Amendment Claims.

#### A.    The Proclamation Violates the First Amendment.

##### 1.    The Proclamation discriminates based on viewpoint.

"Premised on mistrust of governmental power, the First Amendment stands against attempts to disfavor certain subjects or viewpoints." *Citizens United v. FEC*, 558 U.S. 310, 340 (2010). Viewpoint discrimination is "an egregious form of content discrimination"—the government "*must* abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger*, 515 U.S. at 829 (emphasis added). Indeed, "[a]t the heart of the First Amendment's Free Speech Clause is the recognition that viewpoint discrimination is uniquely harmful to a free and

democratic society." *Vullo*, 602 U.S. at 187. And this "bedrock" prohibition on targeting disfavored speakers or speech, *Texas v. Johnson*, 491 U.S. 397, 414 (1989), is all the more vital when it comes to academic speech because the First Amendment "does not tolerate laws that cast a pall of orthodoxy over the classroom." *Keyishian*, 385 U.S. at 603.

The Proclamation discriminates based on Harvard's perceived viewpoint. While it can sometimes be difficult to discern whether viewpoint discrimination or retaliation is motivating government action, *see, e.g.*, *Murthy v. Missouri*, 603 U.S. 43, 80 (2024) (Alito, J., dissenting) (lamenting that, "[i]f a coercive campaign is carried out with enough sophistication, it may get by"), here the government has made that task straightforward. Indeed, the government has repeatedly said the quiet part out loud. The very first sentence of the Proclamation makes clear the government's desire to influence who may "attend, conduct research, or teach" at Harvard. Appx.108. The fact sheet inveighs that Harvard has a "history of ... radicalism" and has admitted "radicalized lunatics." Appx.116-17. The press release accompanying DHS's records request described the Secretary's letter as "scathing" and attacked Harvard's purported tolerance for "anti-American, pro-Hamas ideology poisoning its campus and classrooms." Appx.51. The April 11 Demand Letter explained that the government targeted Harvard because its "student body, faculty, staff, and leadership" lack the requisite "viewpoint diversity"—that

26

is, the government's preferred mix of viewpoints.  Appx.33-34.  *Contra Moody*, 603 U.S. at 733.  When the Department revoked Harvard's SEVP certification, the letter similarly assailed Harvard for "anti-Americanism."  Appx.59.  And in the April 16 press release, Secretary Noem explained that the records request targeted Harvard for its "anti-American" "ideology" and "propaganda," expressly linking the Department's actions to the President's own repeated attacks—the same claims repeated in DHS's May 22 press release issued immediately after the SEVP revocation.  Appx.51, 62.  The record, in short, betrays viewpoint discrimination as obvious as it comes.

All of that would be more than enough to doom the Proclamation, but there is more:  the government has demanded that Harvard adjust its academic offerings to be more to the government's liking if it wants to host international students and enjoy the other benefits of a normalized relationship with the government.  "[I]n case after case," the Supreme Court "has barred the government from forcing a private speaker to present views it wished to spurn in order to rejigger the expressive realm." *Moody*, 603 U.S. at 733.  Yet the Demand Letter insisted that Harvard submit to a "department-by-department" viewpoint "audit," asserting that "[e]very department … found to lack viewpoint diversity must be reformed by hiring a critical mass of new faculty … who will provide viewpoint diversity."  Appx.33-34.  To perform that inquiry, the government must necessarily examine the viewpoint of each

27

Harvard professor, student, and employee to determine whether the overall mix of "viewpoints" is acceptable to the government. The inevitable—indeed, intended—effect of the government's "audit" is that Harvard would be penalized *unless* it rejiggered the mix of viewpoints on campus to sing the government's tune. The government may not, consistent with the First Amendment, punish Harvard for refusing that yoke; "[h]owever imperfect the private marketplace of ideas," the government may not "itself decid[e] when speech [i]s imbalanced, and then coerc[e] speakers to provide more of some views or less of others." *Moody*, 603 U.S. at 733.

The Proclamation's viewpoint discrimination is even clearer in context. Hours after Harvard publicly refused to comply with the Demand Letter, the Federal Task Force froze more than two billion dollars in federal research funds, Appx.41, and the President called for Harvard to lose its tax-exempt status, citing Harvard's perceived "political" and "ideological" positions, Appx.43. The "scathing" records request quickly followed, with a press release that linked it to those two earlier actions. *See* Appx.51. The Proclamation links itself to those earlier demands and accompanying viewpoint discrimination by citing investigations into Harvard's admissions practices and complaints about the sufficiency of Harvard's document production in response to DHS requests. In sum, the Proclamation is part of a drumbeat of openly discriminatory investigations, records requests, and funding cut-offs. So it, too, is impermissibly discriminatory.

28

At bottom, for more than six months, Defendants have waged an all-of-government attack on Harvard for reasons that are plain: the President believes Harvard's "students," "professors," and "attitude … [are] not American." Appx.161. But there is nothing more "anti-American" than the government's attempt to punish Harvard for its perceived viewpoints and to control the mix of viewpoints on Harvard's campus. The Proclamation is, in short, a forbidden attempt to "prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion." *Barnette*, 319 U.S. at 642.

### 2.    The Proclamation is retaliation for protected activity.

The district court correctly concluded that the Proclamation embodies not just viewpoint discrimination, but illicit retaliation for protected activity. A.28-35. Indeed, the Proclamation is part of a series of actions taken, and sanctions imposed, to punish Harvard for refusing to acquiesce to the government's April 11 Demand Letter—which attempts to dictate how Harvard operates, the viewpoints of those it admits and hires, and what it teaches. Immediately after Harvard refused the government's demands, and in retaliation for Harvard's refusal to cede its "autonomous decisionmaking," *Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 226 n.12 (1985), the government revoked billions in funding, threatened to revoke Harvard's 501(c)(3) status, initiated the process that resulted in the revocation notice, convened a meeting at the White House to identify additional ways to punish

Harvard, issued a Notice of Intent to Withdraw, introduced a State Department "pilot program" that imposed additional social-media vetting requirements only on those individuals bound for Harvard, and (once the district court blocked the SEVP revocation) issued the Proclamation.

Each of the elements for a First Amendment retaliation claim is satisfied: (1) Harvard engaged in constitutionally protected conduct; (2) it was immediately subjected to a series of adverse actions by the government, including the Proclamation; and (3) its protected conduct was a substantial or motivating factor in that adverse action. *D.B. ex rel. Elizabeth B. v. Esposito*, 675 F.3d 26, 43 (1st Cir. 2012); *see Hartman v. Moore*, 547 U.S. 250, 260-61 (2006).

Harvard's conduct is and was constitutionally protected. Harvard has a First Amendment right to "autonomous decisionmaking" in managing its academic community and deciding who may teach and what will be taught. *Ewing*, 474 U.S. at 226 n.12; *see Healy v. James*, 408 U.S. 169, 180 (1972); *Asociacion de Educacion Privada de P.R., Inc. v. Garcia-Padilla*, 490 F.3d 1, 8 (1st Cir. 2007). More fundamentally, Harvard has the same First Amendment right that all institutions enjoy against government-imposed orthodoxy. The Demand Letter aimed to sharply constrict those rights by subjecting faculty hiring and the ideological balance of professors and students to government approval.

The Proclamation is plainly adverse action "sufficient to deter a person of

ordinary firmness in plaintiff's position from speaking again." *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016). It precludes Harvard from hosting new international students and scholars and subjects existing international students and scholars at Harvard to potential visa revocation, damaging Harvard's status and reputation as a leading global research institution and frustrating years of careful planning and resource allocation. There is no need to speculate that the government's actions are sufficient to "deter a person of ordinary firmness"—other institutions have yielded under lesser sanctions, and the government continues to ratchet up the pressure with the expectation that Harvard will eventually accede to the government's demands. *See* Oval Office, *supra* n.2, at 0:54 ("every time [Harvard] fight[s], they lose another $250 million").

And Harvard's assertion of its First Amendment rights was a "substantial or motivating factor" in the Proclamation. As the President's above statement indicates, the government is plainly engaged in a campaign to punish Harvard for the way it has exercised its academic freedom and to force Harvard to cede control to the government. Both the Proclamation and the accompanying fact sheet confirm the Administration's retaliatory motive. The very first sentence of the Proclamation makes clear the government's desire to influence who may "attend, conduct research, or teach" at Harvard. Appx.108. And elsewhere the Proclamation states its objection to Harvard's admitting an "excessive" number of foreign students rather

31

than "American[s]," Appx.110.  The Proclamation's fact sheet, for its part, suggests that Harvard has a "history of ... radicalism" and has admitted "radicalized lunatics." Appx.116-17.  There is, in short, no question that the Proclamation was issued to punish Harvard's protected activity.

### 3.    The Proclamation violates the Petition Clause.

Because the Proclamation retaliates not just for Harvard's exercise of First Amendment rights in the classroom and in the public square, but also for vindicating its rights in court, the Proclamation violates Harvard's right "to petition the Government for a redress of grievances."  U.S. Const. amend. I.  "[A] lawsuit" is a archetypal "petition."  *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 390 (2011); *see id.* at 387. The Proclamation violates the Petition Clause by punishing Harvard for filing this lawsuit, as well as another to enjoin the government's funding freeze.

The evidence connecting the punishment and the petitioning is overwhelming: On May 25, 2025, two days after the first TRO below, the President addressed "the problem with Harvard" in comments to the media.  Appx.173.  The following day, the President, referring to this litigation, posted that he was "considering taking Three Billion Dollars of Grant Money away from a very antisemitic Harvard." Appx.83, 85.  Then senior officials brainstormed additional punitive measures, Appx.100, and later that day the President explained that every time Harvard fights, it only loses more, Oval Office, *supra* n.2.

By punishing Harvard for bringing good-faith lawsuits challenging the revocation of its SEVP certification and termination of its federal funding, Defendants violated the Petition Clause.

### B.    The Government's Contrary Arguments Lack Merit.

#### 1.    The government's waived causation argument is meritless.

Unable to defend the Proclamation's obvious unconstitutionality, the government insists the "district court applied an incorrect standard of law" in finding that Harvard's protected conduct caused the government to retaliate by issuing the Proclamation. Br.54. According to the government, Harvard had the burden to show that "the Proclamation would [not] have been promulgated absent alleged retaliatory motives." Br.56. That argument suffers multiple defects: It provides no defense to viewpoint discrimination, is waived, and, in any event, is wrong.

To begin, the government's complaint about the causation standard applied by the district court does nothing to excuse viewpoint discrimination; a government that discriminates on the basis of viewpoint violates the First Amendment, full stop. The fact that the government could or might have taken the same action on a more neutral basis is beside the point. *See, e.g.*, *R.A.V. v. City of St. Paul*, 505 U.S. 377, 384 (1992). The same is true when it comes to government interference with

academic freedom. *See, e.g.*, *Garcia-Padilla*, 490 F.3d at 11.[4]

Regardless, the government has no grounds to complain about the causation standard the district court applied. The government itself told the court, in opposing Harvard's motion for preliminary injunction, that "[t]o succeed on a First Amendment retaliation claim, a plaintiff must show: … (3) the protected conduct was a substantial or motivating factor in the adverse action." D.Ct.Dkt.67 at 21. The government thus waived any argument that a plaintiff must show more than that. *See, e.g.*, *Carmack v. Virginia*, 837 F.App'x 178, 182 (4th Cir. 2020) (plaintiff forfeited argument that proximate cause standard, not *McDonnell-Douglas* framework, applied). "It is unsurprising" that the district court applied the substantial or motivating factor standard; that is the standard both parties briefed. *Carmack*, 837 F. App'x at 182.

In any event, it is not Harvard's burden to disprove that the government might have taken the same action absent its retaliatory motive. The government can only argue otherwise by misquoting *Hartman* for the proposition that "'*[l]ike any other plaintiff* charging official retaliatory action, the plaintiff in a retaliatory prosecution claim must prove the elements of retaliatory animus as the cause of injury,' which

---

[4] Even in the retaliation context, the Supreme Court in *Vullo* found that New York's retaliatory actions violated the First Amendment, wholly apart from any inquiry into whether the investigation might have occurred in the absence of the government's retaliatory motive. *See* 602 U.S. at 195-96.

includes a showing 'that the action would have been taken anyway, independently of any retaliatory animus.'"  Br.55 (quoting *Hartman*, 546 U.S. at 260-61).  In reality, *Hartman* makes clear that it is *the government's* burden to prove "that the action would have been taken anyway." *Hartman*, 547 U.S. at 261.  Once a plaintiff has made "a prima facie showing of retaliatory harm, the burden shifts to the defendant official." *Id.* at 260.  The government did not even try to make such a showing at the preliminary injunction stage, given that it urged, and argued under, the substantial or motivating factor standard.[5]  Moreover, this is not a case where the burden of proof would make any difference.  The government's action here—an exclusion order directed at a single domestic organization—is wholly unprecedented.  The notion that the government would have taken this same action absent any retaliatory animus strains all credulity.

> ###    2.    No deference is merited under *Hawaii* or *Mandel*, and the Proclamation cannot withstand even deferential review.

Likely recognizing that the Proclamation is indefensible under normal

---

[5] The government's invocation of caselaw governing retaliatory arrests and prosecutions is misplaced.  The context-specific reasons for special §1983 rules for retaliatory prosecutions and some arrests are not applicable here.  In a retaliatory prosecution case, the prosecutor enjoys a presumption of regularity and may be a separate actor from the defendant alleged to have acted out of retaliatory animus. *See Hartman*, 547 U.S. at 263.  Retaliatory arrest caselaw, for its part, must contend with the need to give space for the "split-second judgments" inherent in arrests. *Nieves v. Bartlett*, 587 U.S. 391, 401 (2019).  This case presents none of those complications.

standards, the government retreats to pleas for deference.  *See* Br.36-45.  The government suggests that this Court may review the Proclamation only for a "facially legitimate and bona fide reason," *Mandel*, 408 U.S. at 770, or a rational basis, *Hawaii*, 585 U.S. at 704.  Under those standards, the government says, the Court is powerless to redress the Proclamation's blatant constitutional violations. That is wrong on multiple levels.  Deference is appropriate when the executive is using its exclusion authority to achieve foreign policy objectives, but it has no role to play when the government is targeting a domestic institution.  And deference presumes a valid use of the statute, which the Proclamation is not.  Regardless, the Proclamation does not pass muster even under the deferential standard of *Hawaii* and *Mandel*.

1.    *Hawaii* and *Mandel* do not require deferential review of Harvard's constitutional claims.  Deference may generally be appropriate when the executive exercises its foreign affairs powers.  Classic examples include the President's exclusion of aliens from particular foreign countries or of a subclass of foreign nationals who have associated with some foreign group.  In that context, the executive has substantial discretion, and Congress typically has not constrained the President's discretion.  *See, e.g.*, *Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 187 (1993).  *Hawaii* and *Mandel* fit comfortably within that tradition.

Both *Mandel* and *Hawaii* involve classic uses of the exclusion power to

36

achieve foreign policy objectives and provide zero support for deference to an avowed effort to target a domestic institution.  Take *Mandel*, where a single Belgian professor was denied a visa on grounds that he was a professed Marxist.  *See* 408 U.S. at 756-59.  The denial focused on that single alien and denied him entry without regard to where in the United States he would teach or speak.  American professors at universities where Mandel was scheduled to speak sued, citing their First Amendment right to "receive information and ideas."  *Id.* at 762.  But the imposition there was directed at the foreign national, while the impact on any one domestic institution was attenuated.  Moreover, because success on the claim there would force the executive to admit an individual into the country whom the executive wanted to categorically bar at the border, the interference with foreign policy and corresponding need for judicial deference was palpable.

This case is nothing like *Mandel*.  The Proclamation is *not* directed at the entry of aliens abroad; it is directed at Harvard and Harvard alone (and, unlike in *Mandel*, is an avowed attempt to influence the domestic conduct of a domestic institution).  Moreover, granting Harvard relief would not require the admission of any foreign national that the executive wants to categorically exclude from the country, as the Proclamation itself emphasizes that it has no effect on foreign nationals who eschew matriculation at Harvard.  Nothing in *Mandel* calls for deference in a case like this or suggests that the Court would have ruled as it did if the government cared not

37

whether the Belgian professor entered the country, but only whether he entered to affiliate with a particular college that was at odds with the President.

*Hawaii* likewise provides no support for deference when a single domestic entity is targeted and no foreign national is categorically barred from entry. The U.S. plaintiffs there did not and could not allege that the proclamation was aimed at them. The imposition was directed at foreign nationals, and the harm found sufficient for standing purposes was only an indirect consequence: separation "from certain relatives who seek to enter the country," 585 U.S. at 698. Here, the imposition on Harvard is direct and the effect on the foreign nationals only indirect—affected foreign nationals lose their right to attend Harvard, but not their ability to enter the country. For similar reasons, granting relief in *Hawaii*, as in *Mandel*, would require admitting aliens whom the executive wanted to categorically bar at the border. Here, by contrast, relief would simply prevent the executive from discriminating against Harvard vis-à-vis foreign nationals the executive is happy to admit—if only they steer clear of Harvard.

Singling out Harvard in this manner is the express, facial purpose of the Proclamation: the Proclamation defines its "class" solely by an alien's association with Harvard, and the Proclamation exists because of Harvard's First Amendment-protected activity. *See* A.18-19. The Proclamation is therefore not "facially neutral" (*contra* Br.1, 19), like the proclamation in *Hawaii*—a fact that "informed" the

standard of review. 585 U.S. at 702. Finally, the flurry of statements by the President and others explaining the Proclamation's illicit purpose were not "made before the President took the oath of office" (a factor that also "informed [*Hawaii*'s] standard of review," *id.*), but contemporaneously with the avalanche of punitive official actions targeting Harvard. Simply put, nothing in *Mandel* or *Hawaii* shelters the executive's unprecedented use of the exclusion power to target a single domestic institution.

What is more, neither *Hawaii* nor *Mandel* displaces the usual rule that otherwise lawful official acts violate the First Amendment if undertaken in retaliation for Americans' protected speech. The First Amendment *per se* "prohibits government officials from subjecting individuals to 'retaliatory actions' after the fact for having engaged in protected speech," *Hou. Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 474 (2022), even if those retaliatory actions "might well be unexceptionable if taken on other grounds," *Hartman*, 547 U.S. at 256. There is no exception for foreign affairs powers or governmental powers that are generally unreviewable or reviewed only deferentially. Indeed, the Supreme Court recently granted an injunction pending appeal in a case involving an assertion of generally unreviewable power—a legislature's application of its rules to a member—to retaliate against a state legislator for her speech. *See Libby v. Fecteau*, 784 F.Supp.3d 272, 280 (D. Me. 2025), *injunction pending appeal granted*, 145 S.Ct. 1378 (May 20, 2025).

Even governmental powers that can be exercised for almost any reason, or for no reason at all, cannot be exercised in direct retaliation for First Amendment-protected speech and petitioning.

*Hawaii* and *Mandel* call for deference within their sphere, but when the executive attempts to wield these powers against domestic entities in areas where the Constitution and Congress have provided those domestic entities with substantive and procedural rights, claims for deference are misplaced. That is true even when the executive targets domestic entities in service of some foreign policy goal. *Youngstown*, 343 U.S. at 641-46 (Jackson, J., concurring). That is the central lesson of *Youngstown* and a bedrock of our constitutional system. Claims for deference are even weaker in a context like this, where the executive has targeted a domestic entity with domestic (and unconstitutional) objectives in mind.

Here, as in *Youngstown*, there is no question that Harvard enjoys important procedural and substantive rights that cannot be displaced by executive prerogative. For that reason, the district court had little trouble blocking the executive's obviously invalid effort to revoke Harvard's longstanding participation in those programs. The Proclamation is an undisguised effort to accomplish the same goal by stopping would-be foreign students destined for Harvard at the border. In that context, the executive enjoys no claims to extraordinary deference and cannot shield viewpoint discrimination, retaliation, or interference with academic freedom. The

40

Proclamation itself makes clear that it does not stop a single alien from entering the country apart from an association with Harvard; so long as aliens steer clear of Harvard, the Proclamation has no effect. The Proclamation likewise makes explicit that it is prompted in substantial part by the executive's dissatisfaction with Harvard's document production in response to DHS's records requests. Appx.110 (Proclamation "in the national interest" only "[u]ntil such time as the university shares the information" that DHS requested). But efforts to precipitously revoke Harvard's SEVP certification are subject to ordinary judicial review—not extraordinary deference—and have flunked. The executive cannot achieve the same basic objective or help itself to extraordinary deference simply by (mis)using a foreign affairs tool to punish perceived shortcomings with Harvard's domestic document production.

2. In any event, the Proclamation is such an outlier and such a misuse of government power that it would still fail even under *Hawaii* and *Mandel*. While *Hawaii* applied a rational-basis standard, it recognized that a policy lacks a rational basis if it "lack[s] any purpose other than a 'bare ... desire to harm a politically unpopular [entity]'" or is "so discontinuous with the reasons offered for it" that it seems "inexplicable by anything but animus." 585 U.S. at 705-06. The Proclamation fails that test. The government says that "the main basis for the proclamation" is "that Harvard did not supply adequate information in response to

41

SEVP requests to ensure the university is properly monitoring and disciplining its international students." Br.47. But that justification only underscores the fundamental flaw in the government's claim for deference. If the government really believes that Harvard's responses to SEVP requests are inadequate, it has domestic tools—subject to ordinary judicial review—to obtain adequate information. But what the executive cannot do is jump the tracks and (mis)use a foreign policy tool to punish Harvard's domestic document production, all while claiming extraordinary deference. Moreover, the government has *never*, at any point in this litigation (or before it), explained how Harvard's productions were deficient under governing law. Equally important, the records request was itself a product of the government's animus—it thus cannot furnish a rational basis for the Proclamation. *See supra* p.26-28.

The government's other cited justifications fare no better. To begin, the Proclamation itself confirms that these other justifications are immaterial, as Harvard could eliminate the Proclamation's purported "national interest" finding simply by "shar[ing] the information that the Federal Government" requested—without addressing any of the Proclamation's other grievances. Appx.110-11. Regardless, the government says that the district court "improperly demanded a close means-end fit" between those additional "concerns" and the Proclamation. Br.46. Not at all; the district court simply looked for a rational connection between

means and ends and found them wholly lacking. The Proclamation claims that "adversaries," like China, have "tr[ied] to take advantage of American higher education," Appx.108, but it is not limited to students from China and allows students from China to attend any other university. Similarly, concerns about antisemitism in foreign countries and the admission of students "from non-egalitarian nations," Br.51-52, are hard to square with a policy that prevents students from Israel from attending Harvard and allows students from every nation, no matter how antisemitic or non-egalitarian, to enter the country to attend any other university. Finally, the Proclamation states that "[c]rime rates at Harvard University—including violent crime rates—have drastically risen in recent years," Appx.109—but never explains what that has to do with foreign students or why crime rates at other universities are of no concern.

The government argues that even rational basis review is too demanding a standard and this Court may review only for a "facially legitimate and bona fide" reason under *Mandel*. Br.36-45. Not so. While *Mandel* may provide the right standard for congressional "line drawing" related to immigration preferences, *Fiallo v. Bell*, 430 U.S. 787, 795 & n.6 (1977), or a decision to categorically exclude a discrete foreign national—which typically would not be accompanied by a formal contemporaneous explanation—an announced executive policy like that at issue here and in *Hawaii* can and should be tested for its rationality at a minimum.

But even under a "conventional application of *Mandel*," *Hawaii*, 585 U.S. at 704, the Proclamation is not "facially legitimate and bona fide," *Mandel*, 408 U.S. at 770; *see* A.22 n.5. The *Mandel* test leaves the government with substantial discretion, but by requiring *bona fide* government action, it plainly excludes actions that are retaliatory and rejects explanations that are verifiably false or wholly pretextual. The government faults the district court for looking to the fact sheet promulgated alongside the Proclamation. Br.44. But nothing in *Mandel* suggests that if the government itself gives away the game in an official document accompanying an exclusion order, the courts are duty-bound to ignore it. To the contrary, *Mandel* itself considered an explanatory letter from subordinate executive branch officials. 408 U.S. at 769. And the government's argument that the fact sheet's reference to "radicalized lunatics [and] troublemakers," Appx.117, only references "security risks," Br.44, strains credulity.

Simply put, everything from the unprecedented nature of the Proclamation, to its targeting of a single domestic institution, to its express invocation of disputes over domestic document productions, to its accompanying fact sheet screams bad faith. And not even the *Mandel* standard forces courts to ignore that evidence or display the kind of "naivete from which ordinary citizens are free." *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019); *see also Kerry v. Din*, 576 U.S. 86, 105 (2015) (Kennedy, J., concurring in the judgment) (no deference is due under *Mandel*

44

if a plaintiff has made "an affirmative showing of bad faith").

## II.    Harvard Is Likely To Succeed On Its Statutory Claims.

### A.    The Proclamation Violates Section 1182(f).

While the constitutional defects with the Proclamation are unmistakable, the Proclamation also exceeds its purported statutory authority. Section 1182(f) provides that "[w]henever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate." 8 U.S.C. §1182(f). That grant of power does not authorize the President to allow entry for all purposes other than attending a specific domestic university.

The Proclamation is not an entry restriction in any meaningful sense, as access to our nation is affirmatively preserved for aliens who steer clear of Harvard. It thus operates not as an entry restriction, but as an order effectively disabling a domestic institution from participating in visa programs. But there is an entirely separate statutory and regulatory regime for addressing legally cognizable concerns, which respects the reliance interests of participating schools by providing them with substantive and procedural protections subject to ordinary principles of judicial

review.  *See RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) (specific authorizations govern general ones).  Courts have an obligation to make "sense rather than nonsense out of the corpus juris," *W. Va. Univ. Hosps., Inc. v. Casey*, 499 U.S. 83, 101 (1991), and there is little doubt that the rules protecting domestic institutions cannot be subverted by a so-called entry order that is indifferent to aliens' entry into the country and that singles out a single domestic institution for disfavored treatment.  The Proclamation has no grounding in statutory text, structure, or history, and there is no prior example of a president using §1182(f) to target a disfavored U.S. person or entity—despite nearly 100 proclamations over seven decades.  The government's interpretation would give the President wide-ranging power to impose domestic regulations of massive political and economic significance on institutions that rely on affiliation with noncitizens.  That is a Pandora's box that should be kept shut.

1.  The government's problems begin with the statutory text.  The term "class of aliens" plainly suggests that the class is defined by some characteristic of their alienage, not their affiliation with a domestic institution.  The plainest basis for defining a class of aliens is country of origin, but the text permits a number of other classifications, including based on group characteristics, the group's association with political movements, or its members' travel to certain foreign countries or regions.  By contrast, a classification that is utterly indifferent to entry based on

anything related to alienage—and that turns only on whether an alien plans to attend a particular domestic institution once admitted—does not satisfy the statute. Keying a "class of aliens" on affiliation with a domestic institution alone unmoors the term "class of aliens" from concerns about "entry … into the United States," and from §1182(f)'s authorization to suspend the entry of aliens "*as* immigrants or nonimmigrants." 8 U.S.C. §1182(f) (emphasis added).

Indeed, the statutory problems run deeper, because the focus of the President's determination is that "entry … [of] any class of aliens" into the United States would be detrimental to the interests of the United States. *Id*. Nothing in the statute authorizes the President to exclude aliens whose "entry … into the United States" is perfectly compatible with the interests of the United States, based on concerns with that alien attending Harvard after entry. But the Proclamation does just that, and only that. The Proclamation does not bar *entry* to the United States for any class of aliens—or even a single alien—conceding by its own terms that the "entry" itself is not dangerous. Indeed, the Proclamation emphasizes that the suspension of entry "shall not apply to any alien who enters the United States to attend other universities." Appx.111.

This Court should reject the government's attempt to reverse-engineer a "class of aliens" based on a finding that *Harvard* is a detriment to the national interest, and that therefore attendance at Harvard *following* entry should be "suspended." The

Proclamation does not "suspend entry" of any alien based on a finding that that entry would harm the United States; it operates only to condition entry on the alien's decision not to attend a disfavored domestic institution. None of the risks the Proclamation identifies relate to "entry," as the same individuals are permitted to enter so long as they attend another university. Properly understood, the Proclamation is not an entry restriction at all.

2. The INA's structure further underscores the misfit between §1182(f) and a purported entry restriction that focuses on a single domestic institution. In *Hawaii*, the Court took as given that "§1182(f) does not allow the President to expressly override particular provisions of the INA." 585 U.S. at 689. Yet that is just what the President did here. 8 U.S.C. §1372(c) permits DHS to "prescribe *by regulation* reporting requirements" for the SEVP program. 8 U.S.C. §1372(c)(5) (emphasis added). The Department has done so, and those regulations are specifically designed to account for both institution-specific problems and the reliance interests of domestic institutions. *See, e.g.*, 8 C.F.R. §214.3(g). The Proclamation seeks to compel Harvard to produce information exceeding what those regulations require and without affording the attendant protections. To the extent there are disputes about whether a particular institution has provided sufficient information (it bears repeating that the government has never explained *how* Harvard's document production was supposedly deficient), the government has domestic options to

48

address its concerns subject to the availability of judicial review to protect the interests of the institution.  The President cannot circumvent all that by misusing §1182(f) in an avowed effort to unilaterally override DHS's detailed "program to collect … information."  8 U.S.C. §1372(a)(1).

3.  Finally, the history of §1182(f)'s use underscores that the Proclamation is not only unauthorized, but also unprecedented.  Much as the meaning of broad constitutional text "receive[s] a considerable impression" from historical practice, *United States v. Rahimi*, 602 U.S. 680, 726 (2024) (Kavanaugh, J., concurring) (quoting *M'Culloch v. Maryland*, 17 U.S. (4 Wheat.) 316 (1819)), statutory text may be "liquidated and ascertained by a series of particular discussions and adjudications," The Federalist No. 37, at 229 (James Madison) (Clinton Rossiter ed., 1961); *see also* A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal Texts* 256 (2012).  That is particularly true when a highly attractive power that would tilt the separation of powers in favor of the executive has never previously been employed under comparable circumstances.  *See West Virginia v. EPA*, 597 U.S. 697, 731-32 (2022).

The Proclamation is entirely unprecedented in its effort to invoke §1182(f) to target a domestic institution.  Prior proclamations have restricted entry from certain countries (as in *Hawaii*), of certain foreign government officials, or of certain

individuals subject to sanctions.[6]  And they have followed §1182(f)'s language by categorically suspending entry of those individuals "*as* immigrants or nonimmigrants," 8 U.S.C. §1182(f) (emphasis added), rather than welcoming them in as long as they eschewed a particular domestic entity.  By contrast, no President over more than seven decades has ever before defined a class of aliens not by some aspect of their alienage or foreign activities but by their affiliation with a disfavored domestic institution, a strong indication that this "long-extant statute" does not contain the heretofore "unheralded power" the government now asserts.  *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014); *see, e.g.*, *Kent v. Dulles*, 357 U.S. 116, 127-28 (1958) (looking to historical practice to determine scope of Congress's delegation in immigration context).

4.  The government's contrary arguments lack merit.  The government's lead argument is that "'[c]lass' is a broad concept with virtually infinite permutations." Br.26.  The government continues that "the Proclamation here suspends entry for a class of aliens based on a finding of harm to national interest," Br.26—that is, "that Harvard's persistent failure to monitor and discipline its foreign students has created risks to public safety and undermined visa integrity," Br.27.  But while "class" may

---

[6] *See, e.g.*, Proclamation No. 8697, *Suspension of Entry as Immigrants and Nonimmigrants of Persons Who Participate in Serious Human Rights and Humanitarian Law Violations and Other Abuses*, 76 Fed. Reg. 49,277 (Aug. 4, 2011).

be a broad concept, the statute speaks to a "class of aliens," which reflects that some aspect of alienage or a related foreign policy concern must define the class. Moreover, the object of §1182(f) is the denial of entry, and the Proclamation does not deny entry to any class of aliens, or even a single alien, as long as the aliens steer clear of Harvard. Simply put, as the very title of the Proclamation announces, the government has found that *Harvard*, not any class of aliens—broad, narrow, or in between—is the actor that risks detriment to the national interest. And it has not suspended the entry of any class of aliens "as immigrants or nonimmigrants," but has opened the borders to all aliens as long as they matriculate elsewhere.

The government objects that the district court "offered no textual basis for its categorical dismissal of purpose-based classifications," Br.27, and argues that, in *Hawaii*, "the same immigrant barred for business or tourism could enter on a different non-immigrant visa, as a permanent resident, or as an asylee," Br.29. But the problem is not with purpose-based classes *per se*. For example, a class of law-enforcement informants from a given country (for whom "S-visas" are generally available) may be different—in a sense that bears on whether those individuals' "entry" could be "detrimental"—from a class of business travelers or scholars from the same country. It does no violence to the statute to make those distinctions. Similarly, a definition of "class" tied to an individual's affiliation with foreign entities—like the North Korean Workers' Party, *see* Br.31—is not inconsistent with

the statute.  Because the affiliated entity is *foreign* and the class is truly barred from *entry*, a class of aliens can be defined by reference to that entity without divorcing the defined class from a finding that its members' "entry" would be "detrimental." A member of the North Korean Workers' Party is a member of that party no matter whom he would like to affiliate with in the United States after entry.

The problem with the government's boundless conception of "class" is that it would permit the executive to target domestic entities with unfavorable treatment and bypass the procedural protections that domestic entities enjoy under domestic legal regimes.  Indeed, under the government's theory, the executive could target any domestic entity, be it a research university or a small liberal arts college, a Fortune 500 corporation or a nascent start-up, or a national foundation or a local charity, that the government has deemed insufficiently responsive to some government inquiry or initiative and cut them off from foreign nationals.

The government's attempt to diminish the power it asserts is puzzling.  *See* Br.35.  No one disputes that "Section 1182(f) has been in effect since 1952," and has never been used in this manner.  *Id.*  Nor can the government deny that converting §1182(f) from a tool directed externally to aliens from particular nations or with particular foreign associations into a tool for settling domestic scores is a major and dramatic transformation.  If this tool of foreign policy can be used domestically in this manner, to evade searching review with appeals to the kind of deference

appropriate only when the executive deals with foreign matters, it will surely be used in this manner frequently. After all, if Harvard's asserted non-compliance with document requests suffices to invoke this extraordinary power, then this power can be invoked at will. A president could ban international travel to states controlled by the opposing political party, for the purpose of speaking with media unfriendly to the administration, or to join the workforce of politically disfavored companies.

This Court should not open the door to such abuses. Authorizing the use of §1182(f) in this manner would give the Administration (and future ones) "a loaded weapon ready for the hand of any authority that can bring forward a plausible claim of an urgent need" to punish a disfavored domestic institution. *Korematsu v. United States*, 323 U.S. 214, 246 (1944) (Jackson, J., dissenting).

### B. Harvard's Statutory Challenge is Justiciable.

The government seems to suggest (though it never quite argues) that this case is non-justiciable. *See* Br.22-25 & n.5. That suggestion is as wrong as it is dangerous. As reflected by the Supreme Court's decisions reaching the merits in both *Hawaii*, 585 U.S. at 682-83, and *Sale*, 509 U.S. at 171, it is "well settled" that judicial review is available where U.S. citizen plaintiffs "confine their challenge to the lawfulness of the [governing] policy," instead of contesting individual consular determinations, *Pietersen v. U.S. Dep't of State*, 138 F.4th 552, 560 (D.C. Cir. 2025). Section 1182(f) may be a broad delegation within its sphere, but it remains the

judiciary's role to ensure the executive has not exceeded Congress' delegation or the executive's constitutional authority. *See Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 196 (2012); *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 385 (2024).

## III.    The Other Preliminary Injunction Factors Favor Harvard.

### A.    Harvard Will Be Irreparably Harmed Absent an Injunction.

The district court correctly concluded that Harvard would be irreparably harmed in the absence of injunctive relief. That necessarily follows from the government's violation of Harvard's First Amendment rights: "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (per curiam). The government does not seriously contest this point; its brief argues only that Harvard's First Amendment claims fail on the merits. *See* Br.58. Moreover, as the district court explained, Harvard's inability to host foreign students and scholars "would halt important research, hamper the educational experience for students left without teachers or advisors, and deprive the community of medical care." A.42. And it would "irreparably harm[] Harvard's ability to compete with other institutions for the most qualified applicants at home and abroad." *Id.*

The government's arguments to the contrary are meritless. The government says that harms like freezing important research "would be injuries to individuals, not to Harvard itself." Br.58. That is wrong: Harvard unquestionably has a direct

interest in the research it superintends and the education it provides. And the government does not even address the irreparable injury to Harvard's competitiveness and reputation, which can only be to Harvard itself, especially given the Proclamation's open invitation for these promising students and researchers to attend rival universities. The government's only other rejoinders are that the Proclamation is time-limited, that it would be terminated if Harvard complied with unlawful records requests, and that Harvard could blunt "enrollment effects" by admitting more Americans. Br.59. But First Amendment violations inflict irreparable injury even if they exist for "minimal periods of time." *Roman Cath. Diocese of Brooklyn*, 592 U.S. at 19. As for the government's suggestion that Harvard can end its punishment by complying with records requests or enrolling more American students, that just underscores the misuse of the statute and the government's ongoing efforts to interfere with Harvard's academic freedom.

### B.    The Balance of the Equities and the Public Interest Favor Harvard.

The district court was likewise correct to find that the balance of the equities and the public interest strongly favor Harvard. These factors merge when the government is the defendant. *Nken v. Holder*, 556 U.S. 418, 435 (2009). First, "injunctions protecting First Amendment freedoms are always in the public interest." *Texans for Free Enter. v. Tex. Ethics Comm'n*, 732 F.3d 535, 539 (5th Cir. 2013); *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013)

(same). Second, neither the government nor the public has an interest in the enforcement of an unconstitutional policy. *See, e.g.*, *K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist.*, 710 F.3d 99, 114 (3d Cir. 2013); *Brown v. Yost*, 133 F.4th 725, 738 (6th Cir. 2025). Third, Harvard has "specifically alleged significant harms to the public interest stemming from the loss of its international students, including consequences for STEM research and medical care in the community"—even putting aside the "impacts on the international students themselves." A.43. The government does not seriously dispute these harms.

## CONCLUSION

This Court should affirm.

Dated: January 12, 2026

Ishan Bhabha
Ian Heath Gershengorn
Lauren J. Hartz
JENNER & BLOCK LLP
1099 New York Ave. NW, Suite 900
Washington, DC 20001

Andrianna Kastanek
JENNER & BLOCK LLP
353 N Clark St.
Chicago, IL 60654

Steven P. Lehotsky
Scott A. Keller
Serena M. Orloff
Shannon G. Denmark
Jacob B. Richards
LEHOTSKY KELLER COHN LLP

Respectfully submitted,

*/s/ Paul D. Clement*
PAUL D. CLEMENT
 *Counsel of Record*
JAMES Y. XI*
JEFFREY C. THALHOFER*
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com

*Supervised by principals of the firm who are members of the Virginia Bar

William A. Burck
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
1300 I St. NW, Suite 900
Washington, DC 20005

200 Massachusetts Ave. NW, Suite 700
Washington, DC 20001

Katherine C. Yarger
LEHOTSKY KELLER COHN LLP
700 Colorado Blvd., #407
Denver, CO 80206

Joshua P. Morrow
LEHOTSKY KELLER COHN LLP
408 W. 11th St., 5th Floor
Austin, TX 78701

Danielle K. Goldstein
LEHOTSKY KELLER COHN LLP
3280 Peachtree Rd. NE
Atlanta, GA 30305

Robert K. Hur
KING & SPALDING LLP
1700 Pennsylvania Ave. NW, Suite 900
Washington, DC 20006

## <u>CERTIFICATE OF SERVICE</u>

Counsel for Appellant certify that they have submitted the foregoing document with the Clerk of Court for the United States Court of Appeals for the First Circuit, using the electronic case filing system of the Court. Counsel for Appellant hereby certify that they have served all parties electronically or by another manner authorized by Fed. R. Civ. P. 5(b)(2).

<u>*/s/Paul D. Clement*</u>

Dated: January 12, 2026

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Fed. R. App. P. 32(g), I hereby certify that this document complies with the type-volume limitations set forth in Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 12,957 words.

I further certify that this document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in a 14-point Times New Roman font.


Dated:  January 12, 2026

<em><u>/s/Paul D. Clement</u></em>