No. 25-1627

# UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

PRESIDENT AND FELLOWS OF HARVARD COLLEGE,

*Plaintiff-Appellee,*

v.

UNITED STATES DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, in her official capacity as Secretary of the United States Department of Homeland Security; United States Immigration and Customs Enforcement; TODD LYONS, in his official capacity as Acting Director of United States Immigration and Customs Enforcement; STUDENT EXCHANGE VISITOR PROGRAM; JOHN DOE, in their official capacity as Director of the Student and Exchange Visitor Program; JAMES HICKS, in his official capacity as Deputy Assistant Director of the Student and Exchange Visitor Program; UNITED STATES DEPARTMENT OF JUSTICE; PAMELA BONDI, in her official capacity as Attorney General of the United States; UNITED STATES DEPARTMENT OF STATE; MARCO RUBIO, in his official capacity as Secretary of the United States Department of State

*Defendants-Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS (Hon. Allison Burroughs, U.S.D.J.) Case No. 25-cv-11472

# BRIEF OF CITY OF CAMBRIDGE AS AMICUS CURIAE IN SUPPORT OF PLAINTIFF-APPELLEE AND AFFIRMANCE

OWEN R. WOLFE
SEYFARTH SHAW LLP
620 Eighth Avenue
New York, New York 10018
Telephone: (212) 218-3389
owolfe@seyfarth.com

MEGAN B. BAYER, CITY SOLICITOR
FRANZISKUS LEPIONKA, ASSISTANT
CITY SOLICITOR
CITY OF CAMBRIDGE
795 Massachusetts Avenue
Cambridge, Massachusetts 02139

DAWN R. SOLOWEY
SEYFARTH SHAW LLP
Seaport East, Suite 1200
Two Seaport Lane
Boston, Massachusetts 02210
Telephone: (617) 946-4800
dsolowey@seyfarth.com

*Attorneys for Amicus Curiae*

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................ i

TABLE OF AUTHORITIES ................................................................. ii

IDENTITY AND INTERESTS OF *AMICUS CURIAE* ............................................. 1

ARGUMENT ................................................................................ 4

    I.    The public interest weighs in favor of injunctive relief because of the impact on Cambridge and the surrounding area ........................ 4

        A.    Vacating the injunction would have a significant negative economic impact on Cambridge and the surrounding area ........ 5

        B.    Vacating the injunction would negatively impact the social and cultural fabric of Cambridge and the surrounding area ........................................................................ 9

    II.    The public interest further weighs in favor of injunctive relief because of the potential chilling effect on First Amendment rights ................................................................................ 16

CONCLUSION ............................................................................. 20

CERTIFICATE OF COMPLIANCE ....................................................... 21

CERTIFICATE OF SERVICE ............................................................. 22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Akebia Therapeutics, Inc. v. Azar*,
   976 F.3d 86 (1st Cir. 2020)................................................................4

*Bantam Books, Inc. v. Sullivan*,
   372 U.S. 58 (1963)............................................................................17

*Citizens United v. Fed. Election Comm'n*,
   558 U.S. 310 (2010)..........................................................................18

*Corp. Techs., Inc. v. Harnett*,
   731 F.3d 6 (1st Cir. 2013).................................................................4

*hiQ Labs, Inc. v. LinkedIn Corp.*,
   31 F.4th 1180 (9th Cir. 2022) ..........................................................4

*Hunter v. Hamilton County Bd. of Elections*,
   635 F.3d 219 (6th Cir. 2011) ............................................................4

*Keyishian v. Bd. of Regents of Univ. of State of N.Y.*,
   385 U.S. 589 (1967)..........................................................................18

*Mississippi Power & Light Co. v. United Gas Pipe Line Co.*,
   760 F.2d 618 (5th Cir. 1985) ............................................................4

*Nat'l Rifle Ass'n of Am. v. Vullo*,
   602 U.S. 175 (2024)..........................................................................17

*New Hope Fam. Servs., Inc. v. Poole*,
   966 F.3d 145 (2d Cir. 2020) .............................................................17

*Pleasant Grove City, Utah v. Summum*,
   555 U.S. 460 (2009)......................................................................19, 20

*Regents of the Univ. of Cal. v. Bakke*,
   438 U.S. 265 (1978)..........................................................................18

*Speech First, Inc. v. Cartwright*,
   32 F.4th 1110 (11th Cir. 2022) ........................................................17

*Speech First, Inc. v. Whitten*,
    145 S. Ct. 701 (2025) ........................................................................17

*Stand With US Ctr. for Legal Just. v. Mass. Inst. of Tech.*,
    158 F.4th 1 (1st Cir. 2025) ..............................................................18

*Sweezy v. N.H.*,
    354 U.S. 234 (1957) ........................................................................18

*Turner Broad. Sys., Inc. v. F.C.C.*,
    512 U.S. 622 (1994) ........................................................................17

**Other Authorities**

Bjorn Markeson and Chandler West, *Measuring the Economic Risk of
    Federal Actions Against Harvard*, IMPLAN (June 9, 2025),
    *available at* https://blog.implan.com/harvard-impact ...........................6

*Boston*, PHIL ROSENTHAL WORLD,
    https://www.philrosenthalworld.com/cities/boston
    (last visited Jan. 16, 2026) ..................................................................3

*Boston Refugee Youth Enrichment (BRYE) Extension*, PHILLIPS
    BROOKS HOUSE ASSOCIATION,
    https://www.pbha.org/programs/brye-extension
    (last visited Jan. 16, 2026) ................................................................13

Deb Mandel, *Joyce Chen Started With a 250-Seat Restaurant, Went to
    350 and Only Grew Her Empire From There*, HISTORY
    CAMBRIDGE, https://historycambridge.org/articles/joyce-chen-
    started-with-a-250-seat-restaurant-went-to-350-and-only-grew-her-
    empire-from-there/ (2022) ................................................................11

Deb Mandel, *Julia Child's Kitchen*, HISTORY CAMBRIDGE,
    https://historycambridge.org/articles/julia-childs-kitchen/
    (2022) ..............................................................................................11

*Demographics and Statistics Frequently Asked Questions*,
    CAMBRIDGE COMMUNITY DEVELOPMENT DEPARTMENT,
    https://www.cambridgema.gov/CDD/factsandmaps/demographicfa
    q (last visited Jan. 16, 2026) ............................................................10

*Fall 2025 International Student Enrollment Outlook and Economic Impact*, NAFSA: ASSOCIATION OF INTERNATIONAL EDUCATORS, https://www.nafsa.org/fall-2025-international-student-enrollment-outlook-and-economic-impact (Aug. 8, 2025) ....................................................7

Fernando M. Reimers, *Why Harvard Needs International Students*, Harvard Magazine (Aug. 8, 2025), *available at* https://www.harvardmagazine.com/commentary/harvard-international-students-necessary-campus-culture........................................12, 13

Foster Wong, *These World Leaders Went to Harvard Before Trump's Foreign Student Ban*, Bloomberg (May 23, 2025), *available at* https://www.bloomberg.com/news/articles/2025-05-23/these-world-leaders-went-to-harvard-before-trump-s-foreign-student-ban.................15

*Frequently Asked Questions*, CAMBRIDGE HISTORICAL SOCIETY, https://www.cambridgema.gov/historic/aboutchc/faqpage#:~:text=December%2028%2C%201630%20%2D%20The%20name,Newtowne%22%20to%20%22Cambridge.%22 (last visited Jan. 16, 2026) ....................................................................................1

*In the Chinese American Community*, CHINA COMES TO MIT, https://chinacomestomit.org/#/in-the-community/ (last visited Jan. 16, 2026) ................................................................11

*Innovation in Cambridge*, HISTORY CAMBRIDGE, https://historycambridge.org/self-guided-tours/innovation-in-cambridge/ (last visited Jan. 16, 2026) ................................................................15

*International Student Economic Value Tool: Massachusetts*, NAFSA: Association of International Educators, https://www.nafsa.org/isev/reports/state?year=2023&state=MA (last visited Jan. 16, 2026) ................................................................6

*International Families and Student Center*, CAMBRIDGE PUBLIC SCHOOLS, https://www.cpsd.us/academics/multilingual-learner-programs-department/international-families-and-student-center (last visited Jan. 16, 2026) ........................................................ 10-11

iv

Kayla Webley Adler, *Jacinda Ardern Captured the World. And Then She Walked Away*, ELLE (Mar. 17, 2025), *available at* https://www.elle.com/culture/career-politics/a64147509/jacinda-ardern-new-zealand-prime-minister-interview-2025/ .................................. 15-16

*Long Distance Relocation*, CAMBRIDGE PUBLIC SCHOOLS, https://www.cpsd.us/administration/student-registration-center/special-considerations/long-distance-relocation (last visited Jan. 16, 2026) .................................................................. 10

*One Harvard, One World,* HARVARD WORLDWIDE, https://worldwide.harvard.edu/oneworld/ (last visited Jan. 16, 2026) ....................................................................9

*Open Doors 2025 Presentation*, OPEN DOORS DATA, https://opendoorsdata.org/wp-content/uploads/2025/11/OpenDoors25_PresentationPDF.pdf (last visited Jan. 16, 2026) .................................................................14

Peter Ciurczak, *Brain Gain: International Students in Massachusetts*, BOSTON INDICATORS (May 14, 2025), *available at* https://www.bostonindicators.org/article-pages/2025/may/international_students .............................................................14

Stuart Anderson, *International Students Are Founding America's Great Startups*, FORBES (Nov. 5, 2018), *available at* https://www.forbes.com/sites/stuartanderson/2018/11/05/international-students-are-founding-americas-great-startups/ ...........................................15

Stuart Anderson, *International Students Who Started Billion-Dollar Companies*, INTERNATIONAL EDUCATOR (July–Aug. 2016), *available at* https://www.nafsa.org/sites/default/files/ektron/files/underscore/ie_julaug16_frontlines.pdf ..........................................................14

*Student Economic Value Tool: Congressional Massachusetts District 5*, NAFSA: ASSOCIATION OF INTERNATIONAL EDUCATORS, https://www.nafsa.org/isev/reports/district?state=MA&district=05&year=2023 (last visited Jan. 16, 2026) .............................................................. 6-7

*Top 25 Employers*, CAMBRIDGE COMMUNITY DEVELOPMENT
　　DEPARTMENT,
　　https://www.cambridgema.gov/cdd/factsandmaps/economicdata/to
　　p25employers
　　(last visited Jan. 16, 2026) .....................................................................5

Tréa Lavery and Juan Wulff, *As Foreign Students Reconsider Coming
　　to Boston, Local Businesses Prepare for Fallout*, MassLive (June
　　30, 2025), *available at*
　　https://www.masslive.com/boston/2025/06/as-foreign-students-
　　reconsider-coming-to-boston-local-businesses-prepare-for-
　　fallout.html................................................................................8, 9

*Updated Economic Analysis: Fall 2025 International Student
　　Enrollment Decline Reveals Drop of $1.1 Billion and Nearly
　　23,000 Jobs*, NAFSA: ASSOCIATION OF INTERNATIONAL
　　EDUCATORS, https://www.nafsa.org/fall-2025-international-
　　student-enrollment-snapshot-economic-impact (Nov. 2025) .............................7

*Why Cambridge*, CAMBRIDGE
　　MASSACHUSETTS, https://cambridgeusa.org/why-cambridge/
　　(last visited Jan. 16, 2026) ..................................................................19

## IDENTITY AND INTERESTS OF *AMICUS CURIAE*

The City of Cambridge ("Cambridge")[1] is a city in Massachusetts and home to Harvard University ("Harvard").[2]  Cambridge submits this *amicus curiae* brief in support of Harvard's position and affirmance of the District Court's preliminary injunction order.[3]  By that order, the District Court enjoined Defendants-Appellants (collectively, "Defendants") from carrying out directives that would have restricted non-U.S. individuals seeking entry to the United States under F, M, and J visas to attend Harvard.  *See* A1-44.[4]

---

[1] As a governmental entity, no disclosure statement is required pursuant to Fed. R. App. P. 26.1.

[2] In addition to being chosen as the site for the first institution of higher learning in what would become the United States, *i.e.*, Harvard, Cambridge was originally called "Newtowne" until 1638; the city was re-named after Cambridge University in England, as leading officials in what had been Newtowne "had attended Cambridge University in England and thought that it would be an appropriate name for a college town in New England."  *Frequently Asked Questions*, CAMBRIDGE HISTORICAL SOCIETY, https://www.cambridgema.gov/historic/aboutchc/faqpage#:~:text=December%202 8%2C%201630%20%2D%20The%20name,Newtowne%22%20to%20%22Cambri dge.%22 (last visited Jan. 16, 2026).  Accordingly, education and internationalism have been part of Cambridge's identity from its inception.

[3] Counsel for the parties did not author this brief in whole or in part.  No party contributed financial support intended to fund the preparation or submission of this brief.  No other individual(s) or organization(s) contributed financial support intended to fund the preparation or submission of this brief.  All parties consent to the filing of this *amicus* brief.

[4] References to "A___" are to the Addendum to the Brief of Defendants-Appellants ("Def. Br.").

Lifting the District Court's injunction, and permitting Defendants to prohibit foreign-born individuals from attending Harvard, would have a tremendous, detrimental impact on Cambridge and the surrounding area. As set forth further below, Harvard is the largest employer in Cambridge, and so any ill effects suffered by Harvard from Defendants' intended actions would reverberate through Cambridge and the surrounding area. Moreover, the foreign individuals who attend Harvard directly influence Cambridge's local economy in numerous ways, such that barring them from attending Harvard would have significant negative impacts on the local economy.

Defendants' proposed actions, if not enjoined, would go beyond economic impacts, however. Foreign visitors to Harvard and other educational institutions have an enormous effect on the cultural and social fabric of Cambridge in ways unmeasured in dollars. An episode from the Netflix travel and food documentary series *Somebody Feed Phil* provides a good example of the ways in which international students enrich the culture of Cambridge and other nearby towns. In one episode, the show's host, Phil Rosenthal, traveled to Boston and the surrounding area. He visited a restaurant called Comfort Kitchen in Dorchester, about 15 minutes from Cambridge. One of the chefs, Biplaw Rai, told Mr. Rosenthal that he first came to Cambridge from Nepal as part of an exchange program, decided to settle in the area, and helped open a restaurant that brings food and culture from other parts of

globe to the area around Harvard.  As Mr. Rosenthal aptly put it, "[c]ross-cultural exchange is a marvelous thing."[5]  The loss of this type of cultural enrichment would impact the fabric of Cambridge and the surrounding area.

Finally, Defendants' actions, if not enjoined, could lead to a significant chilling effect on the First Amendment rights of universities and colleges, which would be particularly damaging to Cambridge, as the home of Harvard, the Massachusetts Institute of Technology ("MIT"), Lesley University, and other institutions of higher learning.  Beyond universities, however, Defendants' actions could have a broad chilling effect on the speech rights of state and local governments, including Cambridge, if they are forced to self-censor or conform their speech to messages favored by the federal government.  This is not a partisan issue specific to a particular president.  If Defendants' actions here are not enjoined, then, for example, a future Democratic president could revoke federal benefits for cities and entities in retaliation for their refusal to promote Democratic policies.  The District Court's injunction avoids this chilling effect, and it should be affirmed.

---

[5] *See Boston*, PHIL ROSENTHAL WORLD,
https://www.philrosenthalworld.com/cities/boston (last visited Jan. 16, 2026).

## ARGUMENT

**I.    The public interest weighs in favor of injunctive relief because of the impact on Cambridge and the surrounding area.**

In evaluating a preliminary injunction, this Court considers factors including the public interest.  *See, e.g., Corp. Techs., Inc. v. Harnett*, 731 F.3d 6, 9 (1st Cir. 2013).  Contrary to Defendants' assertion (Def. Br. 58-59), the potential harms to non-parties are relevant to this injunction factor.  *See, e.g., Akebia Therapeutics, Inc. v. Azar*, 976 F.3d 86, 92 (1st Cir. 2020) (courts "must consider the effect, if any, that the issuance of an injunction (or the withholding of one) will have on the public interest"); *see also hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1202 (9th Cir. 2022) ("[t]he public interest inquiry primarily addresses impact on non-parties rather than parties, and takes into consideration the public consequences in employing the extraordinary remedy of injunction" (internal quotation marks omitted)); *Hunter v. Hamilton County Bd. of Elections*, 635 F.3d 219, 244 (6th Cir. 2011) ("the public interest [factor] primarily addresses impact on non-parties" (internal quotation marks omitted)); *Mississippi Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 625-26 (5th Cir. 1985) ("the public interest involved in this dispute compels us to look beyond the immediate interests of the named litigants").

Here, the loss of foreign students, researchers, scholars, and their families at Harvard would impact Cambridge and the surrounding area in several ways.  First, Cambridge will suffer a significant financial impact, both based upon the harms to

4

its largest employer, Harvard, and the loss of revenue generated by foreign visitors to Harvard. Second, Harvard's foreign students, researchers, scholars, and their families have a significant impact on the cultural and social fabric of Cambridge and the surrounding area. Those social and cultural contributions will be lost or severely damaged without injunctive relief.

### A. Vacating the injunction would have a significant negative economic impact on Cambridge and the surrounding area.

The District Court's injunction should be affirmed because it will prevent significant, negative economic impacts on Cambridge, its citizens, and the surrounding area. As an initial matter, Harvard is the largest employer in Cambridge. *See Top 25 Employers*, CAMBRIDGE COMMUNITY DEVELOPMENT DEPARTMENT,

https://www.cambridgema.gov/cdd/factsandmaps/economicdata/top25employers

(last visited Jan. 16, 2026). To the extent Defendants' actions would have a detrimental impact on Harvard, *see* A42-43, those harms will therefore necessarily be felt by Cambridge and its citizens.

Moreover, Harvard's international students, researchers, and scholars are significant contributors to the Cambridge economy in their own right, such that restrictions on Harvard's ability to enroll international students would have a material negative impact on Cambridge's tax revenues and the city's businesses. One calculation, from economic analytics firm IMPLAN, estimates that

international students at Harvard contribute $180 million to the local GDP. *See* Bjorn Markeson and Chandler West, *Measuring the Economic Risk of Federal Actions Against Harvard*, IMPLAN (June 9, 2025), *available at* https://blog.implan.com/harvard-impact. Another estimate shows that, in the 2023–2024 academic year, Harvard's international students contributed approximately $383.6 million to the Massachusetts state-wide economy and supported 3,910 jobs, including positions within the university and in surrounding sectors such as housing, food, and retail. *See International Student Economic Value Tool: Massachusetts*, NAFSA: ASSOCIATION OF INTERNATIONAL EDUCATORS, https://www.nafsa.org/isev/reports/state?year=2023&state=MA (last visited Jan. 16, 2026).

Moreover, in 2023–2024, international students in Massachusetts at all institutions (not just Harvard) generated an estimated $3.9 billion in financial contributions and supported 35,849 jobs, with Massachusetts's Fifth Congressional District (where Harvard sits) accounting for $703.7 million and 6,793 jobs generated from international students. *See Student Economic Value Tool: Congressional Massachusetts District 5*, NAFSA: ASSOCIATION OF INTERNATIONAL EDUCATORS, https://www.nafsa.org/isev/reports/district?state=MA&district=05&year=2023 (last visited Jan. 16, 2026).

Some projections indicated that if visas for foreign students had been more broadly restricted, statewide contributions from international students would have fallen to $3.5 billion and 32,072 jobs during the 2025–2026 academic year, a decline of nearly $600 million and 3,800 jobs, which would have translated to losses of approximately $100 million and 720 jobs in the Fifth Congressional District. *See Fall 2025 International Student Enrollment Outlook and Economic Impact*, NAFSA: ASSOCIATION OF INTERNATIONAL EDUCATORS, https://www.nafsa.org/fall-2025-international-student-enrollment-outlook-and-economic-impact (Aug. 8, 2025). An updated analysis showed that the actual drop in foreign student enrollment for the 2025-2026 economic year is expected to result in losses of $92.1 million in Massachusetts, which translates to losses of approximately $14 million in the Fifth Congressional District. *See Updated Economic Analysis: Fall 2025 International Student Enrollment Decline Reveals Drop of $1.1 Billion and Nearly 23,000 Jobs*, NAFSA: ASSOCIATION OF INTERNATIONAL EDUCATORS, https://www.nafsa.org/fall-2025-international-student-enrollment-snapshot-economic-impact (Nov. 2025).

Cambridge would necessarily feel an outsized impact from restrictions on foreign student visas, given that it is home to not only Harvard, but to other major universities and colleges like MIT, Lesley University, Hult International Business School, and Longy School of Music of Bard College. If not enjoined, Defendants'

conduct would ripple through municipal tax bases and innovation ecosystems, weakening Cambridge's position as a global academic and entrepreneurial hub.

Needless to say, businesses local to Cambridge's Harvard Square, and other areas surrounding Harvard campuses throughout Cambridge and Boston neighborhoods, rely heavily on international students and scholars at Harvard. For example, Harvard Square restaurant Felipe's Taqueria estimates that 15–20% of its customers are foreign students, while another, Wusong Road Tiki Bar, reports 5–10% of its customers are international students. Tréa Lavery and Juan Wulff, *As Foreign Students Reconsider Coming to Boston, Local Businesses Prepare for Fallout*, MASSLIVE (June 30, 2025), *available at* https://www.masslive.com/boston/2025/06/as-foreign-students-reconsider-coming-to-boston-local-businesses-prepare-for-fallout.html.

These figures underscore the effects of enrollment restrictions on Cambridge's local economy, as reductions in international student numbers would directly diminish consumer spending and employment opportunities. Even if Harvard were to ultimately admit more U.S.-citizen students to make up for the loss of international students—and the record below is silent about when or if that would ever happen—those U.S.-citizen students are unlikely to have the same spending power or bring with them the same number of dependents who separately contribute to the Cambridge economy and civic society. *See* Case No. 25-cv-11472, ECF No.

54 ¶ 7 (international students at Harvard have more than 300 dependents present with them); *see also* Lavery & Wulff, *supra* ("a large portion of international students come from families that can pay full tuition bills and living expenses out of pocket").

Given the likely economic impact of Defendants' conduct on Cambridge, its citizens, and the surrounding area, the public interest weighs heavily in favor of affirming the District Court's injunction.

### B.  Vacating the injunction would negatively impact the social and cultural fabric of Cambridge and the surrounding area

"Without its international students, Harvard is not Harvard."  Case No. 25-cv-11472, ECF No. 54 ¶ 9.  It is equally true that without those international students, Cambridge is not Cambridge.  Harvard's international student body—comprising more than 6,700 individuals from over 147 countries—contributes to a unique, cosmopolitan community in Cambridge and the surrounding area, fostering cross-cultural dialogue, global insights, and innovation.  *See One Harvard, One World,* HARVARD WORLDWIDE, https://worldwide.harvard.edu/oneworld/ (last visited Jan. 16, 2026).

Immigrants and international students comprise a significant percentage of Cambridge residents.  Nearly a third of Cambridge residents were born in a foreign country, and at least 23% of Cambridge residents speak a language other than English at home.  *Demographics and Statistics Frequently Asked Questions,*

CAMBRIDGE                COMMUNITY                DEVELOPMENT                DEPARTMENT,

https://www.cambridgema.gov/CDD/factsandmaps/demographicfaq    (last   visited

Jan. 16, 2026).  Many of these individuals are international students: college and

graduate students at Harvard and other institutions make up about 24% of

Cambridge's residents, *see id.*, which includes the foreign-born students.

So many international students and scholars come to Cambridge that the

Cambridge public school system has a webpage devoted to explaining how those

international students and scholars can enroll their children in the Cambridge

schools.  *See Long Distance Relocation*, CAMBRIDGE PUBLIC SCHOOLS,

https://www.cpsd.us/administration/student-registration-center/special-

considerations/long-distance-relocation (last visited Jan. 16, 2026).  The

Cambridge public schools also have an International Families and Student Center,

helping to integrate international students and their families into the classroom and

community, where cross-cultural exchanges can take place.  *See International*

*Families and Student Center*, CAMBRIDGE PUBLIC SCHOOLS,

https://www.cpsd.us/academics/multilingual-learner-programs-

department/international-families-and-student-center (last visited Jan. 16, 2026).

As the example from *Somebody Feed Phil* discussed above highlights,

international students and visitors to Cambridge often enrich the city through food.

As far back as the 1920s, Chinese-born MIT alumni started Chinese restaurants in

and around Boston.  *In the Chinese American Community*, CHINA COMES TO MIT,
https://chinacomestomit.org/#/in-the-community/ (last visited Jan. 16, 2026).  One
can imagine that longtime Cambridge resident Julia Child fit in well with the
international visitors bringing their food and cultures to Cambridge while she
promoted French cuisine and purchased cooking utensils from a European home
furnishings store in Harvard Square.  *See* Deb Mandel*, Julia Child's Kitchen*,
HISTORY CAMBRIDGE, https://historycambridge.org/articles/julia-childs-kitchen/
(2022).  One of Ms. Child's friends in Cambridge was a woman named Joyce Chen,
who immigrated from China in 1949 and opened her first restaurant in Cambridge;
she went on to create a culinary empire and was memorialized on a U.S. postage
stamp in 2014.  *See* Deb Mandel, *Joyce Chen Started With a 250-Seat Restaurant,
Went to 350 and Only Grew Her Empire From There*, HISTORY CAMBRIDGE,
https://historycambridge.org/articles/joyce-chen-started-with-a-250-seat-restaurant-
went-to-350-and-only-grew-her-empire-from-there/ (2022).  The unique,
international food culture in Cambridge in which Ms. Child and Ms. Chen operated
was shaped, and continues to be shaped, by international students and scholars at
Harvard and other institutions.

International students and their families enrich Cambridge's cultural fabric in
many other ways, including by sharing diverse traditions, languages, and
perspectives.  Fernando M. Reimers, a professor at the Harvard Graduate School of

Education, asked his students to share what they learned from their international student peers, who described "invaluable lessons in cross-cultural communication and collaborative problem-solving; exposure to a range of ideas about competition, teamwork, and leadership; and a global network of friendship and support that persisted beyond graduation." Fernando M. Reimers, *Why Harvard Needs International Students* HARVARD MAGAZINE (Aug. 8, 2025), *available at* https://www.harvardmagazine.com/commentary/harvard-international-students-necessary-campus-culture.

Beyond the classroom, international students leverage their experiences and perspectives to give back to local communities. Professor Reimers cited examples in which his international students utilized their backgrounds and knowledge of education systems in different countries to support underserved local communities. *See id.* In one example, the students prepared a report on how to support the growing population of children of Haitian immigrants in Gardner, a small city in North Central Massachusetts. *See id.* The students used their global experience to benefit the education leaders of a relatively isolated school district in Massachusetts.

In another example, a team of former teachers from Massachusetts, Japan, and Azerbaijan traveled to Holyoke, a Massachusetts town where 83.6% of students were low-income. *See id.* They proposed solutions for persistent absenteeism in

12

Holyoke schools that drew upon initiatives and strategies utilized in Japan and Azerbaijan. *See id.*

Harvard's international students also help drive Harvard student organizations that benefit local communities and lead community service programs. For example, the Phillips Brooks House Association (PBHA)—a student-led non-profit at Harvard that serves more than 1,000 low-income youth in the Cambridge and Boston areas—has a program that pairs Harvard students, including international students, with refugee youth in the Boston area for tutoring, English as a second language (ESL) instruction, and mentoring, often connecting students who share similar immigrant experiences. *Boston Refugee Youth Enrichment (BRYE) Extension*, PHILLIPS BROOKS HOUSE ASSOCIATION, https://www.pbha.org/programs/brye-extension (last visited Jan. 16, 2026).

Harvard's international students have made lasting contributions to local communities beyond the span of their student programs. Many students go on to become business owners, inventors, and even world leaders after graduation. With nearly half of Massachusetts' international students enrolled in a Master's program, and approximately 57% of international students nationwide pursuing STEM fields, it should come as no surprise that many international students at Harvard, MIT, and other Massachusetts universities form successful start-ups and develop innovative technologies with broad reaching impacts. Peter Ciurczak,

*Brain Gain: International Students in Massachusetts*, Boston Indicators (May 14, 2025), *available at* https://www.bostonindicators.org/article-pages/2025/may/international_students; *Open Doors 2025 Presentation*, Open Doors Data, https://opendoorsdata.org/wp-content/uploads/2025/11/OpenDoors25_PresentationPDF.pdf (last visited Jan. 16, 2026).

A 2016 study found that 21 of 87 U.S. billion-dollar companies at the time were founded by individuals who came to the United States as international students, with Harvard and MIT among the leading schools producing these entrepreneurs. Stuart Anderson, *International Students Who Started Billion-Dollar Companies*, International Educator (July–Aug. 2016), *available at* https://www.nafsa.org/sites/default/files/ektron/files/underscore/ie_julaug16_frontlines.pdf. Some foreign-born students who found major companies settle in or near Cambridge.

For example, Noubar Afeyan came to the United States from Canada to attend MIT and later founded Moderna; Mr. Afeyan now resides near Cambridge, in Lexington, Massachusetts. *See* Stuart Anderson, *International Students Are Founding America's Great Startups*, Forbes (Nov. 5, 2018), *available at* https://www.forbes.com/sites/stuartanderson/2018/11/05/international-students-are-founding-americas-great-startups/. This is not a recent phenomenon. French

immigrant Georges Doriot, known as "the father of venture capital," came to the United States to study at Harvard; settled in Cambridge; and made investments that paved the way for modern venture capitalism while in Cambridge. *See Innovation in Cambridge*, HISTORY CAMBRIDGE, https://historycambridge.org/self-guided-tours/innovation-in-cambridge/ (last visited Jan. 16, 2026).

A striking number of Harvard's international students have also become world leaders, including the Prime Minister of Canada, Mark Carney; the Prime Minister of Greece, Kyriakos Mitsotakis; and President of Moldova, Maia Sandu. Foster Wong, *These World Leaders Went to Harvard Before Trump's Foreign Student Ban*, BLOOMBERG (May 23, 2025), *available at* https://www.bloomberg.com/news/articles/2025-05-23/these-world-leaders-went-to-harvard-before-trump-s-foreign-student-ban. Dame Jacinda Ardern, the former Prime Minister of New Zealand, lived in Cambridge while teaching at Harvard and her daughter attended school in Cambridge during that time. *See* Kayla Webley Adler, *Jacinda Ardern Captured the World. And Then She Walked Away*, ELLE (Mar. 17, 2025), *available at* https://www.elle.com/culture/career-politics/a64147509/jacinda-ardern-new-zealand-prime-minister-interview-2025/. Whether international students and scholars ultimately settle down in the Cambridge area or move elsewhere after their time at Harvard, their contributions to Cambridge's culture, businesses, and reputation are felt long after they graduate.

While it is impossible to capture the full social and cultural impact of Harvard's international students on Cambridge and the surrounding area, it cannot be doubted that they play an integral role in shaping Cambridge's identity and ecosystem. Restricting this pipeline of cross-cultural ideas and entrepreneurial talent would undermine the city's diversity, intellectual vibrancy, and standing as a hub of innovation and cultural exchange. As a result, the public interest strongly favors affirming the District Court's injunction.

## II. The public interest further weighs in favor of injunctive relief because of the potential chilling effect on First Amendment rights.

As the District Court stated, "[t]he First Amendment prohibits government officials from relying on the threat of invoking legal sanctions and other means of coercion . . . to achieve the suppression of disfavored speech," and "a government official cannot directly or indirectly coerce a private party to punish or suppress disfavored speech on her behalf." A28 (internal quotation marks omitted) (quoting *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 176 (2024) and *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963)).

When the government mandates that a person "explicitly agree with government policy on a particular matter, it plainly violates the First Amendment." *New Hope Fam. Servs., Inc. v. Poole*, 966 F.3d 145, 170 (2d Cir. 2020); *see also Turner Broad. Sys., Inc. v. F.C.C.,* 512 U.S. 622, 641 (1994) ("Government action that stifles speech on account of its message, or that requires the utterance of a

particular message favored by the Government, contravenes this essential right."). But government actions that indirectly chill speech violate the First Amendment too: as Justice Thomas explained, plaintiffs have standing to challenge government actions that would cause them to "self-censor." *Speech First, Inc. v. Whitten*, 145 S. Ct. 701, 703 (2025) (Thomas, J., dissenting from denial of certiorari); *see also Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1120 (11th Cir. 2022) ("we simply ask whether the 'operation or enforcement', of the government policy would cause a reasonable would-be speaker to 'self censor'…even where the policy 'fall[s] short of a direct prohibition against the exercise of First Amendment rights'" (internal quotation marks and alterations omitted)).

Defendants' proposed actions are in retaliation for Harvard's speech, *see* A28-35, and would cause reasonable, would-be speakers to self-censor or adopt the speech favored by the federal government.  This potential chilling effect impacts Cambridge in at least two ways.

***First***, corporate entities like Harvard have First Amendment rights.  *See Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 343 (2010) (rejecting the argument that "political speech of corporations or other associations should be treated differently under the First Amendment simply because such associations are not 'natural persons'").  Moreover, "[a]cademic freedom, though not a specifically enumerated constitutional right, long has been viewed as a special concern of the

17

First Amendment." *Regents of the Univ. of Cal. v. Bakke*, 438 U.S. 265, 312 (1978); *see also Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 603 (1967) (academic "freedom is therefore a special concern of the First Amendment, which does not tolerate laws that cast a pall of orthodoxy over the classroom"). The Supreme Court has emphasized the importance of academic freedom in American universities and warned that "[t]o impose any strait jacket upon the intellectual leaders in our colleges and universities would imperil the future of our Nation." *Stand With US Ctr. for Legal Just. v. Mass. Inst. of Tech.*, 158 F.4th 1, 12 (1st Cir. 2025) (quoting *Sweezy v. N.H.*, 354 U.S. 234, 250 (1957) (plurality opinion)).

Defendants' proposed actions, if not enjoined, threaten to stifle the speech of, and academic freedom at, Harvard and other educational institutions, which might reasonably self-censor to avoid Harvard's fate. This chilling effect would have an outsized impact on Cambridge: again, in addition to being home to Harvard, Cambridge is home to MIT and other leading institutions. The innovation and educational opportunities created by these institutions are huge parts of what makes Cambridge so unique. *Why Cambridge*, CAMBRIDGE MASSACHUSETTS, https://cambridgeusa.org/why-cambridge/ (last visited Jan. 16, 2026). Accordingly, Cambridge would be severely harmed if the chilling effect resulting from Defendants' conduct undermined the exchange of ideas and academic freedom at Harvard and other educational institutions.

***Second***, Cambridge and other government entities have their own important right to engage in speech. "A government entity has the right to 'speak for itself'" and to "say what it wishes." *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 467-68 (2009). "Indeed, it is not easy to imagine how government could function if it lacked this freedom" to say what it wants and control its messages to the public. *Id.* at 468.

If the federal government can withhold benefits only it can bestow, such as student visas, to universities like Harvard because it disagrees with Harvard's exercise of its First Amendment rights, it could do the same to cities engaging in government speech with which the federal government disagrees, or could otherwise cause local governments to self-censor. This is not a partisan issue, but could apply to any presidential administration. If Defendants are not enjoined, one can imagine a future where, for example, presidential administrations routinely withhold federal benefits from local governments based on differing political positions or even simple speech, political or otherwise. If a presidential administration of either party could use federal benefits to dictate speech, state and local governments would "lack[] th[e] freedom" of speech needed for them to "function." *See Pleasant Grove*, 555 U.S. at 468.

Cambridge, its citizens, and the general public have a strong interest in ensuring that state and local governments and universities can exercise their speech

rights without fear of federal government reprisal.  The public interest lies in favor of affirming the District Court.

## CONCLUSION

For the foregoing reasons, the undersigned *amicus curiae* respectfully requests that this Court affirm the District Court's preliminary injunction.

Dated:        January 16, 2026              Respectfully submitted,

*/s/ Owen R. Wolfe*          ____

OWEN R. WOLFE                        DAWN R. SOLOWEY
SEYFARTH SHAW LLP                    SEYFARTH SHAW LLP
620 Eighth Avenue                    Seaport East, Suite 1200
New York, New York 10018             Two Seaport Lane
Telephone: (212) 218-3389            Boston, Massachusetts 02210
owolfe@seyfarth.com                  Telephone: (617) 946-4800
                                     dsolowey@seyfarth.com
MEGAN B. BAYER, CITY SOLICITOR
FRANZISKUS LEPIONKA, ASSISTANT CITY
SOLICITOR
CITY OF CAMBRIDGE
795 Massachusetts Avenue
Cambridge, Massachusetts 02139


*Attorneys for Amicus Curiae*

20

## CERTIFICATE OF COMPLIANCE

**1st Cir. Case Number(s): <u>25-1627</u>**

I am the attorney or self-represented party.

**This brief contains 3,951 words**, including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f).  The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief is an **amicus** brief and complies with the word limit of FRAP 29(a)(5).

Dated: January 16, 2026

*/s/ Owen R. Wolfe*
Owen R. Wolfe

## CERTIFICATE OF SERVICE

I hereby certify that on January 16, 2026, I electronically filed the foregoing Amicus Brief with the Clerk of the Court for the United States Court of Appeals for the First Circuit by using the appellate CM/ECF system, which caused a copy of the same to be served on counsel of record by email.


*/s/ Owen R. Wolfe*
Owen R. Wolfe