**No. 25-1627**

In The

# United States Court of Appeals for the First Circuit

———————————

PRESIDENT AND FELLOWS OF HARVARD COLLEGE,

*Plaintiff - Appellee*,

v.

UNITED STATES DEPARTMENT OF HOMELAND SECURITY, KRISTI NOEM, in her official capacity as Secretary of the United States Department of Homeland Security; UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT; TODD LYONS, in his official capacity as Acting Director of United States Immigration and Customs Enforcement; STUDENT AND EXCHANGE VISITOR PROGRAM; JOHN DOE, in their official capacity as Director of the Student and Exchange Visitor Program; JAMES HICKS, in his official capacity as Deputy Assistant Director of the Student and Exchange Visitor Program; UNITED STATES DEPARTMENT OF JUSTICE; PAMELA BONDI, in her official capacity as Attorney General of the United States; UNITED STATES DEPARTMENT OF STATE; MARCO RUBIO, in his official capacity as Secretary of the United States Department Of State,

*Defendants - Appellants*.

———————————

# BRIEF OF *AMICI CURIAE* AMERICAN COUNCIL ON EDUCATION AND 22 OTHER HIGHER EDUCATION ORGANIZATIONS IN SUPPORT OF PLAINTIFF-APPELLEE

———————————

On Appeal from the United States District Court for the District of Massachusetts
Case No. 1:25-cv-10338-AK

———————————

JESSICA L. ELLSWORTH
STEPHANIE J. GOLD
REEDY C. SWANSON
ERIC ROYTMAN-CASH
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-5600
jessica.ellsworth@hoganlovells.com

January 20, 2026

*Counsel for Amici Curiae*

## RULE 26.1 DISCLOSURE STATEMENT

*Amici* have no parent companies, and no publicly-owned corporation owns 10% or more of their stock.

/s/ Jessica L. Ellsworth
Jessica L. Ellsworth

# TABLE OF CONTENTS

                                                                                Page

RULE 26.1 DISCLOSURE STATEMENT.................................................................i

TABLE OF AUTHORITIES ...................................................................... iii

STATEMENT OF INTEREST OF *AMICI CURIAE* ................................................1

ARGUMENT ........................................................................................1

I.      Institutional Autonomy In Higher Education Is A Bedrock
        Principle In American Law, And It Delivers Concrete
        Benefits For The Nation ...............................................................4

II.     The Proclamation Is Fundamentally Inconsistent With
        Institutional Autonomy—At Harvard And Other Educational
        Institutions Across The Country.................................................8

III.    The Administration's Retaliatory Actions Against Harvard
        Are Unconstitutional And Set A Dangerous Precedent For
        All Institutions Of Higher Education .....................................11

CONCLUSION ...................................................................................15

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

<div align="right">Page</div>

### CASES:

*Asociación de Educación Privada de P.R., Inc. v. García-Padilla*,
490 F.3d 1 (1st Cir. 2007)..........................................................................4, 10

*Hosty v. Carter*,
412 F.3d 731 (7th Cir. 2005) ..........................................................................4

*Joint Anti-Fascist Refugee Comm. v. McGrath*,
341 U.S. 123 (1951)......................................................................................14

*Keyishian v. Board of Regents of Univ. of State of N.Y.*,
385 U.S. 589 (1967).......................................................... 1, 3-5, 7

*Knox v. Service Emps. Int'l Union, Local 1000*,
567 U.S. 298 (2012)......................................................................................13

*Lieberman v. Gant*,
630 F.2d 60 (2d Cir. 1980) ............................................................................7

*Moody v. NetChoice, LLC*,
603 U.S. 707 (2024)..................................................................................11, 12

*National Rifle Ass'n of Am. v. Vullo*,
602 U.S. 175 (2024)......................................................................................12

*President & Fellows of Harvard Coll. v. United States
Dep't of Health & Human Servs.*,
798 F. Supp. 3d 77 (D. Mass. 2025).........................................................9, 10

*Regents of Univ. of Mich. v. Ewing*,
474 U.S. 214 (1985)........................................................................................5

*Students for Fair Admissions, Inc. v. President & Fellows
of Harvard Coll.*,
600 U.S. 181 (2023)........................................................................................7

*Sweezy v. New Hampshire*,
354 U.S. 234 (1957)..............................................................................2, 4, 12

## TABLE OF AUTHORITIES—CONTINUED

Page(s)

*United States v. Alvarez,*
    567 U.S. 709 (2012)...................................................................15

*West Virginia State Bd. of Educ. v. Barnette*,
    319 U.S. 624 (1943)...................................................................15

*Whitney v. California*,
    274 U.S. 357 (1927)...................................................................15

STATUTES:

42 U.S.C. § 2000d ............................................................................8

42 U.S.C. § 2000d-1 .........................................................................8

42 U.S.C. § 2000d-2 .........................................................................8

REGULATION:

34 C.F.R. subtit. B, pt. 100 .............................................................8

CONSTITUTIONAL PROVISIONS:

U.S. Const. amend. I ................................................................*passim*

U.S. Const. amend. V .......................................................................8

OTHER AUTHORITIES:

Philippe Aghion et al., *The Governance and Performance of Research*
    *Universities: Evidence from Europe and the U.S.*, Nat'l Bureau
    of Econ. Research, Working Paper No. 14851 (Apr. 2009)...........................5

Emily G. Blevins, *Pricing & March-In Rights Under the Bayh-Dole*
    *Act*, Cong. Rsch. Serv. IF12582 (Dec. 3, 2024) ...........................................10

Center for World Univ. Rankings, *Global 2000 List 2025 Edition*........................13

iv

## TABLE OF AUTHORITIES—CONTINUED

Page(s)

CNBC Television, *Education Secretary Linda McMahon to Harvard: Obey the Law and You Can Be Eligible for Funding*, YouTube (May 7, 2025) .........................................................................11, 12

Jonathan R. Cole, *The Great American University: Its Rise to Preeminence, Its Indispensable National Role, Why It Must Be Protected* (PublicAffairs 2010) ............................................ 5-7, 13

Higher Ed Dive, *Harvard's Operations Lost $112.6M in FY25 Amid Trump's Pressure Campaign* (Oct. 17, 2025) ................................14

Letter from Howard Lutnick to Dr. Alan M. Garber (Aug. 8, 2025) .....................10

Michael W. McConnell, *Academic Freedom in Religious Colleges and Universities*, 53 Law & Contemp. Probs. 303 (1990) ..............................6

Gustavo Morello, *The Catholic Church and Argentina's Dirty War* (Oxford Univ. Press 2015)...............................................................13

Kristi Noem, Sec'y, U.S. Dep't of Homeland Sec., to Maureen Martin, Harvard Univ., *Harvard's Student and Exchange Visitor Program Decertification* (May 22, 2025) ..........................................9

Fran O'Leary, *University Ag Innovation Hubs Under Threat*, FarmProgress (June 22, 2021) ....................................................6

Staff Writers, *From Campus to Combat: How University Research Is Revolutionizing Defense Technology*, EnvZone (Dec. 16, 2024) ..................6

The White House, *President Trump Participates in a Cabinet Meeting*, YouTube (Apr. 30, 2025) .........................................10, 11

Times Higher Education, *World University Rankings 2026* ...................................13

United States Dep't of Educ., *U.S. Department of Education's Office for Civil Rights Sends Letters to 60 Universities Under Investigation for Antisemitic Discrimination and Harassment*....................14

v

## STATEMENT OF INTEREST OF *AMICI CURIAE*[1]

*Amicus* American Council on Education (ACE) is joined on this amicus brief in support of Harvard University by 22 associations of colleges, universities, educators, trustees, and other representatives of American higher education. A list of all *amici* is in the addendum to this brief. *Amici*, whose members include public, independent, large, small, urban, rural, denominational, non-denominational, graduate, and undergraduate institutions throughout the United States, submit this brief to explain how the Administration's actions against Harvard threaten the autonomy of institutions throughout American higher education and impose unacceptable costs on society as a whole. The District Court's injunction should be affirmed.

## ARGUMENT

The United States Supreme Court has long held that "[t]he vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools." *Keyishian v. Board of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 603 (1967). Its precedents recognize that "[t]he classroom is peculiarly 'the marketplace of ideas.'" *Id.* The First Amendment plays a critical role in allowing that

---

[1] All parties have consented to the filing of this brief. This brief was authored entirely by counsel for amici; no party or party's counsel contributed money intended to fund the brief's preparation or submission; and no person other than *amici* contributed money intended to fund the brief's preparation or submission.

marketplace to survive and thrive by protecting the autonomy of educational institutions to determine for themselves where they fit in the rich mosaic of higher education in America. Over this country's last two and half centuries, those protections have made possible the development of a remarkable spectrum of colleges and universities—from religious schools, to community colleges, to trade schools, to small liberal arts schools, to large research institutions. "To impose any strait jacket upon" these institutions and "the vital role in a democracy" that they play "would imperil the future of our Nation." *Id.* (quoting *Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957) (plurality op.)).

This case presents a vital test for these First Amendment principles. Over the last year, the current Administration has engaged in an unprecedented effort to coerce institutions of higher education to behave in a manner that reflects the Administration's preferred ideology, including by reshaping their faculty, curriculum, and student body. When Harvard resisted the Administration's unlawful demands, the Administration retaliated with extreme sanctions, including the Proclamation at issue in this appeal. The Proclamation is blunt and succinct: It prohibits any foreign national from entering the United States for the purpose of attending Harvard.

*Amici* are steadfast in the view that it is essential for colleges and universities to support a wide spectrum of thought. Higher education, after all, should facilitate

2

"that robust exchange of ideas which discovers truth out of a multitude of tongues." *Keyishian*, 385 U.S. at 603 (quotation marks omitted).  When universities fall short of this ideal, they can and should be held accountable.

But that does not permit any political actor—past, present, or future—to impose by executive fiat "a pall of orthodoxy over the classroom." *Id.*  Yet that is exactly what the current Administration seeks to do at Harvard.  Its actions are dangerous—not just for Harvard, and not just for higher education, but for the nation as a whole.  Every American enjoys the concrete benefits that have resulted from the autonomy embedded in, and enabling the missions of, our colleges and universities.  This institutional autonomy has resulted in major breakthroughs in medicine, technology, and—especially relevant to this case—the development of varied environments for higher education, from research universities to religious schools and community colleges.  The whole country will bear the cost if that autonomy is dismantled.

The Administration's actions at issue in this case are directed at Harvard, but they reverberate throughout every state in the nation.  If the federal government may punish a university for its perceived ideology or that of its students, then the marketplace of ideas collapses into a monopoly of dogma.  That is the antithesis of America's constitutional values, and it jeopardizes the richness of the spectrum of higher education that has long been one of our country's greatest strengths.

I.    **INSTITUTIONAL AUTONOMY IN HIGHER EDUCATION IS A BEDROCK PRINCIPLE IN AMERICAN LAW, AND IT DELIVERS CONCRETE BENEFITS FOR THE NATION.**

Institutional autonomy in higher education, which is "a special concern of the First Amendment," *Keyishian*, 385 U.S. at 602-603, includes a university's right to "manage an academic community and evaluate teaching and scholarship free from interference by . . . units of government," *Hosty v. Carter*, 412 F.3d 731, 736 (7th Cir. 2005) (en banc) (Easterbrook, J.).  In other words, the First Amendment protects "four essential freedoms of a university—to determine for itself on academic grounds who may teach, what may be taught, how it shall be taught, and who may be admitted to study." *Asociación de Educación Privada de Puerto Rico, Inc. v. García-Padilla*, 490 F.3d 1, 9-10 (1st Cir. 2007) (quoting *Sweezy*, 354 U.S. at 263 (Frankfurter, J., concurring)).

These freedoms are "of transcendent value to all of us." *Id.* at 8 (quoting *Keyishian*, 385 U.S. at 603).  Indeed, institutional autonomy plays a "vital role in a democracy" by ensuring "[t]eachers and students … remain free to inquire, to study and to evaluate, [and] to gain new maturity and understanding." *Sweezy*, 354 U.S. at 250 (plurality op.).  The "Nation's future," after all, requires "leaders trained through wide exposure to th[e] robust exchange of ideas," "[rather] than through any kind of authoritative selection." *Keyishian*, 385 U.S. at 603.  By ensuring that "laws [do not] cast a pall of orthodoxy over the classroom," institutional autonomy creates

"breathing space" for the full range of colleges and universities: secular, religious, public, private, STEM-focused, liberal-arts-focused, community colleges, and everything in between. *Id.* at 604.

As part of this rich mosaic, schools are permitted (within the bounds of law) to admit students who align with their institutional missions and priorities. STEM-focused schools may seek out STEM-focused students. Religious schools and other institutions organized around a particular set of values may admit the students who best serve their mission. Because a college campus "is peculiarly the marketplace of ideas," *Keyishian*, 385 U.S. at 603 (quotation marks omitted), universities compete in that marketplace in part by choosing "who may be admitted to study," *Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 226 & n.12 (1985).

This competitive environment drives innovation and success. American universities are "obvious positive outliers in performance" because "autonomy and competition increase the inventive output" of universities. Philippe Aghion et al., *The Governance and Performance of Research Universities: Evidence from Europe and the U.S.*, Nat'l Bureau of Econ. Research, Working Paper No. 14851, at 1, 28 (Apr. 2009). America's tradition of institutional autonomy has allowed universities to "evolve[] into creative machines unlike any other," "cranking out information and discoveries." Jonathan R. Cole, *The Great American University: Its Rise to Preeminence, Its Indispensable National Role, Why It Must Be Protected* 4

5

(PublicAffairs 2010).  Indeed, independent research drives national achievement in biomedical engineering, medicine, genetics, technological development, national defense, food production, and more.  *Id.* at 207-298.

The fruits of that innovation are ubiquitous and world-changing—from the engineering underlying GPS to the "algorithm for Google searches," from MRI technology to DNA fingerprinting.  *Id.* at 4.  Because universities have historically been able to enroll students, hire faculty, and pursue research without fear of government backlash, they have delivered agricultural innovations, such as corn hybrids, soybean varieties, and even the Honeycrisp apple.  *See* Fran O'Leary, *University Ag Innovation Hubs Under Threat*, FarmProgress (June 22, 2021).[2]  The Department of Defense has a long history of benefitting from research projects led by universities, which can and do take on the kind of "high-risk, high-reward research projects" that the private sector often shies away from.  Staff Writers, *From Campus to Combat: How University Research is Revolutionizing Defense Technology*, EnvZone (Dec. 16, 2024).[3]  And institutional autonomy allows faculty at religious schools to "teach and research within the parameters of the religious tradition."  Michael W. McConnell, *Academic Freedom in Religious Colleges and Universities*, 53 Law & Contemp. Probs. 303, 306 (1990).

---

[2] https://www.farmprogress.com/technology/university-ag-innovation-hubs-under-threat.

[3] https://perma.cc/XX26-TAD8.

These innovations are "the *sine qua non* for [this nation's] greatness," Cole, *Great American University*, supra, at 5, and they did not fall out the sky. Rather, they are the product of a fundamental commitment to a "long tradition" of institutional autonomy. *Lieberman v. Gant*, 630 F.2d 60, 67 (2d Cir. 1980) (Friendly, J.).

It is this tradition—and the extraordinary opportunities it offers—that makes American higher education the destination of choice for students from around the world. In turn, those who come from abroad to study and research in the United States enrich and strengthen our country in innumerable ways. As the Supreme Court has explained, truth emerges "out of a multitude of tongues," *Keyishian*, 385 U.S. at 683 (quotation marks omitted), and it is "commendable" for schools to "prepar[e] graduates to adapt to an increasingly pluralistic society" and "broaden[] and refin[e] understanding" across cultures. *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 214 (2023) (quotation marks omitted). But these benefits are unattainable when schools are prohibited from enrolling international students because they do not pass the government's ideological litmus test.

None of this makes universities and colleges beyond reproach or above the law. Universities should be receptive to thoughtful criticism and accountable when they fall short. And Congress has mandated that colleges and universities that

receive federal funding must comply with certain federal laws—including that they do not unlawfully discriminate in violation of Title VI, *see* 42 U.S.C. § 2000d.  These obligations are enforceable through procedures dictated by statute and regulation, which must themselves comply with the constitutional guarantee of due process. *See, e.g.*, 42 U.S.C. §§ 2000d-1, 2000d-2; 34 C.F.R. subtit. B, pt. 100; U.S. Const. amend. V.  But the Executive Branch cannot act without regard to those lawful processes.  And it certainly cannot coerce a school into surrendering its core institutional rights purely because it disagrees with the perceived ideology of an institution, its faculty members, or its student body.

## II.     THE PROCLAMATION IS FUNDAMENTALLY INCONSISTENT WITH INSTITUTIONAL AUTONOMY—AT HARVARD AND OTHER EDUCATIONAL INSTITUTIONS ACROSS THE COUNTRY.

Last year, the Administration came to several universities, including Harvard, with a list of demands.  Those demands included, among other things, commissioning a government-approved third party to "audit" the school's staff for "viewpoint diversity," reforming "every department or field found to lack viewpoint diversity," revising its recruitment to promote the current Administration's understanding of "American values," and ending support for student groups with which the Administration did not agree.  App'x 32-36.

Harvard refused.  The Administration then requested that Harvard provide certain information for "each student visa holder" across Harvard's 13 schools

8

within ten business days.  App'x 125.  Failure to do so "within the timeframe provided" would be "treated as a voluntary withdrawal" from the exchange-student visa program altogether.  *Id.*  Harvard did its best—gathering and providing all the information it could within ten days.  *Id.*; *see* Harvard Br. 14 (describing the "competing obligations" universities must balance when "producing educational records to the government").  But the Administration stated without further explanation that the response was "insufficient," and it revoked Harvard's visa certification.  App'x 125.

The letter announcing Harvard's decertification is candid in confessing the Administration's ideological motives, stating that the Administration intended "to send a clear signal to Harvard and all universities . . . that the Trump Administration will . . . root out the evils of" what it calls "anti-Americanism in society and campuses."  Kristi Noem, Sec'y, U.S. Dep't of Homeland Sec., to Maureen Martin, Harvard Univ., *Harvard's Student and Exchange Visitor Program Decertification* (May 22, 2025).  The Administration then issued the challenged Proclamation, barring foreign students from entering the country for the specific purpose of studying at Harvard.  App'x 111-112.

The Administration also targeted Harvard in other ways after Harvard refused its demands, including by freezing its federal grant funding and threatening its tax-exempt status.  *See President & Fellows of Harvard Coll. v. United States Dep't of*

9

*Health & Human Servs.*, 798 F. Supp. 3d 77, 91-92 (D. Mass. 2025).  It has also threatened to undermine Harvard's patent rights for inventions funded in part by federal grants, invoking a law that has never been used for that purpose in the nearly 50 years since it was adopted.  *See* Letter from Howard Lutnick to Dr. Alan M. Garber (Aug. 8, 2025)[4]; Emily G. Blevins, *Pricing & March-in Rights Under the Bayh-Dole Act*, Cong. Rsch. Serv. IF12582 (Dec. 3, 2024) (noting the Government has never attempted to exercise these powers before).[5]  In other words, the Administration sought to leverage multiple aspects of federal power to undermine Harvard's "essential freedoms"—"who may teach, what may be taught, how it shall be taught, and who may be admitted to study."  *García-Padilla*, 490 F.3d at 9-10.

All the while, the President and Administration officials made numerous statements confirming the Administration's motives and objective: to coerce Harvard into surrendering its institutional autonomy.  At a public cabinet meeting in April 2025, Education Secretary Linda McMahon and Homeland Security Secretary Kristi Noem discussed with President Trump the funding freeze and requests for information regarding Harvard's foreign students.  The President responded, "Good . . . [t]he students they have, the professors they have, the attitude they have, is not American." The White House, *President Trump Participates in a Cabinet Meeting*,

---

[4] https://perma.cc/4SVC-ZLWA.
[5] https://www.congress.gov/crs-product/IF12582.

YouTube, at 1:23:20-26 (Apr. 30, 2025).[6]  Secretary McMahon later reiterated this viewpoint in a TV interview, asking whether Harvard is "vetting students who are coming in from outside of the country to make sure they're not activists?  Are they vetting professors that they're hiring to make sure that they're not teaching ideologies, but that they're teaching subject matter?"  CNBC Television, *Education Secretary Linda McMahon to Harvard: Obey the Law and You Can Be Eligible for Funding*, YouTube, at 1:04-31 (May 7, 2025) ("CNBC Interview").[7]  McMahon explained that because Harvard had "taken a very hard line" in refusing the Administration's demands, the Administration "took a hard line back."  *Id.*  The result has been, as Harvard aptly puts it, a steady "drumbeat of openly discriminatory investigations, record requests, and funding cut-offs."  Harvard Br. 28.

## III.    THE ADMINISTRATION'S RETALIATORY ACTIONS AGAINST HARVARD ARE UNCONSTITUTIONAL AND SET A DANGEROUS PRECEDENT FOR ALL INSTITUTIONS OF HIGHER EDUCATION.

The Administration's retaliation against Harvard is unconstitutional.  "[I]n case after case," the Supreme Court "has barred the government from" efforts "to rejigger the expressive realm."  *Moody v. NetChoice, LLC*, 603 U.S. 707, 733 (2024).  "However imperfect the private marketplace of ideas" might be, it is far worse for the government to decide that speech is "imbalanced" and coerce "speakers to

---

[6] https://perma.cc/H89V-3XXM.

[7] https://perma.cc/E5AM-8ZSC.

provide more of some views or less of others." *Id.* Such viewpoint discrimination "is uniquely harmful to a free and democratic society." *National Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 187 (2024). And the government cannot leverage discretionary benefits to achieve these impermissible ends—that is, "a government official cannot do indirectly what she is barred from doing directly." *Id.* at 190.

The Proclamation at issue in this appeal flouts these basic principles. Its goal is to "rejigger the expressive realm" in higher education. *Moody*, 603 U.S. at 733. The Administration sees Harvard's students as too "activist" and its professors as invested in teaching the wrong "ideologies." CNBC Interview. And in response to Harvard's resistance to the Administration's demand to vet on ideological grounds Harvard's student body, the Administration is leveraging state power to coerce Harvard "to provide more of some views [and] less of others," *Moody*, 603 U.S. at 733.

History teaches what lies down this path. "Scholarship cannot flourish in an atmosphere of suspicion and distrust," and a "university ceases to be true to its own nature if it becomes the tool of . . . [the] State." *Sweezy*, 354 U.S. at 250 (plurality op.); *Id.* at 263 (Frankfurter, J., concurring). Indeed, when educational institutions come "under the thumb of external political forces," "[s]ound science" gives way to "unsubstantiated belief." Cole, *Great American University*, supra, at 349. And the costs to society can be dire: Before 1933, "German universities were the best in the

world," *id.* at 4, but now they struggle to creep into the top thirty. *See, e.g.*, Times Higher Education, *World University Rankings 2026*;[8] Center for World Univ. Rankings, *Global 2000 List 2025 Edition*.[9]  A similar story played out in the Soviet Union, where in the 1930s the government stifled scientific advances deemed "antithetical to the state's political ideology."  Cole, *Great American University*, supra, at 347-349.  And in Argentina, where the government's military junta attacked dissident Catholic seminarians in the 1970s.  *See* Gustavo Morello, *The Catholic Church and Argentina's Dirty War* 13-16 (Oxford Univ. Press 2015).  Actions such as these undermine democracy itself by preventing the free exchange of ideas—both within the higher-education community and beyond it—that is essential to "our Nation's commitment to self-government."  *Knox v. Service Emps. Int'l Union, Local 1000*, 567 U.S. 298, 308 (2012).

Even if one agrees with the current Administration's criticisms of Harvard's academic community, what happens when the shoe is on the other foot down the road?  The pendulum of politics will inevitably swing in another direction.  When it does, are colleges and universities, together with their faculty, researchers and students, forced to swing with it?  A future administration might, for example, encourage universities to fire professors critical of government policy, suppress

---

[8] https://perma.cc/HQ6V-DFSC.
[9] https://perma.cc/ZYQ2-JN63.

research that contradicts government narratives, or condition government financial aid on the adoption of ideologically approved curricula. If the actions here are permissible, then it is hard to see how those actions could be distinguished.

If the Executive Branch can put Harvard on a "proclaimed governmental blacklist[]," no university is safe. *Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 143-144 (1951) (Black, J., concurring). After all, relatively speaking, Harvard is fortunate. It has substantial resources to resist these incursions on its autonomy through litigation—and to withstand financial consequences in the meantime. *See, e.g.*, Higher Ed Dive, *Harvard's Operations Lost $112.6M in FY25 Amid Trump's Pressure Campaign* (Oct. 17, 2025) (noting Harvard reported a $112 million operating deficit in FY 2025, its first since the pandemic).[10] But the Administration is also targeting numerous other institutions—public and private, large and small, religious and secular. *See, e.g.*, United States Dep't of Educ., *U.S. Department of Education's Office for Civil Rights Sends Letters to 60 Universities Under Investigation for Antisemitic Discrimination and Harassment*.[11] Many of these schools are not as well positioned to withstand the Administration's punitive approach, even for a short time.

---

[10] https://perma.cc/4TVX-N5GX.

[11] https://perma.cc/AUK6-7VU8.

The concern is very real, and the stakes are very high.  That is why it is so important to remember and vigorously support the premise that—in *this* country— the remedy for viewpoints the government disfavors must be "more speech, not enforced silence."  *United States v. Alvarez*, 567 U.S. 709, 727-728 (2012) (quoting *Whitney v. California*, 274 U.S. 357, 377 (1927) (Brandeis, J., concurring)).  It is essential for this court to reaffirm "that no official, high or petty, can prescribe what shall be orthodox" in American higher education.  *West Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943).

## CONCLUSION

For these reasons and those in Plaintiff-Appellee's brief, this Court should affirm.

<div style="margin-left:40%">

Respectfully submitted,

/s/ Jessica L. Ellsworth
JESSICA L. ELLSWORTH
STEPHANIE J. GOLD
REEDY C. SWANSON
ERIC ROYTMAN-CASH
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-5600
jessica.ellsworth@hoganlovells.com

</div>

January 20, 2026

<div style="margin-left:40%">

*Counsel for Amici Curiae*

</div>

## CERTIFICATE OF COMPLIANCE

1.      This document complies with the type-volume limits of Fed. R. App.

P. 32(a)(7) and Fed. R. App. P. 29(a)(5) because, excluding the parts of the document

exempted by Fed. R. App. P. 32(f), this document contains 4,622 words (including

the addendum).

2.      This document complies with the typeface requirements of Fed. R. App.

P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this

document has been prepared in a proportionally spaced typeface using Microsoft

Word 2010 in 14-point Times New Roman.


/s/ Jessica L. Ellsworth
Jessica L. Ellsworth

## CERTIFICATE OF SERVICE

I certify that on January 20, 2026, the foregoing was electronically filed through this Court's CM/ECF system, which will send a notice of filing to all registered users.

/s/ Jessica L. Ellsworth
Jessica L. Ellsworth

**ADDENDUM**

The **American Council on Education (ACE)** is a membership organization that leads higher education with a united vision for the future, galvanizing its members to make change and collaborating across the sector to design solutions for today's challenges, serve the needs of a diverse student population, and shape effective public policy.  As the major coordinating body for the nation's colleges and universities, its strength lies in its diverse membership of nearly 1,600 colleges and universities, related associations, and other organizations in America and abroad. ACE is the only major higher education association to represent all types of U.S. accredited, degree-granting colleges and universities.
www.acenet.edu/About/Pages/default.aspx

The **American Association of Community Colleges (AACC)** is the primary advocacy organization for the nation's community colleges. It represents the more than 1,000 regionally accredited, associate degree-granting institutions.
www.aacc.nche.edu/about-us/

The **American Association of State Colleges and Universities (AASCU)** is a Washington, D.C.-based higher education association that represents the sector of over 500 regional public colleges, universities, and systems whose members share a learning- and teaching-centered culture, a historic commitment to serving today's students, and a dedication to research and creativity that advances their regions' economic progress and cultural development. These are institutions delivering America's promise.
www.aascu.org/our-organization/

The **American Speech-Language-Hearing Association (ASHA)** is the national professional, scientific, and credentialing association for 241,000 members and affiliates who are audiologists; speech-language pathologists; speech, language, and hearing scientists; audiology and speech-language pathology support personnel; and students. Audiologists specialize in preventing and assessing hearing and balance disorders as well as providing audiologic treatment, including hearing aids. Speech-language pathologists identify, assess, and treat speech and language problems, including swallowing disorders.
www.asha.org/about

The **Association of American Medical Colleges (AAMC)** is a nonprofit association dedicated to improving the health of people everywhere through medical education, clinical care, biomedical research, and community collaborations. Its members are all 162 U.S. medical schools accredited by the Liaison Committee on Medical Education; nearly 500 academic health systems and teaching hospitals; and more

than 70 academic societies. Through these institutions and organizations, the AAMC leads and serves America's medical schools, academic health systems and teaching hospitals, and the millions of individuals across academic medicine, including more than 210,000 full-time faculty members, 99,000 medical students, 162,000 resident physicians, and 60,000 graduate students and postdoctoral researchers in the biomedical sciences.

www.aamc.org/about-us

The **Association of American Universities (AAU)** was founded in 1900 and is composed of America's leading research universities. AAU's member universities earn the majority of competitively awarded federal funding for research that improves public health, seeks to address national challenges, and contributes significantly to our economic strength, while educating and training tomorrow's visionary leaders and innovators. Its members include 69 public and private research universities in the United States.

www.aau.edu/who-we-are-americas-leading-research-universities

The **Association of Governing Boards of Universities and Colleges (AGB)** believes in the power of higher education to transform lives, strengthen inclusive democracy, and support a thriving society. We believe that strong higher education starts with great governing boards. AGB provides advocacy, leading practices, educational resources, expert support, and renowned programs that advance board excellence for 40,000 AGB members from more than 2,000 institutions and foundations. For more than 100 years, AGB has been the trusted authority for board members, chief executives, board professionals, and key administrators on higher education governance and leadership.

www.agb.org/about-us/

The **Association of Jesuit Colleges and Universities (AJCU)** represents all 27 Jesuit institutions in the U.S. (and one in Belize) and is affiliated with over 180 Jesuit institutions worldwide.

www.ajcunet.edu/about/

The **Association of Research Libraries (ARL)** is a nonprofit membership organization of research libraries and archives in major public and private universities, federal government agencies, and large public institutions in the U.S. and Canada. ARL champions research libraries and archives, develops visionary leaders, and shapes policy for the equitable advancement of knowledge.

www.arl.org/who-we-are/

The **College and University Professional Association for Human Resources (CUPA-HR)**, the voice of human resources in higher education, represents more than 24,000 human resources professionals at more than 1,700 colleges and universities. Its membership includes 87 percent of all United States doctoral institutions, 63 percent of all master's institutions, 57 percent of all bachelor's institutions, and over 550 two-year and specialized institutions.
www.cupahr.org/about/

**Council for Advancement and Support of Education (CASE)** is the global nonprofit association dedicated to educational advancement—alumni relations, communications, development, marketing, and advancement services—and championing education to transform lives and society.
www.case.org/about-case

The **Council of Academic Programs in Communication Sciences and Disorders (CAPCSD)** is a membership organization with over 350 communication sciences and disorders programs from the United States, Canada, Puerto Rico, and New Zealand. Member programs offer degrees in communication sciences and disorders, including undergraduate, graduate, and doctoral programs.
www.capcsd.org/about-capcsd/

The **Council of Independent Colleges (CIC)** is an association of more than 700 nonprofit independent colleges and universities, state-based councils of independent colleges, and other higher education affiliates, that works to support college and university leadership, advance institutional excellence, and enhance public understanding of independent higher education's contributions to society.
www.cic.edu/about/what-we-do/

**Council on Governmental Relations (COGR)**, an association of over 230 public and private research universities, affiliated medical centers, and independent research institutes, is a national authority on federal policies and regulations affecting U.S. research institutions.
www.cogr.edu

The **Educational Testing Service (ETS)** is a global education and talent solutions organization whose mission is to advance the science of measurement to power human progress, aligning research, assessment, and innovation to expand opportunity worldwide. ETS has also committed to readying 100M+ people for the next generation of jobs by 2035, linking education and workforce readiness at a global scale. Through world leading assessments, research institutes, AI driven

measurement science, and partnerships with governments, institutions, and employers, ETS develops and delivers solutions that help learners demonstrate skills, inform policy, and improve outcomes across education and work.
www.ets.org/about.html

**EDUCAUSE** is a nonprofit association comprised of approximately 2,100 colleges, universities, and related organizations. EDUCAUSE's mission is to lead the way, advancing the strategic use of technology and data to further the promise of higher education. We connect and empower our member community through insights, advocacy, resources, and learning opportunities to anticipate trends and strengthen professional practice. We believe in inspiring the transformation of higher education in service to a greater good.
www.educause.edu

The **Middle States Commission on Higher Education (MSCHE)** is a global institutional accreditor recognized by the United States Secretary of Education since 1952. As an accreditor and member of the regulatory triad, MSCHE assures students and the public of the educational quality for its over 500 institutions of higher education.
www.msche.org/about-us/

**NAFSA: Association of International Educators** is the world's largest and most comprehensive nonprofit association dedicated to international education and exchange. NAFSA promotes policies that ensure the continued growth and impact of global learning, cultural exchange, and mutual understanding through study abroad, international student services, and campus internationalization. NAFSA serves the needs of more than 11,000 members and international educators worldwide at more than 4,300 institutions in 170+ countries.
www.nafsa.org

**NASPA: Student Affairs Administrators in Higher Education (NASPA)** is the leading voice of student affairs, driving innovation and evidence based, student-centered practice throughout higher education, nationally and globally.
www.naspa.org/about/about-naspa

**The National Association for College Admission Counseling (NACAC)**, founded in 1937, is a global organization of more than 28,000 professionals dedicated to supporting students as they navigate choices about pursuing postsecondary education. NACAC empowers college admission counseling

professionals through education, advocacy, and community, and advances a vision in which the transformative power of postsecondary education is accessible to all. www.nacacnet.org/who-we-are/

The **National Association of Independent Colleges and Universities (NAICU)** serves as the unified national voice of private, non-profit higher education in the United States.  With more than 5 million students attending 1,700 independent colleges and universities in all 50 states, the private sector of American higher education has a dramatic impact on our nation's larger public interests. www.naicu.edu/about-naicu/

Since its founding in 1776, **Phi Beta Kappa** has celebrated excellence in the liberal arts and sciences and championed freedom of thought and diversity of opinion. Phi Beta Kappa is a nonprofit membership organization with over 500,000 members worldwide and chapters at over 290 colleges and universities in the United States. As America's most prestigious academic honor society, Phi Beta Kappa advocates for the value and benefits of liberal arts and sciences education. www.pbk.org/about

**University Risk Management and Insurance Association (URMIA)** promotes the advancement and application of effective risk management principles and practices in institutions of higher education. www.urmia.org/about/abouturmia