Case No. 25-1627

---

# In the United States Court of Appeals
# For the First Circuit

---

**PRESIDENT AND FELLOWS OF HARVARD COLLEGE**,

*Plaintiff-Appellee,*

v.

**UNITED STATES DEPARTMENT OF HOMELAND SECURITY**, **KRISTI NOEM**, in her official capacity as Secretary of the United States Department of Homeland Security; **UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT**; **TODD LYONS**, in his official capacity as Acting Director of United States Immigration and Customs Enforcement; **STUDENT AND EXCHANGE VISITOR PROGRAM**; **JOHN DOE**, in their official capacity as Director of the Student and Exchange Visitor Program; **JAMES HICKS**, in his official capacity as Deputy Assistant Director of the Student and Exchange Visitor Program; **UNITED STATES DEPARTMENT OF JUSTICE**; **PAMELA BONDI**, in her official capacity as Attorney General of the United States; **UNITED STATES DEPARTMENT OF STATE**; **MARCO RUBIO**, in his official capacity as Secretary of the United States Dep't Of State,

*Defendants-Appellants.*

---

*On Appeal from the United States District Court for the District of Massachusetts; Judge Allison Burroughs, Case No. 1:25-cv-11472-ADB*

---

## REPLY BRIEF FOR DEFENDANTS-APPELLANTS

---

**BRETT A. SHUMATE**
Assistant Attorney General

**DREW ENSIGN**
Deputy Assistant Attorney General

**CATHERINE M. RENO**
Acting Assistant Director

**EVAN P. SCHULTZ**
Trial Attorney

**TIBERIUS T. DAVIS**
Counsel to the Assistant Attorney General, Civil Division
P.O. Box 878, Ben Franklin Station
Washington, D.C. 20044
Tel. (202) 514-4357
*Counsel for Appellants*

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................ I

TABLE OF AUTHORITIES ...................................................... II

INTRODUCTION ................................................................... 1

ARGUMENT .......................................................................... 4

    I.    The President's Proclamation Falls Well Within
         Section 1182(f). .......................................................... 4

    II.   In the Face of Sections 1182(f) and 1185(a)(1)'s
         Sweeping Language, Harvard's Arguments Fail. ................ 7

    III.  Harvard's Distinctions of *Hawaii* Are Flawed ..................... 20

    IV.  The Proclamation Passes Any Plausible Standard. ............ 25

    V.   Harvard Has Not Established the Remaining
         Injunction Factors. ................................................... 31

CONCLUSION ...................................................................... 34

CERTIFICATES

## <u>TABLE OF AUTHORITIES</u>

Page(s)

### CASES

*Abourezk v. Reagan*,
  785 F.2d 1043 (D.C. Cir. 1986) ............................................................. 16

*Adams v. Vance*,
  570 F.2d 950 (D.C. Cir. 1978) ............................................................... 33

*Biden v. Nebraska*,
  600 U.S. 477 (2023) ............................................................................... 16

*Chamber of Com. of United States v. United States Dep't of Homeland Sec.*,
  2025 WL 3719234 (D.D.C. Dec. 23, 2025) .................................. *passim*

*Doe #1 v. Trump*,
  984 F.3d 848 (9th Cir. 2020) .......................................................... 10, 21

*Fed. Commc'ns Comm'n v. Consumers' Rsch.*,
  606 U.S. 656 (2025) ............................................................................... 16

*Free Speech Coal., Inc. v. Paxton*,
  145 S. Ct. 2291 (2025) ........................................................................... 27

*Gattineri v. Town of Lynnfield*,
  58 F.4th 512 (1st Cir. 2023) ........................................................... 28, 29

*Gomez v. Trump*,
  485 F. Supp. 3d 145 (D.D.C. 2020) ............................................. 9, 12, 21

*Hartman v. Moore*,
  547 U.S. 250 (2006) ......................................................................... 28, 29

*Kleindienst v. Mandel,*
  408 U.S. 753 (1972) ....................................................................*passim*

*Maryland v. King,*
  567 U.S. 1301 (2012) ...............................................................33

*McCoy v. Town of Pittsfield, NH,*
  59 F.4th 497 (1st Cir. 2023) ....................................................26

*McCullen v. Coakley,*
  573 U.S. 464 (2014) .................................................................26

*Pacito v. Trump,*
  152 F.4th 1082 (9th Cir. 2025) ................................................15, 16, 19

*Roe v. Dep't of Def.,*
  947 F.3d 207 (4th Cir. 2020) ..................................................32

*Rumsfeld v. Forum for Academic and Institutional Rights, Inc.,*
  547 U.S. 47 (2006) ...................................................................25

*Sale v. Haitia,*
  *n Centers. Council, Inc.,* 509 U.S. 155 (1993) .....................................12

*Trump v. CASA, Inc.,*
  606 U.S. 831 (2025) .................................................................33

*Trump v. Hawaii,*
  585 U.S. 667 (2018) ....................................................................*passim*

*United States ex rel. Knauff v. Shaughnessy,*
  338 U.S. 537 (1950) ................................................................4, 11, 22

*United States v. Rahimi,*
  602 U.S. 680 (2024) ...................................................................17, 18

*Youngstown Sheet & Tube Co. v. Sawyer*,
  343 U.S. 579 (1952) .......................................................................*passim*

*Zivotofsky ex rel. Zivotofsky v. Kerry*,
  576 U.S. 1 (2015) ............................................................................21, 31

## STATUTES

8 U.S.C. § 1101(a)(15)(F) ...............................................................................8

8 U.S.C. § 1101(a)(15)(H) .............................................................................12

8 U.S.C. § 1101(a)(15)(J) ...............................................................................8

8 U.S.C. § 1101(a)(15)(M) ...............................................................................8

8 U.S.C. § 1101(a)(15)(O) .............................................................................12

8 U.S.C. § 1101(a)(15)(R) .............................................................................12

8 U.S.C. § 1182(f) .......................................................................................*passim*

8 U.S.C. § 1185(a)(1) ...............................................................................11, 12

8 U.S.C. § 1372(a)(1) .....................................................................................19

8 U.S.C. § 1372(c)(5) .....................................................................................19

## OTHER AUTHORITIES

Pres. Proc. No. 10948, 90 Fed. Reg. 24493, *Enhancing National Security
  by Addressing Risks at Harvard University* (June 4, 2025)........*passim*

Pres. Proc. No. 10294, 86 Fed. Reg. 59603, Advancing the Safe
  Resumption of Global Travel During the COVID-19 Pandemic (Oct.
  25, 2021) ......................................................................................16

iv

Pres. Proc. No. 10052, 85 Fed. Reg. 38263, *Suspension of Entry of Immigrants and Nonimmigrants Who Present a Risk to the United States Labor Market During the Economic Recovery Following the 2019 Novel Coronavirus Outbreak* (June 25, 2020) ............................ 16

Pres. Proc. No. 10043, 85 Fed. Reg. 34353, *Suspension of Entry as Nonimmigrants of Certain Students and Researchers From the People's Republic of China* (May 29 2020) ......................................... 15

Pres. Proc. No. 9945, 84 Fed. Reg. 53991, *Suspension of Entry of Immigrants Who Will Financially Burden the United States Healthcare System, in Order To Protect the Availability of Healthcare Benefits for Americans* (Oct. 9, 2019) .................................................. 16

*Presidential Task Force on Combating Antisemitism and Anti-Israeli Bias*, HARV. U. 25 (Apr. 29, 2025), https://www.harvard.edu/wp-content/uploads/2025/04/FINAL-Harvard-ASAIB-Report-4.29.25.pdf ...................................................................................... 30,32

Svea Herbst-Bayliss, Harvard endowment swells to nearly $57 billion, donations reach a record, Reuters (Oct. 16, 2025, 3:00 p.m.), https://www.reuters.com/world/us/harvard-endowment-swells-nearly-57-billion-donations-reach-record-2025-10-16/ ................................... 32

## **INTRODUCTION**

Harvard has failed to monitor and discipline its students for severe antisemitic conduct, crimes, entanglement with China, and much more for too long. The Proclamation is a legal means of helping ameliorate the harms caused by the entry of these student aliens absent adequate oversight.[1] Harvard's contrary arguments fail on multiple grounds.

Harvard succinctly describes the key to this case: "the government contends that the deference owed it in the foreign affairs context under cases like *Kleindienst v. Mandel*, 408 U.S. 753 (1972), and *Trump v. Hawaii*, 585 U.S. 667 (2018), justifies" the President's Proclamation. Opp.Br. 3-4.[2] That *is* the law. And under those binding Supreme Court decisions, the government's position is correct. As is discussed more below, and at length in Appellants' Brief, the statute's wide breadth

---

[1] Pres. Proc. No. 10948, 90 Fed. Reg. 24493, *Enhancing National Security by Addressing Risks at Harvard University* (June 4, 2025), *available at* Appx.103 ("Proclamation").

[2] This filing refers to Harvard's opposition brief as "Opp.Br." and to the government's opening brief as "Br."

"exudes deference to the President in every clause." *Hawaii*, 585 U.S. at 684.

On this dispositive issue—whether the Proclamation falls within the scope of 8 U.S.C. § 1182(f)—Harvard offers little more than a laundry list of claims that the *Hawaii* decision has *already* cast aside. First, Harvard falsely claims that the Proclamation only targets a domestic institution and that proclamations are limited to foreign affairs. Second, it claims that the Proclamation does not target a class of aliens, but rather Harvard itself. Third, it argues the Proclamation does not restrict entry as the aliens can come in other ways. Fourth, Harvard claims the Proclamation is unique in history. And finally, Harvard says the Proclamation overrides the SEVP program. *Hawaii* and recent cases reject all of these arguments. 585 U.S. at 694. Fundamentally, the Proclamation suspends the entry of aliens from entry for a specific purpose. That suffices.

Separately, Harvard wrote pages of analysis concerning the First Amendment. But these prolix claims completely miss the mark: "the courts will neither look behind the exercise of that discretion, nor test it

by balancing its justification against . . . First Amendment interests."
*Mandel*, 408 U.S. at 770. Even if this Court were to consider the First
Amendment arguments—which *Mandel* prohibits—Harvard's claims of
viewpoint discrimination ignore the rational basis standard required by
*Hawaii*. Harvard's distinctions from *Hawaii* have no basis in the statutes
or the precedents. They are completely made up.

Under *Mandel* or *Hawaii* the Proclamation clearly passes. It is
neutral on its face as to Harvard's speech. And it is rational. Harvard's
nitpicking of the Proclamation's scope is more akin to intermediate
scrutiny than rational basis. Even using the retaliation standard,
Harvard must show that retaliatory animus was the *but for* cause of the
adverse action. Harvard cannot come close to meeting that standard. Nor
can it satisfy the remaining injunction factors. The Proclamation is
clearly lawful and this Court should reverse and vacate the district
court's erroneous preliminary injunction.

# **ARGUMENT**

## I. **The President's Proclamation Falls Well Within Section 1182(f).**

To resolve this case, this Court need only perform a straightforward application of *Hawaii*, *Mandel*, and 8 U.S.C. § 1182(f) to the President's Proclamation.

Under the Constitution, the power to exclude aliens and impose conditions on their entry is "inherent in sovereignty," *Mandel*, 408 U.S. at 765, and courts uphold it "without exception." *Id.* at 765. "Over no conceivable subject is the legislative power of Congress more complete than it is over the admission of aliens." *Mandel*, 408 U.S. at 766 (cleaned up). This power allows Congress to "exclude aliens altogether" and it equally permits Congress "to prescribe the terms and conditions upon which they may come to this country." *Id.* Moreover, this "plenary discretionary authority" may be "placed in the hands of the Executive" by Congress. *Id.* at 768-69. Indeed, the President's "right" to exclude aliens "stems not alone from legislative power but is *inherent* in the executive power to control the foreign affairs of the nation." *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542 (1950) (emphasis added).

4

Then, "when the Executive exercises this power negatively on the basis of a *facially legitimate and bona fide reason*," judges have finished their review. *Mandel*, 408 U.S. at 770 (emphasis added). At that point, "the courts will neither look behind the exercise of that discretion, nor test it by balancing its justification against . . . First Amendment interests." *Id.* In fact, the President is "not required to conclusively link all of the pieces in the puzzle" in a way that satisfies the courts. *Hawaii*, 585 U.S. at 687.

Here, using that constitutional authority, Congress employed Section 1182(f) to delegate power in a manner that "exudes deference to the President in every clause." *Hawaii*, 585 U.S. at 684. It allows the president to "suspend the entry of *all* aliens or *any* class of aliens" or else to "impose on the entry of aliens *any* restrictions he may deem to be appropriate." *Id.* (emphasis added). Given the President's inherent authority over foreign affairs and this sweeping congressional delegation, the President's "authority is at its maximum." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson, J., concurring).

The President's Proclamation here falls well within both Sections 1182 and 1185(a)(1) and within *Mandel*. The President defined classes of aliens related to F, J, and M visas. Proclamation, Appx.105. His Proclamation also offered facially legitimate and bona fide reasons for his decisions, specifically, related to Harvard's failure to cooperate with Student and Exchange Visitor Program (SEVP) oversight, foreign entanglements, and related security concerns. Proclamation, Appx.103-05. Those grounds more than satisfy *Mandel*'s test. And even if rational basis were applied, the same Presidential findings demonstrate that the Proclamation is plausibly related to a legitimate objective, which is all rational basis requires. *Hawaii*, 585 U.S. at 705. After all, "the Court hardly ever strikes down a policy as illegitimate under rational basis scrutiny." *Id.*

By asserting that Section 1182(f) does not apply, Harvard reaches beyond even the District Court's already flawed holding. The District Court never held that President Trump's proclamation violates Section 1182(f), it merely noted that it was "skeptical" about whether the Proclamation fell within the statute. Dist. Ct. Memorandum and Order,

6

Br. A20 (Dist. Ct. Order). While that equivocation is wrong, at least it nods toward the statute's breadth. Harvard, by contrast, does not show similar restraint. Instead, it flatly claims that "the Proclamation violates Section 1182(f)." Opp.Br. 45 (cleaned up). Harvard's argument highlights the extreme view that it is taking toward Section 1182(f), galumphing over a boundary that even the District Court did not dare to step beyond.

## II.    In the Face of Sections 1182(f) and 1185(a)(1)'s Sweeping Language, Harvard's Arguments Fail.

Section 1182(f) provides that "[w]henever the President finds that the entry of any aliens or of any class of aliens" would be "detrimental to the interests of the United States, he may by proclamation… suspend the entry of all aliens or any class of aliens… or impose on the entry of aliens any restrictions he may deem to be appropriate." "By its terms, § 1182(f) exudes deference to the President in every clause." *Hawaii*, 585 U.S. at 684. Section 1185(a)(1) further grants the President broad authority to adopt "reasonable rules, regulations, and orders" governing entry or removal of aliens, "subject to such limitations and exceptions as [he] may prescribe." The Proclamation satisfies either the suspension or

7

restriction requirements of Section 1182(f) or the regulation, rules, and orders requirements of 1185(a)(1).

The Proclamation clearly defines a class of aliens who may "pursue a course of study at Harvard University under section 101(a)(15)(F) or section 101(a)(15)(M) of the INA, 8 U.S.C. 1101(a)(15)(F) or 1101(a)(15)(M)," or may "participate in an exchange visitor program hosted by Harvard University under section 101(a)(15)(J) of the INA, 8 U.S.C. 1101(a)(15)(J)." Proclamation, Appx.105. For this class, the Proclamation "suspended and limited" their entry for a set time. *Id.*

Facing the expansive and deferential language of Sections 1182(f) and 1185(a)(1), Harvard argues that (1) the Proclamation impermissibly targets a domestic institution, which is demonstrated by the fact that it (2) does not apply to a class of aliens, (3) does not suspend their entry, and (4) is unique in history. Opp.Br. 46-50. Harvard also throws in an argument the District Court rejected: (5) the Proclamation supplants the SEVP program. Opp.Br. 48-49. Each is fundamentally mistaken and "simply amounts to an unspoken tailoring requirement found nowhere in Congress's grant of authority." *Hawaii*, 585 U.S. at 688.

8

1.     The Proclamation does not and cannot regulate Harvard itself. The Proclamation literally suspends the entry for a class of aliens. Those seeking to enter the country on an F or J visa for the purpose of attending Harvard are temporarily suspended or restricted from doing so. That more than satisfies Sections 1182(f) and 1185(a)(1). The argument that the Proclamation cannot target a domestic institution because the statutes are about foreign affairs permeates every aspect of Harvard's brief. *See* Opp.Br. 4, 23, 25, 36-37, 41-42, 50, 52-53. That fundamental mistake in how the Proclamation operates and the scope of the statutes is fatal for Harvard.

The distinction between foreign and domestic policy "finds no support in the statutory text" *Gomez v. Trump*, 485 F. Supp. 3d 145, 180 (D.D.C. 2020). In fact, the proclamation in *Hawaii* stemmed from concerns about unvetted migrants raising "national security" and "public-safety threats" within the United States. 585 U.S. at 677-80. The Ninth Circuit rejected a nearly identical argument "because all additional restrictions under § 212(f) on who may *enter* the United States are ultimately based on the detrimental' impact of those aliens' presence,

9

*see* 8 U.S.C. § 1182(f), all such restrictions may be characterized as reflecting 'domestic' policy concerns to a greater or lesser degree. Indeed, the many grounds for inadmissibility in § 212(a) of the INA underscore how the decision whether to admit an alien can have adverse domestic consequences." *Doe #1 v. Trump*, 984 F.3d 848, 870 (9th Cir. 2020), *vacated on denial of reh'g en banc sub nom as moot. Doe #1 v. Biden*, 2 F.4th 1284 (9th Cir. 2021). In fact, a court recently rejected nearly identical arguments and upheld a restriction on entry for H-1B petitioners over arguments that the proclamation was really regulating domestic businesses. *See Chamber of Com. of United States v. United States Dep't of Homeland Sec.*, 2025 WL 3719234, at *15 (D.D.C. Dec. 23, 2025). Harvard can repeat the mantra that the Proclamation is impermissibly regulating them all they want, but that does not make it so or invent authority that supports their novel theory.

Harvard's parade of horribles ignores that these powers are limited to the *entry of aliens*. They are also generally temporary. So they can only be used to exert domestic pressure the way Harvard fears by restricting the entry of aliens, which the Executive can do in any number of ways.

10

Harvard also ignores that this is a power "inherent in the executive department of the sovereign." *Knauff*, 338 U.S. at 543. And that Congress chose to expressly delegate this power to the President. *See Youngstown*, 343 U.S. at 635 (Jackson, J., concurring). At bottom, the true restraint is political, not with courts.

**2.**    Similarly, Harvard says the Proclamation does not restrict a class of aliens because the class is defined in relation to Harvard. Opp.Br. 46-48, 50-53. Again, the text contains no such limit and Harvard ignores the other powers within the statutes. Section 1182(f) allows the President to "suspend the entry of entry of all aliens or any class of aliens" *or* "impose on the entry of aliens any restrictions he may deem to be appropriate." Restrictions on entry, therefore, do not require a class. Neither do the "reasonable rules, regulations, and orders" governing entry or removal of aliens "subject to such limitations and exceptions as the President may prescribe" require a class of aliens. 8 U.S.C. § 1185(a)(1). Either power can sustain the Proclamation without a class. Aside from noting their existence, *see* Opp.Br. 18-19, 45, Harvard's actual arguments do not

address the "restrictions" power of Section 1182(f) or Section 1185(a)(1) *at all*.

Even so, the Proclamation does name a class of aliens: aliens seeking to enter the country on J or F visas for the *purpose* of attending Harvard. Harvard admits that "class" is a broad term that can encompass many permutations including based on "purpose." Opp.Br. 51. Harvard's only argument is to list a parade of horribles about targeting domestic entities, thus reprising its first Argument. *Id.* Such hypotheticals are unresponsive to the class issue.

Indeed, courts have upheld broad classes where the commonalities between the aliens were limited to entry on certain vessels, *Sale v. Haitian Centers. Council, Inc.*, 509 U.S. 155, 172 (1993), and a class of all immigrants without a currently valid visa, *Gomez*, 485 F. Supp. 3d at 161. Here the class of aliens is defined by the *purpose* of their entry. Harvard pretends that this is novel. But that is how most visas work. Visas such as H-1Bs, O-1s, and R-1s turn on specific entry purposes and require domestic sponsoring organizations. *See* 8 U.S.C. § 1101(a)(15)(H), (O), (R). Again, the H-1B court rejected identical arguments, ruling that

12

the proclamation either did not require a class as a restriction or regulation or was sufficient as a class. *Chamber of Com. of United States*, 2025 WL 3719234, at *15. The same is true here.

Tellingly, Harvard has *no* cases to the contrary. This is because the Supreme Court in *Hawaii* rejected a similar argument that the class "must refer to a well-defined group of individuals who share [some] common 'characteristic.'" *Hawaii*, 585 U.S. at 688. That, the Court found, would have amounted to "an unspoken tailoring requirement found nowhere in Congress's grant of authority to suspend entry of not only 'any class of aliens' but '*all* aliens.'" *Id.* at 688 (emphasis added). The proclamation's restrictions were not based on nationality alone but also the security and vetting procedures of foreign nations. *Id.* at 684, 688. Defining a class based on the purpose of entry is a common characteristic that easily satisfies the statutes.

**3.** Even Harvard concedes that the Proclamation "operates . . . to condition entry," Opp.Br. 48, and the District Court made clear that "Defendants are technically correct that the Proclamation has the effect of restricting entry," Dist. Ct. Order, Br. A18. Given the statute's text and

13

these concessions, there is nothing more for this Court to analyze.[3] Yet Harvard argues that the Proclamation "does not bar the entry of a single alien" because they can enter for other purposes, thus somehow rendering it invalid. Opp.Br. 24, 40-41, 45, 51. Again this is nowhere in the text. The statutes do not require a total ban: the President can suspend or restrict entry under Section 1182(f) and impose reasonable regulations, rules, or orders under Section 1185(a)(1). Harvard ignores these additional powers.

Even so, it is almost always true that an alien cannot enter for one purpose under a proclamation but can for another. In *Hawaii*, the same immigrant could be barred for business or tourism but enter on a different non-immigrant visa, as a permanent resident, or as an asylee. 585 U.S. at 685, 680. The H-1B court again rejected an argument that a proclamation restricting entry unless H-1B petitioners paid $100,000 was not a suspension or restriction on entry because they could otherwise

---

[3] In this sense, the statutory language parallels the government's foreign affairs power under the Constitution, mentioned above, which allow Congress "to prescribe the terms and conditions upon which they may come to this country." *Mandel*, 408 U.S. at 766.

enter. *Chamber of Com.*, 2025 WL 3719234, at \*16. Similarly, the Ninth Circuit granted a stay in favor of a ban on refugees even though those aliens could enter through other means. *See Pacito v. Trump*, 152 F.4th 1082, 1087 (9th Cir. 2025) (90 Fed. Reg. 8459). Indeed, the President has previously suspended entry for Chinese F and J visa students even though they could enter any other way. *See* 85 Fed. Reg. 34353. That is still a suspension or restriction on entry for a particular purpose.

As with the Chinese students, entry to do certain research presented a detriment to the nation's interest but their entry otherwise did not. The same is true here. Harvard has shown itself untrustworthy of monitoring and disciplining its foreign students, so entry for that purpose is detrimental while entry for another purpose might not be. That is perfectly within the broad bounds of Sections 1182(f) and 1185(a)(1).

**4.** Harvard argues that no Proclamation has been used in this way previously, alluding to the major question doctrine without ever raising

it. Opp.Br.49-50.[4] Several Presidents have recently used these authorities in new ways to respond to new problems. *See, e.g.,* 86 Fed. Reg. 59603 (Oct. 25, 2021) (vaccination requirement); 84 Fed. Reg. 53991 (Oct. 9, 2019) (health insurance requirements); 85 Fed. Reg. 38263 (June 25, 2020) (persons seeking to enter on H-1B, H-2B, J, and L visas during COVID-19); *Pacito*, 152 F.4th at 1087 (permitting suspension of all refugees). This is no different.

The Supreme Court considered and rejected a parallel argument, noting "historical practice is a double-edged sword." *Hawaii*, 585 U.S. at 693. That is because, when seeking to limit a provision's meaning to past-practice, "the harder it becomes to see such a refined delegation in a

---

[4] Harvard waives reliance on the major question doctrine but regardless the doctrine applies "in the domestic sphere," but not here in "the national security or foreign policy contexts" because "Congress intends to give the President substantial authority and flexibility to protect America and the American people." *Fed. Commc'ns Comm'n v. Consumers' Rsch.*, 606 U.S. 656, 706-07 (2025) (Kavanaugh, J., concurring). Moreover, there must be a "'mismatch[]'" between the breadth of the asserted power and the "narrow[ness]" of the statute. *Biden v. Nebraska*, 600 U.S. 477, 517-518 (2023) (Barrett, J., concurring). The opposite is true here. Sections 1182(f) and 1185(a) confer "sweeping proclamation power." *Abourezk v. Reagan*, 785 F.2d 1043, 1049 n.2 (D.C. Cir. 1986) (R.B. Ginsburg, J.).

16

statute that grants the President sweeping authority." *Id.* The definition that Harvard offers is so "remarkably cramped" that "no Congress that wanted to confer on the President only" limited authority "would ever use language of the sort in § 1182(f)." *Hawaii*, 585 U.S. at 691.

Following this logic, the H-1B court upheld the $100,000 restriction on H-1Bs despite no similar proclamations being issued before. *See Chamber of Com.*, 2025 WL 3719234, at *17. This is surely no more inventive. As Justice Barrett has said, historical practice can be relevant, but one cannot assume previous Presidents exercised their power "maximally" and previous practice cannot give us "a law trapped in amber," preventing all innovations to address new challenges. *United States v. Rahimi*, 602 U.S. 680, 739 (2024) (Barrett, J., concurring). Yet that is precisely what Plaintiffs seek; to ossify the proclamation power based on past practice.

**5.** Congress layered the President's Sections 1182(f) and 1185(a)(1) authority on top of his authority under the Immigration and Nationality Act (INA) to prescribe restrictions on alien admissions. Indeed, *Hawaii* explained that "§ 1182(f) vests the President with 'ample power' to impose

entry restrictions in addition to those elsewhere enumerated in the INA."
585 U.S. at 684 (emphasis added). The Supreme Court rebuked the
plaintiffs there for adopting a "cramped" reading of the President's
authority and rejected the Ninth Circuit's argument that Congress had
created a "reticulated regulatory scheme" for security vetting and visa
waivers that the proclamation overrode. *Id.* at 681, 691. Despite this,
Harvard argues that the Proclamation overrides the SEVP program.
Opp.Br. 48-49. The district court correctly rejected this argument. Dist.
Ct. Order, Br. A20 n.4.

Section 1182(f) is an independent grant of authority that allows the
President to restrict entry irrespective of agency-level reporting
frameworks. *See Hawaii*, 585 U.S. at 691 ("[N]o Congress that wanted to
confer on the President only a residual authority to address emergency
situations would ever use language of the sort in § 1182(f)."). The SEVP
program cannot override, and is not in conflict with, the President's
power to suspend entry. *Id.* at 695 (rejecting similar argument and noting
laws operate in "different spheres"). Those statutory provisions do not
even mention the President. In any case, the Proclamation addresses a

18

wide range of issues beyond record production: national security, exploitation of higher education institutions by the People's Republic of China, instances on campus involving misconduct, criminality, and discrimination in admissions. Proclamation, Appx.103. By contrast, 8 U.S.C. §§ 1372(a)(1) and (c)(5) do not touch on any of them. In other words, "this is not a situation where "Congress has stepped into the space and solved the exact problem." *Hawaii*, 585 U.S. at 691.

Once again, the H-1B court rejected a nearly identical argument, noting that the sections at issue there did not "hint at constraining [the President's] power to impose entry regulations." *Chamber of Com. of United States,* 2025 WL 3719234, at *21; *see also Pacito*, 152 F.4th at 1087 (rejecting similar arguments). The Proclamation does not override the SEVP regulations or conflict with them, they remain in force and are being followed. Because Harvard does not "point to any contradiction with another provision of the INA, the President has not exceeded his authority under § 1182(f)." *Id.*

## III.  Harvard's Distinctions of *Hawaii* Are Flawed.

When there is a "facially legitimate and bona fide reason" for the President's action, then "the courts will neither look behind the exercise of that discretion, nor test it by balancing its justification against . . . First Amendment interests." *Mandel*, 408 U.S. at 770. That should end this Court's First Amendment analysis. *See also* Br. 36-45. The Proclamation was issued out of concern that Harvard was not monitoring and disciplining its foreign students adequately given rampant antisemitism, Chinese national security threats, rising crime, and racial admission policies. Appx.103-04. Those are legitimate bona fide reasons that justify the Proclamation and cannot be ignored.

So while Harvard spills substantial ink on its First Amendment arguments, Opp.Br. 25-33, this Court cannot consider them. Harvard's attempts to distinguish these foundational cases are unavailing. Harvard and the District Court erroneously argue that *Mandel* and *Hawaii* only apply to foreign affairs while this Proclamation is singling out a domestic institution in violation of its constitutional rights. Opp.Br.36-41. As explained, there is no basis for this distinction between foreign and

20

domestic policy in the statute or in precedent. *See supra* Section II. Harvard simply makes it up.

First, the Proclamation does touch on foreign affairs, as it facially suspends or restricts the entry of aliens. Most Proclamations address domestic concerns but still restrict entry for aliens abroad. *See Gomez*, 485 F. Supp. 3d at 180; *Doe #1*, 984 F.3d at 870; *Chamber of Com.*, 2025 WL 3719234, at *15. After all, we live in a "world that is ever more compressed and interdependent." *Zivotofsky ex rel. Zivotofsky v. Kerry,* 576 U.S. 1, 21 (2015). This Proclamation is no different. The Supreme Court made clear that these powers necessarily touch on foreign affairs and thus afforded substantial deference. *Hawaii,* 585 U.S. at 704. This is doubly true when the proclamation touches on "national security." *Id.* The Proclamation here makes clear that China is using students to secure sensitive research from Harvard, whose lax monitoring makes this possible. Appx.103-04. Harvard's arguments that this is only incidental has no foundation in *Hawaii.*

Second, Harvard strangely argues that *Youngstown* shows the limits of inherent foreign affairs powers and protects their procedural

rights. Opp.Br. 40-41. *Youngstown* cuts against Harvard. The President does have "inherent" foreign affairs authority. *Knauff*, 338 U.S. at 542. But this is not a situation where the President is acting alone. Here, Congress delegated this sweeping authority in Sections 1182(f) and 1185(a)(1). Under *Youngstown*, this is where the President's "authority is at its maximum." *Youngstown*, 343 U.S. at 635 (Jackson, J., concurring). Situations where the President acts without a legislative mandate, which is the explicit concern of Harvard, *see* Opp.Br. 23, 52, have nothing to do with this case.

Third, Harvard writes that "[a]pplying such deference would provide carte blanche for the executive to use its foreign affairs powers to violate domestic law, up to and including the Bill of Rights." Opp.Br. 23. It also argues that the Proclamation was per se retaliatory and thus different in kind. Opp.Br. 39 But the same arguments could apply in *Mandel* and *Hawaii*. Indeed, the Supreme Court said it "has previously considered the merits of claims asserted by United States citizens regarding violations of their personal rights allegedly caused by the Government's exclusion of particular foreign nationals." *Hawaii*, 585

U.S. at 704. Harvard's distinction is rejected on the face of these precedents.

In *Mandel* the Supreme Court rejected a First Amendment challenge brought by American professors who wished to hear from a foreign journalist that was denied entry because he "advocates the economic, governmental, and international doctrines of world communism." 408 U.S. at 756, 769. Even though the Supreme Court agreed this burdened the First Amendment rights of American citizens, it held that the Government offered a "facially legitimate and bona fide reason" that he had abused the visa process, so "the courts will neither look behind the exercise of that discretion, nor test it by balancing its justification against the First Amendment interests." *Id.* at 770. In *Hawaii*, the Supreme Court upheld a travel ban challenged under the First Amendment for allegedly targeting Muslims, noting that if it asked only whether the policy is "facially legitimate and bona fide, [it] would put an end to our review." 585 U.S. at 704. That challenge was partially brought by Muslim citizens claiming just because of their religion their relatives could not enter. *Id.* at 680-81.

23

Harvard says those restrictions were incidental (Opp.Br. 38-39), but neither case says that. Indeed, some non-citizens in the United States who would have First Amendment rights could not leave the country and reenter while others could, allegedly based on their religion. 585 U.S. at 698. Harvard also argues retaliation is different from other First Amendment claims with no grounds. Opp.Br. 39.

Harvard also broaches an alleged violation of the right to petition the government under the First Amendment. Opp.Br. 32-33. This is old wine in new bottles. Specifically, by virtue of the fact that this is still a First Amendment argument, it is still not relevant under *Hawaii*. And in substance, this alleged violation restates Harvard's retaliation argument. *See, e.g.*, Opp.Br. 33, alleging that the government is "punishing" Harvard. There is no more to this argument than to that one.

At bottom, *Mandel* and *Hawaii* clearly apply. Harvard's distinctions are unmoored from the text of the statutes and those key precedents. Harvard simply makes up lines it wishes exist. Properly applying binding precedent, either courts cannot review the

24

Proclamation because it is facially legitimate or at most rational basis applies. The Proclamation clearly passes either.

## IV.   The Proclamation Passes Any Plausible Standard.

**1.**   As explained, the Proclamation clearly passes the standard in *Mandel*, which is why Harvard is desperate to distinguish it. Harvard claims that the Proclamation is not facially neutral because it targets Harvard. Opp.Br. 38-39. But it is facially neutral about Harvard's *speech*; it says nothing about its speech and is instead focused on a myriad of issues unrelated to Harvard's speech. The Proclamation makes clear that it is responding not to speech, but to Harvard's *actions*: Harvard's failure to provide records, Harvard's failure to discipline students, Harvard's failure to limit crime, Harvard's documented toleration of antisemitic harassment, among other conduct. Appx.103. The First Amendment permits regulation of non-expressive conduct. *See Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, 547 U.S. 47, 64 (2006). Harvard argues the Proclamation is "pretextual" based on tweets and other ancillary evidence (Opp.Br.39, 42-44), which is precisely the argument the Supreme Court rejected, *Hawaii*, 585 U.S. at 699.

25

Relatedly, as is discussed above, the President's Proclamation offered facially legitimate and bona fide reasons for his decisions, specifically, related to Harvard's failure to cooperate with SEVP oversight, foreign entanglements, and related security concerns. Proclamation, Appx.103-05. Those grounds more than satisfy the facially legitimate and bona fide test from *Mandel*.

**2.** The Proclamation also passes rational basis. Notably, Harvard nowhere even broaches the strict scrutiny standard. As this Court has held, "content-based and viewpoint-based restrictions are subject to strict scrutiny." *McCoy v. Town of Pittsfield, NH*, 59 F.4th 497, 506 (1st Cir. 2023) (*citing McCullen v. Coakley*, 573 U.S. 464, 478 (2014)). Yet the words and phrases "strict scrutiny," "compelling," and "narrowly tailored" are absent from Harvard's filing. If Harvard truly believes that the Proclamation places unconstitutional limits on its viewpoint, or involves retaliation, why doesn't it use every argument at its disposal, including strict scrutiny?

The likely answer is that Harvard understands that, due to the binding precedent of *Mandel* and *Hawaii*, only two standards of review

are available, the two that it briefed: *Mandel*'s, and rational basis. The Proclamation clearly passes rational basis. Br. 36-53. Harvard argues that all of the Proclamation's justifications do not match the scope of the policy and thus cannot be bona fide or rational. Br. 41-44. As noted, both the District Court and Harvard are really advocating for an intermediate scrutiny type inquiry, which *Mandel* and *Hawaii* reject. *See Hawaii*, 585 U.S. at 669, 686. The fit between the rationale and the policy does not have to be perfect. *See Free Speech Coal., Inc. v. Paxton*, 145 S. Ct. 2291, 2318 (2025) (even intermediate security does not require a perfect fit, the policy can be over and underinclusive). The President is "not required to conclusively link all of the pieces in the puzzle" in a way that satisfies courts, *Hawaii*, 585 U.S. at 687, yet that is exactly what Harvard demands with its litany of under and over inclusive arguments.

Under the *actual* rational basis test, however, there is no doubt that the Proclamation is sufficient. The only inquiry in rational-basis review is whether the policy is "plausibly related" to a legitimate objective. *Hawaii*, 585 U.S. at 704-05. This standard is satisfied as long as the policy can "reasonably be understood to result from a justification

independent of unconstitutional grounds." *Hawaii*, 585 U.S. at 705 (footnote omitted). Not surprisingly, "the Court hardly ever strikes down a policy as illegitimate under rational basis scrutiny." *Id.* Here, Harvard's basic reporting failures raise serious national security concerns that Havard is unable or unwilling to properly host, monitor, discipline, and report on its foreign students. That is all the rational basis test requires.

**3.**     Even the test Harvard advocates for retaliation is wrong absent *Mandel* and *Hawaii*. To prevail, Harvard must show that the Proclamation would not have issued "but for" retaliatory animus. *See Hartman v. Moore*, 547 U.S. 250, 260–61 (2006); *Gattineri v. Town of Lynnfield*, 58 F.4th 512, 515 (1st Cir. 2023). Relying on non-binding cases, the Harvard and the district court apply a laxer standard that allows a First Amendment claim to be predicated on actions with multiple motivations, only one of which may be arguably retaliatory. Harvard argues that under *Hartman*, the Government bears the burden of proving an alternative motive. But binding First Circuit precedent says the "substantial or motivating factor" requires that "appellants must show that [defendants'] 'retaliatory animus' was the 'but-for' cause of

28

[plaintiff's] injuries, 'meaning that the adverse action against [him] would not have been taken absent the retaliatory motive.'" *Gattineri*, 58 F.4th at 515 (quotation omitted). Harvard tellingly wholly ignores this case.

Faced with this, Harvard has to meekly rely on waiver. Opp.Br.34.[5] As alleged proof of the waiver, Harvard cites Defs.' Br. in Opposition to Motion for a Temporary Restraining Order/Preliminary Injunction, Dkt. No. 67, at 21 (Defendants' TRO-PI Opp.). Opp.Br. 34. In fact, the government made its argument in that same filing, but in a different location. Specifically, the government wrote: "In *Hartman v. Moore*, the Supreme Court held that a plaintiff must plead and prove not only retaliatory motive but also the absence of independent lawful reasons for the official action. 547 U.S. 250, 260–61 (2006)." Defendants' TRO-PI Opp., Dkt. 67 at 29. Indeed, the district court acknowledged this argument by unpersuasively arguing that it only applied to prosecutions.

---

[5] Harvard says this does not respond to their viewpoint argument. But Harvard does not say what standard does apply, never mentioning strict scrutiny. And unlike retaliation, Harvard does not say its viewpoint claim is specially exempt from *Mandel* and *Hawaii*.

Dist. Ct. Order, Br. A38 n.16. This argument was clearly preserved, despite Harvard's claim to the contrary.

Harvard can only argue that the Proclamation fails rational basis or was only passed for retaliatory motives by ignoring all of the issues the Proclamation focuses on. One key fact in this case illustrates that truth, which Harvard glosses over. Harvard never directly mentions the report the university issued documenting its tolerance for harassment of Jews. But its title is revealing: "Final Report, Presidential Task Force on Combating Antisemitism *and Anti-Israeli Bias"* (emphasis added).[6] At least in that report (though not in its Brief), even Harvard acknowledges that its many problems include bias against Israel and Jews generally.

In other words, what happens in Cambridge, Massachusetts matters in Israel, matters in Congress, and as the Proclamation demonstrates, clearly matters in the White House. Given Harvard's admitted tolerance for antisemitism, which impacts international

---

[6] *See Presidential Task Force on Combating Antisemitism and Anti-Israeli Bias*, HARV. U. 25 (Apr. 29, 2025), https://www.harvard.edu/wp-content/uploads/2025/04/FINAL-Harvard-ASAIB-Report-4.29.25.pdf ("Harvard Report").

relations, it is very much a foreign affairs concern of the President when "Harvard University is no longer a trustworthy steward of international student and exchange visitor programs," including students from Israel who would suffer under Harvard's bias. Proclamation, Appx.104. Harvard's attempts to finely parse domestic and foreign affairs make no sense in a "compressed and interdependent" world, and where Congress "makes the law," as it did with Section 1182(f). *Zivotofsky,* 576 U.S. at 21.

## V.    Harvard Has Not Established the Remaining Injunction Factors.

Harvard also cannot satisfy the remaining factors necessary to secure a preliminary injunction: irreparable harm to Harvard *itself*, and the balance of equities.

**1.**    On irreparable harm, Harvard relies too much on the assumption that it will prevail on its First Amendment arguments. *See, e.g.,* Opp.Br. 55 ("First Amendment violations inflict irreparable injury"). But as discussed above, the First Amendment questions are not relevant. Even if there were a First Amendment violation that did inflict harm, Harvard itself would not suffer. Rather, the foreign *students* who could not attend Harvard would bear any burden. Harvard, with the world's largest

31

endowment,[7] would manage. Further detracting from any speculative injury is the short duration of the Proclamation—Harvard has not explained how the problems it highlights can become so dire in just a few months. Opp.Br. 54-55. Therefore, Harvard cannot show an injury that is actually *irreparable*. *See Roe v. Dep't of Def.*, 947 F.3d 207, 228 (4th Cir. 2020), *as amended* (Jan. 14, 2020).

**2.**     Harvard also cannot establish that the balance of equities or the public interest favors an injunction. It is stunning that Harvard's balancing analysis completely omits any mention of its report documenting antisemitism, which required hundreds of pages to describe all of the abuses against Jewish and Israeli students. *Compare* Opp.Br. 54-55 *with* Harvard Report (discussed above). That confessed failure to protect its own students from harassment clearly weighs the balance against Harvard. Also weighing against Harvard is the importance of the

---

[7] *See* Svea Herbst-Bayliss, Harvard endowment swells to nearly $57 billion, donations reach a record, Reuters (Oct. 16, 2025, 3:00 p.m.), https://www.reuters.com/world/us/harvard-endowment-swells-nearly-57-billion-donations-reach-record-2025-10-16/ ("The value of Harvard University's endowment, the world's largest among universities, grew by nearly $4 billion to $56.9 billion in fiscal 2025").

government's foreign affairs power. As mentioned above, here, Congress and the President have acted in tandem: Congress by passing 8 U.S.C. § 1182(f), and the President by issuing the Proclamation. In such a situation, the President can "be said . . . to personify the federal sovereignty . . . and the burden of persuasion would rest heavily upon any who might attack it." *Youngstown*, 343 U.S. at 636 (Jackson, J., concurring). *See also Adams v. Vance*, 570 F.2d 950, 954 (D.C. Cir. 1978) (injunction "deeply intrudes into the core concerns of the executive branch."); *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (the government suffers irreparable harm when it is "enjoined by a court from effectuating statutes enacted by representatives of its people"—as the Proclamation does) (*cited by Trump v. CASA, Inc.*, 606 U.S. 831, 860 (2025)). That weighty interest clearly tips toward the government. Harvard's balancing discussion does not even acknowledge these countervailing interests. Harvard cannot prevail on the remaining factors necessary to secure a preliminary injunction.

## <u>CONCLUSION</u>

For the reasons explained above, and also explained in the government's Opening Brief, the Court should reverse and vacate the District Court's preliminary-injunction order.

Respectfully submitted,

**BRETT A. SHUMATE**
Assistant Attorney General
Civil Division

**EVAN P. SCHULTZ**
Trial Attorney

**DREW C. ENSIGN**
Deputy Assistant Attorney
General

*/s/ Tiberius T. Davis*
**TIBERIUS T. DAVIS**
Counsel to the Assistant
Attorney General
P.O. Box 878
Ben Franklin Station
Washington, D.C. 20044

**CATHERINE M. RENO**
Acting Assistant Director

Dated: February 9, 2026

34

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 6,169 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Word in fourteen-point Century Schoolbook.

## CERTIFICATE OF SERVICE

I certify that on February 9, 2026, I electronically filed the foregoing Reply Brief for Respondent with the Clerk of Court for the United States Court of Appeals for the First Circuit using the appellate CM/ECF system. I also certify that opposing counsel are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ *Tiberius Davis*
TIBERIUS DAVIS
Counsel to the Assistant Attorney
General
Civil Division
P.O. Box 878, Ben Franklin Station
Washington, DC 20044